# EXHIBIT A

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS     FILED

2018 SEP 27 P 3: 10

WAKE CO., C.S.C.

BY _____

AMERICATOWNE HOLDINGS, INC., )
a Nevada corporation, )
)
     Plaintiff, )
)
v. )
)
OTC MARKETS GROUP, INC., a )
Delaware corporation, )
)
     Defendant. )
_____ )

**COMPLAINT AND
MOTION FOR TEMPORARY
RESTRAINING ORDER**

PLAINTIFF, COMPLAINING OF THE DEFENDANT, SAYS AND ALLEGES:

## PARTIES, JURISDICTION, VENUE

    1.    Plaintiff AmericaTowne Holdings, Inc. ("AmericaTowne"), is a Nevada corporation with its principle place of business at 4700 Homewood Court in Raleigh, North Carolina. Between June 27, 2016 and August 2, 2018, AmericaTowne conducted business under the name ATI Modular Technology Corp., a Nevada corporation ("ATI Modular"). Prior to June 27, 2016, AmericaTowne was known as Global Recycling Energy, Inc., a Nevada corporation ("GREI"). AmericaTowne, ATI Modular, and GREI, are the same legal entity and may be referred to herein as the "Company." The Company has 460 shareholders and twenty-two employees.

    2.    Defendant OTC Markets Group, Inc., ("Defendant") is a Delaware corporation with its principle place of business located at 304 Hudson Street in New York, New York 10013. Upon information and belief, Defendant is authorized to conduct business in the state of North Carolina, has been doing so, and therefore is subject to the personal jurisdiction of this Court pursuant to N.C. Gen. Stat. § 1-75.4(1)(d).

3.     This Court has subject matter jurisdiction as it seeks equitable relief in addition to monetary damages.

4.     Venue is proper pursuant to N.C. Gen. Stat. § 1-80.

## FACTUAL ALLEGATIONS

### *Background Regarding the Parties and OTC Markets*

5.     The Company is a publicly reporting company based in Raleigh, North Carolina. It is subject to the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). The Company files current and periodic reports pursuant to the Securities Act and Exchange Act with the Securities and Exchange Commission ("SEC"), which are publicly available. These public disclosures ensure complete transparency regarding the Company's financial condition and business activities.

6.     Defendant maintains a financial marketplace that provides price and liquidity information for companies whose securities are traded "over-the-counter," an industry phrase that denotes securities bought and sold directly between parties without the supervision or intervention of a national securities exchange.

7.     Defendant organizes securities traded over its platform into three separate submarkets, which denote the risk associated with each security: OTCQX, OTCQD, and OTC Pink (collectively, the "OTC Marketplace"). Each company with a security traded on the OTC Marketplace is given a company profile where information is provided to investors, including corporate addresses, officers, directors, biographical information, financial information, and stock quotes and prices (an "OTC Profile").

8.     Defendant defines OTC Pink as the most risky market—it has no financial standards or reporting requirements. Companies trading on the Pink market are not required to be

2

registered with the SEC. Pink market securities are often associated with shell corporations that have little or no assets, operations, or activity. Many securities traded on the Pink market trade below $0.01 per share, lack up to date financial reporting, or are otherwise objectively risky investments.

9.       Defendant also designates some companies with a caveat emptor, or a skull and crossbones designation. The caveat emptor appears on the securities OTC Profile and is meant to warn investors that a security is especially risky. Individuals who click on the caveat emptor are provided the following information:

> Buyer Beware. There is a public interest concern associated with the company, which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions.

(OTCMarkets.com Website, **Exhibit 1**, p. 2).

10.      Defendant's caveat emptor policy states that it may apply a caveat emptor to a company's OTC Profile when Defendant "becomes aware" of a public interest concern. This same policy notes that Defendant <u>will</u> remove the caveat emptor under the following circumstances: (1) the company meets the qualifications for "Pink Current Information," i.e. is update on financial disclosures; (2) the company has verified the information on its OTC Profile, and (3) the company "demonstrates that there is no longer a public interest concern." (OTC Caveat Emptor Policy, **Exhibit 2**). Defendant's policy indicates it does not remove the caveat emptor for thirty days after posting the same. (Exhibit 2).

### *The Company's Corporate History*

11.      Prior to June 2, 2016, the Company was a dormant corporation with limited or no assets and operations. It was listed on OTC Pink under the trading symbol "GREI" and controlled

3

by a single shareholder, Joseph Arcaro ("Arcaro"). The Company was not a publicly reporting company subject to the Securities Act and Exchange Act and was delinquent in its financial disclosures.

12. Curiously, even though the Company lacked transparency and had no operations prior to June 2, 2016, Defendant did not post a caveat emptor on the Company's OTC Profile.

13. On June 2, 2016, Arcaro entered into a Stock Purchase and Sale Agreement ("SPSA") with AmericaTowne, Inc., a Delaware corporation ("ATI"), whereby ATI purchased the majority of the issued and outstanding stock from Arcaro for $175,000. (SPSA, **Exhibit 3**).

14. Thereafter, ATI approved, and the Company initiated, a series of corporate actions. This included changing (1) the name of the Company to ATI Modular and (2) the trading symbol from GREI to ATMO (collectively the "2016 Corporate Actions"). The 2016 Corporate Actions were reviewed—and subject to comment—by the Financial Industry Regulatory Authority ("FINRA"). The Company filed its notice of corporate action with FINRA, initiating the review process.

15. At the same time, the Company filed its Form 10 with the SEC, which required the Company to comply with the reporting requirements of the Securities Act and Exchange Act.

16. Both FINRA and the SEC issued comments and requests for information relating to the 2016 Corporate Actions and Form 10, respectively.

17. While the Company responded to inquiries from FINRA and the SEC, it began implementing its business plan—developing and constructing modular technology in China. This information, as well as several key contracts, were included in the Form 10 filed with the SEC, as well as subsequent amendments to the Form 10. (Form 10/A, **Exhibit 4**).

4

18.     FINRA and the SEC reviewed the Company's filings for over one year. The 2016 Corporate Actions were approved by FINRA on June 12, 2017, and the SEC deemed the Company's Form 10 effective as of August 30, 2017. (SEC Correspondence, **Exhibit 5**).

19.     Thus, by June 12, 2017, the Company was not only up to date on its financial disclosures, it was also initiating operations and generating business interest. The Company transitioned from a dormant shell company to an operational entity during this period of time.

20.     Shortly after the Company's Form 10 was deemed effective, the Company initiated a second series of corporate actions, which included (1) changing the Company's name to AmericaTowne, (2) effectuating a reverse stock split of the Company's issued and outstanding common stock, and (3) merging ATI into the Company (collectively, the "2017 Corporate Actions").

21.     The 2017 Corporate Actions were subject to review by both FINRA and the SEC. The Company submitted a second notice of corporate action to FINRA and filed its Information Statement on Schedule 14C with the SEC. (Schedule 14C- Exhibit 6)

22.     The 2017 Corporate Actions were approved by FINRA on or about March 7, 2018. The SEC notified the Company it had no further comments on the Company's Schedule 14C effective on or about June 15, 2018.

23.     The 2017 Corporate Actions were effectuated by the Company as of August 2, 2018, or twenty days after the Company's Schedule 14C was mailed to shareholders notifying shareholders of the 2017 Corporate Actions.

### *The Caveat Emptor and Defendant's Representations to the Company*

24.     Shortly after Arcaro sold the majority of the Company's issued and outstanding stock to ATI, and the Company began implementing its business plan and updating its financial

disclosures, Defendant placed a caveat emptor on the Company's OTC Profile without warning and without explanation.

25.     The caveat emptor effectively bars the Company, and its 460 shareholders, from selling the Company's stock over-the-counter because the caveat emptor signals that there is nefarious activity associated with the Company.

26.     The application of the caveat emptor was especially surprising to the Company given that it was updating its financial reporting (which had been delinquent) and initiating operations by implementing its new business plan.

27.     The Company immediately inquired regarding the caveat emptor and was told by Defendant's agents that the Company had to pay a fee of $3,000 every quarter to "verify" the Company's OTC Profile (the "Quarterly Fee").

28.     In order to quickly address the harmful caveat emptor, the Company paid the Quarterly Fee. However, Defendant did not remove the caveat emptor.

29.     Thereafter, the Company followed up multiple times with Defendant to inquire about Defendant's failure to remove the caveat emptor as promised. Defendant told the Company that there was an unidentified "public interest concern" associated with the Company, but refused to give the Company any other details.

30.     While failing to provide any specific instruction or explanation regarding the public interest concern, the Defendant's agent—identified as "Amanda"— suggested that the Company's regular financial reporting under the Securities Act and Exchange Act would remedy the caveat emptor. Amanda instructed the Company to "check back" with Defendant in three months.

31.     The Company continued financial reporting and regular payment of the Quarterly Fee to Defendant. Defendant's agents continued to display the caveat emptor on the Company's

6

OTC Profile, regardless of the regular financial reporting, "verified" company profile, and the Company's frequent inquiry regarding the status of the caveat emptor.

32. After approximately six months of paying the Quarterly Fee and timely submitting financials to the SEC, Defendant reaffirmed its position that the Company posed an unidentified "public interest concern," this time suggesting that the SEC's approval of the Company's Form 10 would remedy the issue.

33. In or about August of 2017, after the Company's Form 10 was deemed effective, Defendant lifted the caveat emptor. However, after approximately three weeks, Defendant issued a new caveat emptor on the Company's OTC Profile, claiming once again that there was an alleged public interest concern relating to an uncharacteristically high bid on the Company's stock.

34. The Company explained that it was unaware of the high bid and had no information regarding who made the bid. Regardless, the Defendant continued to post the caveat emptor, making the familiar representation to "check back" in three months.

35. After three months, the Company—directly and through counsel—contacted Defendant in an attempt to ascertain what action needed to be done to remove the caveat emptor. However, Defendant's agents represented that there was nothing that could be done. The Company regularly followed up with Defendant for months, but was provided no further guidance, and was instead told to wait several months each time the Company contacted Defendant. Eventually, Defendant's agent, Amanda, again suggested that completing of the 2017 Corporate Actions would resolve the issues associated with the caveat emptor.

36. After the 2017 Corporate Actions were approved by FINRA and the SEC, the Company once again contacted Defendant asking for removal of the caveat emptor.

37.     However, after several weeks, Defendant contacted the Company and explained that it would not remove the caveat emptor, regardless of the fact that the Company is in compliance with its SEC financial reporting obligations and regularly paid the Quarterly Fee to Defendant. (Email from Amanda, **Exhibit 7**).

38.     The Company repeatedly requested information from Defendant regarding the alleged public interest concern, including what information the Company needed to provide to cure the same, since the Defendant's caveat emptor policy <u>places the burden on the Company to remedy the alleged public interest concern.</u> (Exhibit 2).

39.     Defendant has refused to identify what the alleged public interest concern is and stated that it does not require any further information from, or action by, the Company.

40.     This has put the Company in an inequitable position—because Defendant refuses to identify the alleged public interest concern associated with the Company, it is impossible for the Company to remedy the same as required by Defendant's caveat emptor policy.

41.     Defendant has displayed a caveat emptor on the Company's OTC Profile, without cause or justification, for over two years, rather than the typical thirty days as outlined in Defendant's caveat emptor policy.    (Exhibit 2).    During that time, the Company and its shareholders have been has irreparably harmed.

42.     Defendant's continued display of the caveat emptor on the Company's OTC Profile has deflated the Company's stock price and trading volume.  For example, before the caveat emptor was originally displayed in 2016, the Company's stock price was approximately $9.00 per share. However, when the caveat emptor was applied, the Company's stock price fell to $0.35 per share.

43. During the short period of time the Company did not have the caveat emptor displayed in August of 2017, the average price of the Company's stock rebounded to approximately $6.30 per share on average. However, once the caveat emptor was reapplied without warning or justification, the stock price dropped again to $0.35 per share.

44. Trading volume (shares traded each day) is another indicator of demand for a company's stock. During the short period of time the Company did not have a caveat emptor displayed on the OTC Profile, it averaged a daily trading volume of approximately 3800 shares per day. However, when the caveat emptor is displayed, the average trading volume is approximately 200 shares per day. This explicitly demonstrates the effect of the caveat emptor on the Company. Demand for its stock decreased by almost 95% during the time period Defendant displays the caveat emptor on the Company's OTC Profile.

45. The Company estimates that it has suffered damages of approximately $1,078,640.64 as a result of Defendant's unjustified application of the caveat emptor to the Company's OTC Profile. This does not take into consideration the significant damages suffered by the Company's 460 shareholders, who are directly affected by the caveat emptor.

46. For over twelve months, the Company has repeatedly requested Defendant remove the caveat emptor from its OTC Profile, or alternatively identify the alleged public interest concern so the Company could remedy the same pursuant to Defendant's caveat emptor policy. However, the Company's requests have been ignored.

## MOTION FOR TEMPORARY RESTRAINING ORDER

47. The Company restates and realleges the foregoing allegations as though fully set forth herein.

48. The Company's business interests are being harmed each day that the caveat emptor symbol remains attached to its profile in that: 1) investors are being directed away from purchasing

9

Company stock by the symbol as evidenced from higher purchase and sale volume when the symbol was briefly removed, 2) the Company share price is drastically lower when the symbol is attached to the profile as compared to when it was briefly removed, 3) investors are being misled by the Defendant and the Company has no way to remedy a problem that the Defendant refuses to define or elaborate upon, 4) the artificial warning Defendant attaches to the Company's OTC Profile suppresses and effectively prohibits the Company from raising capital necessary to the stability and growth of the Company, 5) The Company is continuing to pay the Quarterly Fee to the Defendant but is receiving nothing in return.

49. The Company currently has approximately twenty-two full time employees and approximately 460 shareholders, all of whom are being harmed by the artificial warning and artificial suppression of the Company's stock price, value, and tradability on the OTC market as a direct result of the Defendant's actions.

50. Should Defendant's actions, or inaction as it were, be allowed to continue, it will effectively eliminate the ability of the Company to operate on a day to day basis without interference. The Company would be forced to cease operations and go out of business, thus eliminating its entire workforce and causing the investment capital of its shareholders to be rendered worthless.

51. If Defendant is not enjoined from allowing the caveat emptor symbol to remain on the Company's profile, the Company will continue suffering immediate and irreparable injury in the form of lost investment capital, lost ability to generate capital, artificially low share price and value and the beginning of an effective dissolution of its business as an ongoing concern affecting all of its employees and shareholders.

52.     For the above mentioned reasons, the Company requests that this Court issue an order maintaining the *status quo* by prohibiting Defendant from allowing the caveat emptor symbol to remain on its profile for a minimum of 180 days, during which time the Defendant is ordered to clearly define the manner in which the Company can keep the symbol removed permanently; and furthermore, present these requirements to this Court for a determination of their reasonableness and validity.

53.     Further, the Company is likely to succeed on the merits of their claims as set forth below.

54.     For the above-mentioned reasons, a Temporary Restraining Order is necessary in order to preserve the *status quo* between the parties until a motion for Preliminary Injunction can be ruled upon by the Court.

## COUNT I
## BREACH OF CONTRACT

55.     The Company restates and realleges the foregoing allegations as though fully set forth herein.

56.     The Company and Defendant entered into oral and written contracts, including, but not limited to, (1) agreements regarding the removal of the caveat emptor, and (2) agreements under which the Company's quotes would appear on the OTC Marketplace. The Company does not have a signed copy of any written contract, but said contracts—if in existence—are believed to be in Defendant's possession.

57.     The Company has complied with all aspects of its contractual relationships with Defendant, including payment of the Quarterly Fee to Defendant.

58.     Defendant has breached the contractual relationships in a number of ways, including, but not limited to, placing a caveat emptor on the Company's OTC Profile without

11

justification or explanation, and acting in a manner that prohibits the Company from complying with Defendant's caveat emptor policy.

59. As a result, the Company has suffered damages in excess of $25,000.

## COUNT II
## UNJUST ENRICHMENT

60. The Company restates and realleges the foregoing allegations as though fully set forth herein.

61. Defendant received a benefit from the Company in the form of payments made toward "verifying" the Company's OTC Profile, which the Company was told would resolve the caveat emptor issue.

62. Defendant consciously accepted the benefit provided by the Company.

63. As of the date of this filing, the Company has not received what Defendant promised for these payments thereby unjustly enriching the Defendant.

64. As a result, the Company has suffered damages in excess of $25,000.

## COUNT III
## FRAUD

65. The Company restates and realleges the foregoing allegations as though fully set forth herein.

66. Defendants made a series of false representations, with scienter, including, but not limited to, specific actions that the Company had to take in order to have the caveat emptor removed from its OTC Profile, such as the SEC's approval of the Form 10 and the effectuation of the 2017 Corporate Actions.

67.     These representations were intended to induce the Company into relying on the same, to encourage the Company to continue paying the Quarterly Fee and providing additional benefits to Defendant.

68.     The Company did, in fact, rely on these false representations.

69.     As a result of the Company's reliance on these false representations, the Company suffered damages in excess of $25,000.

### COUNT IV
### NEGLIGENT MISREPRESENTATION

70.     The Company restates and realleges the foregoing allegations as though fully set forth herein.

71.     Defendant owed a duty to the Company and did not use reasonable care in supplying information to the Company regarding the status of the caveat emptor appearing on the Company's OTC Profile. Instead, Defendant regularly suggested that certain acts, such as approval of the Form 10 and 2017 Corporate Actions would resolve the alleged public concern.

72.     These statements were misrepresentations made to the Company, on which the Company justifiably relied.

73.     As a result of these misrepresentations, and the reliance placed on those misrepresentations, the Company has suffered damages in excess of $25,000.

### COUNT V
### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE

74.     The Company restates and realleges the foregoing allegations as though fully set forth herein.

13

75.     By continuing to display the caveat emptor on the Company's OTC Profile, Defendants have caused the Company's stock price and demand to fall and discouraged other potential investors from investing in the Company.

76.     This has negatively affected the Company and its shareholders, who are now unable to sell the Company's common stock due to the lack of demand in the OTC Marketplace.

77.     Defendant have posted the caveat emptor without justification or explanation and have refused to provide any information regarding what the alleged public interest concern is. Further, Defendant refuses to give the Company any direction regarding corrective action. The Company is effectively left guessing with no recourse and minimal ability to raise funds and sell stock. Further, the caveat emptor suggests that the Company is extremely risky, when the Company, in fact, is fully transparent through its reporting with the SEC.

78.     But for Defendant's conduct, the Company (and its shareholders) would be able to effectively sell its shares without interference and at a higher market value than currently available.

79.     As a result, the Company has been damaged in an amount exceeding $25,000.

## COUNT VI
## VIOLATIONS OF NORTH CAROLINA'S CHAPTER 75:
## UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

80.     The Company restates and realleges the foregoing allegations as though fully set forth herein.

81.     Defendant has engaged in unfair and deceptive trade practices as described, including, but not limited to, directing the Company to make Quarterly Fee payments in furtherance of removing the caveat emptor and making other misleading statements regarding the removal of the caveat emptor in order to induce the Company into continued cooperation with Defendant.

14

82.    These acts were unfair to the Company in that the false promises made by the Defendant were an inducement to the Company to pay for something the Defendant never planned to do.

83.    These acts were in and affected commerce in that the Company and the Defendant both do business in North Carolina and the restriction on the Company's business affects commerce in North Carolina.

84.    As a result of the Defendant's unfair and deceptive trade practices, the Company was damaged in the amount exceeding $25,000, and all damages found by this Court, pursuant to N.C.G.S. 75-16 shall be trebled.

WHEREFORE, the Plaintiff respectfully prays to this Honorable Court as follows:

1. The Court issue a Temporary Restraining Order enjoining the Defendant from continuing to post the Caveat Emptor symbol on the Company's profile for 180 days;

2. That the Defendant provide to this Court within 30 days, the requirements necessary for the Company to have the Caveat Emptor symbol permanently removed from its profile;

3. A refund of all amounts paid to Defendant under the guise of a "quarterly fee";

4. An amount of $1,078,640.64, or such other amount found at a trial on this matter to represent the lost investment income suffered by the Company during the time which the Caveat Emptor symbol was on the Company's profile;

5. That this Court treble all damages found at trial;

6. That the Court order the costs of the action and reasonable attorney's fees be awarded to Plaintiff as allowed by law;

7. That all such issues triable be tried by a jury;

8.  For such other and further relief as this Court shall so find.


Respectfully submitted this 27th day of September, 2018.

Chad E. Axford
Attorney for Plaintiff
16 W. Martin St., Ste. 508
P.O. Box 23
Raleigh, NC 27602
(919)714-9988
(919)714-9935(f)
N.C. Bar#26059

16

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS

AMERICATOWNE HOLDINGS, INC.,
a Nevada corporation,

  Plaintiff,

v.

OTC MARKETS GROUP, INC., a
Delaware corporation,

  Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF ALTON PERKINS
IN SUPPORT OF AMERICATOWNE
HOLDINGS, INC., COMPLAINT AND
MOTION FOR TEMPORARY
RESTRAINING ORDER**

COUNTY OF WAKE   )
          )SS
STATE OF NORTH CAROLINA )

Alton Perkins, being duly sworn, states as follows:

1.  I am the Chief Executive Officer and Chairman of the Board of Directors for Plaintiff AmericaTowne Holdings, Inc. (the "Company").

2.  I have personal knowledge of the facts attested to herein, and if called to testify, I would do so consistent with this Affidavit.

3.  The Company is a publicly reporting company based in Raleigh, North Carolina. It is subject to the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). The Company files current and periodic reports pursuant to the Securities Act and Exchange Act with the Securities and Exchange Commission ("SEC"), which are publicly available. These public disclosures ensure complete transparency regarding the Company's financial condition and business activities.

4.     Prior to June 2, 2016, the Company was a dormant corporation with limited or no assets and operations. It was controlled by a single shareholder, Joseph Arcaro ("Arcaro"). The Company was not a publicly reporting company subject to the Securities Act and Exchange Act and was delinquent in its financial disclosures. Additionally, Defendant OTC Markets Group, Inc. ("Defendant") did not display a caveat emptor on the Company's trading profile on OTCmarkets.com (the "OTC Profile").

5.     On June 2, 2016, Arcaro entered into a Stock Purchase and Sale Agreement ("SPSA") with AmericaTowne, Inc., a Delaware corporation ("ATI"), whereby ATI purchased the majority of the issued and outstanding stock from Arcaro for $175,000. At that time, I was the Chief Executive Officer and Chairman of the Board of Directors of ATI.

6.     Thereafter, the Company began implementing a new business plan, filed its Registration Statement on Form 10 with the SEC, and initiated a name change and symbol change request with FINRA.

7.     As the Company was in the process of initiating operations, Defendant placed a caveat emptor on the Company's OTC Profile without warning and without explanation, which surprised me, given that the Company had updated its financials and was implementing a business plan.

8.     The Company immediately inquired regarding the caveat emptor and was told by Defendant's agents that the Company had to pay a fee of $3,000 every quarter to "verify" the Company's OTC Profile (the "Quarterly Fee").

9.     I ensured the Company paid the Quarterly Fee, however the caveat emptor was not removed. The Company continued to follow up with Defendants, who refused to provide guidance regarding what the "public interest concern" was regarding the Company's stock.

2

10.     Thereafter, I began receiving invoices for the Quarterly Fee and, given Defendant's representations that payment of the Quarterly Fee would result in removal of the caveat emptor, I ensured the Company promptly paid the Quarterly Fee every three months.

11.     After over a year of having the caveat emptor displayed on the Company's OTC Profile, Defendant temporarily removed it after the Company's corporate actions were approved by FIRNA and the Company's Registration Statement on Form 10 was deemed effective by the SEC.

12.     During the period the caveat emptor was removed, the Company's stock increased from approximately $0.35 per share to around $6.30 per share, on average.

13.     However, after approximately three weeks, Defendant issued a new caveat emptor on the Company's OTC Profile, claiming once again that there was an alleged public interest concern relating to an uncharacteristically high bid on the Company's stock.

14.     The Company—directly and through counsel—explained that it was unaware of the high bid and had no information regarding who made the bid. Regardless, the Defendant continued to post the caveat emptor. I was again told to "check back" in three months.

15.     After three months, the Company contacted Defendant in an attempt to ascertain what action needed to be done to remove the caveat emptor. However, Defendant's agents— specifically an individual named "Amanda"—represented that there was nothing that could be done. The Company regularly followed up with Defendant for months, but was provided no further guidance, and was instead told to wait several months each time the Company contacted Defendant.

3

16.     Eventually, Defendant's agent Amanda suggested that the completion of several new corporate actions, which involved the merger of ATI and the Company (the "2017 Corporate Actions")—would resolve the issues associated with the new caveat emptor.

17.     After the 2017 Corporate Actions were approved by FINRA and the SEC, the Company once again contacted Defendant asking for removal of the caveat emptor.

18.     However, after several weeks, Defendant contacted me and explained that it would not remove the caveat emptor, regardless of the fact that the Company is in compliance with its SEC financial reporting obligations and regularly paid the Quarterly Fee to Defendant.

19.     The Company repeatedly requested information from Defendant regarding the alleged public interest concern, but have been given no answers or any guidance. In fact, Defendant has refused to even identify what the alleged public interest concern is and stated that it does not require any further information from, or action by, the Company.

20.     Defendant's continued display of the caveat emptor on the Company's OTC Profile has deflated the Company's stock price and trading volume.

21.     I have reviewed publicly available trading records for the time period the caveat emptor was posted on the Company's OTC Profile. Before the caveat emptor was originally displayed in 2016, the Company's stock price was approximately $9.00 per share. However, when the caveat emptor was applied, the Company's stock price fell to $0.35 per share.

22.     As previously stated, during the short period of time the Company did not have the caveat emptor displayed in August of 2017, the average price of the Company's stock rebounded to approximately $6.30 per share on average. However, once the caveat emptor was reapplied without warning or justification, the stock price dropped again to $0.35 per share.

4

23.     Another measure of demand for a company's stock is trading volume. During the short period of time the Company did not have a caveat emptor displayed on the OTC Profile, it averaged a daily trading volume of approximately 3800 shares per day. However, when the caveat emptor is displayed, the average trading volume is approximately 200 shares per day.

24.     Demand for the Company's stock has dropped by almost 95% during the time period Defendant displays the caveat emptor on the Company's OTC Profile.

25.     The Company estimates that it has suffered damages of approximately $1,078,640.64, a figure that I calculated, which represents the lost opportunity the Company has suffered as a result of the decrease in demand due to the unjustified display of the caveat emptor.

26.     Every day the caveat emptor is displayed, the Company' business interests are harmed in that 1) investors are being directed away from purchasing Company stock by the symbol as evidenced from higher purchase and sale volume when the symbol was briefly removed, 2) the Company share price is drastically lower when the symbol is attached to the profile as compared to when it was briefly removed, 3) investors are being misled by the Defendant and the Company has no way to remedy a problem that the Defendant refuses to define or elaborate upon, 4) the artificial warning Defendant attaches to the Company's OTC Profile suppresses and effectively prohibits the Company from raising capital necessary to the stability and growth of the Company, 5) The Company is continuing to pay the Quarterly Fee to the Defendant but is receiving nothing in return.

27.     The Company currently has approximately twenty-two full time employees and approximately 460 shareholders, all of whom are being harmed by the artificial warning and artificial suppression of the Company's stock price, value, and tradability on the OTC market as a direct result of the Defendant's actions.

5

28.     Should Defendant's actions, or inaction as it were, be allowed to continue, it will effectively eliminate the ability of the Company to operate on a day to day basis without interference. The Company would be forced to cease operations and go out of business, thus eliminating its entire workforce and causing the investment capital of its shareholders to be rendered worthless.

29.     If Defendant is not enjoined from allowing the caveat emptor symbol to remain on the Company's profile, the Company will continue suffering immediate and irreparable injury in the form of lost investment capital, lost ability to generate capital, artificially low share price and value and the beginning of an effective dissolution of its business as an ongoing concern affecting all of its employees and shareholders.


Further affiant sayeth not.

ALTON PERKINS

Subscribed and sworn to before me this
_13_ day of _September_, 2018

_____ , Notary Public
State of North Carolina, County of _Wake_
My Commission Expires: _07-19-2019_
Acting in _____Wake_____ County


Kathryn C Brewer
Notary Public
Wake County
North Carolina
My Commission Expires 7/19/2019

6

# – Markets

AboutBlogOTCIQ    IQ

Market Activity

Corporate Services

OTC Link ATS

Market Data

Learn

About

Blog



| Quote | Q |
| --- | --- |

📈 Stock Screener

| | OTC MARKETS TOTALS | SECURITIES 10,573 | DOLLAR VOL $1.2B | SHARE VOL 4.5B | TRADES 185,720 |
| --- | --- | --- | --- | --- | --- |

Glossary

**Glossary**
Search   Q

**52 Week High/Low**   The highest and the lowest prices paid for a given security for the last 52 weeks.

**52 Week Low** The lowest price for a given security for the last 52 weeks.

**52 Week Range** The highest and the lowest prices paid for a given security for the last 52 weeks.

**American Depositary Receipts (ADRs)**   Receipt for shares of foreign-based companies that entitle the shareholder to all dividends and capital gains. ADRs allow Americans to buy shares of foreign-based corporations' securities at American exchanges instead of having to go to overseas exchanges.

**Annual Low** The lowest price at which a security was traded for the past year.

**Annual Report (10K)**   A report providing financial information required by the SEC for all U.S. public companies to be filed annually.

**Arbitrage** Arbitrage is the trading strategy that takes advantage of the price differential between two or more markets for the same underlying asset. Investors and traders profit from the price differential by buying at the cheaper price and selling at the higher price or vice versa. In liquid markets, arbitrage is a short-term strategy because traders quickly recognize the imbalance and correct their prices. The large number of American

Depositary Receipts (ADRs) and Foreign Ordinaries that trade in the OTC market (e.g., Roche — OTCQX: RHHBY, adidas — OTCQX: ADDYY) make price imbalance a concern for OTC traders and investors. ADRs represent a set ratio of home market shares; thus, movement in the home market price and foreign exchange considerations will directly affect the price of the ADR. Foreign Ordinaries should theoretically mirror home market trading once currency rates are considered. ADR and Foreign Ordinary investors should be aware of the home market symbol, venue, and trading patterns, as well as current foreign exchange considerations.

**Average Daily Volume (3m)** The average number of daily shares traded for the past 3 months.

**Bankruptcy** Bankruptcy shall mean, with respect to the Company, (i) an adjudication that it is bankrupt or insolvent, (ii) an admission of its inability to pay its debts as they mature, (iii) its making a general assignment for the benefit of creditors, (iv) its filing of a petition in bankruptcy or a petition for relief under any section of the United States Bankruptcy Code or any other bankruptcy or insolvency statute, or (v) the involuntary filing against it of any such petition that is not discharged within 60 days thereafter. OTCQX Rules and OTCQB Standards require that companies not be subject to any Bankruptcy or reorganization proceedings. OTCQX Rules and OTCQB Standards require that companies not be subject to any Bankruptcy or reorganization proceedings.

**Best Ask** The lowest price at which someone is willing to sell a security.

**Best Bid** The highest price at which someone is willing to buy a security.

**Beta Coefficient** A measure of the volatility of a stock relative to the overall market. Beta is calculated by applying linear regression, the security's week-to-week percent price change to the correlating index's week-to-week percent change for a given period of time. A beta value of 1.1 indicates a 1.10% movement for a 1% move in the index, regardless of direction.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████

**Change / Percent Change** Price change (net or percent wise) between the current price and the close from the previous trading day.

**CIK Code**A unique identifier assigned by the SEC to all companies that file with the SEC.

**Class Notes**Information about a particular class of a stock such as an IPO (initial public offering).

**Close**The price of the last sale for a security at the end of the trading day.

**Company Notes**Information about a company such as filing for bankruptcy, former name, etc.

**Control Dispute** A Control Dispute occurs when multiple parties claim control of a company. OTC Markets Group does not determine control or work to resolve the dispute. When OTC Markets Group becomes aware of a control dispute, our practice is to remove all control persons from the Company Profile and await resolution provided by a court or applicable governmental agency.

**Daily Low**The lowest price that was paid for a stock during a day.

**Daily Range**The highest and the lowest prices paid for a given security in the last trading day.

**Dividend**A portion of company's quarterly profit paid to its shareholders in the form of cash or stock.

**Dually Quoted Stocks (OTC Link and FINRA's BB)**     Stocks that are quoted on both OTC Link and FINRA's BB.

**Earnings/Share (Earnings per Share or EPS)**     Earnings per Share number reflects the company's profit divided by its number of outstanding shares. Companies usually use a weighted average number of shares outstanding over reporting term.

**Estimated Market Cap (Market Capitalization)**     Calculated by multiplying the number of shares outstanding times previous close price. This number reflect the total dollar value of company's outstanding shares.

Case 5:18-cv-00487-D     Document 1-1     Filed 10/12/18     Page 26 of 223

**Exchange Act Rule 15c2-11** SEC Rule 15c2-11 establishes requirements for the publication and submission of quotations for over-the-counter securities.

**Fail to Deliver** A 'fail to deliver' is a transaction where one of the counterparties in the transaction fails to meet their respective obligations. For example, a broker/dealer does not deliver shares sold short.

**FINRA** The Financial Industry Regulatory Authority is an independent regulator for all US securities firms.

**FINRA OTCBB** FINRA operates an electronic bulletin board for OTC stocks.

**Foreign Ordinary Shares** Foreign ordinary shares are equivalent to foreign common stock traded on U.S. markets. Ordinary shares are stocks bought by U.S. investors representing shares in foreign companies that are traded on their home markets, as opposed to stocks that trade in the U.S.

**Form 211** SEC Rule 15c2-11 requires that, before a broker or dealer publishes proprietary quotes on a quotation medium, it must gather, review, and retain certain information about the issuer. The market maker must file a Form 211 with FINRA, along with two copies of the required issuer information. After a successful review, FINRA will notify the market maker that it may enter a quotation on OTC Link. Read more about the 211 filing process.

**Grey Market** Grey Market, "OTC" or "Other OTC" is a security that is not currently traded on the OTCQX, OTCQB or Pink markets. Broker-dealers are not willing or able to publicly quote OTC securities because of a lack of investor interest, company information availability or regulatory compliance.

**Halt** A temporary stop to trading, usually for 30 minutes, during the time when news from the issuing company is being disseminated over the news wires. A trading halt gives investors an equal opportunity to evaluate news and make their buy, sell and hold decisions accordingly. A trading halt may also be imposed for purely regulatory reasons, either by the Nasdaq Stock Market or an exchange.

**Issuers** A company or municipality offering its securities for sale to investors.

**Last Sale**The price at which the last trade was executed in a security.

**Liquidity**From a trading perspective, liquidity is the ability of a security to be bought or sold without causing a significant movement in the price of the security. Liquid securities may be bought and sold in large numbers without a dramatic movement in the price of the security. The opposite is true for illiquid securities. Liquidity depends on a number of forces including supply and demand, price transparency, trading history, market venue, market participants and freely tradable shares (public float).

**Market Makers**Firms that publish bid and/or ask price(s) for a given security by using their own capital, research, retail and/or systems resources . Market Makers compete with each other for orders to buy or sell at publicly quoted prices (called making a market).

**Morningstar Quantitative Equity Rating**A measure of the Quantitative Valuation of a stock.

**Nasdaq**A national securities exchange.

**Net Dividend Yield**     The value of the annual dividend payments after the deduction of taxes and expenses divided by the last sale of the security.

**NYSE**New York Stock Exchange

**NYSE AMEX Equities**Formerly known as the American Stock Exchange (AMEX)

**Opening Price**Price for a given stock at the beginning of the trading day.

**OTC Link**OTC Link is a centralized quotation service that collects and publishes market maker quotes for OTC securities in real time. OTC Link is a nexus of OTC dealer markets that enhances price transparency in the OTC markets so investors can more efficiently buy and sell OTC securities. OTC Link is owned and operated by OTC Markets Group Inc.

Securities quoted exclusively on OTC Link have primary venue as OTC Link. Bonds exclusively quoted on the OTC Link have primary venue as Yellow Sheets.

OTC Link LLC is a wholly-owned subsidiary of OTC Markets Group.

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 28 of 223

**OTC Markets Group Inc.** OTC Markets Group Inc. (OTCQX: OTCM) operates the OTCQX Best Market, the OTCQB Venture Market, and the Pink Open Market for 10,000 U.S. and global securities. Through OTC Link ATS, we connect a diverse network of broker-dealers that provide liquidity and execution services. We enable investors to easily trade through the broker of their choice and empower companies to improve the quality of information available for investors.

OTC Link ATS is operated by OTC Link LLC, member FINRA/SIPC and SEC regulated ATS.

**OTCQB** The OTCQB Venture Market is for early-stage and developing U.S. and international companies.

**OTCQX** The OTCQX Market is our best market, for companies that meet high financial standards and are current in their disclosure.

**OTCQX Best 50** An annual ranking of the top 50 U.S. and international companies traded on the OTCQX Best Market based on an equal weighting of one-year total return and average daily dollar volume growth.

**OTCQX30 Constituent** Security is a constituent of the OTCM QX ADR 30 Index (Ticker: .OTCQX30).

**Other OTC** Also known as the "Grey Market".

**Outstanding Shares** The total number of shares of a given security currently owned by shareholders.

**P/E Ratio (Price/Earnings Ratio)** P/E Ratio is calculated by dividing stock's market price by the company's earnings per share.

**Penny Stock** Penny Stocks are, generally speaking, those securities that are not listed on a national securities exchange and are priced under $5. There are exclusions for securities of issuers that have net tangible assets greater than $2 million if they have been in operation at least three years or greater than $5 million if in operation less than three years. Securities of issuers with average revenue of at least $6 million for the last three years are also not considered penny stocks. For a complete definition of a Penny Stock, see SEC Rule 3a51-1. FINRA BB securities are considered penny stocks unless they qualify for one of the exclusions. See: SEC Rule 3a51-1 - Definition of a Penny Stock

**Penny Stock Exempt** This security is exempt from the definition of a Penny Stock under SEC under <u>Rule 240.3a51-1</u> because it meets one of the following tests: 1) A price of over $5 per share, 2) the issuer has Average Revenue of at least $6 million for the last 3 years, or 3) the issuer has Net Tangible Assets in excess of $2 million if the issuer has been in continuous operations for at least 3 years or $5 million if less than 3 years.

**Penny Stock Rules** Penny Stock Rule is designed to prevent deceptive or manipulative practices. It provides that a broker cannot sell a Penny Stock to any person unless it has approved that person's account for penny stock transactions and the broker/dealer has received in writing from customer agreement to the transaction. Approving an account includes, among other things, reviewing the customer's financial data and determining the customer's suitability, including the capability to evaluate the risks of trading in penny stocks. Some types of transactions in penny stocks are exempt from these rules. Exempt transactions include those with an established customer (a customer of more than one year or one who has made at least three separate penny stock purchases) and transactions in which the customer is an institutional investor. See: <u>SEC Schedule 15g</u>

**Piggy-Back Rule** A "piggyback qualified" security is one that meets the frequency-of-quotation requirement described in SEC Rule 15c2-11(f)(3). The frequency-of-quotation test or "piggyback" exception is based on whether a broker/dealer has itself published quotations in the security in the applicable interdealer quotation system on at least 12 business days during the preceding 30 calendar days, with not more than four consecutive business days without quotations. Once this criteria has been satisfied, authorized participants may register on-line in a security. As long as the security remains piggyback qualified, any participant may quote the security without a Form 211 submission.

**Pink Current Information** Companies that follow the International Reporting Standard, the Alternative Reporting Standard, or are current in the SEC reporting obligations are designated as Pink Current Information.

**Pink Limited Information** Companies that have posted limited financial information through the OTC Disclosure & News Service or are late in their filing obligations with the SEC are designated as Pink Limited Information.

**Pink No Information** Pink No Information companies are not able or willing to provide disclosure to the public markets - either to a regulator, an exchange or OTC Markets Group.

**Previous Close** The price of the last sale for a given security at the end of the previous trading day.

| **Primary Venue** | The market, exchange or quotation service where a given security is primarily quoted. |
|---|---|

| **Quarterly Report (10Q)** | A report providing unaudited financial information required by the SEC for all U.S. public companies to be filed quarterly. |
|---|---|

| **SEC Filing** | A document, usually containing a financing statement, filed with the SEC and made available to the public. |
|---|---|

| **SEC Suspension** | The SEC can suspend a stock from trading for up to ten trading days when it serves the public interest and will protect investors. The SEC will act when it believes public information about a company is not current, accurate, or adequate. For stocks that trade in the OTC or the over-the-counter market, quotation does not automatically resume when a suspension ends. (The OTC market includes OTC Link and the FINRA BB.) After a suspension, SEC regulations require a broker-dealer to review information about a company before publishing a proprietary quote. If a broker-dealer does not have confidence that a company's financial statements are current and accurate, especially in light of the questions raised by the SEC, then a broker-dealer may not publish a proprietary quote for the company's stock. However broker - dealers may publish quotes representing an unsolicited customer order. |
|---|---|

| **Securities and Exchange Commission (SEC)** | Primary federal regulatory agency responsible for administering federal securities laws, promoting full disclosure and protecting investors against fraudulent and manipulative practices in the securities markets. |
|---|---|

| **Shell** | A Shell Company is a company, other than an asset-backed issuer, with no or nominal operations and either 1) no or nominal assets; 2) assets consisting of cash and cash equivalents; or 3) assets consisting of any amount of cash and cash equivalents and nominal other assets, as defined by Securities Act Rule 405 and Exchange Act Rule 12b-2. SEC reporting companies designate their shell status in their periodic filings. |
|---|---|

| **Shell Risk** | The Shell Risk designation indicates that a company displays characteristics common to Shell Companies. This designation is made at OTC Markets' sole and absolute discretion based on an analysis of the company's annual financial data and may differ from issuers' self-reported shell classifications in their own public filings. |
|---|---|

| **Short Selling** | Short selling is a trading strategy where an investor, believing that a security is over-valued, borrows (from a broker-dealer or institutional investor) and sells a security and then |
|---|---|

repurchases and returns (to the broker-dealer or institutional investor) the security at a lower price. The difference between the sale price and the purchase price is the investor's profit.

Short selling is a valid trading strategy; however, there are two important points that investors must remember:

- Short selling carries with it unlimited risk because the purchase price of a security can rise to any price point. Conversely, long investors (buyers) may only lose the amount invested — if, for example, the security price drops to zero.
- Short sellers are subject to price manipulation schemes — or short squeezes. In a short squeeze, traders believing that there are a lot of short sellers begin buying shares to force the price and the short sellers losses higher. These traders hope that the short sellers will be forced to buy pushing the price even higher at which point they can sell their shares at a profit. Short squeezes are easier to execute in illiquid securities.

**Slow PO** Enables companies to enter into the public markets by making previously restricted shares available for public trading by brokers on the OTCQX, OTCQB and Pink markets. More Information.

**Spread** The Spread is a term that applies to all markets and represents the difference between the highest bid price and the lowest ask price. For example if "the bid" is $10.00 and "the ask" is $11.00, then the spread is $1.00. The spread is one of the ways that broker-dealers, specifically market makers (a type of broker-dealer that provides liquidity by quoting and trading both sides of the market), make money. In an ideal world, market makers want to buy at the bid price and sell at the ask price. This scenario allows them to have very little risk and make "the spread" on each share transacted. Unfortunately for market makers, this scenario is not extremely common due to price volatility - movements in the price of a security.

Volatility makes it possible for market makers to lose money providing liquidity to both sides of the market. Security purchases at the bid price can become unprofitable if the price quickly or significantly moves lower. Therefore, spreads tend to be wider (larger) in very volatile or illiquid (not easily tradable) securities.

Spreads are often the result of the amount of information available on a security. This information may come in the form of past trading data, news or company financials. If very little information is available on a security, spreads may be very large because the market maker does not want to be caught off guard by a better-informed investor. Conversely, active securities with current disclosure tend to have tighter spreads because market makers believe they have sufficient knowledge of the company and the security to buy and sell with confidence.

OTC investors are wise to pay attention to the spread in OTC securities.

**Stock Promotion** OTC Markets designates a security with a promotion flag when it becomes aware of current stock promotion related to the issuer. The promotion flag remains on the security for 15 days following the end of the stock promotion. For more information, please see our Policy on Stock Promotion.

Case 5:18-cv-00487-D    Document 1-1    Filed 10/12/18    Page 32 of 223

**Stock Symbol** A system of letters used to designate a security for trading.

**Tick** The change in price, either up or down.

**Transfer** The Transfer Agent Verified Shares Program provides investors current and reliable share
**Agent**    data. The program enables stock transfer agents to report their clients' share data,
**Verified** including authorized and outstanding shares, to OTC Markets Group on a regular basis via
             a secure, electronic file transfer. Share data provided by transfer agents is displayed on
             www.otcmarkets.com alongside a "Verified" logo, indicating the information is reliable and
             trustworthy. This data is also disseminated through OTC Markets Group's market data
             feeds to investors and broker-dealers.

**Unable to Contact** OTC Markets Group is unable to verify contact information for this company.

**Unsolicited** An unsolicited quote is one which represents an "Unsolicited Customer Order".
**Quote**    Publishing unsolicited quotes allows a broker/dealer to meet an exception to Rule 15c2-
             11, which requires a broker to have in its possession current information, including
             financial information, about the issuer of the securities . To avail itself of this exception
             to SEC Rule 15c2-11, a FINRA member firm must ensure that the quotation published
             or submitted: (1) is solely on behalf of a customer; (2) represents the customer's
             indication of interest; and (3) does not involve the solicitation of the customer's interest.

**Verified** The Company Profile data was verified by the issuer within the previous 6 months. OTCQX
**Profile**  Rules and OTCQB Standards require issuers to maintain a verified profile.

**Volume** The total number of shares traded on a given day.

**Why is size** In order to provide investors with the most current prices, OTCMarkets.com is now
**value**    displaying real-time inside prices. Complete price and size data is available through the
**always 1?** Real-Time Level 2 Quote Display product.

**Yield** The annual rate of return on an investor's capital investment, expressed as a percentage. For
         bonds, yield is the coupon rate of interest divided by the purchase price.

| QUOTE | 🔍 | SYMBOL | LAST | CHANGE | BID | ASK | VOLUME | TIME |
|---|---|---|---|---|---|---|---|---|
| | | OTCM | 28.35 | -0.40 (-1.39%) | 28.06 | 28.44 | 4970 | 14:54 |

f   🐦   in   ▶️   🔊

Contact
Careers
Market Hours
Glossary

© 2018 OTC Markets Group Inc.    Terms of Service    Linking Terms    Trademarks    Privacy Statement    Risk Warning    Supported Browsers

# − Markets

AboutBlogOTCIQ     IQ

Market Activity

Corporate Services

OTC Link ATS

Market Data

Learn

About

Blog

| Quote | Q |
|-------|---|

| ⌁ Stock Screener | | **OTC MARKETS TOTALS** | SECURITIES 10,573 | DOLLAR VOL $1.3B | SHARE VOL 4.7B | TRADES 193,771 |
|---|---|---|---|---|---|---|

Learn / Caveat Emptor Policy

## Caveat Emptor Policy

Market 101    Getting Traded    Reporting Standards    Investor Protection    **Caveat Emptor Policy** •••

**OVERVIEW** OTC Markets Group designates certain securities as 'Caveat Emptor' and places a skull and crossbones icon next to the stock symbol to inform investors that there may be reason to exercise additional care and perform thorough due diligence before making an investment decision in that security.

**The Caveat Emptor Designation may be assigned when OTC Markets becomes aware of one or more of the following:**

- **Promotion** — The security is the subject of stock promotion that may be misleading or manipulative. Promotional activities may include news releases, spam email, and newsletters, whether they are published by the issuer or a third party. See OTC Markets Group's Policy on Stock Promotion.
- **Investigation of Fraud or Other Criminal Activities** — There is an investigation or other indication of fraudulent or other criminal activity involving the company, its securities or insiders.
- **Suspension/Halt** — A regulatory authority or an exchange has halted or suspended trading for public interest concerns (i.e. not a news or earnings halt).
- **Undisclosed Corporate Actions** — The security or company is the subject of a corporate action, such as a reverse merger, stock split, or name change, without adequate current information being publicly available.
- **Other Public Interest Concern** — OTC Markets Group may determine that there is a public interest concern regarding the security. Such concerns may include but are not limited to promotion, spam or disruptive corporate actions even when adequate current information is available.

### When Does Caveat Emptor Get Removed?

Facts and circumstances may differ, however generally, OTC Markets Group will remove the Caveat Emptor designation once the company meets the qualifications for Pink Current Information, has verified the information on its company profile on www.otcmarkets.com, and demonstrates that there is no longer a public interest concern. The Caveat Emptor designation is typically removed within the first 30

days. During the time it is labeled Caveat Emptor, any stock that is not in Pink Current
Information will also have its quotes blocked on www.otcmarkets.com.

| QUOTE | | SYMBOL | LAST | CHANGE | BID | ASK | VOLUME | TIME |
|---|---|---|---|---|---|---|---|---|
| | Q | OTCM | 28.35 | -0.40 (-1.39%) | 28.06 | 28.44 | 4970 | 14:54 |

Contact
Careers
Market Hours
Glossary

© 2018 OTC Markets Group Inc.   Terms of Service   Linking Terms   Trademarks   Privacy Statement   Risk Warning   Supported Browsers

EX-99.1 8 e991.htm STOCK PURCHASE AGREEMENT (ARCARO)

# STOCK PURCHASE AND SALE AGREEMENT

**THIS STOCK PURCHASE AND SALE AGREEMENT** ("Agreement") is effective as of the 2nd day of June, 2016 (the "Effective Date"), by and between Joseph Arcaro ("Seller"), an individual with a notice address of 22837 Pacific Coast Highway, Suite 632, Malibu, CA 90265, and AmericaTowne, Inc. a Delaware corporation, or its designee or assign, with a notice address at 4700 Homewood Court, Suite 100, Raleigh, North Carolina 27609 ("Buyer").

**WHEREAS**, Seller owns ONE HUNDRED MILLION (100,000,000) restricted shares of common stock (the "Shares") of **Global Recycle Energy, Inc., (OTC Pink GREI)** a Nevada corporation (the "Company"). This Agreement provides for the acquisition of the Shares by Buyer, in a private transaction whereby Buyer intends on holding the shares acquired in its account for its own benefit and not with the intent of public resale or distribution, for a total purchase price of ONE HUNDRED SEVENTY FIVE THOUSAND U.S. Dollars ($175,000.00) (the "Purchase Price") on the terms and conditions set forth below.

**WHEREAS**, Seller and Buyer have determined, subject to the terms and conditions set forth in this Agreement, that the transaction contemplated hereby is desirable and in the their best interests, respectively.

**NOW, THEREFORE**, on the stated premises and for and in consideration of the mutual covenants and agreements hereinafter set forth and the mutual benefits to the parties to be derived here from, it is hereby agreed as follows:

-1-



# ARTICLE I
## SALE AND PURCHASE OF THE SHARES

**Section 1.1 <u>Sale and Purchase</u>.** Subject to the terms and conditions hereof, at the Closing (as defined in paragraph 1.2 below), Seller agrees to sell, assign, transfer, convey and deliver to Buyer or Buyer's assignee, and Buyer agrees to purchase from Seller, the Shares. The Shares and the Purchase Price, as defined below, are to be transferred and paid, respectively, through the Escrow Agent pursuant to the terms and conditions of the Escrow Agreement, which is incorporated herein by reference.

**Section 1.2 <u>Closing</u>.** The purchase of the Shares shall be consummated at a closing ("Closing") to take place on or before June 6, 2016, unless otherwise agreed upon by the parties in a writing signed by the parties (the "Closing Date"). The Purchase Price for the Shares shall be paid on or before the Closing Date, by Buyer to Seller, through the Escrow Agent, by wire transfer or other form of immediately available good funds against delivery of the Shares, through the Escrow Agent, in transferable form from Seller to Buyer or Buyer's assignee, provided to facilitate the Closing.

# ARTICLE II
## REPRESENTATIONS, COVENANTS AND WARRANTIES

As an inducement to and to obtain the reliance of Buyer, Seller individually represents and warrants to Buyer as follows:

**Section 2.1 <u>No Conflict, Authority, Issued Shares</u>.** The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the material breach of any term or provision of, or constitute an event of default under, any material debt instrument, which may include an indenture, mortgage, deed of trust or other contract, agreement or instrument to which Seller is a party or to which the Shares are subject. Seller has full power, authority and legal right and has taken all action required by law or otherwise to authorize the execution and delivery of this Agreement. The Company is authorized to issue up to two hundred fifty million (250,000,000) shares of common stock.

**Section 2.2 <u>Title to the Shares; No Pending Litigation</u>.** Seller owns of record and beneficially the Shares of the Company, free and clear of all liens, encumbrances, pledges, claims, options, charges and assessments of any nature whatsoever, with full right and lawful authority to transfer the Shares to Buyer. No person has any preemptive rights or rights of first refusal with respect to any of the Shares. There exists no voting agreement, voting trust, or outstanding proxy with respect to any of the Shares. Other than disclosed by the Seller to the Buyer, there are no outstanding rights, options, warrants, calls, commitments, or any other agreements of any character, whether oral or written, with respect to the Shares. To Seller's actual knowledge, there is no pending or threatened complaint, suit, demand or other dispute relating to the Shares or the Company. The Company is validly existing and in good standing under the laws of the State of Nevada, and holds a Nevada State Business license. The Company is in full compliance with the March 27, 2015 order issued by the District Court in Clark County, Nevada (Case No. A-15-712031-B). The Company has no assets and no liabilities beyond those liabilities set forth in Schedule A, which the Seller shall direct the Escrow Agent to pay off at Closing.

-2-

**Section 2.3 Brokers and Finders.** The Seller represents and warrants that he/she/it has made no agreements involving any fees of any type that relate to this Agreement that would involve the Buyer, including but not limited to broker's fee, finder's fees or any similar compensation arrangement.

**Section 2.4 Continued Operation of Business in Usual Course.** The Seller agrees to exercise his controlling shares in the Company to operate the business of the Company in the usual course; however, the Seller agrees not to incur any additional liabilities between the Effective Date and Closing, and agrees not to issue any securities of the Company without the written consent of the Buyer.

As an inducement to and to obtain the reliance of Seller, Buyer individually represents and warrants to Seller as follows:

**Section 2.5 No Conflict, Authority.** The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the material breach of any term or provision of, or constitute an event of default under, any material debt instrument, which may include an indenture, mortgage, deed of trust or other contract, agreement or instrument to which Buyer is a party. Buyer has full power, authority and legal right and has taken all action required by law or otherwise to authorize the execution and delivery of this Agreement.

**Section 2.6 Restricted Shares.** Buyer acknowledges that the Shares purchased have not been registered under the Securities Act or any state securities laws, will be issued in reliance upon an exemption from the registration and prospectus delivery requirements of the Act which relate to private offerings, will be issued in reliance upon exemptions from the registration and prospectus delivery requirements of state securities laws which relate to private offerings and the Buyer must therefore bear the economic risk of such investment indefinitely unless a subsequent disposition thereof is registered under the Act and applicable state securities laws or is exempt therefrom. Buyer acknowledges that the shares shall bear restrictive legends. Buyer further represents that the Shares are being purchased for its own account, pursuant to consents and resolutions of its Board of Directors, without the intent to resell to the public absent an exemption to registration or registration of the Shares.

**Section 2.7 Buyer's Sophistication.** Buyer (i) acknowledges that the purchase of Shares involves a high degree of risk in that the Company has limited business operations and may require substantial funds; (ii) an investment in the Company is highly speculative and only investors who can afford the loss of their entire investment should consider investing in the Company and the Shares; (iii) has such knowledge and experience in finance, securities, investments, including investment in non-listed and non registered securities, and other business matters so as to be able to protect its interests in connection with this transaction; (iv) that the sale of the Shares to Buyer is not registered with the U.S. Securities and Exchange Commission or with the securities administrator of any state; (v) that the Shares are being sold pursuant to an exemption from such registration requirements; and (vi) the Shares are "restricted securities" that will bear a restrictive legend prohibiting their further transfer without registration or any exemption therefrom.

**Section 2.7 Due Diligence Materials Provided.** Buyer acknowledges that Seller has provided Buyer provided Buyer with true and accurate copies of all corporate books and records relating to the Company in Seller's possession or control. Buyer acknowledges that Seller has only recently become the controlling shareholder of the Company and has obtained control of the Company through court process which, by its nature, provides Seller with only very limited information regarding the Company, its history, its financial condition and any potential debts, obligations, liabilities or other claims. Buyer understands that there may be significant obligations, claims or other obligations against the Company of which the Seller is unaware that would make the Company unsuitable for the business operations therein contemplated by Buyer, and Buyer expressly assumes such risk.

-3-

# ARTICLE III
## EXCHANGE PROCEDURE AND OTHER CONSIDERATION

**Section 3.1 Seller's Delivery**. On the Closing Date, the Seller shall deliver the following to Buyer, conditioned upon (i) all of Buyer's representations and warranties set forth in Section 2, above, shall be true and correct as of the Closing, and (ii) Buyer's performance of its delivery obligations in section 3.2, below:

(a) The Shares together with a stock power or other instruction required for the transfer of the Shares to Buyer. An indemnification will be used and is approved by Pacific Stock Transfer in lieu of medallion. If necessary, after the Closing, the Seller shall also execute such other certificates or other documents reasonably necessary to transfer the Shares to Buyer.

(b) An updated list of shareholders as of Closing.

(c) Written consent from the Company's board of directors or shareholders, consistent with the Company's Bylaws and Articles of Incorporation approving this Agreement and the transaction contemplated hereunder, and appointing Buyer's designee(s) to the board of directors, effective upon Closing.

(d) Written resignation from all members of the Company's board of directors excepting only Buyer's designee, effective upon Closing.

(e) A written resignation from all officers of the Company, effective upon Closing.

(f) Final payoff letters from those vendors identified on Schedule A.

(g) Any required notifications provided to FINRA, SEC or OTC Markets Group.

(h) Executed Indemnification and Hold Harmless Agreement related to the Oil Lease.

(i) Assignment between the Company and Arcaro regarding the transfer of the Oil Lease.

-4-

**Section 3.2 Buyer's Delivery.** On the Closing Date, Buyer shall deliver the following to Seller, conditioned upon (i) all of Seller's representations and warranties set forth in Section 2, above, shall be true and correct as of the Closing, and (ii) Seller's performance of its delivery obligations in section 3.1, above:

(a) Purchase Price in good funds totaling $175,000 through the Escrow Agent.

(b) A consent/resolution from the Buyer's Board of Directors appointing nominees to serve on the Board of Directors of the Company effective immediately upon Closing, and appointment of officers pursuant to the Company's Bylaws. The consent/resolution will also include (i) approval and ratification of the Buyer's obligations under this Agreement, (ii) mailing address for each director and officer appointed by Buyer, (iii) identification of the Company's new registered agent, and (iv) any other corporate matters associated with the Company's ongoing business.

**ARTICLE IV**
**MISCELLANEOUS**

**Section 4.1 Notification of Pink OTC Markets, Inc. and Nevada Secretary of State.** Buyer shall, not later than forty-eight (48) hours following the Closing, take the following actions:

(a) Notify OTC Markets Group, both via certified letter and by access to the website section of www.otcmarkets.com established for this purpose, of the new address and registered agent for the Company, the new director(s) and officers of the Company, including its President. Buyer shall be responsible for any and all costs associated with this notification.

(b) Notify the Nevada Secretary of State, by filing an amended annual list of officers and directors and by amending its articles of incorporation in changing its resident agent notification, of the new address and resident agent for the Company, the new director(s) of the Company and the new officers of the Company, including its President. Buyer shall promptly pay any fees associated with these filings.

(c) Confirm to Seller in writing via certified letter to Seller, and by providing copies of the notices and filings provided to OTC Markets Group and the Nevada Secretary of State that Buyer has performed its obligations pursuant to sections 4.1(a) and (b), above. Should Buyer fail to perform according to this Section 4.1, Buyer expressly authorizes Seller to provide the notices and filings contemplated by this Section 4.1, and Buyer agrees to promptly reimburse Seller for all expenses related thereto, including filing fees and attorney's fees actually incurred.

-5-

**Section 4.2 Notices**. Any notices or other communications required or permitted hereunder shall be sufficiently given if personally delivered to it or sent by registered mail or certified mail, postage prepaid, or by prepaid telegram addressed to the addresses set forth in this Agreement or such other addresses as shall be furnished in writing by any party in the manner for giving notices hereunder, and any such notice or communication shall be deemed to have been given as of the date so delivered, mailed or telegraphed.

**Section 4.3 Attorneys' Fees**. Except as expressly provided herein, each party will be responsible for their own attorney's fees.

**Section 4.4 Confidentiality**. Each party hereto agrees with the other party that, unless and until the transactions contemplated by this Agreement have been consummated, they and their representatives will hold in strict confidence all data and information obtained with respect to another party or any subsidiary thereof from any representative, officer, director or employee, or from any books or records or from personal inspection, of such other party, and shall not use such data or information or disclose the same to others, except: (i) to the extent such data is a matter of public knowledge or is required by law to be published; and (ii) to the extent that such data or information must be used or disclosed in order to consummate the transactions contemplated by this Agreement. Notwithstanding, Seller authorizes Buyer to disclose any confidential information related to the Company and this Agreement to the extent necessary in Buyer's disclosure requirements as a reporting company under the rules promulgated by the United States Securities and Exchange Commission, and in the event Buyer elects to exercise its controlling interest in the Company after the Closing to become subject to the reporting requirements for public companies.

**Section 4.5 Third Party Beneficiaries**. This contract is between Seller and Buyer. No other person or entity shall be deemed to be a third party beneficiary of this Agreement.

**Section 4.6 Entire Agreement.** This Agreement, and the Escrow Agreement, represents the entire agreement between the parties relating to the subject matter hereof. This Agreement alone fully and completely expresses the agreement of the parties relating to the subject matter hereof. There are no other courses of dealing, understanding, agreements, representations or warranties, written or oral, except as set forth herein. This Agreement may not be amended or modified, except by a written agreement signed by all parties hereto.

**Section 4.7 Survival; Termination**. The representations, warranties and covenants of the respective parties shall survive the Closing Date and the consummation of the transactions herein contemplated within the applicable statute of limitations.

**Section 4.8 Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument.

**Section 4.9 Amendment or Waiver**. Every right and remedy provided herein shall be cumulative with every other right and remedy, whether conferred herein, at law, or in equity, and may be enforced concurrently herewith, and no waiver by any party of the performance of any obligation by the other shall be construed as a waiver of the same or any other default then, theretofore, or thereafter occurring or existing. At any time prior to the Closing Date, this Agreement may be amended by a writing signed by all parties hereto, with respect to any of the terms contained herein, and any term or condition of this Agreement may be waived or the time for performance hereof may be extended by a writing signed by the party or parties for whose benefit the provision is intended.

-6-

**Section 4.10 Expenses.** Each party herein shall bear all of their respective costs and expenses incurred in connection with the negotiation of this Agreement and in the consummation of the transactions provided for herein and the preparation thereof.

**Section 4.11 Headings; Context.** The headings of the sections and paragraphs contained in this Agreement are for convenience of reference only and do not form a part hereof and in no way modify, interpret or construe the meaning of this Agreement.

**Section 4.12 Benefit.** This Agreement shall be binding upon and shall inure only to the benefit of the parties hereto, and their permitted assigns hereunder. This Agreement shall not be assigned by any party without the prior written consent of the other party.

**Section 4.13 Severability.** In the event that any particular provision or provisions of this Agreement or the other agreements contained herein shall for any reason hereafter be determined to be unenforceable, or in violation of any law, governmental order or regulation, such unenforceability or violation shall not affect the remaining provisions of such agreements, which shall continue in full force and effect and be binding upon the respective parties hereto.

**Section 4.14 No Strict Construction.** The language of this Agreement shall be construed as a whole, according to its fair meaning and intendment, and not strictly for or against either party hereto, regardless of who drafted or was principally responsible for drafting the Agreement or terms or conditions hereof.

**Section 4.15 Execution Knowing and Voluntary.** In executing this Agreement, the parties severally acknowledge and represent that each: (a) has fully and carefully read and considered this Agreement; (b) has been or has had the opportunity to be fully apprised by its attorneys of the legal effect and meaning of this document and all terms and conditions hereof; (c) is executing this Agreement voluntarily, free from any influence, coercion or duress of any kind.

**Section 4.16 Further Assurances, Cooperation.** Each party shall, upon reasonable request by the other party, execute and deliver any additional documents necessary or desirable to complete sale contemplated by this Agreement. The parties hereto agree to cooperate and use their respective reasonable best efforts to consummate the transactions contemplated by this Agreement.

**Section 4.17 Governing Law.** This Agreement shall be construed (both as to validity and performance) and enforced in accordance with and governed by the laws of the state of Nevada applicable to agreements made and to be performed wholly within such jurisdiction and without regard to conflicts of laws. Any dispute arising out of this Agreement shall be resolved in the state or federal courts sited in Clark County, Nevada, to the exclusion of all other venues. The prevailing party in any such action shall be entitled to an award of costs and its reasonable attorneys' fees.

**Section 4.18 Conflict Disclosure and Waiver.** The Seller acknowledges that the law firm of Paesano Akkashian Apkarian, P.C. (the "Firm") represents the interests of the Buyer in this transaction. The Seller has not sought, or been given, legal advice from the Firm. The Seller has been advised of the conflict of interest in the Firm serving as counsel for the Buyer and as Escrow Agent under the Escrow Agreement, as more thoroughly set forth in the Escrow Agreement, and has knowingly and willingly waived any conflict of interest after having sufficient opportunity to evaluate the conflict.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first above written.

| **Seller** | **Buyer** |
|---|---|
| /s/Joseph Arcaro | /s/Alton Perkins |
| Joseph Arcaro<br>President<br>Global Recycle Energy, Inc. | Alton Perkins<br>CEO, Chairman of the Board AmericaTowne, Inc. |
| **Address of Seller for Notices:** | **Address of Buyer for Notices:** |
| Joseph Arcaro<br>22837 Pacific Coast Highway Suite 632<br>Malibu, CA 90265 | Alton Perkins<br>4700 Homewood Court<br>Suite 100<br>Raleigh, North Carolina 27609 |
| | Copy to: |
| | Paesano Akkashian Apkarian, P.C.<br>c/o Anthony R. Paesano<br>7457 Franklin Road<br>Suite 200<br>Bloomfield Hills, MI 48301 |

-8-

## Schedule A

### Liabilities to be Paid at Closing

-9-

10-12G/A 1 atmo-form10amend12_20170824.htm 10-12G/A
# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

Form 10

Amendment No. 12



Date of Amendment No. 12: August 25, 2017
Date of Amendment No. 11: August 16, 2017
Date of Amendment No. 10: July 31, 2017
Date of Amendment No. 9: June 20, 2017
Date of Amendment No. 8: April 14, 2017
Date of Amendment No. 7: February 13, 2017
Date of Amendment No. 6: February 1, 2017
Date of Amendment No. 5: December 6, 2016 -
Date of Amendment No. 4: November 2, 2016
Date of Amendment No. 3: November 2, 2016
Date of Amendment No. 2: October 18, 2016
Date of Amendment No. 1: October 4, 2016
Date of Original Filing: September 30, 2016

General Form for Registration of Securities

Pursuant to Section 12(b) or (g) of the Securities Exchange Act of 1934

### ATI MODULAR TECHNOLOGY CORP.
(Exact name of registrant as specified in its charter)

| Nevada | 81-3131497 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

c/o Alton Perkins
4700 Homewood Court, Suite 100, Raleigh, North Carolina

| | 27609 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrants telephone number, including area code: (888) 406-2713

-1-

Send all correspondence to:

Alton Perkins
4700 Homewood Court
Suite 100
Raleigh, North Carolina 27609
Telephone/Facsimile: (888) 406-2713
Email: ap@atimodular.com

Copies to:

Anthony R. Paesano
Paesano Akkashian Apkarian, P.C.
7457 Franklin Road
Suite 200
Bloomfield Hills, Michigan 48301
Telephone: (248) 792-6886
Email: apaesano@paalawfirm.com

Securities to be registered under Section 12(b) of the Act: None

Securities to be registered under Section 12(g) of the Exchange Act:

| Title of each class to be so registered | Name of Exchange on which each class is to be registered |
|---|---|
| Common Stock, $.0001 | N/A |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of large accelerated filer, accelerated filer and smaller reporting company in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐                    Accelerated filer ☐

Non-accelerated filer ☐                       Smaller reporting company ☒
(Do not check if a smaller reporting company)

We are filing this General Form for Registration of Securities on Form 10 to register our common stock, par value $0.0001 per share (the Common Stock), pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended (the Exchange Act). Unless otherwise noted, referenced in this registration statement to ATI Modular or the Company, or pronouns such as, we, our or us refers to ATI Modular Technology Corp. Once this registration statement is deemed effective, we will be subject to the requirements of Regulation 13A under the Exchange Act, which will require us to file annual reports on Form 10-K, quarterly reports on Form 10-Q, and current reports on Form 8-K, and we will be required to comply with all other obligations of the Exchange Act applicable to issuers filing registration statements pursuant to Section 12(g) of the Exchange Act.

-2-

# EXPLANATORY NOTE

On September 30, 2016, the Company filed its registration information on Form 10. The Company has since responded to comments provided by the Securities and Exchange Commission ("SEC"), resulting in nine (9) prior amendments to date. These amendments also outlined changes in the Company's articles of incorporation and agreements entered into by the Company.

This Twelfth Amendment to the Company's Form 10 addresses the comments raised in SECs comment letter dated August 23, 2017. As referenced herein, the term Form 10 shall refer to the Company's Twelfth Amendment to its Form 10 Information.

# FORWARD LOOKING STATEMENTS

### Special Note Regarding Forward-Looking Statements

Information included or incorporated by reference in this registration statement on Form 10 contains forward-looking statements. All forward-looking statements are inherently uncertain as they are based on current expectations and assumptions concerning future events or future performance of the Company. Readers are cautioned not to place undue reliance on these forward-looking statements, which are only predictions and speak only as of the date hereof. Forward-looking statements may contain the words believes, project, expects, anticipates, estimates, forecasts, intends, strategy, plan, may, will, would, will be, will continue, will likely result, and similar expressions, and are subject to numerous known and unknown risks and uncertainties. Additionally, statements relating to implementation of business strategy, future financial performance, acquisition strategies, capital raising transactions, performance of contractual obligations, and similar statements may contain forward-looking statements. In evaluating such statements, prospective investors and shareholders should carefully review various risks and uncertainties identified in this Report, including the matters set forth under the captions Risk Factors and in the Company's other SEC filings. These risks and uncertainties could cause the Company's actual results to differ materially from those indicated in the forward-looking statements. The Company disclaims any obligation to update or publicly announce revisions to any forward-looking statements to reflect future events or developments.

Although forward-looking statements in this registration statement on Form 10 reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by us. Consequently, forward-looking statements are inherently subject to risks and uncertainties, and actual results and outcomes may differ materially from the results and outcomes discussed in or anticipated by the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include, without limitation, those specifically addressed under the heading Risk Factors Related to Our Business below, as well as those discussed elsewhere in this Form 10. Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Form 10. We file reports with the Securities and Exchange Commission ("SEC"). You can read and copy any materials we file with the SEC at the SECs Public Reference Room, 100 F. Street, NE, Washington, D.C. 20549. You can obtain additional information about the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains an Internet site (www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us.

-3-

We disclaim any obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this registration statement on Form 10. Readers are urged to carefully review and consider the various disclosures made throughout the entirety of this Form 10, which attempt to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

## Item 1. Description of Business.

### (a) General Development of Business

We are an operating company engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US-based methods for creating modular spaces, facilities, and properties. We are in the business of all aspects of modular construction, including but not limited to, (a) the furtherance of modular construction technology, education and development in developed and undeveloped countries, (b) acquisition and/or installation of construction equipment, materials, furnishings, adware, insulation, flooring, roofing, wiring, plumbing, heating and air conditioning, and landscaping, and (c) other businesses directly or tangentially related to these lines of services, including assisting businesses and entrepreneurs in securing naming, licensing or promotional rights, driving internet and media traffic, increasing visibility of product and name recognition, and other services. As with any business plan that is aspirational in nature, there is no assurance we will be able to accomplish all of our objectives or that we will be able to meet our financing needs to accomplish our objectives. We believe that we are a shell company, as defined under Rule 12b-2 of the Exchange Act. Our CIK number is 0001697426, and we have selected December 31 as our fiscal year.

In China, the modular construction industry is new and in its very early stages. There are only three other competitors, and those competitors are based in China. None of the competitors are from the United States. We believe that it is recognized that United States modular technology is more advanced than our Chinese counterparts, and the technology is recognized as the gold standard. The construction industry in China, as a whole, has a mandate to immediately start developing modular technology with cities and provinces developing modular construction plans and targets to construct modular in both the public as well as private sectors. Most communities have milestones and are creating official policies on modular construction with the actual percentage of production mandated by particular target dates.

In our view, our position is strong. We have been sought out by three separate governments in China to assist their communities in developing their modular industry based upon United States technology. We have experience in the construction sector in China and the United States, and thus we believe we have the leverage in assembling experts in the modular industry to assist in delivery of goods, services, equipment, technology, and know-how all under the moniker of Made in the USA.

We are concluding registering our subsidiary in China and shortly expect to announce the physical location of our offices in China as well as our plant and other operating facilities. Our principal executive offices are located at 4700 Homewood Court, Suite 100 in Raleigh, North Carolina. We are registered as a foreign business entity in the State of North Carolina. We lease the office space from Yilaime Corporation, a Nevada corporation doing business in North Carolina, and a related party to the Company, as set forth below.

-4-

The Company was incorporated on January 2, 1969 as United Gold & Silver Co. ("UGS"). On February 17, 1971, UGS merged with Lucky Irish Silver, Inc., a Montana corporation, and Deep Creek Mines, Inc., a Washington corporation, in which the surviving entity's name remained USG. On November 29, 1999, USG merged with Auto America, Inc., ("Auto America"), a Delaware corporation, through the filing of Articles of Merger resulting in the surviving entity changing its name from USG to Auto America. From 2002 to 2007, the State of Washington automatically filed numerous Certificates of Administrative Dissolutions for Auto America for failure to file annual reports. On May 14, 2007, Auto America filed its final Application of Reinstatement resulting in restoring the Company to good standing. Also, on May 14, 2007, Auto America filed Amended Articles of Incorporation changing its name to Charter Equities, Inc. ("Charter Equities"). Charter Equities converted to an Arizona corporation on January 23, 2008. Shortly thereafter, the Company converted to Nevada corporation and changed its name to Global Recycle Energy, Inc. We amended our articles of incorporation on June 27, 2016, changing our name to ATI Modular Technology Corp.

**(b) Description of Registrants Plan of Operation**

As of the filing of this Registration Statement, we are in the first quarter of our fiscal year. Our focus at this time is on performing our duties and obligations under a series of pending operational agreements, discussed below.

As set forth below, the Company intends on relying on other businesses controlled by our sole director and officer, and beneficial owner of the majority shares of common stock in the Company Alton Perkins, in implementing its business plan.

Mr. Perkins is the control person of Yilaime Corporation, AmericaTowne and AXP Holding Corporation. At this time, the purpose of the Company is to service the construction and related technology needs of AmericaTowne under AmericaTowne's agreements with the Shexian County Investment Promotion Bureau in developing an AmericaTowne community in the Hanwang mountains in Shexian, China. The Company also intends on supporting these services in other AmericaTowne ventures at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency in developing an AmericaTowne Community and an International School in Longyan County China.

The related export services rendered to the Company in the implementation of its business plan cannot be provided by AmericaTowne or through the AmericaTowne relationship. In order to avoid conflicts of interest, Mr. Perkins is of the opinion that there must be a separate and distinct agreement between, in this case, the Company and AXP Holding Corporation. Furthermore, although other similar IC-DISC entities exist, the Company is able to obtain better terms and conditions from AXP Holding Corporation in light of Mr. Perkins control of AXP Holding Corporation.

AmericaTowne's Board of Directors determined that operating and controlling a separate but related entity focused on the development and the exporting of modular energy efficient technology and processes for government and private enterprises in China would be more prudent from a risk mitigation and operational standpoint than providing these services under the AmericaTowne business plan. Furthermore, the intent of the Company is to expand its services and relationships to other similar endeavors in projects not related to AmericaTowne, thus the need to maintain and operate a separate entity.

-5-

*Cooperative Agreement AmericaTowne, Inc. and Shexian County Investment Promotion Bureau*

On June 21, 2016, AmericaTowne, the controlling shareholder of the Company by virtue of its majority ownership of common stock in the Company, entered into a Cooperative Agreement with the Shexian County Investment Promotion Bureau (the "Shexian County Bureau") out of Shexian, China (hereinafter, the "AT/Shexian Cooperative Agreement"). The AT/Shexian Cooperative Agreement relates to the construction of an AmericaTowne location in advancing tourism in the Hanwang mountains.

Under the terms of the AT/Shexian Cooperative Agreement, AmericaTowne and the Shexian County Bureau have agreed to a strategic partnership wherein the Shexian County Bureau intends to invest local resources to AmericaTowne for construction of an AmericaTowne community. In consideration, AmericaTowne intends on investing funds towards the development of the AmericaTowne community. AmericaTowne will be obligated to bear any and all applicable taxes and the projected investment by AmericaTowne into the development of the AmericaTowne community is estimated to be $30,000,000. It is anticipated that the definitive agreement will set forth a detailed projection and proforma associated with the use of funds. There is no guarantee that AmericaTowne will be able to raise this capital in the event a definitive agreement is executed. Furthermore, AmericaTowne's ability to raise the necessary capital and to perform obligations under any definitive agreement might be materially affected in the event the Company is not able to perform any of its obligations under any future definitive agreement with the Shexian County Bureau.

*Cooperative Agreement ATI Modular and Shexian County Investment Promotion Bureau*

The Company is controlled by AmericaTowne by virtue of the AmericaTowne's majority ownership of common stock. On June 21, 2016, the Company agreed to participate with the Shexian County Bureau in building local modular construction, researching technology and intelligent systems related thereto, and servicing the full lifecycle of modular construction in the locale through the execution of the Cooperative Agreement (the "ATI Modular/Shexian Cooperative Agreement").

Pursuant to future negotiations and more definitive agreements, ATI Modular has agreed to purchase the requisite equipment and technology in performing under the ATI Modular/Shexian Cooperative Agreement. In consideration for the services provided by ATI Modular, the Shexian County Bureau has agreed to be responsible for providing factories and land, and other resources and manpower in developing the modular construction. The Company has also agreed to exercise its best efforts in raising approximately $30,000,000 in furthering the parties' collective interests under the ATI Modular/Shexian Cooperative Agreement. These funds would be allocated towards different operating costs than the funds necessary for AmericaTowne to perform under the AT/Shexian Cooperative Agreement. It is anticipated that the definitive agreement will set forth a detailed projection and proforma associated with the use of funds. The Company and the Shexian County Bureau have agreed to continue to cooperate in good faith in executing and further agreements needed in furthering their respective objectives. However, notwithstanding this intent, the Company's ability to perform might be materially affected in the event AmericaTowne is not able to meet its obligations in furthering any future definitive agreement with the Shexian County Bureau.

-6-

*Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project (Jiangnan)*

On September 8, 2016, the Company entered into the Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project ("Jiangnan Agreement") with the Jiangnan Industry Zone in Anhui Province ("Jiangnan"). Under the Jiangnan Agreement, the Company agreed, among other things, to manufacture and install modular buildings, and provide research into the development of green building module manufacturing. The Jiangnan Agreement was not a definitive agreement. Rather, it memorialized the parties' future intent as to the subject matter therein.

On December 28, 2016, the Company and Jiangnan entered into the American ATI Modular Technology Company Project Investment Agreement (the "Investment Agreement"), which superseded the Jiangnan Agreement. Under the Investment Agreement, Jiangnan and the Company agreed to the construction of the Company's green, modular building and related technology under the project name Modular Plant Production Base. The Investment Agreement calls for the Company will rent buildings, factories and rental houses from Jiangnan, or its related-party - Jiangnan Construction & Development Co., Ltd. ("Jiangnan Construction"), with a total acreage of approximately 244,776 square meters (approximately 2,634,747 square feet) for purposes of advancing the Company's modular construction, technology and research, and with a chosen location within this area for the Company's global company offices. The Company will retain its offices in the United States. In the event the Company does not occupy the rented facilities in one-year, Jiangnan may place other tenants in the buildings for unrelated projects. The rental rate is as follows per square meter, per month: (a) 9 Chinese Yuan (approximately $1.29 USD) for single-storied factory buildings, (b) 7 Chinese Yuan (approximately $1.01 USD) for multi-storied factory buildings, (c) 6 Chinese Yuan (approximately $.86 USD) for two-storied buildings, (d) 5 Chinese Yuan (approximately $.75 USD) for three-storied buildings and public rental, and (e) 10 Chinese Yuan (approximately $1.38 USD) for commercial housing. The first twenty-seven months is rent free. Pursuant to the Investment Agreement, the lease term for the property the Company will utilize will be ten (10) years. The Company intends on entering into a formal lease agreement with Jiangnan, however said lease has not been finalized. The Company will finalize the separate lease agreement once it completes the foreign entity registration process.

The initial deposit of 330,000 Chinese Yuan (approximately $48,000 USD) is due upon the Company's registration as a foreign entity with the Chinese government. This amount may be applied to the Company's rental obligations. The Company has agreed to further capitalize the operation with 396,000,000 Chinese Yuan (approximately $57,000,000 USD) with 79,200,000 Chinese Yuan (approximately $11,000,000 USD) by December 31, 2017.

The capitalization under the Investment Agreement is, in part, the Company's responsibility. However, the Company and Jiangnan have agreed to certain provisions to mitigate against financing risks, including, but not limited to: (a) access upon request by the Company to local bank loans in the Anhui Province and United States Exim Bank, (b) equity fund insertion up to $3,000,000 USD, and (c) contribution by Jiangnan up to $2,900,000 upon meeting conditions in the Investment Agreement.

The Company's majority and controlling shareholder, ATI, has no financial obligations under the Investment Agreement. However, ATIs director, officer and control person by virtue of his beneficial ownership of more than 51% of the issued and outstanding shares of common stock is Alton Perkins. Mr. Perkins is also the beneficial owner of the controlling interest in the Company by virtue of his ownership in ATI, and he is the Company's sole director and officer. As a result, Mr. Perkins might elect to vote ATIs shares, or exercise his rights as the sole member of the Board of Directors of ATI, to loan funds from AmericaTowne to the Company to satisfy the capital requirements under the Investment Agreement. If this occurred, the loaned funds would become a related-party debt to the Company. There are no current plans or intentions by Mr. Perkins to facilitate such a loan.

*Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project (Yongan)*

On September 9, 2016, the Company entered into the Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project with the Yongan government in the Fujian province (the "Yongan Agreement"). Under the Yongan Agreement, similar to the Jiangnan Agreement, the Company has agreed to manufacture and install modular buildings, and provide research into the development of green building module manufacturing. The Company has agreed to provide appropriate technology and intelligent systems in providing modular building lifecycle services. The

location of the planned project is Yongan city in the Fujian province, China. The parties have projected a cost of $30,000,000.

The Company has agreed to grant the Yongan government audit, access, supervision, inspection and other rights. The Yongan government has agreed to coordinate any and all necessary services in securing benefits associated with the Company being a foreign investment enterprise, including but not limited to, providing the site for the manufacturing facility, tax relief, access to financing and a Project Headquarter for the Company, which is defined in the Yongan Agreement.

The Yongan Agreement is not a definitive agreement; rather, it is a memorialization of the parties' future intent as to the subject matter therein. The Company's business plans and objectives could be impaired in the event the parties do not reach a definitive agreement. The Company is responsible for financing and providing any necessary facilities inside any factory plant. There is no guarantee that the Company can secure such financing or develop the necessary facilities.

-7-

*Sales and Support Services Agreement (Yilaime Corporation)*

On June 27, 2016, we entered into a Sales and Support Services Agreement with Yilaime Corporation, a Nevada corporation ("Yilaime"). Yilaime is the holder of the majority of issued and outstanding shares of common stock in AmericaTowne, Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission. Mr. Perkins is also the Trustee of the Alton & Xiang Mei Lin Perkins Family Trust ("Perkins Trust") and the AXP Nevada Asset Protection Trust 1 ("AXP"), which holds 5,100,367 and 120,000 shares, respectively, of the issued and outstanding common stock in ATI. Mr. Perkins is the beneficial owner of 20,674,484 shares of ATI, which equals 90.11% of issued and outstanding shares. Mr. Perkins is the beneficial owner of the majority and controlling interest in the Company through his direct holdings, and beneficial holdings through Yilaime, AXP and the Perkins Trust. ATI, Perkins Trust and Mr. Perkins beneficially own 110,117,593 shares, or 86%, of the Company's common stock.

Under the Services Agreement, Yilaime will provide the Company with marketing, sales, and support services in the Company's pursuit of modular business in China in exchange for a commission equal to ten percent (10%) of the gross amount of monies procured for the Company through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay the Company a quarterly fee of $250,000. The Services Agreement is set to expire on June 10, 2020.

Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of the Company.

*Modular Construction & Technology Services Agreement (AmericaTowne)*

On June 28, 2016, we entered into a Modular Construction & Technology Services Agreement (the "Modular Services Agreement") with AmericaTowne Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). The impetus behind the Modular Services Agreement was the Company's Cooperative Agreement with the Shexian County Government, China. Under the Cooperative Agreement, ATI and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains, Shexian, China. In addition, ATI, at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency plan to pursue the development of an AmericaTowne Community and an International School in Longyan County China.

-8-

Under the Modular Services Agreement, ATI Modular shall provide the research, development, training and modular technology in a manner deemed commercially acceptable by ATI based on its commercially reasonable requirements, plans and specifications, which shall be agreed upon in advance of any substantial and material construction. ATI will pay the Company a quarterly fee of $125,000 per quarter. The initial fee under the Modular Services Agreement with AmericaTowne was recorded as a related-party receivable upon its execution. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. ATI retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019.

*Interest Charge Domestic International Sales Agreement (AXP Holding Corporation)*

On June 29, 2016, we entered into an IC-DISC Service Provider Agreement with AXP Holding Corporation, a Nevada corporation ("AXP Holding") and related party to the Company through Mr. Perkins control of AXP Holding. AXP Holding is an Interest Charge - Domestic International Sales Corporation, or IC-DISC. AXP IC-DISC tax-exempt status was authorized and approved by the United States Department of the Treasury, Internal Revenue Service. As an IC-DISC, AXP Holding may, under certain conditions, act as a sister corporation to entities and provide services to assist a company in obtaining lower tax rates on export income. In addition to the export tax savings provided by AXP, AXP can provide an additional array of services including promoting the Company's export activities, purchasing receivables from the Company at a discount through a factoring relationship, and providing the Company with working capital loans.

The term under the IC-DISC Service Provider Agreement is set to expire on December 6, 2019, absent early termination for breach thereof by either party. AXP retains the right to extend the term, exercising its sole discretion, to December 6, 2024 by providing written notice to the Company by November 6, 2019. AXP has agreed to a non-compete and non-circumvent in providing the services under the IC-DISC Service Provider Agreement.

The Company has agreed to pay AXP a commission fee up to the greater of 50% of the Company's export net income or 4% of the Company's export gross receipts. The Company will determine the exact amount and the method of payment of the commission fee. The commission fee shall be paid at the option of the Company periodically throughout the year, but no later than December 31 on annual basis. If there is no commission fee due to no export sales, the Company will pay AXP an export service fee of $50,000. The export service fee, if any, is due on or before December 31 on an annual basis.

In addition, for referring businesses from the Company's Export Platform or Community, AXP agrees to pay the Company 25% of each Sales Export Service Fee charged and received as an IC-DISC Commission from each Exporter or Licensee resulting from participating in the Export Platform or Community. This fee is called a Group Export Consulting Fee in the IC-DISC Service Provider Agreement, and is due no later than fifteen business days after receipt from the Exporter or Licensee, but no later than December 31 on an annual basis. For illustrative purposes, if AXP receives and or charges an Exporter 50% of its net export sales as a commission, and that value is $100,000, AXP would owe the Company 25%, or $25,000. Furthermore, during the term, the Company shall pay AXP a flat fee of $5,000 per transaction for purchasing receivables from the Company, plus an interest rate for such factoring at the prime rate plus one-percent.

-9-

The Company is in the early stages of its operations, and many of its plans and objectives are aspirational in nature, and thus might never come to fruition. At this time, the Company plans to retain engineering and architectural firms based in the United States who have extensive experience in developing modular structures in the United States, China and other foreign locations based on market demand, which has not been thoroughly researched to date. The Company has been focused on obtaining quotes, negotiating formal engagements and researching all aspects of the modular construction industry. While the infrastructure is still in the developmental stage, the Company is confident that it has the experience, or access to those with experience, in the modular construction field.

The Company plans on engaging in onsite placement and delivery of modular structures. Mr. Perkins has extensive experience in operating business in China. One of the reasons that Mr. Perkins was sought out and invited to participate in developing the modular industry in China is that he was the co-chairman of a construction company in China - Yilaime Foreign Partnership in Henghsui China. His experience with Yilaime Foreign Partnership allows ATI Modular to call on local companies in China as well as modular companies and experts in the United States to help provide on-site services. Yilaime Foreign Partnership is not a related party to the Company, ATI, Yilaime or AXP.

In addition, the Company recently joined the Modular Building Institute in Charlottesville, Virginia. In September of 2016, Mr. Perkins attended the Institute's annual exposition in order to line up available suppliers, and experts in the modular construction field.

We intend on offering support services in all phases of modular construction. Our approach will be to focus on exporting United States based technology, services and equipment, and general know-how. Exporters in our related company, AmericaTowne, are experienced in the modular field and we plan on allowing those experienced exporters to participate in various levels of our program.

The Company currently does not have a principal supplier of raw materials. The Company has identified potential sources of raw materials in the United States through its membership in the Modular Building Institute. One of our primary challenges will be pricing the source of raw materials and delivery to China. We are also looking to potential raw material sources in China.

To operate within China, the Company requires approval of government officials in China. In both cases where the Company has signed Cooperative Agreements (and in the case of the Shexian Agreement), and at the invitation of the local government, we have the approval to register and conduct business.

*Employees*

The Company currently has two full-time employees.

-10-

*Emerging Growth Company*

We are an emerging growth company under the JOBS Act. We shall continue to be deemed an emerging growth company until the earliest of:

(a) the last day of the fiscal year of the issuer during which it had total annual gross revenues of $1,000,000,000 (as such amount is indexed for inflation every 5 years by the Commission to reflect the change in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics, setting the threshold to the nearest 1,000,000) or more;

(b) the last day of the fiscal year of the issuer following the fifth anniversary of the date of the first sale of common equity securities of the issuer pursuant to an effective IPO registration statement;

(c) the date on which such issuer has, during the previous 3-year period, issued more than $1,000,000,000 in non-convertible debt; or

(d) the date on which such issuer is deemed to be a large accelerated filer, as defined in section 240.12b-2 of title 17, Code of Federal Regulations, or any successor thereto.

As an emerging growth company we are exempt from Section 404(b) of Sarbanes Oxley. Section 404(a) requires Issuers to publish information in their annual reports concerning the scope and adequacy of the internal control structure and procedures for financial reporting. This statement shall also assess the effectiveness of such internal controls and procedures. Section 404(b) requires that the registered accounting firm shall, in the same report, attest to and report on the assessment on the effectiveness of the internal control structure and procedures for financial reporting.

As an emerging growth company we are also exempt from Section 14A (a) and (b) of the Securities Exchange Act of 1934 which require the shareholder approval of executive compensation and golden parachutes. We have elected to use the extended transition period for complying with new or revised accounting standards under Section 102(b)(2) of the Jobs Act, that allows us to delay the adoption of new or revised accounting standards that have different effective dates for public and private companies until those standards apply to private companies. As a result of this election, our financial statements may not be comparable to companies that comply with public company effective dates.

*Going Concern*

Our auditor has expressed substantial doubt about your ability to continue as a going concern. Our net loss after provision for income tax is $3,693, and we do not have sufficient revenue to cover any further losses that may occur.

As a shell company, the Company and its shareholders are subject to certain consequences, challenges and risks. All of the presently outstanding shares of common stock are restricted securities as defined under Rule 144 promulgated under the Securities Act and may only be sold pursuant to an effective registration statement or an exemption from registration, if available. The SEC has adopted final rules amending Rule 144 which became effective on February 15, 2008. These final rules may be found at: www.sec.gov/rules/final/2007/33-8869.pdf.

-11-

Pursuant to the new Rule 144, one year must elapse from the time a shell company, as defined in Rule 405, ceases to be shell company and files Form 10 information with the SEC, before a restricted shareholder can resell their holdings in reliance on Rule 144. Form 10 information is equivalent to information that a company would be required to file if it were registering a class of securities on Form 10 under the Securities and Exchange Act of 1934 (the "Exchange Act").

Under the amended Rule 144, restricted or unrestricted securities, that were initially issued by a reporting or non-reporting shell company or an Issuer that has at any time previously a reporting or non-reporting shell company as defined in Rule 405, can only be resold in reliance on Rule 144 if the following conditions are met: (1) the issuer of the securities that was formerly a reporting or non-reporting shell company has ceased to be a shell company; (2) the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act; (3) the issuer of the securities has filed all reports and material required to be filed under Section 13 or 15(d) of the Exchange Act, as applicable, during the preceding twelve months (or shorter period that the Issuer was required to file such reports and materials), other than Form 8-K reports and (4) at least one year has elapsed from the time the issuer filed the current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

At the present time, the Company is classified as a shell company as defined in Rule 12b-2 of the Exchange Act. As such, all restricted securities presently held by the affiliates or control persons of the Company may not be resold in reliance on Rule 144 until: (1) the Company files Form 10 information with the SEC when it ceases to be a shell company; (2) the Company has filed all reports as required by Section 13 and 15(d) of the Securities Act for twelve consecutive months; and (3) one year has elapsed from the time the Company files the current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

There can be no assurance that we will ever meet these conditions and any purchases of our shares are subject to these restrictions on resale. A purchase of our shares may never be available for resale as we cannot be assured we will ever lose our shell company status.

## Item 1A. Risk Factors.

As a smaller reporting company, we are not required to provide the information required by this item.

## Item 2. Financial Information.

## Management's Discussion and Analysis of Financial Condition and Results of Operation.

You should read the following discussion of our financial condition and results of operations together with the audited financial statements and the notes to the audited financial statements included in this Registration Statement on Form 10. This discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results may differ materially from those anticipated in these forward-looking statements.

-12-

We qualify as an "emerging growth company" under the JOBS Act. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;
- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);
- submit certain executive compensation matters to shareholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and
- disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the CEO's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

The Company is in the early stages of its operations, and many of its plans and objectives are aspirational in nature, and thus might never come to fruition. At this time, the Company plans to retain engineering and architectural firms based in the United States who have extensive experience in developing modular structures in the United States, China and other foreign locations based on market demand, which has not been thoroughly researched to date. The Company has been focused on obtaining quotes, negotiating formal engagements and researching all aspects of the modular construction industry. While the infrastructure is still in the developmental stage, the Company is confident that it has the experience, or access to those with experience, in the modular construction field.

The Company plans on engaging in onsite placement and delivery of modular structures. Mr. Perkins has extensive experience in operating business in China. One of the reasons that Mr. Perkins was sought out and invited to participate in developing the modular industry in China is that he was the co-chairman of a construction company in China - Yilaime Foreign Partnership in Henghsui China. His experience with Yilaime Foreign Partnership allows ATI Modular to call on local companies in China as well as modular companies and experts in the United States to help provide on-site services. Yilaime Foreign Partnership is not a related party to the Company, ATI, Yilaime or AXP.

In addition, the Company recently joined the Modular Building Institute in Charlottesville, Virginia. In September of 2016, Mr. Perkins attended the Institute's annual exposition in order to line up available suppliers, and experts in the modular construction field.

-13-

We intend on offering support services in all phases of modular construction. Our approach will be to focus on exporting United States based technology, services and equipment, and general know-how. Exporters in our related company, AmericaTowne, are experienced in the modular field and we plan on allowing those experienced exporters to participate in various levels of our program.

The Company currently does not have a principal supplier of raw materials. The Company has identified potential sources of raw materials in the United States through its membership in the Modular Building Institute. One of our primary challenges will be pricing the source of raw materials and delivery to China. We are also looking to potential raw material sources in China.

To operate within China, the Company requires approval of government officials in China. In both cases where the Company has signed Cooperative Agreements (and in the case of the Shexian Agreement), and at the invitation of the local government, we have the approval to register and conduct business.

**Fiscal Year**

Our fiscal year ends December 31.

**Results of Operations for the Six Months Ended June, 2017 and 2016**

Our operating results for the six months ended June 30, 2017 and 2016 are summarized as follows:

|  | Six Months Ended | |
|  | June 30, 2017 | June 30, 2016 |
|---|---|---|
| Revenue | $     250,000 | $     125,000 |
| Cost of Revenues | $ | $ |
| Operating Expenses | $     204,404 | 27,902 |
| Net Income (Loss) | $      38,757 | $     100,957 |

*Revenues*

During the second quarter of 2017, the Company generated revenue of $250,000. The Company's revenues came from related parties for services rendered $250,000 for the service rights agreement with AmericaTowne. We can make no assurances that we will find commercial success- in any of our revenue producing contracts. Our revenues, thus far, rely entirely on related parties. We are a new company and thus have very limited experience in sales expectations and forecasting. We also have not fully discovered any seasonality to our business as we began operations in the second quarter of 2016.

*Operating Expenses*

Our expenses for the first six months ended June 30, 2017 and 2016 are outlined in the table below:

|  | Six Months Ended | |
|  | June 30, 2017 | June 30, 2016 |
|---|---|---|
| General and Administrative | $     204,404 | $     27,902 |
| Total Operating Expenses | $     204,404 | $     27,902 |

-15-

Our operating expenses are largely attributable to administrative expenses related to our reporting requirements as a public company and implementation of our business plan.

*Net Income*

As a result of our operations, the Company reported net income before tax obligations of $38,757 for the second quarter of 2017.

**Liquidity and Capital Resources**

*Working Capital*

|  | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Current Total Assets | $ 1,122,039 | $ 712,793 |
| Current Total Liabilities | $ 830,143 | $ 534,086 |
| Working Capital | $ 291,896 | $ 178,707 |

*Cash Flow*

|  | Six Months Ended | |
|---|---|---|
|  | June 30, 2017 | June 30, 2016 |
| Net Cash Provided by Operating Activities | $ 98,539 | $ 4,156 |
| Net Cash Used in Investing Activities | $ 861 | $ 4,156 |
| Nat Cash Provided by Financing Activities | $ 22,499 | $ - |
| Increase/Decrease in Cash | $ 120,178 | $ - |

-16-

*Cash Used in Operating Activities*

We have $98,539 and $4,156 net cash used in operating activities for the six months ended June 30, 2017 and 2016, respectively. The increase is mainly due to increase in deferred revenue.

*Cash Used in Investing Activities*

For the six months ended June 30, 2017 and 2016, we spent $861 and $4,156 on purchasing fixed assets, respectively.

*Cash Provided by Financing Activities*

We received $22,499 from issuance of stock for the six months ended June 30, 2017.

**Results of Operations through December 31, 2016**

Our operating results are summarized as follows:

| | For the Six Months Ended December 31 | | For the Years Ended June 30 | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| | | (Unaudited) | | |
| Revenue | $ 250,000 | | $ 125,000 | |
| Operating Expenses | $ 352,510 | $ 4,650 | $ 132,552 | $ 3,859 |
| Net Income (Loss) | $ 102,510 | ($ 4,650) | ($ 7,552) | ($ 3,859) |

**Revenues**

Pursuant to the Company's Service Agreements, the Company recognized $250,000 with AmericaTowne for the six months ended December 31, 2016. For six months ended December 31, 2016 and 2015, there was no cost of revenues.

We can make no assurances that we will find commercial success in any of our revenue producing contracts. We are a new company and thus have very limited experience in sales expectations and forecasting. We also have not fully discovered any seasonality to our business as we began operations in the first quarter of 2016.

The Company discloses that all revenues recorded and reflected in this annual report are related to service agreements with related parties. Specifically, the Company has entered into agreements with AmericaTowne as described above and incorporated herein by reference. The Company is controlled by one of its related parties, AmericaTowne, by virtue of AmericaTowne holding a majority of the Company's issued and outstanding restricted common stock.

**Operating Expenses**

Our operating expenses are largely attributable to office, rent and professional fees related to our reporting requirements as a public company and implementation of our business plan. For the six months ended December 31, 2016 our operating expenses were $352,510, while the operating expenses for the years ending June 30, 2016 and June 30, 2015 were $132,552 and $3,859, respectively.

-17-

## Net Income

As a result of our operations, for the six months ended December 31, 2016, the Company reported net income after provision for income tax of $102,510. Compared to the years ended June 30, 2016 and June 30, 2015, our net income was ($3,693) and ($3,859), respectively. The increase in our net income is due to starting our business plan and generating revenues from related parties in relation to services provided pursuant to certain contracts, as explained above.

## Liquidity and Capital Resources

### Working Capital

| | December 31 2016 (Restated) | June 30 2016 (Restated) | June 30 2015 |
|---|---|---|---|
| Current Assets | $ 712,793 | 137,991 | |
| Current Liabilities | $ 534,085 | $ 49,699 | $ 3,859 |
| Working Capital (Deficit) | $ 178,708 | $ 88,292 | $ (3,859) |

On December 31, 2016, June 30, 2016 and June 30, 2015, we have working capital (deficit) of $178,708, $88,292 and ($3,859), respectively. This increase in working capital is due to implementing our initial business plans.

### Cash Flow

| | For the Six Months Ended December 31 | | For the Year Ended June 30 | |
|---|---|---|---|---|
| | 2016 | 2015 (Unaudited) | 2016 | 2015 |
| Net cash provided by (used in) operating activities | $ (48,243) | | $ 4,156 | |
| Cash used in investing activities | $ 2,540 | | $ 4,156 | |
| Cash provided by financing activities | $ 145,049 | | | |
| Increase (Decrease) in cash | $ 94,266 | | | |

-18-

## Cash Provided by (Used in) Operating Activities

Compared to prior periods, the increase in cash used in operating activities for the six months ended December 31, 2016 is mainly due to increase in accounts receivable.

## Cash Used in Investing Activities

We spent $2,540 on fixed assets for the six months ended December 31, 2016, as compared to $4,156, $0 for the years ended June 30, 2016 and June 30, 2015, and $0 for the six months ended December 31, 2015.

## Cash Provided by Financing Activities

Compared to prior periods, the increase in cash provided by financing activities for the six months ended December 31, 2016 is due to proceeds from issuance of common stock.

As of December 31, 2016, the Company had enough cash including receivables to operate its business at the current level for the next twelve months, but insufficient cash to achieve our business goals and initiatives set forth above. To address the cash situation, the Company continues to manage its cash accounts and receivables closely.

To date, we have been able to meet all our account payable obligations within a five to ten-day window. If required, we can extend this window to improve our cash flow position. Additionally, we have a plan to increase sales. There is no assurance that we will be able to maintain this level of operations.

The success of our business plan beyond the next twelve months is contingent upon us growing our business, keeping costs down, increasing revenue and obtaining additional equity and/or debt financing. We intend to fund operations through our pro-active efforts to monitor receivables, and debt and/or equity financing arrangements, which may be insufficient to fund our capital expenditures, working capital, or other cash requirements. We do have a commitment from Chizhou government to provide cash infusions and or loan guarantees as we complete our operations in China. Other than Chizhou, we do not have any formal commitments or arrangements for the sales of stock or the advancement or loan of funds at this time. There is no assurance that such additional financing will be available to us on acceptable terms, or at all or that our receivable plan will be effective in the future.

## Plan of Operation and Cash Requirements

The Company anticipates that its expenses over the next twelve months will be approximately $5,000,000 as described in the table below. These estimates may change significantly depending on the nature of our business activities and our ability to raise capital from our shareholders or other sources.

| Description | Potential Completion Date | Estimated Expenses $ |
|---|---|---|
| Initial Plant and Operations Set-up | 12 months | 250,000 |
| Salaries | 12 months | 300,000 |
| Utility expenses | 12 months | 50,000 |
| Investor relations costs | 12 months | 50,000 |
| Marketing expenses | 12 months | 100,000 |
| Professional fees | 12 months | 150,000 |
| Other administrative expenses | 12 months | 100,000 |
| Equipment Purchases | 12 months | 4,000,000 |
| Total | | 5,000,000 |

-19-

Our other administrative expenses for the year will consist primarily of transfer agent fees, bank and interest charges and general office expenses. The professional fees are related to our regulatory filings throughout the year and include legal, accounting and auditing fees. The equipment purchases and plant set-up are related to the materially definitive agreement with Jiangnan.

Based on our planned expenditures, we will require approximately $5,000,000 to proceed with our business plan over the next twelve months. If we secure less than the full amount of financing that we require, we will not be able to carry out our complete business plan and we will be forced to proceed with a scaled back business plan based on our available financial resources.

We intend to raise the balance of our cash requirements for the next twelve months pursuant to our agreement with Jiangnan by accessing upon request bank loans, bank guarantees and equity funding. Additionally, we may have private placements, shareholder loans or possibly a registered public offering (either self-underwritten or through a broker-dealer). If we are unsuccessful in raising enough money through such efforts, we may review other financing possibilities such as bank loans. At this time, other than our agreement with Jiangnan we do not have a commitment from any third-party to provide us with financing. There is no assurance that any financing will be available to us or if available, on terms that will be acceptable to us.

Even though we plan to raise capital through equity or debt financing, we believe that the latter may not be a viable alternative for funding our operations, as we do not have sufficient tangible assets to secure any such financing. We anticipate that any additional funding will be in the form of equity financing from the sale of our common stock. At the close of 2016, we are considering financing arrangements for our common stock. However, the arrangements are not final and we cannot provide any assurance that we will be able to raise sufficient funds from the sale of our common stock to finance our operations. In the absence of such financing, we may be forced to abandon our business plan.

-20-

**Off-Balance Sheet Arrangements**

We have not entered into any off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources and would be considered material to investors.

**Item 3. Properties.**

We currently do not own any properties. We rent office space and equipment from Yilaime for $2,500 per month. The Company currently has no policy with respect to investments or interests in real estate, real estate mortgages or securities of, or interests in, persons primarily engaged in real estate activities.

**Item 4. Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth the ownership of our common stock by each person known by us to be the beneficial owner of more than 5% of our outstanding common stock as a group as of December 31, 2016. There are not any pending arrangements that may cause a change in control. The information presented below has been presented in accordance with the rules of the SEC and is not necessarily indicative of ownership for any other purpose.

A person is deemed to be a beneficial owner of a security if that person has or shares the power to vote or direct the voting of the security or the power to dispose or direct the disposition of the security. A person is deemed to own beneficially any security as to which such person has the right to acquire sole or shared voting or investment power within 60 days through the conversion or exercise of any convertible security, warrant, option or other right. More than one person may be deemed to be a beneficial owner of the same securities. The percentage of beneficial ownership by any person as of a particular date is calculated by dividing the number of shares beneficially owned by such person, which includes the number of shares as to which such person has the right to acquire voting or investment power within 60 days, by the sum of the number of shares outstanding as of such date plus the number of shares as to which such person has the right to acquire voting or investment power within 60 days. Consequently, the denominator used for calculating such percentage may be different for each beneficial owner.

-21-

| Name and Address[1] | Amount and Nature of Beneficial Ownership | Percentage of Class [2] |
|---|---|---|
| Alton Perkins[3] | 110,117,593[4] | 86.8% |

(1)     The address for the person named in the table above is c/o the Company.

(2)     Based on 126,740,708 shares outstanding as of the date of this Registration Statement.

(3)     Alton Perkins is Chief Executive Officer, Chief Financial Officer, Secretary and Director of the Company.

(4)     Individually, and through Yilaime and Perkins Trust

This table is based upon information derived from our stock records. We believe that each of the shareholders named in this table has sole or shared voting and investment power with respect to the shares indicated as beneficially owned.

**Item 5. Directors and Executive Officers.**

(a)  Identification of Directors and Executive Officers.

Our officers and directors and additional information concerning them are as follows:

| Name | Age | Position(s) |
|---|---|---|
| Alton Perkins | 65 | Chief Executive, Secretary, Treasurer and Director |

*Alton Perkins Sole Director and Officer.*

Mr. Perkins has been the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, Treasurer and Secretary of the Company since the change in control event on June 27, 2016. Mr. Perkins serves in these same capacities for ATI, Yilaime, Yilaime NC and AXP Holding. Mr. Perkins is a former decorated Air Force Officer and Missile Launch Officer with 22 years of military service, who graduated from the University of Southern Illinois with a B.S. in Business Administration and a M.B.A. from the University of North Dakota. Between 1988 and 1997, he held CEO positions with start-up companies in the jet fuels, defense contracting, construction, business consulting and development, and real estate industries. Between 1997 and 2009, Mr. Perkins served as the CEO and Chief Technology Officer for internet, childcare operations, media, and realty development companies. From 2009 to the present, Mr. Perkins has served as Chairman of Yilaime and its related entities ATI, Yilaime NC and AXP Holding. Mr. Perkins has expertise in conducting business in China. Living and working in China studying Chinese consumer habits, working with Chinese entrepreneurs and government agencies, he developed the AmericaTowne and AmericaStreet concepts.

-22-

Mr. Perkins lived in China between September 1, 2010 and April 28, 2012. He worked for the Yilaime Foreign Invested Partnership in Hengshui, China between September 19, 2010 and December 30, 2012. In addition to serving as Co-Chair of Yilaime Foreign Invested Partnership in China, an entity focused on real estate development, he served as a chief consultant to a major Chinese chemical company responsible for funding and technology transfer, and coordinated business with USA based auditors, DOW Chemical and USA Exim Bank. In addition, Mr. Perkins is the recently appointed sole director and officer of ATI Nationwide Holding Corp., f/k/a EXA, Inc., a Florida corporation ("ATI Nationwide"). The Company's largest shareholder ATI, closed on the purchase of the majority and controlling interest of ATI Nationwide on October 13, 2016. ATI Nationwide is listed on the OTC:Pinks as ATIN. No Company funds were used to purchase ATIs interest in ATI Nationwide.

Mr. Perkins is subject to a Desist and Refrain Order dated March 21, 2008 (the "Order") issued by the State of California's Business, Transportation and Housing Agency, Department of Corporations (the "Department"). In 2003, Mr. Perkins had been the Chief Executive Officer of Sunburst Holding Corporation ("Sunburst"). The Department alleged that in May of 2003, Sunburst and Mr. Perkins offered and sold securities through general solicitation to finance art-related activities. The Department alleged that Sunburst and Mr. Perkins omitted material facts, and more specifically, that Mr. Perkins had pled no contest to felony counts related to an indictment for fraudulent misappropriation of funds in a fiduciary capacity in Maryland, and had received a five-year suspended sentence.

The Department was of the opinion that investments offered and sold by Sunburst and Mr. Perkins constituted securities, which were subject to qualification under the California law, and that the securities were offered without being qualified, and were not exempt, in violation of California law. The Department ordered Sunburst and Mr. Perkins to desist and refrain from the further offer or sale of securities in California unless and until qualification has been made under the law or unless exempt. The Department also ordered that Sunburst and Mr. Perkins to desist and refrain from offering or selling or buying or offering to buy securities in California, including but not limited to stock, by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (discussed below). Mr. Perkins did not agree with the proposed order and filed a complaint with the Department. Mr. Perkins complaint was based on the fact that the shares in question were subject to a Registration statement filed by Sunburst and the shares were not required to be qualified and or authorized by the State of California since the shares had been appropriately registered with the SEC.

Mr. Perkins has been in compliance with the Order since issuance. The Order is not related in any manner with respect to the Company or its related parties. To the extent the Order was entered (i.e. only copy available for inspection by management is an unsigned version), there is no restriction on Mr. Perkins from engaging in an offering in California provided he complies with the appropriate disclosures and laws. The Company is not aware of any similar orders in any other jurisdiction.

The Company further discloses that the aforementioned Order references the failure of Mr. Perkins to disclose his eleven (11) pleas of nolo contendere in the Circuit Court for Prince Georges County, Maryland, for fraudulent misappropriation by a fiduciary in connection with a real estate transaction unrelated to the Company or its subsidiaries. On or about March 10, 2000, Mr. Perkins had been arraigned on eleven counts of fraudulent misappropriation by a fiduciary. The alleged misappropriation occurred on or about November 24, 1999 (i.e. the date set by the Court as the offense date). Mr. Perkins pled nolo contendere on August 31, 2000 without any admission or finding of guilt. Mr. Perkins was and had been given a five-year suspended sentence, which has since expired. Mr. Perkins disclosed to the Company that he had subsequently obtained a judgment out of the Superior Court of Mecklenburg County in North Carolina in the amount of $125,000 against an individual who defamed him and published false comments related to his nolo contendere plea. The company further discloses that the state of Virginia Division of Securities conducted an investigation into the matter. After careful review of the matter and applicable law, they concluded that no action was warranted and stated that the matter is closed.

-23-

(b) Significant Employees. None

(c) Family Relationships. Mr. Perkins wife, Xiang Mei Lin Perkins, is a beneficiary under the Perkins Trust.

(d) Involvement in Certain Legal Proceedings.

Except as otherwise disclosed, no officer, director, or persons nominated for such positions, promoter or significant employee has been involved in the last ten years in any of the following:

Any bankruptcy petition filed by or against any business of which such person was a general partner or executive officer either at the time of the bankruptcy or within two years prior to that time;

Any conviction in a criminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

Being subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his involvement in any type of business, securities or banking activities; and

Being found by a court of competent jurisdiction (in a civil action), the Commission or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated.

(e) The Board of Directors acts as the Audit Committee and the Board has no separate committees. The Company has no qualified financial expert at this time because it has not been able to hire a qualified candidate. Further, the Company believes that it has inadequate financial resources at this time to hire such an expert. The Company intends to continue to search for a qualified individual for hire.

(f) Code of Ethics. We do not currently have a code of ethics.

**Prior Blank Check Company Experience**

Mr. Perkins is the only member of management who has served as an officer or director of a prior blank check company.

| Name | Filing Date Registration Statement | Operating Status | SEC File Number | Pending Business Combinations | Additional Information |
|---|---|---|---|---|---|
| AmericaTowne, Inc. | May 12, 2015 | Effective November 5, 2015 | 000-55206 | None | None |
| ATI Nationwide Holding Corp. | N/A | Shell Company | 000-1591387 | None | None |

-24-

Case 1:18-cv-02437-TSC Document 1-1 Filed 10/12/18

Mr. Perkins beneficial ownership in ATI is set forth in this Registration Statement. ATI, formerly known as Alpine 5, Inc., filed its Form 10-12G/A on June 13, 2014. ATI ceased to be a blank check company on March 3, 2015 upon the Commission having no further comment on ATIs disclosures on Form 8-K, Item 5.06 (Change in Shell Status). ATI is publicly reporting with the Commission. ATI is engaged in exporting and consulting in the exporting of American made goods, products and services to China and Africa through strategic relationships in China and in the United States.

ATIs aim is to provide upper and middle-income consumers in China with Made in The USA goods and services allowing customers to experience the United States culture and lifestyle. In order to facilitate these objectives, ATI plans on creating a 50-plus acre plot consisting of small businesses, hotel, villas, senior care facilities, a theme park and performing arts center all located on specific acreage in China depicting American lifestyle and the American experience. This is commonly referred to by ATI as the AmericaTowne Community concept.

The development of the AmericaTowne Community is aspirational in nature. There are barriers to entry that make it difficult for entrants into the industry including, but not limited, to the socio-political environment in China. Although the Company provides different types of services and intends on providing a variety of products through its contractual relationships, the key notable competitors are China HGS Real Estate Inc. (HGSH) and China Housing & Land Development, Inc. (CHLN), and Xinyuan Real Estate Co., Ltd (XIN), and IFM Investments Limited (CTC). As ATI develops its business model further, it expects additional competitors to service and the competitive picture to become clearer.

ATI is the majority and controlling shareholder of ATI Nationwide Holding Corp., a Florida corporation ("ATI Nationwide"). ATI Nationwide is formerly known as EXA, Inc. ATI Nationwide recently had its Notice of Corporate Action with FINRA approved, formally changing ATI Nationwide's name and changing its symbol from EXAI to ATIN. ATI acquired the controlling interest in ATI Nationwide through a private stock acquisition with Carson Holdings, LLC, a Utah limited liability company, and Joseph C. Passalaqua, an individual, which closed on October, 7 2016. ATI Nationwide is a blank check company; however, through ATIs performance under the Master Joint Venture and Operational Agreement with Nationwide Microfinance Limited, a Ghanaian corporation, which has been disclosed by ATI on Form 8-K dated July 14, 2016, ATI Nationwide is in the process of taking necessary steps to cease being a blank check company; however, there is no guarantee that it will be able to cease being a blank check company.

## Item 6. Executive Compensation.

On July 1, 2016, the Company entered into an Employment Agreement with Mr. Perkins to serve as the Company's Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer, Treasurer and Secretary (the "Employment Agreement"). The term of the Employment Agreement is five years with successive one-year option terms. In consideration his services under the Employment Agreement, the Company issued 10,000,000 shares of restricted common stock to Mr. Perkins designee the Perkins Trust, which is allowed for under Section 3.2 of the Employment Agreement.

-25-

The stock issuance is subject to certain lock-up provisions in the Employment Agreement, which are more thoroughly set forth in the enclosed exhibit. Until the Company acquires additional capital, it is not anticipated that Mr. Perkins, or any future officer or director will receive compensation from the Company other than reimbursement for out-of-pocket expenses incurred on behalf of the Company. In addition to this issuance, the Company agreed to issue Mr. Perkins, or his authorized designee, an option to purchase up to 5,000,000 shares of common stock of the Company per year at any time prior to the conclusion of the first year of the Employment Agreement, i.e. prior to 365 days after execution of the Employment Agreement, at a price of 1.5% per share of the closing price of the Company's stock quoted on a major exchange or OTC Market one business day before purchase, and annually thereafter for a total of 5 consecutive years. The shares purchased under this option are subject to all rights and lock-up restrictions set forth in the Employment Agreement.

Mr. Perkins, who is also a director, officer and control person of ATI, intends to devote very limited time to our affairs. Other than as set forth above, the Company has no stock option, retirement, pension, or profit sharing programs for the benefit of directors, officers or other employees, but our sole officer and director may recommend adoption of one or more such programs in the future. The Company does not have a standing compensation committee or a committee performing similar functions, since the Board of Directors has determined not to compensate the officer and director.

## Item 7. Certain Relationships and Related Transactions, and Director Independence.

The Company has not entered into, nor does it have plans to enter into, any related party transaction in excess of $120,000 since the beginning of its last year, i.e. since July 1, 2016. For those related party transactions entered into the preceding fiscal year, i.e. prior to July 1, 2016, we incorporate those disclosures set forth in Item 1(b). For these transactions, as disclosed above, Mr. Perkins has a direct and indirect material interest in our performance of those related-party transactions by virtue of his beneficial, and controlling, ownership in ATI, Yilaime and AXP Holding. The approximate dollar amount on an annual basis is: (a) Sales and Support Services Agreement with Yilaime is $1,000,000, (b) Modular Construction & Technology Services Agreement with ATI is $500,000, and (c) IC-DISC Service Provider Agreement with AXP Holding is a minimum of $50,000, and could exceed approximately $200,000 based on performance. Mr. Perkins approximate dollar value of the amount of the related party transactions is $1,550,000, not accounting for profit or loss.

We do not have a policy or procedures in place for the review, approval or ratification of any related-party transaction, other than, written consent in lieu of the meeting of the Board of Directors or shareholders, as the case may be, for the given transaction. The related party transactions set forth in Item 1(b) were approved by the Board of Directors, but not approved pursuant to any written policy or procedure. Our internal controls in the review, approval or ratification of related party transactions are not sufficient. The Company has no disclosures regarding promoters since none have been used over the past five years. The Company's parent entity ATI, owns 86% of the common shares of the Company, and thus has control over the affairs of the Company.

Mr. Perkins is involved in other business activities and may, in the future, become involved in other business opportunities. These other businesses might be vendors or service providers to the Company, e.g. ATI, Yilaime and AXP Holding, or might take more of Mr. Perkins time in providing director and officer services to the Company. Furthermore, a conflict of interest might arise if Mr. Perkins other business activities coincide with an event of the Company. As a result, Mr. Perkins would have to evaluate and act on a conflict in selecting between the Company and his other business interests. The Company has not formulated a policy for resolution of any conflict of interest.

-26-

We do not have director independence under Item 407(a) of Regulation S-K. Pursuant to Article XI of the Company's Bylaws, no contract or transaction shall be void or voidable if such contract or transaction is between the corporation and one or more of its Director or Officers, or between the corporation and any other corporation, partnership, association, or other organization in which one or more of its Directors or Officers, are directors or officers, or have a financial interest, when such Director or Officer is present at or participates in the meeting of the Board, or the committee of the shareholders which authorizes the contract or transaction or his, her or their votes are counted for such purpose, if:

(a)     the material facts as to his, her or their relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee and are noted in the minutes of such meeting, and the Board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Directors, even though the disinterested Directors be less than a quorum; or

(b)     the material facts as to his, her or their relationship or relationships or interest or interests and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(c)     the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board of Directors, a committee of the shareholders; or

(d)     the fact of the common directorship, office or financial interest is not disclosed or known to the Director or Officer at the time the transaction is brought before the Board of Directors of the Corporation for such action.

Such interested Directors may be counted when determining the presence of a quorum at the Board of Directors' or committee meeting authorizing the contract or transaction.

## Item 8. Legal Proceedings.

None.

## Item 9. Market Price of and Dividends on the Registrants Common Equity and Related Stockholder Matters.

There is no established public trading market for the Company's common shares. Prior to June 27, 2016, the Company was incorporated as Global Recycle Energy, Inc. (GREI). On June 27, 2016, the Company amended its Articles of Incorporation with the State of Nevada to change the name of the Company to ATI Modular Technology Corporation. On June 12, 2017, FINRA approved the name change to ATI Modular Technology Corp and symbol change to ATMO. The Company is subject to Alternative Reporting Standards. The range of high and low bid information for the Company's common shares for each full quarterly period within the two most recent fiscal years, and any subsequent interim period for which financial statements are included, or as required under Article 3 of Regulation S-X, is as follows:

-27-

|  | 7/1/15-9/30/15 | 10/1/15-12/31/15 | 1/1/16-3/31/16 | 4/1/16-6/30/16 | 7/1/16-9/30/16 | 10/1/16-12/31/16 | 1/1/17-3/31/17 | 4/1/17-6/30/17 |
|---|---|---|---|---|---|---|---|---|
| High | 0.3 | 0.14 | 0.44 | 0.4 | 9.74 | 8.95 | 9.39 | 8.25 |
| Low | 0.01 | 0.09 | 0.1 | 0.15 | 0.4 | 7.5 | 5.25 | 0.35 |

As of September 26, 2016, there are approximately 172 record holders of our common stock with an aggregate of 126,075,716 shares issued and outstanding. The Company has not paid any cash dividends to date and does not anticipate or contemplate paying dividends in the foreseeable future. It is the present intention of management to utilize all available funds for the development of the Company's business. We have no securities authorized for issuance under any Equity Compensation Plans.

OTC has discontinued the display of the Company's quotes. The Company is currently listed by FINRA as a Caveat Emptor security and public interest concern with the OTC. The potential reasons for this categorization are set forth at http://www.otcmarkets.com/stock/GREI/quote, even though no specific reason has been stated by OTC.

**Item 10. Recent Sales of Unregistered Securities.**

Within the past three years, the Company issued a total of 111,157,621 shares of unregistered securities. In 2016, the Company had issued 100,000,000 shares to Joseph Arcaro ("Arcaro") for services rendered in the amount of $100,000. ATI subsequently purchased these shares on June 2, 2016 in a private transaction without solicitation or through the use of a broker or intermediary. As a condition of closing the Stock Purchase Agreement with Arcaro, Arcaro facilitated the cancellation of 500,000 shares of the Company's common stock previously issued in 2016 for rights under an oil lease. The Company has no further rights, title or interest in the oil lease.

In 2016, the Company issued 657,621 shares of common stock at the aggregate price of $.22 per share. Additionally, the Company issued 10,000,000 shares of common stock to the Perkins Trust as compensation for Alton Perkins, pursuant to his employment agreement. In the six months ending June 30, 2017, the Company issued 7,371 shares of common stock at the average price of $3.05 per share.

For all issuances, the Company relied on Section 4(2) of the Securities Act of 1933, as amended. We believe that Section 4(2) was available because neither of the issuances involved underwriters, underwriting discounts or commissions; restrictive legends had been placed on the certificates; no sales were made by general solicitation; and the issuances were made to an accredited investor in consideration of a release of a debt obligation. As of the most recent practicable date, there are 126,740,708 shares of common stock issued and outstanding.

**Item 11. Description of Registrants Securities to be Registered.**

**Common Stock**

The Company has 500,000,000 shares of authorized common stock (CUSIP# 00215H 103), of which, as of the end of its fiscal year had 126,075,716 issued and outstanding. Of the amount of issued and outstanding, ATI owned a total of 100,000,000 shares as a result of the closing of the Stock Purchase Agreement on June 6, 2016 with Arcaro, above.

Between June 13, 2016 and September 13, 2016, Mr. Perkins purchased on the open market, as trustee of the Alton & Xiang Mei Lin Perkins Family Trust (the "Perkins Trust"), with a tax identification number of 46-7513804, and individually, 15,964 shares and 101,629 shares, respectively, of the Company's common stock at the average per share price of $1.91 and $.89, respectively. Perkins and Perkins Trust used personal funds for the purchase. The total number of shares issued and outstanding as of the date of this Registration Statement equals 126,740,708. ATI, Perkins Trust and Perkins beneficially own 110,117,593 shares, or 86%, of the Company's common stock.

-28-

The holders of our common stock have equal ratable rights to dividends from funds legally available if and when declared by our board of directors; are entitled to share ratably in all of our assets available for distribution to holders of common stock upon liquidation, dissolution or winding up of our affairs; do not have preemptive, subscription or conversion rights and there are no redemption or sinking fund provisions or rights; and are entitled to one non-cumulative vote per share on all matters on which stockholders may vote. All shares of common stock now outstanding are fully paid and non-assessable and are fully paid for and non-assessable. As of the date of this prospectus, we have not paid any cash dividends to stockholders. The declaration of any future cash dividend will be at the discretion of our board of directors and will depend upon our earnings, if any, our capital requirements and financial position and our general economic condition. It is our intention not to pay any cash dividends in the foreseeable future, but rather to reinvest earnings, if any, in our business operations. We refer you to our Articles of Incorporation, Bylaws and the applicable statutes of the State of Nevada for a more complete description of the rights and liabilities of holders of our securities.

**Preferred stock**

We do not have a class of preferred stock.

**Anti-takeover provisions**

There are no Nevada anti-takeover provisions that may have the effect of delaying or preventing a change in control.

**Reports**

We will be required to file reports with the SEC under section 15(d) of the Securities Act and the reports will be filed electronically. The reports we will be required to file are Forms 10-K, 10-Q, and 8-K. You may read copies of any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet site that will contain copies of the reports we file electronically. The address for the Internet site is www.sec.gov.

**Stock Transfer Agent**

The Company's Transfer Agent is Pacific Stock Transfer Co. (www.pacificstocktransfer.com) located at 6725 Via Austin Parkway, Suite 300 in Las Vegas, Nevada 89119 (telephone number (800) 785-7782).

**(b) Debt Securities.** None

**(c) Other Securities to be Registered.** None

-29-

## Item 12. Indemnification of Directors and Officers.

Section 78.7502 of the Nevada Revised Statutes empowers Nevada corporations to indemnify their officers and directors and further states that the indemnification provided by Section 78.7502 shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under the articles of incorporation or any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office; thus, Section 78.7502 does not by itself limit the extent to which the Company may indemnify persons serving as its officers and directors. At this time, neither the Company's Articles of Incorporation nor its Bylaws provide indemnity.

The Board of Directors of the Company may conclude that, to retain and attract talented and experienced individuals to serve as officers and directors of the Company and to encourage such individuals to take the business risks necessary for the success of the Company, it is necessary for the Company to contractually indemnify its officers and directors, and to assume for itself liability for expenses and damages in connection with claims against such officers and directors in connection with their service to the Company, and has further concluded that the failure to provide such contractual indemnification could result in great harm to the Company and its stockholders.

We believe that the future amendment to our Bylaws to include indemnification provisions might be necessary to attract and retain qualified persons as directors and officers. Insofar as indemnification for liabilities arising under the Securities Act of 1933 may eventually be permitted under our Bylaws to directors, officers or persons controlling the Company pursuant to provisions of the State of Nevada, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable.

## Item 13. Financial Statements and Supplementary Data.

We set forth below a list of our audited financial statements included in this Registration Statement on Form 10. The financial statements follow page 19 of this Registration Statement on Form 10.

## Item 14. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

There are not and have not been any disagreements between the Company and its accountants on any matter of accounting principles, practices or financial statement disclosure.

## Item 15. Financial Statements and Exhibits.

(a) Financial Statements.

The financial statements and related notes are included as part of this Registration Statement on Form 10 as indexed in the appendix on page F-1 through F-6.

-30-

(b) Exhibits.

| Exhibit | Exhibit Description | Filed herewith | Incorporated by reference | | | |
|---|---|---|---|---|---|---|
| | | | Form | Period ending | Exhibit | Filing date |
| 3.1 | Articles of Incorporation | X | | | | |
| 3.2 | Amended Articles of Incorporation - Increase in Shares | X | | | | |
| 3.3 | Amended Articles of Incorporation - Name change | X | | | | |
| 3.4 | By-laws | X | | | | |
| 4.1 | Specimen Stock Certificate | X | | | | |
| 4.2 | Stock Purchase Agreement (Arcaro) | X | | | | |
| 10.1 | Cooperative Agreement between ATI Modular and Shexian County Investment Promotion Bureau | X | | | | |
| 10.2 | Cooperative Agreement between AmericaTowne and Shexian County Investment Promotion Bureau | X | | | | |
| 10.3 | Sales and Support Services Agreement (Yilaime) | X | | | | |
| 10.4 | Modular Construction & Technology Services Agreement (ATI) | X | | | | |
| 10.5 | IC-DISC Service Provider Agreement (AXP Holding) | X | | | | |
| 10.6 | Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project, Yongan Agreement | X | | | | |
| 10.7 | Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project, Chizou Jiangnan Agreement | X | | | | |
| 10.8 | Employment Agreement (Perkins) | X | | | | |
| 10.9 | Amendment to Articles of Incorporation (Fiscal Year) | X | | | | |
| 10.10 | Amendment to Articles of Incorporation (Authorized Shares) | X | | | | |
| 10.11 | Definitive ATI Modular Agreement | X | | | | |
| 23.1 | Consent of Independent Auditors | X | | | | |

-31-

# SIGNATURES

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: August 25, 2017                                    **ATI MODULAR TECHNOLOGY CORP.**

                                                          By:/s/ Alton Perkins
                                                          Alton Perkins, President, Secretary, and
                                                          Treasurer

-32-

# ATI Modular Technology Corp
## Balance Sheets

| | | June 30 2017 (Unaudited) | | December 31 2016 |
|---|---|---:|---|---:|
| **Assets** | | | | |
| Current assets | | | | |
|   Cash and cash equivalents | $ | 214,444 | $ | 94,266 |
|   Accounts receivable, net - related parties | | 793,418 | | 458,755 |
|   Other receivables - related parties | | 114,177 | | 159,772 |
| Total Current Assets | | 1,122,039 | | 712,793 |
| | | | | |
| Office Equipment Furniture & Fixtures | | 4,349 | | 6,280 |
| | | | | |
| Total Assets | $ | 1,126,388 | $ | 719,073 |
| | | | | |
| Liabilities and Stockholders' Equity | | | | |
| | | | | |
| Current Liabilities | | | | |
|   Accounts payable and accrued expenses | $ | 68,917 | $ | 209,699 |
|   Deposit from customers | | — | | — |
|   Deferred vendor allowances - related party | | 754,387 | | 324,387 |
|   Income tax payable | | 6,839 | | — |
| Total Current Liabilities | | 830,143 | | 534,086 |
| | | | | |
| Total Liabilities | | 830,143 | | 534,086 |
| | | | | |
| Commitments and Contingencies | | | | |
| | | | | |
| Stockholders' Equity | | | | |
|   Common stock, $0.001 par value, 500,000,000 shares authorized; | | | | |
|   126,740,708 and 126,733,337 shares issued and outstanding | | 126,741 | | 126,733 |
|   Common stock subscribed | | 1,000 | | 982 |
|   Additional paid in capital | | 896,318 | | 833,363 |
|   Deferred compensation | | (400,000) | | (450,000) |
|   Receivable for issuance of stock | | (207,480) | | (167,000) |
|   Retained Earnings | | (120,334) | | (159,091) |
| Total stockholders' equity | | 296,245 | | 184,987 |
| Total liabilities and stockholders' equity | $ | 1,126,388 | $ | 719,073 |

**See Notes to Financial Statements**

-33-

**ATI Modular Technology Corp**
**Statements of Operations**
**(Unaudited)**

|  | For the three months ended June 30 | | For the six months ended June 30 | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
| Revenues - related parties | $ 125,000 | $ 125,000 | $ 250,000 | $ 125,000 |
| Cost of revenues - related parties | — | — | — | — |
| Gross profit | 125,000 | 125,000 | 250,000 | 125,000 |
| Operating expenses |  |  |  |  |
| General and administrative | 94,169 | 27,452 | 204,404 | 27,902 |
| Net income (loss) from operation | 30,831 | 97,548.00 | 45,596 | 97,098 |
| Other Income | — | 3,859 | — | 3,859 |
| Net income (loss) from operation before taxes | 30,831 | 101,407 | 45,596 | 100,957 |
| Provision for income taxes | 4,624 | — | 6,839 | — |
| Net income (loss) | $ 26,207 | $ 101,407 | $ 38,757 | $ 100,957 |
| Earnings (Loss) per common share-basic and diluted | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| Weighted average number of common shares outstanding basic and diluted | 126,740,708 | 116,075,716 | 126,739,461 | 116,075,716 |

**See Notes to Financial Statements**

-34-

ATI Modular Technology Corp

Statements of Cash Flows
(Unaudited)

|  | | For the Six Months Ended June 30 | | |
| --- | --- | --- | --- | --- |
|  | | 2017 | | 2016 |
| Operating Activities | | | | |
| Net income (loss) of the period | $ | 38,757 | $ | 100,957 |
| Adjustments to reconcile net loss from operations | | | | |
| Bad debt expense | | 17,614 | | 6,250 |
| Depreciation | | 2,792 | | — |
| Shares issued for services | | — | | — |
| Amortization on deferred compensation | | 50,000 | | — |
| Changes in Operating Assets and Liabilities | | | | |
| Accounts receivable | | (352,276) | | (125,000) |
| Other receivables | | 45,596 | | — |
| Advances to officers | | — | | (19,241) |
| Accounts payable and accrued expenses | | (140,782) | | 19,699 |
| Due to related parties | | — | | 8,509 |
| Deposit from customers | | — | | 30,000 |
| Deferred revenue | | 430,000 | | — |
| Income tax payable | | 6,839 | | — |
| Net cash provided by operating activities | | 98,539 | | 4,156 |
| | | | | |
| Investing Activities | | | | |
| Purchase of fixed assets | | (861) | | (4,156) |
| Net cash used in investing activities | | (861) | | (4,156) |
| | | | | |
| Financing Activities | | | | |
| Proceeds from issuance of stock | | 22,499 | | — |
| Net cash provided by financing activities | | 22,499 | | — |
| | | | | |
| Net increase (decrease) in cash and equivalents | | 120,178 | | — |
| | | | | |
| Cash and equivalents at beginning of the period | | 94,266 | | — |
| Cash and equivalents at end of the period | $ | 214,444 | $ | — |
| | | | | |
| Supplemental cash flow information: | | | | |
| Interest paid | $ | — | $ | — |
| Income taxes paid | $ | — | $ | — |

See Notes to Financial Statements

-35-

**ATI Modular Technology Corp.**
**Notes to Financial Statements**
**(Unaudited)**

## NOTE 1. ORGANIZATION AND DESCRIPTION OF BUSINESS

ATI Modular Technology Corp., defined above and herein as the "Company" formerly Global Recycle Energy, Inc., was incorporated under the laws of the State of Nevada on March 7, 2008. The Company is engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US-based methods for creating modular spaces, facilities, and properties. As with any business plan that is aspirational in nature, there is no assurance we will be able to accomplish all our objective or that we will be able to meet our financing needs to accomplish our objectives.

The Company is an operating company engaged in the development and the exporting of modular energy efficient and smart technology and processes that allow government and private enterprises in China and elsewhere to use US-based methods for creating modular spaces, facilities, and properties. The Company is in the business of all aspects of modular and smart construction, including but not limited to, (a) the furtherance of modular and smart construction technology, education, development and production in developed and undeveloped countries, (b) acquisition and/or installation of construction equipment, materials, furnishings, hardware, insulation, flooring, roofing, wiring, plumbing, heating and air conditioning, and landscaping, and (c) other businesses directly or tangentially related to these lines of services, including assisting businesses and entrepreneurs in securing naming, licensing or promotional rights, driving internet and media traffic, increasing visibility of product and name recognition, and other services.

-36-

Our principal executive offices are located at 4700 Homewood Court, Suite 100 in Raleigh, North Carolina. We are registered as a foreign business entity in the State of North Carolina. We lease the office space from Yilaime Corporation, a Nevada corporation doing business in North Carolina, and a related party to the Company, as set forth below. Our physical location for our operations in China along with a manufacturing facility is Anhui Province Jiangnan Industrial Concentration Zone New Energy Industry Park A1, A2, A5 Plant Chizhou City, Anhui Province, China. The Company has registering its wholly owned subsidiary Anhui Ao De Xin Modular Building Technology Co. Ltd. in Jiangnan Industry Zone, Chizhou, China.

The Company entered an Investment and Cooperation Agreement with the Jiangnan Industry Zone in Anhui Province, China dated September 8, 2016 (the "Jiangnan Cooperation Agreement"). On December 28, 2016, the Company entered the definitive agreement, American ATI Modular Technology Company Project Investment Agreement (the "Investment Agreement") with the Administrative Committee, Jiangnan Industry Zone in Anhui Province. The Investment Agreement superseded the Jiangnan Cooperation Agreement. Under the Investment Agreement, the Administrative Committee of Jiangnan Industrial Concentration Zone of Anhui Province (hereinafter, "Jiangnan") and the Company have agreed to the construction of the Company's green, modular building and related technology under the project name "Modular Plant Production Base."

Under the Investment Agreement, the Company has agreed to manufacture and install modular buildings, and provide research into the development of green building module manufacturing using US based technology. The Company has agreed to provide appropriate technology and intelligent systems in providing modular building lifecycle services. In addition, to modular and smart technology, the Company and Jiangnan has agreed to establish: 1) a modular development institute research and training center; 2) an entrepreneurial incubator; 3) an engineering technology research center; 4) an industrial design center; 5) a post-doctoral workstations and engineering laboratories; and 6) an international student intern summer work program. Where possible the Company's aim is to increase US exports by using American based technology, equipment and services. (Strategy).

The Company presented to Anhui Project to United States Ex-Im Bank, which provided a Letter of Interest in providing support for the Project. Additionally, pursuant to its agreement with Chizhou government, Chizhou preliminarily agreed to provide support for EX-IM funding either by a guarantee or local bank support. Although no loan application has been submitted management is under the impression that subject to meeting Ex-Im Bank's standard underwriting requirements, there is a possibility of loans, and other funding including working capital and insurance. Going forward, we plan on working with Ex-Im to seek insurance and funding for the Chizhou operations. There is no assurance that funding and or insurance will be obtained.

The Company entered the Modular Services Agreement with AmericaTowne, a related party and the majority and controlling shareholder of the Company, to support AmericaTowne's obligations under the Shexian Agreement in designing, installing and manufacturing American modular technology for use in all government and private buildings throughout Shexian County, and elsewhere in China. The terms and conditions of the Modular Services Agreement with AmericaTowne and the Shexian Agreement are set forth above.

Also, the Company has entered the Yongan and Shexian Agreements to pursue the development of business opportunities involving modular technology and investments, and business development. While we plan to have robust operations in the United States and international locations, we expect the bulk of our operations and revenue will come from China.

China's economy and its government impact our revenues and operations. While the Company has an agreement in place with the government of Jiangnan as well as the approval by government officials in Shexian and Yongan China to operate facilities there is no assurance that we will operate the facilities successfully. Additionally, the Company will need government approval in other locations in China to operate other aspects of our business plan. There is no assurance that we will be successful in obtaining approvals from government entities in other locations to operate other aspects of our business plan. Finally, Mr. Perkins, as a control person of each entity – AmericaTowne and the Company, might elect to forego certain obligations of AmericaTowne under other Corporative Agreements currently in place or not enter more definitive agreements with Governments in China and elsewhere, which in turn, could impact the Company's ability to meet its business plan set forth herein.

-37-

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation

These financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP").

Interim Financial Statements

These interim unaudited financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. They do not include all the information and footnotes required by generally accepted accounting principles for complete financial statements. Therefore, these financial statements should be read in conjunction with the Company's audited financial statements and notes thereto contained in its report on Form 10-K for the transition period ended December 31, 2016.

The financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly the Company's financial position at June 30, 2017, and the results of its operations and cash flows for the six months ended June 30, 2017. The results of operations for the period ended June 30, 2017 are not necessarily indicative of the results to be expected for future quarters or the full year.

Accounting Method

The Company's financial statements are prepared using the accrual method of accounting. The Company has elected a fiscal year ending on December 31.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. In the opinion of management, all adjustments necessary in order to make the financial statements not misleading have been included. Actual results could differ from those estimates.

Financial Instruments

The carrying amount reported in the balance sheet for cash, accounts receivable, accounts payable, accrued expenses, interest payable and short-term notes payable approximate fair value because of the immediate or short-term maturity of these financial instruments.

Cash Equivalents

The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

Accounts Receivable

Accounts' receivable are stated at the amount management expects to collect from outstanding balances. Management provides for probable uncollected amounts through a charge to earnings and a credit to an allowance for bad debts based on its assessment of the current status of individual accounts. Balances that are still outstanding after management has used reasonable collection efforts are written off through a charge to the allowance for bad debts and a credit to accounts receivable.

Our bad debt policy is determined by the Company's periodic review of each account receivable for reasonable assurance of collection. Factors considered are the customer's financial condition, past payment history if any, any conversations with the customer about the customer's financial conditions and any other extenuating circumstances. Based upon the above factors the Company makes a determination whether the receivable are reasonable.

-38-

Concentration of Credit Risk

Financial instruments that potentially subject the Company to a significant concentration of credit risk consist primarily of cash and cash equivalents. The Company maintains deposits in federally insured financial institutions in excess of federally insured limits. However, management believes the Company is not exposed to significant credit risk due to the financial position of the depository institutions in which those deposits are held.

Property, Plant, and Equipment

Property, plant and equipment are initially recognized recorded at cost. Gains or losses on disposals are reflected as gain or loss in the period of disposal. The cost of improvements that extend the life of plant and equipment are capitalized. These capitalized costs may include structural improvements, equipment and fixtures. All ordinary repairs and maintenance costs are expensed as incurred.

Depreciation for financial reporting purposes is provided using the straight-line method over the estimated useful lives of the assets:

| | |
|---|---|
| Office equipment | 5 years |

For the six months ended June 30, 2017 and 2016 depreciation expense is $2,792 and $0, respectively.

Income Taxes

Income taxes are provided in accordance with Statement of Financial Accounting Standards ASC 740 Accounting for Income Taxes. A deferred tax asset or liability is recorded for all temporary differences between financial and tax reporting and net operating loss carry forwards. Deferred tax expense (benefit) results from the net change during the year of deferred tax assets and liabilities. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion of all the deferred tax assets will be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

The Company was established under the laws of the State of Nevada and is subject to U.S. federal income tax and Nevada state income tax, if any. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts and are based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred income tax assets to the amount expected to be realized.

-39-

Earnings per Share

In February 1997, the FASB issued ASC 260, "Earnings per Share", which specifies the computation, presentation and disclosure requirements for earnings (loss) per share for entities with publicly held common stock. ASC 260 supersedes the provisions of APB No. 15, and requires the presentation of basic earnings (loss) per share and diluted earnings (loss) per share. The Company has adopted the provisions of ASC 260 effective (inception).

Basic earnings or net loss per share amounts are computed by dividing the net income or loss by the weighted average number of common shares outstanding. Diluted earnings per share are the same as basic earnings per share due to the lack of dilutive items in the Company.

At June 30, 2017 and December 31, 2016, no potentially dilutive shares were outstanding.

Impact of New Accounting Standards

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

Revenue Recognition

The Company's revenue recognition policies comply with FASB ASC Topic 605. The Company follows paragraph 605-10-S99-1 of the FASB Accounting Standards Codification for revenue recognition. The Company will recognize revenue when it is realized or realizable and earned. The Company considers revenue realized or realizable and earned when all the following criteria are met: (i) persuasive evidence of an arrangement exists, (ii) the product has been shipped or the services have been rendered to the customer, (iii) the sales price is fixed or determinable, and (iv) collectability is reasonably assured.

The Company does not provide unconditional right of return, price protection or any other concessions to its customers.

There were no sales returns and allowances from inception to June 30, 2017.

-40-

## NOTE 3. GOING CONCERN

The Company's financial statements are prepared using accounting principles generally accepted in the United States of America applicable to a going concern that contemplates the realization of assets and liquidation of liabilities in the normal course of business.

The Company is still in development stage and has not created sufficient revenue to cover any operating losses it may incur. Management's plans include the raising of capital through the equity markets to fund future operations, seeking additional acquisitions, and generating of revenue through our business. However, there can be no assurances the Company will be successful in its efforts to secure additional equity financing and obtaining sufficient revenue producing contracts. These factors raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classification of liabilities that might result from this uncertainty.

## NOTE 4. ACCOUNT RECEIVABLES – RELATED PARTIES

The nature of the accounts receivable for June 30, 2017 in the amount of $835,177 are for modular construction and technology services and utilization of anticipated modular construction technology by ATI pursuant to the Modular Construction & Technology Services Agreement between ATI and the Company dated June 28, 2016 (hereinafter, the "ATI Services Agreement") and for the Sales and Support Services Agreement with Yilaime on June 27, 2016 (the "Yilaime Services Agreement"). On June 30, 2017, the Company's allowance for bad debt is $41,759 which provides a net receivable balance of $793,418.

Accounts receivable consist of the following:

|  | June 30 2017 | Dec 31 2016 |
|---|---|---|
| Accounts receivable related parties | 835,177 | 482,900 |
| Less: Allowance for doubtful accounts | (41,759) | (24,145) |
| **Accounts receivable, net** | **$ 793,418** | **$ 458,755** |

Bad debt expense was $17,614 and $6,250 for the quarter ended June 30, 2017 and 2016, respectively.

-41-

## NOTE 5. DEFERRED VENDOR ALLOWANCES

The Company has the right to receive a $250,000 quarterly fee from Yilaime for Sales and Support Services Agreement. In accordance with ASC 605-50-45, the Company defers and recognizes as a reduction to the future costs for quarterly fee. For the six months June 30, 2017, $500,000 fee from exclusive agreement recorded for Sales and Support Services; $754,387 is booked as current liability as deferred vendor allowances – related parties on June 30, 2017 and $70,000 went against cost charged by Yilaime.

## NOTE 6. SHAREHOLDER'S EQUITY

The stockholders' equity section of the Company contains the following classes of capital stock as of June 30, 2017:

Common stock, $ 0.001 par value: 500,000,000 shares authorized; 126,740,708 shares issued and outstanding;

Preferred stock, none: 0 shares authorized; but not issued and outstanding.

## NOTE 7. STOCK BASED COMPENSATION

The Company entered into an employment lock-up agreement on July 1, 2016 with Alton Perkins to serve as the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer and Secretary. The term of Mr. Perkins' agreement is five years with the Company retaining an option to extend in one-year periods. In consideration for Mr. Perkins' services, the Company has agreed to issue to his designee, the Alton & Xiang Mei Lin Perkins Family Trust, 10,000,000 shares of common stock. The Company may elect in the future to include money compensation to Mr. Perkins or his designee for his services provided there is sufficient cash flow.

For the six months ended June 30, 2017, $50,000 of stock compensation was charged to operating expenses and $400,000 was recorded as deferred compensation on June 30, 2017.

## NOTE 8. RELATED PARTIES TRANSACTIONS

The Company intends on relying on other businesses controlled by our sole director and officer, and beneficial owner of the majority shares of common stock in the Company – Alton Perkins, in implementing its business plan.

Mr. Perkins is the control person of Yilaime Corporation, AmericaTowne and AXP Holding Corporation. At this time, the purpose of the Company is to service the construction and related technology needs of AmericaTowne under AmericaTowne's agreements with the Shexian County Investment Promotion Bureau in developing an AmericaTowne community in the Hanwang mountains in Shexian, China. The Company also intends on supporting these services in other AmericaTowne ventures at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency in developing an AmericaTowne Community and an International School in Longyan County China.

The related export services rendered to the Company in the implementation of its business plan cannot be provided by AmericaTowne or through the AmericaTowne relationship. In order to avoid conflicts of interest, Mr. Perkins is of the opinion that there must be a separate and distinct agreement between, in this case, the Company and AXP Holding Corporation. Furthermore, although other similar IC-DISC entities exist, the Company is able to obtain better terms and conditions from AXP Holding Corporation in light of Mr. Perkins' control of AXP Holding Corporation.

AmericaTowne's Board of Directors determined that operating and controlling a separate but related entity focused on the development and the exporting of modular energy efficient technology and processes for government and private enterprises in China would be more prudent from a risk mitigation and operational standpoint than providing these services under the AmericaTowne business plan. Furthermore, the intent of the Company is to

expand its services and relationships to other similar endeavors in projects not related to AmericaTowne, thus the need to maintain and operate a separate entity.

-42-

*Cooperative Agreement (Shexian County Government, China)*

The Company's majority and controlling shareholder – AmericaTowne, is a party under the Cooperative Agreement with the Shexian County Investment Promotion Bureau (the "Shexian Agreement"). Under the Shexian Agreement, AmericaTowne and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains. Although not definitive at this time, the parties have agreed that, in consideration for AmericaTowne's investment of approximately $30,000,000 into the development, plus any additional tax paid to the local government, where applicable, the Shexian County Bureau will dedicate local resources, including land (which AmericaTowne would be required to obtain rights through local bid invitation), and participation with AmericaTowne in an agreed upon equity split through a future definitive agreement.

The Company will be providing construction and technology services to AmericaTowne in facilitating AmericaTowne's obligations under the Shexian Agreement. The Company's ability to generate revenue under its agreement with AmericaTowne could be impaired in the event AmericaTowne is not able to meet its obligations under the Shexian Agreement. Furthermore, Mr. Perkins, as a control person of each entity, might elect to forego certain obligations of AmericaTowne under the Shexian Agreement or not enter into a more definitive agreement with the Shexian County Bureau, which in turn, could impact the Company's ability to meet its business plan set forth herein.

*Sales and Support Services Agreement (Yilaime Corporation)*

On June 27, 2016, we entered into a Sales and Support Services Agreement with Yilaime Corporation, a Nevada corporation ("Yilaime"). Yilaime is controlled by Alton Perkins, who is our sole director and officer. Yilaime, and another related-party – Yilaime Corporation of NC, Inc. ("Yilaime NC"), are the holders of the majority of issued and outstanding shares of common stock in AmericaTowne, Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). Mr. Perkins is also the Trustee of the Alton & Xiang Mei Lin Perkins Family Trust ("Perkins Trust") and the AXP Nevada Asset Protection Trust 1 ("AXP"), which holds 5,100,367 and 120,000 shares, respectively, of the issued and outstanding common stock in ATI. Mr. Perkins is the beneficial owner of 20,674,484 shares of ATI, which equals 90.11% of issued and outstanding shares. Mr. Perkins is the beneficial owner of the majority and controlling interest in the Company through his direct holdings, and beneficial holdings through Yilaime, AXP and the Perkins Trust. ATI, Perkins Trust and Mr. Perkins beneficially own 110,117,593 shares, or 86%, of the Company's common stock.

Under the Services Agreement, Yilaime will provide the Company with marketing, sales and support services in the Company's pursuit of ATI Modular business in China in consideration of a commission equal to 10% of the gross amount of monies procured for the Company through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay the Company a quarterly fee of $250,000 starting on July 1, 2016. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. Yilaime retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of the Company.

-43-

*Modular Construction & Technology Services Agreement (AmericaTowne)*

On June 28, 2016, we entered into a Modular Construction & Technology Services Agreement (the "Modular Services Agreement") with AmericaTowne Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). The impetus behind the Modular Services Agreement was the Company's Cooperative Agreement with the Shexian County Government, China. Under the Cooperative Agreement, ATI and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains, Shexian, China. In addition, ATI, at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency plan to pursue the development of an AmericaTowne Community and an International School in Longyan County China.

Under the Modular Services Agreement, ATI Modular shall provide the research, development, training and modular technology in a manner deemed commercially acceptable by ATI based on its commercially reasonable requirements, plans and specifications, which shall be agreed upon in advance of any substantial and material construction. ATI will pay the Company a quarterly fee of $125,000 per quarter. The initial fee was paid upon signing the Modular Services Agreement. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. ATI retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

*Interest Charge – Domestic International Sales Agreement (AXP Holding Corporation)*

On June 29, 2016, we entered into an IC-DISC Service Provider Agreement with AXP Holding Corporation, a Nevada corporation ("AXP Holding") and related party to the Company through Mr. Perkins control of AXP Holding. AXP Holding is an Interest Charge - Domestic International Sales Corporation, or "IC-DISC". AXP IC-DISC tax-exempt status was authorized and approved by the United States Department of the Treasury, Internal Revenue Service. As an IC-DISC, AXP Holding may, under certain conditions, act as a sister corporation to entities and provide services to assist a company in obtaining lower tax rates on export income. In addition to the export tax savings provided by AXP, AXP can provide an additional array of services including promoting the Company's export activities, purchasing receivables from the Company at a discount through a factoring relationship, and providing the Company with working capital loans.

The term under the IC-DISC Service Provider Agreement is set to expire on December 6, 2019, absent early termination for breach thereof by either party. AXP retains the right to extend the term, exercising its sole discretion, to December 6, 2024 by providing written notice to the Company by November 6, 2019. AXP has agreed to a non-compete and non-circumvent in providing the services under the IC-DISC Service Provider Agreement.

-44-

The Company has agreed to pay AXP a commission fee up to the greater of 50% of the Company's export net income or 4% of the Company's export gross receipts. The Company will determine the exact amount and the method of payment of the commission fee. The commission fee shall be paid at the option of the Company periodically throughout the year, but no later than December 31 on annual basis. If there is no commission fee due to no export sales, the Company will pay AXP an export service fee of $50,000. The export service fee, if any, is due on or before December 31 on an annual basis.

In addition, for referring businesses from the Company's "Export Platform" or "Community," AXP agrees to pay the Company 25% of each "Sales Export Service Fee" charged and received as an "IC-DISC Commission" from each Exporter or Licensee resulting from participating in the Export Platform or Community. This fee is called a "Group Export Consulting Fee" in the IC-DISC Service Provider Agreement, and is due no later than fifteen business days after receipt from the Exporter or Licensee, but no later than December 31 on an annual basis. For illustrative purposes, if AXP receives and or charges an Exporter 50% of its net export sales as a commission, and that value is $100,000, AXP would owe the Company 25%, or $25,000. Furthermore, during the term, the Company shall pay AXP a flat fee of $5,000 per transaction for purchasing receivables from the Company, plus an interest rate for such factoring at the prime rate plus one-percent.

The Company recognizes and confirms the requirements in ACS 850-10-50-6 to disclose all related party transactions between the Company and related party transactions and or relationships.

The Company also leases office space from Yilaime for $2,500/month.

Pursuant to ASC 850-10-50-6, the Company makes the following transaction disclosures for the six months ended or as of June 30, 2017:

For Statement of Operations:

(a) $250,000 in revenues for ATI Services Agreements with the Company;

(b) $15,000 for general and administrative expenses for rent expenses the Company paid to Yilaime towards its lease agreement;

(c) $45,597 of compensation expense for AXP Holding Corp charges for DISC.

(d) $50,000 and $0 for general and administrative operating expenses recorded as stock compensation for respective employment agreements;

(e) $3,477 for general and administrative expenses for commissions and fees

For Balance Sheets on June 30, 2017 and December 31, 2016:

(a) $192,364 and $60,088 net account receivables ATI owes to the Company;

(b) $601,055 and $398,668 net account receivables Yilaime owes to the Company;

(c) $114,177 and $159,772 prepayments to AXP Holding Corp;

(d) $754,387 and $324,387 deferred revenue-Yilaime;

(e) $63,717 and 198,000 as accounts payable to Anhui Ao De Xin Modular Construction Technology Co., Ltd.;

(f) 400,000 and 450,000 as deferred compensation pursuant to respective employment agreements.

-45-

## NOTE 9. INCOME TAXES

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

Significant components of income tax expense for the six months ended June 30, 2017 and 2016 are as follows

|  | For the Six Months Ended | |
| --- | --- | --- |
|  | June 30, 2017 | June 30, 2016 |
| Current tax expense | $        6,839 | $        — |
| Deferred tax expense |            — |            — |
| Tax expense (benefit) | $        6,839 | $        — |

The Company had $6,839 and $0 of income tax liability as of June 30, 2017 and December 31, 2016, respectively.

-46-

**ATI Modular Technology Corp.**
**(FKA Global Recycle Energy, Inc.)**
**FINANCIAL STATEMENTS**
**As of December 31, 2016 and 2015**
**And For the Year Ended December 31, 2016 and 2015**

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
ATI Modular Technology Corp.

We have audited the accompanying balance sheets of ATI Modular Technology Corp. as of December 31, 2016, June 30, 2016 and June 30, 2015 and the related statement of operations, stockholders' equity, and cash flows for the six months ended December 31, 2016 and for each of the years in the two-year period ended June 30, 2016. ATI Modular Technology Corp.'s management is responsible for these financial statements. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of ATI Modular Technology Corp. as of December 31, 2016, June 30, 2016 and June 30, 2015, and the results of operations and cash flows for the six months ended December 31, 2016 and for each of the years in the two-year period ended June 30, 2016 in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the financial statements, The Company is still in development stage and has not created sufficient revenue to cover any operating losses it may incur, which raise substantial doubt about the Company's ability to continue as a going concern. Management's plans concerning this matter are also described in Note 3. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

As discussed in Note 2 to the financial statements, the financial statements for the six months ended December 31, 2016 and for the year ended June 30, 2016 have been restated to correct a misstatement.

/s/Yichien Yeh, CPA

Yichien Yeh, CPA

Oakland Gardens, New York

July 16, 2017

-47-

## ATI Modular Technology Corp
## Balance Sheets

| | December 31 2016 (Restated) | June 30 2016 (Restated) | June 30 2015 |
|---|---|---|---|
| **Assets** | | | |
| Current assets | | | |
| Cash and cash equivalents | $ 94,266 | $ — | $ — |
| Accounts receivable, net - related parties | 458,755 | 118,750 | — |
| Other receivables - related parties | 159,772 | | — |
| Advances to officers | — | 19,241 | — |
| Total Current Assets | 712,793 | 137,991 | — |
| | | | |
| Office Equipment Furniture & Fixtures | 6,280 | 4,156 | — |
| | | | |
| Total Assets | $ 719,073 | $ 142,147 | $ — |
| | | | |
| **Liabilities and Stockholders' Equity** | | | |
| | | | |
| Current Liabilities | | | |
| Accounts payable and accrued expenses | $ 209,699 | $ 19,699 | $ 3,859 |
| Deposit from customers | — | 30,000 | |
| Deferred Vendor Allowances - Related Party | 324,387 | — | — |
| Income tax payable | — | — | — |
| Total Current Liabilities | 534,086 | 49,699 | 3,859 |
| | | | |
| Total Liabilities | 534,086 | 49,699 | 3,859 |
| | | | |
| Commitments and Contingencies | | | |
| | | | |
| Stockholders' Equity | | | |
| Common stock,$0.001 par value, 500,000,000 shares authorized; 126,733,337, 116,075,716 and 16,075,716 shares issued and | | | |
| outstanding, respectively. | 126,733 | 116,076 | 16,076 |
| Common stock subscribed | 982 | — | — |
| Additional paid in capital | 833,363 | 32,953 | 32,953 |
| Deferred compensation | (450,000) | — | — |
| Receivable for issuance of stock | (167,000) | — | — |
| Retained Earnings | (159,091) | (56,581) | (52,888) |
| Total stockholders' equity | 184,988 | 92,448 | (3,859) |
| Total liabilities and stockholders' equity | $ 719,074 | $ 142,147 | $ — |

**See Notes to Financial Statements**

-48-

## ATI Modular Technology Corp
## Statements of Operations

| | For the Six Months Ended December 31 | | For the Years Ended June 30 | |
|---|---|---|---|---|
| | 2016 (Restated) | 2015 (Unaudited) | 2016 | 2015 |
| Revenues - related parties | $ 250,000 | $ — | $ 125,000 | $ — |
| Cost of revenues - related parties | — | — | — | — |
| Gross profit | 250,000 | — | 125,000 | — |
| Operating expenses | | | | |
| General and administrative | 352,510 | 4,650 | 132,552 | 3,859 |
| Net income (loss) from operation | (102,510) | (4,650) | (7,552) | (3,859) |
| Other Income | — | — | 3,859 | — |
| Net income (loss) from operation before taxes | (102,510) | (4,650) | (3,693) | (3,859) |
| Provision for income taxes | — | — | — | — |
| Net income (loss) | $ (102,510) | $ (4,650) | $ (3,693) | $ (3,859) |
| Earnings (Loss) per common share-basic and diluted | $ 0.00 | $ (0.00) | $ (0.00) | $ (0.00) |
| Weighted average number of common shares outstanding basic and diluted | 121,171,157 | 16,075,716 | 16,075,716 | 16,075,716 |

**See Notes to Financial Statements**

-49-

**ATI Modular Technology Corp**
**Statements of Changes in Stockholders' Equity**
**(Restated)**

| | Common Stock Shares | Amount | Common Stock Subscribed | Additional Paid-In Capital | Deferred Compensation | Receivable for Issuance of Stock | Retained Earnings | Total |
|---|---|---|---|---|---|---|---|---|
| Balance, June 30, 2014 | 16,075,716 | $ 16,076 | $ — | $ 32,953 | $ — | $ — | $ (49,029) | $ — |
| Net loss for the year ended June 30, 2015 | — | — | — | — | — | — | (3,859) | (3,859) |
| Balance, June 30, 2015 | 16,075,716 | $ 16,076 | $ — | $ 32,953 | $ — | $ — | $ (52,888) | $ (3,859) |
| Shares issued for services | 100,000,000 | 100,000 | — | — | — | — | — | 100,000 |
| Net loss for the year ended June 30, 2016 | — | — | — | — | — | — | (3,693) | (3,693) |
| Balance, June 30, 2016 | 116,075,716 | $116,076 | $ — | $ 32,953 | $ — | $ — | $ (56,581) | $ 92,448 |
| Shares issued for proceeds | 657,621 | 657 | 982 | 310,410 | — | (167,000) | — | 145,049 |
| Shares issued for services | 10,000,000 | 10,000 | — | 490,000 | (500,000) | — | — | — |
| Amortization of Deferred Compensation | — | — | — | — | 50,000 | — | — | 50,000 |
| Net income for the period ended December 31, 2016 | — | — | — | — | — | — | (102,510) | (102,510) |
| Balance, December 31, 2016 | 126,733,337 | $126,733 | $ 982 | $833,363 | $ (450,000) | $(167,000) | $(159,091) | $(184,987) |

**See Notes to Financial Statements**

-50-

## ATI Modular Technology Corp
## Statements of Cash Flows

| | For the Six Months Ended December 31 | | For the Year Ended June 30 | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| | (Restated) | (Unaudited) | | |
| **Operating Activities** | | | | |
| Net loss of the period | $ (102,510) | $ (4,650) | $ (3,693) | (3,859) |
| Adjustments to reconcile net loss from operations | | | | |
| Bad debt expense | 17,895 | — | 6,250 | — |
| Depreciation | 416 | — | — | — |
| Shares issued for services | — | — | 100,000 | — |
| Amortization on deferred compensation | 50,000 | — | — | — |
| Changes in Operating Assets and Liabilities | | | | |
| Accounts receivable | (357,900) | — | (125,000) | — |
| Other receivables | (159,772) | — | — | — |
| Advances to officers | 19,241 | — | (19,241) | — |
| Accounts payable and accrued expenses | 190,000 | 4,650 | 15,840 | 3,859 |
| Deposit from customers | (30,000) | — | 30,000 | — |
| Deferred Revenue | 324,387 | — | — | — |
| Income tax payable | — | — | — | — |
| Net cash used in operating activities | (48,243) | — | 4,156 | — |
| | | | | |
| **Investing Activities** | | | | |
| Purchase of fixed assets | (2,540) | — | (4,156) | — |
| Net cash used in investing activities | (2,540) | — | (4,156) | — |
| | | | | |
| **Financing Activities** | | | | |
| Proceeds from issuance of stock | 145,049 | — | — | — |
| Net cash provided by financing activities | 145,049 | — | — | — |
| | | | | |
| Net increase (decrease) in cash and equivalents | 94,266 | — | — | — |
| | | | | |
| Cash and equivalents at beginning of the period | — | — | — | — |
| Cash and equivalents at end of the period | $ 94,266 | $ — | $ — | $ — |
| | | | | |
| **Supplemental cash flow information:** | | | | |
| Interest paid | $ — | $ — | $ — | $ — |
| Income taxes paid | $ — | $ — | $ — | $ — |

## See Notes to Financial Statements

-51-

ATI MODULAR TECHNOLOGY CORP
Notes to Financial Statements

## NOTE 1. ORGANIZATION AND DESCRIPTION OF BUSINESS

ATI Modular Technology Corp., defined above and herein as the "Company" formerly Global Recycle Energy, Inc., was incorporated under the laws of the State of Nevada on March 7, 2008. The Company is engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US-based methods for creating modular spaces, facilities, and properties. As with any business plan that is aspirational in nature, there is no assurance we will be able to accomplish all our objective or that we will be able to meet our financing needs to accomplish our objectives.

The Company is an operating company engaged in the development and the exporting of modular energy efficient and smart technology and processes that allow government and private enterprises in China and elsewhere to use US-based methods for creating modular spaces, facilities, and properties. The Company is in the business of all aspects of modular and smart construction, including but not limited to, (a) the furtherance of modular and smart construction technology, education, development and production in developed and undeveloped countries, (b) acquisition and/or installation of construction equipment, materials, furnishings, hardware, insulation, flooring, roofing, wiring, plumbing, heating and air conditioning, and landscaping, and (c) other businesses directly or tangentially related to these lines of services, including assisting businesses and entrepreneurs in securing naming, licensing or promotional rights, driving internet and media traffic, increasing visibility of product and name recognition, and other services.

Our principal executive offices are located at 4700 Homewood Court, Suite 100 in Raleigh, North Carolina. We are registered as a foreign business entity in the State of North Carolina. We lease the office space from Yilaime Corporation, a Nevada corporation doing business in North Carolina, and a related party to the Company, as set forth below. Our physical location for our operations in China along with a manufacturing facility is Jiangnan Industry Zone, Chizhou City, Anhui Province, China. In carrying out its business plan the Company is in the process of registering its wholly owned subsidiary Anhui Ao De Xin Modular Building Technology Co. Ltd. in Jiangnan Industry Zone, Chizhou, China.

The Company entered an Investment and Cooperation Agreement with the Jiangnan Industry Zone in Anhui Province, China dated September 8, 2016 (the "Jiangnan Cooperation Agreement"). On December 28, 2016, the Company entered the definitive agreement, American ATI Modular Technology Company Project Investment Agreement (the "Investment Agreement") with the Administrative Committee, Jiangnan Industry Zone in Anhui Province. The Investment Agreement superseded the Jiangnan Cooperation Agreement. Under the Investment Agreement, the Administrative Committee of Jiangnan Industrial Concentration Zone of Anhui Province (hereinafter, "Jiangnan") and the Company have agreed to the construction of the Company's green, modular building and related technology under the project name "Modular Plant Production Base."

Under the Investment Agreement, the Company has agreed to manufacture and install modular buildings, and provide research into the development of green building module manufacturing using US based technology. The Company has agreed to provide appropriate technology and intelligent systems in providing modular building lifecycle services. In addition, to modular and smart technology, the Company and Jiangnan has agreed to establish: 1) a modular development institute research and training center; 2) an entrepreneurial incubator; 3) an engineering technology research center; 4) an industrial design center; 5) a post-doctoral workstations and engineering laboratories; and 6) an international student intern summer work program. Where possible the Company's aim is to increase US exports by using American based technology, equipment and services. (Strategy)

-52-

The Company entered the Modular Services Agreement with AmericaTowne, a related party and the majority and controlling shareholder of the Company, to support AmericaTowne's obligations under the Shexian Agreement in designing, installing and manufacturing American modular technology for use in all government and private buildings throughout Shexian County, and elsewhere in China. The terms and conditions of the Modular Services Agreement with AmericaTowne and the Shexian Agreement are set forth above.

Also, the Company has entered the Yongan and Shexian Agreements to pursue the development of business opportunities involving modular technology and investments, and business development. While we plan to have robust operations in the United States and international locations, we expect the bulk of our operations and revenue will come from China.

China's economy and its government impact our revenues and operations. While the Company has an agreement in place with the government of Jiangnan as well as the approval by government officials in Shexian and Yongan China to operate facilities there is no assurance that we will operate the facilities successfully. Additionally, the Company will need government approval in other locations in China to operate other aspects of our business plan. There is no assurance that we will be successful in obtaining approvals from government entities in other locations to operate other aspects of our business plan. Finally, Mr. Perkins, as a control person of each entity – AmericaTowne and the Company, might elect to forego certain obligations of AmericaTowne under other Corporative Agreements currently in place or not enter more definitive agreements with Governments in China and elsewhere, which in turn, could impact the Company's ability to meet its business plan set forth herein.

-53-

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation

These financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP").

On May 9, 2017, the Company reported that it had reached a determination to restate its previously filed financial statements for the six months ended December 31, 2016 and for the year ended June 30, 2016. The restatement had no effect on net income for the six months ended December 31, 2016 and for the year ended June 30, 2016. The restatement relates to revoke application of pushdown accounting in accordance with ASC 805-20-15-4.

On July 1, 2017, the Company reported that it had reached a determination to restate its previously filed financial statements for the six months ended December 31, 2016 and for the year ended June 30, 2016. The restatement decrease net income of $186,933 for the six months ended December 31, 2016. For the year ended June 30, 2016, the restatement had no effect on net income. The restatement relates to fees charged by Yilaime which will be recorded as a reduction of the cost of revenue when recognized in accordance with ASC 605-50-45.

The $110,938 adjustment made to Other receivables related party refers to AXP Holding Corporation and adjusts the IC-DISC fees charged. Because of the adjustment of Yilaime quarterly fees are now recorded as a reduction in the cost of revenue when recognized no DISC charges were due. Therefore, fees paid and now owed to the Company are recognized as Other receivables – related parties.

The $175,613 is a reduction in the cost of revenue recognized for services performed by Yilaime on behalf of the Company. The services resulted in the Company receiving an initial letter of interest from US ExIm Bank to provide either a direct loan and or guarantee for equipment and services in support of the Company's, Investment and Cooperation Agreement with the City of Chizhou.

The following summarizes the effects of restatement:

| | Previously Reported | Adjustment | Restated |
|---|---|---|---|
| **Goodwill:** | | | |
| 12/31/2016 | $206,992 | (206,992) | $- |
| 6/30/2016 | $206,992 | (206,992) | $- |
| **Additional paid in capital:** | | | |
| 12/31/2016 | $1,040,355 | (206,992) | $833,363 |
| 6/30/2016 | $239,945 | (206,992) | $32,953 |
| **Deferred Revenue:** | | | |
| 12/31/2016 | $- | 324,387 | $324,387 |
| **Income tax payable:** | | | |
| 12/31/2016 | $26,516 | (26,516) | $- |
| **Other receivables – related parties** | | | |
| 12/31/2016 | $48,834 | 110,938 | $159,772 |
| **Revenue-related parties:** | | | |
| 12/31/2016 | $750,000 | (500,000) | $250,000 |
| **Cost of revenues-related parties when recognized:** | | | |
| 12/31/2016 | $175,613 | (175,613) | $- |
| **General and administrative expenses:** | | | |
| 12/31/2016 | $463,448 | (110,938) | $352,510 |
| **Provision for income taxes:** | | | |
| 12/31/2016 | $26,516 | (26,516) | $- |

Change in Fiscal Year End

The Company has filed its Form 8-K on January 31 of 2017 to change the Company's fiscal year end from June 30 to December 31. As a result of this change, the Company is filing a Transition Report on Form 10-K for the six-month transition period ended December 31, 2016. References to any of the Company's fiscal years mean the fiscal year ending December 31 of that calendar year.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent

assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. In the opinion of management, all adjustments necessary in order to make the financial statements not misleading have been included. Actual results could differ from those estimates.

Financial Instruments

The carrying amount reported in the balance sheet for cash, accounts receivable, accounts payable, accrued expenses, interest payable and short-term notes payable approximate fair value because of the immediate or short-term maturity of these financial instruments.

-54-

Cash Equivalents

The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

Concentration of Credit Risk
Financial instruments that potentially subject the Company to a significant concentration of credit risk consist primarily of cash and cash equivalents. The Company maintains deposits in federally insured financial institutions in excess of federally insured limits. However, management believes the Company is not exposed to significant credit risk due to the financial position of the depository institutions in which those deposits are held.

Property, Plant, and Equipment

Property, plant and equipment are initially recognized recorded at cost. Gains or losses on disposals are reflected as gain or loss in the period of disposal. The cost of improvements that extend the life of plant and equipment are capitalized. These capitalized costs may include structural improvements, equipment and fixtures. All ordinary repairs and maintenance costs are expensed as incurred.

Depreciation for financial reporting purposes is provided using the straight-line method over the estimated useful lives of the assets:

| | |
|---|---|
| Office equipment | 5 years |

For the six month ended December 31, 2016 and 2015, depreciation expense is $416 is $0, respectively. For the years ended June 30, 2016 and 2015, depreciation expense is $0. For the years ended June 30, 2016 and 2015, the Company's effective income tax rate is 0% resulting from full provision of allowance valuation on deferred tax assets from the Company's net loss.

Income Taxes

Income taxes are provided in accordance with Statement of Financial Accounting Standards ASC 740 Accounting for Income Taxes. A deferred tax asset or liability is recorded for all temporary differences between financial and tax reporting and net operating loss carry forwards. Deferred tax expense (benefit) results from the net change during the year of deferred tax assets and liabilities. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion of all of the deferred tax assets will be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

The Company was established under the laws of the State of Nevada and is subject to U.S. federal income tax and Nevada state income tax, if any. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts and are based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred income tax assets to the amount expected to be realized.

For the six months ended December 31, 2016 and for the years ended June 30, 2016 and 2015, the Company's effective income tax rate is 0% resulting from full provision of allowance valuation on deferred tax assets from the Company's net loss.

Earnings per Share

In February 1997, the FASB issued ASC 260, "Earnings per Share", which specifies the computation, presentation and disclosure requirements for earnings (loss) per share for entities with publicly held common stock. ASC 260 supersedes the provisions of APB No. 15, and requires the presentation of basic earnings (loss) per share and diluted earnings (loss) per share. The Company has adopted the provisions of ASC 260 effective (inception).
Basic earnings and net loss per share amounts are computed by dividing the net income by the weighted average number of common shares outstanding. Diluted earnings per share are the same as basic earnings per share due to the lack of dilutive items in the Company.

-55-

Segment Information

The standard, "Disclosures about Segments of an Enterprise and Related Information", codified with ASC 280, requires certain financial and supplementary information to be disclosed on an annual and interim basis for each reportable segment of an enterprise. The Company believes that it operates in business segment of marketing and sales in China while the Company's general administration function is performed in the United States. On December 31, 2016, all assets and liabilities are located in the United States where the income and expense has been incurred since inception to December 31, 2016.

Impact of New Accounting Standards

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

Revenue Recognition

The Company's revenue recognition policies comply with FASB ASC Topic 605. The Company follows paragraph 60510S991 of the FASB Accounting Standards Codification for revenue recognition. The Company will recognize revenue when it is realized or realizable and earned. The Company considers revenue realized or realizable and earned when all of the following criteria are met: (i) persuasive evidence of an arrangement exists, (ii) the product has been shipped or the services have been rendered to the customer, (iii) the sales price is fixed or determinable, and (iv) collectability is reasonably assured.

The Company does not provide unconditional right of return, price protection or any other concessions to its customers.

There were no sales returns and allowances from inception to December 31, 2016.

-56-

In the first step of the review process, we compare the estimated fair value of the reporting unit with its carrying value. If the estimated fair value of the reporting unit exceeds its carrying amount, no further analysis is needed. If the estimated fair value of the reporting unit is less than its carrying amount, we proceed to the second step of the review process to calculate the implied fair value of the reporting unit goodwill in order to determine whether any impairment is required. We calculate the implied fair value of the reporting unit goodwill by allocating the estimated fair value of the reporting unit to all of the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination. If the carrying value of the reporting unit's goodwill exceeds the implied fair value of the goodwill, we recognize an impairment loss for that excess amount. In allocating the estimated fair value of the reporting unit to all of the assets and liabilities of the reporting unit, we use industry and market data, as well as knowledge of the industry and our past experiences.

We base our calculation of the estimated fair value of a reporting unit on the income approach. For the income approach, we use internally developed discounted cash flow models that include, among others, the following assumptions: projections of revenues and expenses and related cash flows based on assumed long-term growth rates and demand trends; expected future investments to grow new units; and estimated discount rates. We base these assumptions on our historical data and experience, third-party appraisals, industry projections, micro and macro general economic condition projections, and our expectations.

We have had no goodwill impairment charges for the six months ended December 31, 2016, the estimated fair value of each of our reporting units exceeded its' respective carrying amount by more than 100 percent based on our models and assumptions.

NOTE 3. GOING CONCERN

The Company's financial statements are prepared using accounting principles generally accepted in the United States of America applicable to a going concern that contemplates the realization of assets and liquidation of liabilities in the normal course of business.

The Company is still in development stage and has not created sufficient revenue to cover any operating losses it may incur. Management's plans include the raising of capital through the equity markets to fund future operations, seeking additional acquisitions, and generating of revenue through our business. However, there can be no assurances the Company will be successful in its efforts to secure additional equity financing and obtaining sufficient revenue producing contracts. These factors raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classification of liabilities that might result from this uncertainty.

NOTE 4. ACCOUNT RECEIVABLES – RELATED PARTIES

The nature of the accounts receivable for December 31, 2016 in the amount of $63,250 are for modular construction and technology services and utilization of anticipated modular construction technology by AmericaTowne pursuant to the Modular Construction & Technology Services Agreement between AmericaTowne and the Company dated June 28, 2016 (hereinafter, the "ATI Services Agreement") and $419,650 for the Sales and Support Services Agreement with Yilaime on June 27, 2016 (the "Yilaime Services Agreement"). On December 31, 2016, the Company's allowance for bad debt is $24,145, which provides a net receivable balance of $458,755.

The nature of the accounts receivable for June 30, 2017 in the amount of $125,000 are for Modular Construction and Technology Services and utilization of anticipated modular construction technology. The Company's allowance for bad debt is $6,250, which provides a net receivable balance of $118,750.

Accounts receivable consist of the following:

|  | 31-Dec 2016 | 30-June 2016 | 30-June 2015 |
| --- | --- | --- | --- |
| Accounts receivable- related parties | 482,900 | 125,000 | 0 |
| Less: Allowance for doubtful accounts | (24,145) | (6,250) | 0 |
| Accounts receivable, net | 458,755 | 118,750 | 0 |

Bad debt expense was $17,895 and $0 for the six months ended December 31, 2016 and 2015, respectively. Bad debt expense was $6,250 and $0 for the fiscal year ended June 30, 2016 and for June 30, 2015 respectively.

Allowance for bad debt policy

Our bad debt policy is determined by the Company's periodic review of each account receivable for reasonable assurance of collection. Factors considered are the exporter's financial condition, past payment history if any, any conversations with the exporter about the exporter's financial conditions and any other extenuating circumstances. Based upon the above factors the Company makes a determination whether the receivable is reasonable assured of collection. Based upon our review if required we adjust the allowance for bad debt. As of December 31, 2016, June 30, 2016, and June 30, 2015, based upon our limited history, our allowance for bad debt is just above bad debt we anticipate will be written off for the year.

NOTE 5. DEFERRED VENDOR ALLOWANCES

The Company has the right to receive a $250,000 quarterly fee from Yilaime for Sales and Support Services Agreement. In accordance with ASC 605-50-45, the Company defers and recognizes as a reduction to the future costs for quarterly fee. For the six months December 31, 2016, $500,000 fee from exclusive agreement recorded for Sales and Support Services; $324,387 is booked as current liability as deferred vendor allowances – related parties on December 31, 2016 and $175,613 went against cost charged by Yilaime.

NOTE 6. SHAREHOLDER'S EQUITY

The stockholders' equity section of the Company contains the following classes of capital stock:

Common stock, $ 0.001 par value: 500,000,000 shares authorized; 126,733,337, 116,075,716 and 16,075,716 shares issued and outstanding as of December 31, 2016, June 31, 2016 and June 30, 2015, respectively; Preferred stock, none: 0 shares authorized; but not issued and outstanding.

NOTE 7. STOCK BASED COMPENSATION

The Company entered into an employment lock-up agreement on July 1, 2016 with Alton Perkins to serve as the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer and Secretary. The term of Mr. Perkins' agreement is five years with the Company retaining an option to extend in one- year periods. In consideration for Mr. Perkins' services, the Company has agreed to issue to his designee, the Alton & Xiang Mei Lin Perkins Family Trust, 10,000,000 shares of common stock. The Company may elect in the future to include money compensation to Mr. Perkins or his designee for his services provided there is sufficient cash flow.

For the six months ended December 31, 2016, $50,000 of stock compensation was charged to operating expenses and $450,000 was recorded as deferred compensation on December 31, 2016.

-58-

## NOTE 8. RELATED PARTIES TRANSACTIONS

The Company intends on relying on other businesses controlled by our sole director and officer, and beneficial owner of the majority shares of common stock in the Company – Alton Perkins, in implementing its business plan.

Mr. Perkins is the control person of Yilaime Corporation, AmericaTowne and AXP Holding Corporation. At this time, the purpose of the Company is to service the construction and related technology needs of AmericaTowne under AmericaTowne's agreements with the Shexian County Investment Promotion Bureau in developing an AmericaTowne community in the Hanwang mountains in Shexian, China. The Company also intends on supporting these services in other AmericaTowne ventures at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency in developing an AmericaTowne Community and an International School in Longyan County China.

The related export services rendered to the Company in the implementation of its business plan cannot be provided by AmericaTowne or through the AmericaTowne relationship. In order to avoid conflicts of interest, Mr. Perkins is of the opinion that there must be a separate and distinct agreement between, in this case, the Company and AXP Holding Corporation. Furthermore, although other similar IC-DISC entities exist, the Company is able to obtain better terms and conditions from AXP Holding Corporation in light of Mr. Perkins' control of AXP Holding Corporation.

AmericaTowne's Board of Directors determined that operating and controlling a separate but related entity focused on the development and the exporting of Yilaime energy efficient technology and processes for government and private enterprises in China would be more prudent from a risk mitigation and operational standpoint than providing these services under the AmericaTowne business plan. Furthermore, the intent of the Company is to expand its services and relationships to other similar endeavors in projects not related to AmericaTowne, thus the need to maintain and operate a separate entity.

Cooperative Agreement (Shexian County Government, China)

The Company's majority and controlling shareholder – AmericaTowne, is a party under the Cooperative Agreement with the Shexian County Investment Promotion Bureau (the "Shexian Agreement"). Under the Shexian Agreement, AmericaTowne and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains. Although not definitive at this time, the parties have agreed that, in consideration for AmericaTowne's investment of approximately $30,000,000 into the development, plus any additional tax paid to the local government, where applicable, the Shexian County Bureau will dedicate local resources, including land (which AmericaTowne would be required to obtain rights through local bid invitation), and participation with AmericaTowne in an agreed upon equity split through a future definitive agreement.

The Company will be providing construction and technology services to AmericaTowne in facilitating AmericaTowne's obligations under the Shexian Agreement. The Company's ability to generate revenue under its agreement with AmericaTowne could be impaired in the event AmericaTowne is not able to meet its obligations under the Shexian Agreement. Furthermore, Mr. Perkins, as a control person of each entity, might elect to forego certain obligations of AmericaTowne under the Shexian Agreement or not enter into a more definitive agreement with the Shexian County Bureau, which in turn, could impact the Company's ability to meet its business plan set forth herein.

Sales and Support Services Agreement (Yilaime Corporation)

On June 27, 2016, we entered into a Sales and Support Services Agreement with Yilaime Corporation, a Nevada corporation ("Yilaime"). Yilaime is controlled by Alton Perkins, who is our sole director and officer. Yilaime holds the majority of issued and outstanding shares of common stock in AmericaTowne, Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). Mr. Perkins is also the Trustee of the Alton & Xiang Mei Lin Perkins Family Trust ("Perkins Trust") and the AXP Nevada Asset Protection Trust 1 ("AXP"), which holds 5,100,367 and 120,000 shares, respectively, of the issued and outstanding common stock in ATI. Mr. Perkins is the beneficial owner of 20,674,484 shares of ATI, which equals 90.11% of issued and outstanding shares. Mr. Perkins is the beneficial owner of the majority and controlling interest in the Company through his direct holdings, and beneficial holdings through Yilaime, AXP and the Perkins Trust. ATI, Perkins Trust and Mr. Perkins beneficially own 110,117,593 shares, or 86%, of the Company's common stock.

-59-

Under the Services Agreement, Yilaime will provide the Company with marketing, sales and support services in the Company's pursuit of ATI Modular business in China in consideration of a commission equal to 10% of the gross amount of monies procured for the Company through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay the Company a quarterly fee of $250,000 starting on July 1, 2016. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. Yilaime retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of the Company.

Modular Construction & Technology Services Agreement (AmericaTowne)

On June 28, 2016, we entered into a Modular Construction & Technology Services Agreement (the "Modular Services Agreement") with AmericaTowne Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). The impetus behind the Modular Services Agreement was the Company's Cooperative Agreement with the Shexian County Government, China. Under the Cooperative Agreement, ATI and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains, Shexian, China. In addition, ATI, at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency plan to pursue the development of an AmericaTowne Community and an International School in Longyan County China.

Under the Modular Services Agreement, ATI Modular shall provide the research, development, training and modular technology in a manner deemed commercially acceptable by ATI based on its commercially reasonable requirements, plans and specifications, which shall be agreed upon in advance of any substantial and material construction. ATI will pay the Company a quarterly fee of $125,000 per quarter. The initial fee was paid upon signing the Modular Services Agreement. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. ATI retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

Interest Charge – Domestic International Sales Agreement (AXP Holding Corporation)

On June 29, 2016, we entered into an IC-DISC Service Provider Agreement with AXP Holding Corporation, a Nevada corporation ("AXP Holding") and related party to the Company through Mr. Perkins control of AXP Holding. AXP Holding is an Interest Charge - Domestic International Sales Corporation, or "IC-DISC". AXP IC-DISC tax-exempt status was authorized and approved by the United States Department of the Treasury, Internal Revenue Service. As an IC-DISC, AXP Holding may, under certain conditions, act as a sister corporation to entities and provide services to assist a company in obtaining lower tax rates on export income. In addition to the export tax savings provided by AXP, AXP can provide an additional array of services including promoting the Company's export activities, purchasing receivables from the Company at a discount through a factoring relationship, and providing the Company with working capital loans.

The term under the IC-DISC Service Provider Agreement is set to expire on December 6, 2019, absent early termination for breach thereof by either party. AXP retains the right to extend the term, exercising its sole discretion, to December 6, 2024 by providing written notice to the Company by November 6, 2019. AXP has agreed to a non-compete and non-circumvent in providing the services under the IC-DISC Service Provider Agreement.

-60-

The Company has agreed to pay AXP a commission fee up to the greater of 50% of the Company's export net income or 4% of the Company's export gross receipts. The Company will determine the exact amount and the method of payment of the commission fee. The commission fee shall be paid at the option of the Company periodically throughout the year, but no later than December 31 on annual basis. If there is no commission fee due to no export sales, the Company will pay AXP an export service fee of $50,000. The export service fee, if any, is due on or before December 31 on an annual basis.

In addition, for referring businesses from the Company's "Export Platform" or "Community," AXP agrees to pay the Company 25% of each "Sales Export Service Fee" charged and received as an "IC-DISC Commission" from each Exporter or Licensee resulting from participating in the Export Platform or Community. This fee is called a "Group Export Consulting Fee" in the IC-DISC Service Provider Agreement, and is due no later than fifteen business days after receipt from the Exporter or Licensee, but no later than December 31 on an annual basis. For illustrative purposes, if AXP receives and or charges an Exporter 50% of its net export sales as a commission, and that value is $100,000, AXP would owe the Company 25%, or $25,000. Furthermore, during the term, the Company shall pay AXP a flat fee of $5,000 per transaction for purchasing receivables from the Company, plus an interest rate for such factoring at the prime rate plus one-percent.

In addition, Joseph Arcaro is the Company's prior Chief Executive Officer, Chief Financial Officer, Secretary and Chairman of the Board of Directors.

The Company recognizes and confirms the requirements in ACS 850 10506 to disclose all related party transactions between the Company and related party transactions and or relationships.

Pursuant to ASC 850-10-50-6, the Company makes the following transaction disclosures:

The Company also leases office space from Yilaime for $2,500/month.

Operating Statement Related Party Transactions (for the six months ending December 31, 2016 and 2015; for the years ended June 30, 2016 and 2015).

(a) $15,000, $0, $2,500 and $0 for general and administrative expenses for rent expenses the Company paid to Yilaime towards its lease agreement.

(b) $250,000, $0, $125,000 and $0 in revenues for ATI Services Agreements with the Company

(c) $50,000, $0, $0 and $0 for general and administrative operating expenses recorded as stock compensation for respective employment agreements;

(d) $3,334, $0, $0 and $0 for general and administrative expenses for commissions and fees;

(e) $198,000, $0, $0 and $0 for operational expense for Anhui Ao De Xin Modular Construction Technology Co., Ltd.

(f) $0, $0, $100,000 and $0 of compensation expense by issuing 100,000,000 shares to Joseph Arcaro.

(g) $0, $0, $3,859 and $0 other income of debt forgiveness from Joseph Arcaro

Balance Sheet Related Party Transactions (on December 31, 2016, June 30, 2016 and June 30, 2015)

(a) $60,088, 118,750 and $0 net account receivables ATI owes to the Company;

(b) $398,668, $0 and $0 net account receivables Yilaime owes to the Company;

(c) $159,772, $0 and $0 prepayments to AXP Holding Corp; and

(d) $198,000, $0 and $0 as accounts payable to Anhui Ao De Xin Modular Construction Technology Co., Ltd.; and

(e) $450,000, $0 and $0 as deferred compensation pursuant to respective employment agreements.

(f) $0, $19,241 and $0 advances to officers-Alton Perkins

(g) $0, $30,000 and $0 deposit from customers- Yilaime.

(h) $324,387, 0 and $0 deferred revenue-Yilaime



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549



DIVISION OF
CORPORATION FINANCE

Mail Stop 4631

August 30, 2017

<u>Via E-mail</u>
Alton Perkins
Chief Executive Officer
ATI Modular Technology Corporation
4700 Homewood Court, Suite 100
Raleigh, North Carolina 27609

> **Re:** **ATI Modular Technology Corporation**
> **Amendment No. 12 to Registration Statement on Form 10-12G**
> **Filed August 25, 2017**
> **File No. 000-55699**

Dear Mr. Perkins:

We have completed our review of your filing. We remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff.

Sincerely,

/s/ Jay Ingram

Jay Ingram
Legal Branch Chief
Office of Manufacturing and
Construction

cc:    Anthony R. Paesano, Esq.

DEF 14C 1 def14c.htm DEF 14C

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**SCHEDULE 14C/A**
**(Rule 14c-101)**

**(Date of Original Filing: July 31, 2017)**
**(Date of First Amendment: August 8, 2017)**
**(Date of Second Amendment: August 31, 2017)**
**(Date of Third Amendment: September 29, 2017)**
**(Date of Fourth Amendment: November 22, 2017)**
**(Date of Fifth Amendment: December 11, 2017)**
**(Date of Sixth Amendment: January 17, 2018)**
**(Date of Seventh Amendment: February 13, 2018)**
**(Date of Eighth Amendment: May 29, 2018)**



**SCHEDULE 14C INFORMATION**

**Information Statement Pursuant to Section 14(c) of the**
**Securities Exchange Act of 1934**

Check the appropriate box:

☐      Preliminary Information Statement

☒      Definitive Information Statement

☐      Confidential, for Use of the Commission Only (as permitted by Rule 14c-5(d)(2))

**ATI Modular Technology Corp.**

(Name of Registrant as Specified in Its Charter)

Payment of Filing Fee (Check the appropriate box):

☒      No fee required

☐      Fee computed on table below per Exchange Act Rules 14c-5(g) and 0-11

(1)      Title of each class of securities to which transaction applies: _____

(2)      Aggregate number of securities to which transaction applies: _____

(3)      Per the filing fee is calculated and state how it was determined: _____unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which

(4)      Proposed maximum aggregate value of transaction: _____

(5)      Total fee paid: _____

☐      Fee paid previously with preliminary materials.

☐      Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)      Amount Previously Paid: _____

(2)      Form, Schedule or Registration Statement No.: _____

(3)      Filing Party: _____

(4)      Date Filed: _____

1

## ATI MODULAR TECHNOLOGY CORP.
4700 Homewood Court, Suite 100
Raleigh, North Carolina 27609
(888) 406-2713

### NOTICE OF ACTION BY
### WRITTEN CONSENT OF MAJORITY SHAREHOLDERS

### WE ARE NOT ASKING YOU FOR A PROXY
### AND YOU ARE REQUESTED NOT TO SEND US A PROXY

### THIS IS NOT A NOTICE OF A MEETING OF SHAREHOLDERS AND NO SHAREHOLDERS' MEETING
### WILL BE HELD TO CONSIDER ANY MATTER DESCRIBED HEREIN.

Attention Shareholders:

We are furnishing this notice and the accompanying information statement (the "Information Statement") to the holders of shares of common stock, par value $0.001 per share ("Common Stock"), of ATI Modular Technology Corp., a Nevada corporation (the "Company") pursuant to Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulation 14C and Schedule 14C thereunder, in connection with the approval of the action described below (the "Actions") taken by written consent of the holders of a majority of the issued and outstanding shares of Common Stock:

1.　　The Company's execution of its Certificate of Amendment to the Articles of Incorporation changing the Company's name from ATI Modular Technology Corp., to AmericaTowne Holdings, Inc., (the "Name Change");

2.　　The Company's execution of its Certificate of Change effectuating a fifty-to-one (50-to-1) reverse stock split of the Company's issued and outstanding common stock (the "Stock Split"); and

3.　　The execution of the Agreement and Plan of Merger dated June 29, 2017 and First Amendment to the Agreement and Plan of Merger dated July 14, 2017 between the Company and AmericaTowne, Inc. ("AmericaTowne"), the Company's majority shareholder. The Plan of Merger outlines a merger of the Company and AmericaTowne into one operating entity, with the Company being the surviving entity as outlined in the Agreement and Plan of Merger executed in June 29, 2017 and First Amendment to the Agreement and Plan of Merger dated July 14, 2017 (collectively, "Plan of Merger").

2

The purpose of this Information Statement is to notify our shareholders that on June 23, 2017, the owner of approximately 78.9% of our issued and outstanding shares of Common Stock voted for the Actions in lieu of a meeting, as allowed for under our Articles of Incorporation, as amended ("Articles") and the Bylaws of the Company, as amended (the "Bylaws"). In accordance with Rule 14c-2 promulgated under the Exchange Act, the Actions will become effective no sooner than 20 days after we mail this notice and the accompanying Information Statement to our shareholders. Effectiveness of this transaction is also dependent on the registration of the Company's shares to be used in this transaction, which have been filed in a Registration Statement on Form S-4 with the Securities and Exchange Commission.

The written consent that we received constitutes the only shareholder approval required for the Actions under Nevada law and, as a result, no further action by any other shareholder is required to approve the Actions and we have not and will not be soliciting your approval of the Actions.

This notice and the accompanying Information Statement are being mailed to our shareholders on or about June 15, 2018. **This notice and the accompanying Information Statement shall constitute notice to you of the action by written consent in accordance with Rule 14c-2 promulgated under the Exchange Act.**

By Order of the Board of Directors,

/s/ Alton Perkins Chairman
of the Board

Dated: June 15, 2018

3

**TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| Item 1. | INFORMATION REQUIRED BY SCHEDULE 14A | 5 |
| | UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION | 8 |
| | Notes to Unaudited Pro Forma Combined Financial Information | 16 |
| | INFORMATION WITH RESPECT TO ATI MODULAR TECHNOLOGY CORP. (the "Acquiring Company") | 19 |
| | ATI Modular Technology Corp Financial Statements | 25 |
| | INFORMATION WITH RESPECT TO AMERICATOWNE, INC. (the "Acquired Company") | 56 |
| | AMERICATOWNE Inc. and Subsidiaries Financial Statements | 61 |
| | STOCKHOLDERS' RIGHTS | 97 |
| | THE STOCK SPLIT | 98 |
| | THE PLAN OF MERGER | 99 |
| Item 3. | INTERESTS OF CERTAIN PERSONS IN OR OPPOSITION TO MATTER TO BE ACTED UPON | 101 |
| Item 4. | PROPOSALS BY SECURITY HOLDERS | 101 |
| Item 5. | DELIVERY OF DOCUMENTS TO SECURITY HOLDERS SHARING AN ADDRESS | 101 |
| | CONSENT OF BOARD OF DIRECTORS IN LIEU OF MEETING (ATI MODULAR TECHNOLOGY CORPORATION) | 102 |
| | CONSENT OF SHAREHOLDERS IN LIEU OF MEETING (ATI MODULAR TECHNOLOGY CORPORATION) | 103 |

4

### ATI MODULAR TECHNOLOGY CORP.
4700 Homewood Court, Suite 100
Raleigh, North Carolina 27609
(888) 406-2713

---

### INFORMATION STATEMENT

#### Action by Written Consent of Majority of Shareholders

---

## ITEM 1. INFORMATION REQUIRED BY SCHEDULE 14A

### GENERAL

This Information Statement is being furnished to the holders of shares of common stock, par value $0.001 per share ("Common Stock" or the "Company's Common Stock") of ATI Modular Technology Corp. in connection with the action by written consent of the holders of a majority of our issued and outstanding shares of Common Stock taken without a meeting to approve the Actions, as defined above and as described in this Information Statement. In this Information Statement, all references to "the Company," "we," "us" or "our" refer to ATI Modular Technology Corp. We are mailing this Information Statement to our shareholders of record on or about June 15, 2018.

Pursuant to Rule 14c-2 promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Actions will not become effective until 20 calendar days following the date on which this Information Statement is first mailed to our shareholders. Effectiveness of this transaction is dependent upon the registration of the Company's shares to be used as collateral in this transaction, which have been filed in a Registration Statement on Form S-4 with the Securities and Exchange Commission.

The Company is paying the entire cost of furnishing this Information Statement. We will request brokerage houses, nominees, custodians, fiduciaries and other like parties to forward this Information Statement to the beneficial owners of the Company's Common Stock held of record by them and will reimburse such persons for their reasonable charges and expenses in connection therewith.

5

---

### Action by Majority Shareholders

The Company's majority shareholder, AmericaTowne, Inc., a Delaware corporation ("AmericaTowne"), which owns 100,000,000 shares, or 78.9%, of the Company's issued and outstanding Common Stock, consented to the following actions recommended by the Board of Directors (the "Actions") on June 23, 2017:

☐ *Action No. 1:* The Company's execution of the Certificate of Amendment of its Articles of Incorporation amending its Articles to change the Company's name from ATI Modular Technology Corp. to AmericaTowne Holdings, Inc. (the "Name Change");

☐ *Action No. 2:* The execution of the Company's Certificate of Change effectuating a fifty-to-one (50-to-1) reverse stock split whereby every fifty (50) shares of the Company's presently issued and outstanding Common Stock are consolidated and reverted into one (1) share of Common Stock with a par value of $0.001 and fractional shares being rounded up to the closest whole share (the "Stock Split"); and

☐ *Action No. 3:* The Company's execution of the Agreement and Plan of Merger and First Amendment to the Agreement and Plan of Merger dated July 14, 2017 between the Company and AmericaTowne, whereby the Company and AmericaTowne are merged into a single entity with the Company surviving the merger as outlined in the Agreement and Plan of Merger executed in June 29, 2017 and First Amendment to the Agreement and Plan of Merger dated July 14, 2017 (collectively, "Plan of Merger").

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 118 of 223

Table of Contents

The Board of Directors unanimously approved of the Actions described above. The Consents of the Board of Directors are attached hereto. The Actions detailed above will become effective twenty days after the filing of this Information Statement. As of the close of business on July 6, 2017, we had 126,740,708 shares of Common Stock outstanding of the Company. Each share of outstanding Common Stock is entitled to one vote. Because the Majority Shareholders already consented to the Actions described herein, your consent is not required and is not being solicited in connection with the approval of the aforementioned Actions.

6

Table of Contents

## INFORMATION REQUIRED BY ITEM 14 OF SCHEDULE 14A

*Special Note Regarding Forward-Looking Statements*

Information included or incorporated by reference in this Information Statement on Schedule 14C contains forward-looking statements. All forward-looking statements are inherently uncertain as they are based on current expectations and assumptions concerning future events or future performance of the Company and/or AmericaTowne. Readers are cautioned not to place undue reliance on these forward-looking statements, which are only predictions and speak only as of the date hereof. Forward-looking statements may contain the words "believes," "project," "expects," "anticipates," "estimates," "forecasts," "intends," "strategy," "plan," "may," "will," "would," "will be," "will continue," "will likely result," and similar expressions, and are subject to numerous known and unknown risks and uncertainties. Additionally, statements relating to implementation of business strategy, future financial performance, acquisition strategies, capital raising transactions, performance of contractual obligations, and similar statements may contain forward-looking statements. In evaluating such statements, shareholders should carefully review various risks and uncertainties identified in this Report. These risks and uncertainties could cause the Company's actual results to differ materially from those indicated in the forward-looking statements. The Company disclaims any obligation to update or publicly announce revisions to any forward-looking statements to reflect future events or developments.

Although forward-looking statements in this Schedule 14C reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by the Company. Consequently, forward-looking statements are inherently subject to risks and uncertainties, and actual results and outcomes may differ materially from the results and outcomes discussed in or anticipated by the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include, without limitation, those specifically addressed under the heading "Risk Factors Related to Our Business" below, as well as those discussed elsewhere in this Schedule 14C. Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Information Statement. The Company and AmericaTowne file reports with the Securities and Exchange Commission ("SEC"). You can read and copy any materials the Company and AmericaTowne file with the SEC at the SEC's Public Reference Room, 100 F. Street, NE, Washington, D.C. 20549. You can obtain additional information about the operation of the Public Reference Room by calling the SEC at 1-800SEC-0330. In addition, the SEC maintains an Internet site (www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us.

We disclaim any obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Information Sheet on Schedule 14C, accept as required by law. Readers are urged to carefully review and consider the various disclosures made throughout the entirety of this Schedule 14C, as well as our other public filings, which attempt to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

7

Table of Contents

**Unaudited Pro Forma Combined Financial Information**

The accompanying unaudited pro forma combined financial information have been prepared to present the balance sheets and statements of operations of the Company to indicate how the consolidated financial statements of the Company might have looked like if the merger of AmericaTowne, Inc. and transactions related to the merger had occurred as of the beginning of the period presented.

The unaudited pro forma condensed combined balance sheet as of March 31, 2018 and statements of operations, for the three months ended March 31, 2018, for the year ended December 31, 2017, for the nine months ended September 30, 2017, for the six months ended December 31, 2016 and for the year ended June 30, 2016 and 2015 are presented as if the merger of AmericaTowne, Inc. had occurred on July 1, 2014.

In the unaudited pro forma condensed financial statements, financial statements of AmericaTowne, Inc. and the Company are presented separately. Due to exclusion of the Company from consolidated financial statements, AmericaTowne's financial statements presented in the pro forma do not agree to those in its corresponding 10-K or 10-Q.

These pro forma condensed financial statements are presented for illustrative purposes only and are not intended to be indicative of actual consolidated financial position and consolidated results of operations had the purchase been in effect during the periods presented, or of consolidated financial condition or consolidated results of operations that may be reported in the future.

The pro forma adjustments contained in the pro forma combined financial statements relate to the assumptions of all prior and existing liabilities of the Company upon consummation of the acquisition.

Table of Contents

AMERICATOWNE Holdings, Inc.
Pro Forma Balance Sheets

| | Historical | | Pro Forma | | |
| | March 31, 2018 | March 31, 2018 | | | |
| | ATI Modular Technology Corp. | America Towne Inc. | Adjustment | Notes | Combined |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and cash equivalents | $ 146,060 | $ 767,229 | | | $ 913,289 |
| Notes receivable - related parties | — | 71,750 | | | 71,750 |
| Accounts receivable, net | — | 812,868 | | | 812,868 |
| Accounts receivable, net - related parties | 1,747,092 | 1,501,758 | (469,441) | (A) | 2,779,409 |
| Other receivables | — | — | | | — |
| Other receivables - related parties | 52,264 | 106,412 | | | 158,676 |
| Prepayment-current | — | 644 | | | 644 |
| Total Current Assets | 1,945,416 | 3,260,661 | | | |
| | | 4,736,636 | | | |
| Prepayment-non current | — | 6,715 | | | 6,715 |
| Property, plant and equipment, net | 9,945 | 28,784 | | | 38,729 |
| Deferred tax assets | — | 239,613 | | | 239,613 |
| Goodwill | — | 40,331 | | | 40,331 |
| Investments | — | 178,859 | (175,000) | (B) | 3,859 |
| Total Assets | $ 1,955,361 | $ 3,754,963 | | | |
| | | | | | $ 5,065,883 |

**LIABILITIES AND SHAREHOLDERS' EQUITY**
**Current Liabilities**

Table of Contents

| | | | | | | |
|---|--:|--:|--:|---|---|--:|
| Accounts payable and accrued expenses | $ 25,411 | 524,246 | (494,148) | (A) | $ | 55,509 |
| Deferred revenues-current | 1,504,387 | 4,542 | | | | 1,508,929 |
| Notes payable | — | — | | | | |
| Other payables | — | 560 | | | | 560 |
| Deposit from customers | — | 1,469 | | | | 1,469 |
| Due to related parties | | 31,333 | | | | 31,333 |
| Income tax payable | 14,868 | 42,972 | | | | 57,840 |
| | | | | | | 1,655,640 |
| Total Current Liabilities | 1,544,666 | 605,122 | | | | 48,306 |
| | | | | | | 1,703,946 |
| Deferred revenues-non current | — | 48,306 | | | | |
| Total Liabilities | 1,544,666 | 653,428 | | | | |

Commitments & Contingencies

| | | | | | | |
|---|--:|--:|--:|---|---|--:|
| | | | | | | 200,220 |
| | | | | | | 6,180 |
| | | | | | | 6,099,073 |
| Shareholders' Equity | | | | | | (2,161,542) |
| Common stock, $0.001 par value; 500,000,000 shares authorized, 198,323,882 shares issued and outstanding | 126,741 | 4,942 | 68,537 | (B) | | (297,203) |
| Common stock subscribed | 1,000 | 154 | 5,026 | (B) | | (480,411) |
| Additional paid-in capital | 897,340 | 5,450,296 | (248,563) | (B) | | (4,380) |
| Deferred compensation | | | | | $ 3,361,937 | |
| | $ 1,955,361 | $ | | | | 5,065,883 |
| | (325,000) | (1,836,542) | | | | ) |
| Receivable for issuance of stock | (206,980) | (90,223) | | | | ) |
| Retained Earnings | (82,406) | (422,712) | 24,707 | (A) | | ) |
| Noncontrolling interest | — | (4,380) | | | | ) |
| Shareholders' Equity | 410,695 | 3,101,535 | | | | |
| Total Liabilities and Shareholders' Equity | | 3,754,963 | | | | |

9

---

AMERICA TOWNE Holdings, Inc.
Pro Forma Statements of Operations

| | Historical | | Pro Forma | | |
|---|---|---|---|---|---|
| | March 31, 2018 | March 31, 2018 | | | |
| | ATI Modular Technology Corp. | America Towne Inc. | Adjustment | Notes | Combined |
| Revenues | | | | | |
| Sales | $ — | $ 111,135 | | | $ 111,135 |
| Services-related parties | 125,000 | 237,000 | (125,000) | (A) | 237,000 |
| | 125,000 | 348,135 | | | 348,135 |
| Cost of Revenues-Related Parties | — | 35,499 | | | 35,499 |

|  | 4,531 | | | | |
|  | 25,673 | (227,536) | | | |
| Gross Profit | 125,000 | 312,636 | | | 312,636 |
| Operating Expenses | | | | | |
| General and administrative | 85,152 | 464,909 | (125,000) | (A) | 418,756 |
| | 9,644 | 75,255 | (6,305) | (A) | 84,899 |
| Professional fees | 94,796 | 540,164 | | | 503,655 |
| Total operating expenses | | | | | |
| Income from operations | 30,204 | (227,528) | | | (191,019) |
| Other Expenses (Income) | — | 8 | | | 8 |
| Provision for income taxes | | — | | | 4,531 |
| Net Income (Loss) | | | | | (195,558) |
| Less: Net income attributable to the noncontrolling interest | — | 9,796 | | | 9,796 |
| Net income attributable to AMERICA TOWNE, Inc common stockholders | | | | | $ (185,762 |
| | | | | | $ (0.001 |
| | $25,673 | $ (217,740) | | 199,081,552 | ) |

Loss per share - basic and diluted )

Weighted average shares outstanding- basic and diluted

10

AMERICA TOWNE Holdings, Inc.
Pro Forma Statements of Operations

| Historical | | Pro Forma |
|---|---|---|
| December 31, 2017 | December 31, 2017 | |

Table of Contents

| | ATI Modular Technology Corp. | America Towne Inc. | Adjustment | Notes | Combined |
|---|---|---|---|---|---|
| Revenues | | | | | |
| Sales | $ — | $ 478,011 | | | $ 478,011 |
| Services-related parties | 500,000 | 1,296,992 | (500,000) | (A) | 1,296,992 |
| | 500,000 | 1,775,003 | | | 1,775,003 |
| Cost of Revenues-Related Parties | — | 303,549 | | | 303,549 |
| | 10,337 | | | | |
| | 51,010 | (541,243) | | | |
| Gross Profit | 500,000 | 1,471,454 | | | 1,471,454 |
| Operating Expenses | 303,631 | 1,778,975 | | | |
| General and administrative | | | (500,000) | (A) | 1,567,366 |
| | 135,023 | 236,073 | (15,240) | (A) | |
| Professional fees | 438,654 | 2,015,048 | | | 371,096 |
| Total operating expenses | | | — | | 1,938,462 |
| Income from operations | 61,346 | (543,594) | | | (467,008) |
| Other Expenses (Income) | (1) | (2,351) | | | (2,352) |
| Provision for income taxes | | — | | | 10,337 |
| Net Income (Loss) | | | | | (474,993) |
| Less: Net income attributable to the noncontrolling interest | — | 25,851 | | | 25,851 |
| Net income attributable to AMERICATOWNE, Inc common stockholders | $ 51,010 | $ (515,392) | | )$ | (449,143) |
| | | | | )$ | (0.003 |
| Loss per share - basic and diluted | | | | | |
| Weighted average shares outstanding- basic and diluted | | | | | 143,960,450 |

11

**AMERICATOWNE Holdings, Inc.**
**Pro Forma Statements of Operations**

| | Historical | | | | Pro Forma |
|---|---|---|---|---|---|
| | For the Nine Months Ended | | | | |
| | September 30, 2017 | September 30, 2017 | | | |
| | ATI Modular Technology Corp. | AmericaTowne Inc. | Adjustment | Notes | Combined |
| **Revenues** | | | | | |
| Sales | $ - | $ 228,404 | | $ | 228,404 |
| Services-related parties | 375,000 | 1,081,992 | (375,000) | (A) | 1,081,992 |
| | 375,000 | 1,310,396 | | | 1,310,396 |
| **Cost of Revenues-Related Parties** | - | 113,076 | | | 113,076 |
| **Gross Profit** | 375,000 | 1,197,320 | | | 1,197,320 |
| **Operating Expenses** | | | | | |
| General and administrative | 223,212 | 1,228,692 | (375,000) | (A) | 1,071,005 |
| | | | (5,899) | (A) | |
| Professional fees | 103,476 | 152,645 | | | 256,121 |
| Total operating expenses | 326,688 | 1,381,337 | | | 1,327,126 |
| **Income from operations** | 48,312 | (184,017) | | | (129,806) |
| **Other Expenses (Income)** | - | (229) | | | (229) |
| Provision for income taxes | 7,247 | - | | | 7,247 |
| **Net Income (Loss)** | 41,065 | (183,788) | | | (136,824) |
| **Less: Net income attributable to the noncontrolling interest** | - | 21,317 | | | 21,317 |
| **Net income attributable to AMERICATOWNE, Inc common stockholders** | $ 41,065 | $ (162,471) | | $ | (115,507) |
| Loss per share - basic and diluted | | | | $ | (0.001) |
| Weighted average shares outstanding- basic and diluted | | | | | 125,799,963 |

12

**AMERICATOWNE Holdings, Inc.**
**Pro Forma Statements of Operations**

| | Historical | | | | Pro Forma | |
|---|---|---|---|---|---|---|
| | For the Six Months Ended | | | | | |
| | December 31, 2016 | December 31, 2016 | | | | |
| | ATI Modular Technology Corp. | AmericaTowne Inc. | Adjustment | Notes | | Combined |
| **Revenues** | | | | | | |
| Sales | $            - | $        208,270 | | | $ | 208,270 |
| Services-related parties | 250,000 | 275,000 | (375,000) | (A) | | 150,000 |
| | 250,000 | 483,270 | | | | 358,270 |
| Cost of Revenues-Related Parties | - | (215,418) | | | | (215,418) |
| Gross Profit | 250,000 | 698,688 | | | | 573,688 |
| **Operating Expenses** | | | | | | |
| General and administrative | 308,754 | 825,565 | (375,000) (3,163) | | | 756,156 |
| Professional fees | 43,756 | 134,926 | | | | 178,682 |
| Total operating expenses | 352,510 | 960,491 | | (A) (A) | | 934,838 |
| Income from operations | (102,510) | (261,803) | | | | (361,150) |
| Other Expenses (Income) | - | 4,466 | | | | 4,466 |
| Provision for income taxes | - | (36,627) | | | | (36,627) |
| Net Income (Loss) | (102,510) | (229,642) | | | | (328,989) |
| Less: Net loss attributable to the noncontrolling interest | - | 15,103 | | | | 15,103 |
| Net income (loss) attributable to AMERICATOWNE, Inc common stockholders | $     (102,510) | $        (214,539) | | | $ | (313,886) |
| Loss per share - basic and diluted | | | | | $ | (0.003) |
| Weighted average shares outstanding- basic and diluted | | | | | | 109,822,948 |

13

Table of Contents

**AMERICATOWNE Holdings, Inc.**
**Pro Forma Statements of Operations**

| | Historical | | | | Pro Forma |
|---|---|---|---|---|---|
| | For the Year Ended | | | | |
| | June 30, 2016 ATI Modular Technology Corp. | June 30, 2016 AmericaTowne Inc. | Adjustment | Notes | Combined |
| **Revenues** | | | | | |
| Sales | $ - | $ 1,603,540 | | $ | 1,603,540 |
| Services-related parties | 125,000 | 375,000 | (125,000) | (A) | 375,000 |
| | 125,000 | 1,978,540 | | | 1,978,540 |
| **Cost of Revenues-Related Parties** | - | 520,228 | | | 520,228 |
| **Gross Profit** | 125,000 | 1,458,312 | | | 1,458,312 |
| **Operating Expenses** | | | | | |
| General and administrative | 110,386 | 1,147,133 | (125,000) | (A) | 1,126,269 |
| | | | (6,250) | (A) | |
| Professional fees | 22,166 | 179,816 | | | 201,982 |
| Total operating expenses | 132,552 | 1,326,949 | | | 1,328,251 |
| Income from operations | (7,552) | 131,363 | | | 130,061 |
| **Other Expenses (Income)** | (3,859) | 59 | | | (3,800) |
| Provision for income taxes | - | (13,984) | | | (13,984) |
| Net Income (Loss) | $ (3,693) | $ 145,288 | | $ | 147,845 |
| Earnings per share - basic and diluted | | | | $ | 0.001 |
| Weighted average shares outstanding- basic and diluted | | | | | 99,687,615 |

14

**AMERICATOWNE Holdings, Inc.**
**Pro Forma Statements of Operations**

Table of Contents

| | Pro Forma | Historical | | | | |
|---|---|---|---|---|---|---|
| | | For the Year Ended | | | | |
| | | June 30, 2015 | June 30, 2015 | | | |
| | | ATI Modular Technology Corp. | AmericaTowne Inc. | Adjustment | Notes | Combined |
| **Revenues** | | | | | | |
| Sales | $          - | $ | 651,305 | | $ | 651,305 |
| Services-related parties | | - | 150,000 | | | 150,000 |
| | | - | 801,305 | | | 801,305 |
| Cost of Revenues-Related Parties | - | 117,986 | 117,986 Gross | | | |
| **Profit** | | - | 683,319 | | | 683,319 |
| **Operating Expenses** | | | | | | |
| General and administrative | 3,859 | | 329,844 | | | 333,703 |
| Professional fees | | - | 107,830 | | | 107,830 |
| Total operating expenses | 3,859 | | 437,674 | | | 441,533 |
| **Income from operations** | (3,859) | | 245,645 | | | 241,786 |
| **Other Expenses (Income)** | (3,859) | | 291 | | | (3,568) |
| Provision for income taxes | | - | 89,406 | | | 89,406 |
| **Net Income (Loss)** | $          - | $ | 155,948 | | $ | 155,948 |
| Earnings per share - basic and diluted | | | | | | $          0.010 |
| Weighted average shares outstanding- basic and diluted | | | | | | 15,872,585 |

15

## Notes to Unaudited Pro Forma Combined Financial Information

### Note 1 – Basis of Presentation

The unaudited pro forma combined balance sheet as of March 31, 2018, and the unaudited pro forma combined statements of operations, for the three months ended March 31, 2018, for the year ended December 31, 2017, for the nine months ended September 30, 2017, for the six months ended December 31, 2016 and for the year ended June 30, 2016 and 2015, are based on the historical financial statements of the Company and AmericaTowne, Inc. after giving effect of the Agreement and Plan of Merger executed in June 29, 2017 and First Amendment to the Agreement and Plan of Merger dated July 14, 2017, and the assumptions, reclassifications and adjustments described in the accompanying notes to the unaudited pro forma condensed combined financial information.

The Company entered into Agreement and Plan of Merger with AmericaTowne, Inc. whereas the merger was accounted under US GAAP as a business combination under common control with the Company being the acquirer as both entities were owned by the same controlling shareholders. The pro forma combined financial information have been presented at historical costs and on a retroactive basis of the entities.

### Note 2 – Adjustments

(A) **To eliminate intercompany transactions.**

(B) **Execution of the Company's 50-to-1 reverse stock split, as well as AmericaTowne's 1-to-4 stock split in accordance with Agreement and Plan of Merger.**

The following table illustrates details of Note (B)

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 129 of 223

Table of Contents

| | ATI Modular Technology Corp. | AmericaTowne Inc. | |
|---|---|---|---|
| **Common Stock** | | | |
| Outstanding shares before split | 126,740,708 | 49,421,350 | |
| 50-to-1 reverse stock split | 0.02 | | |
| 1-to-4 stock split | | 4 | |
| Outstanding shares after split | 2,534,814 | 197,685,400 | |
| Par value in merged company | 0.001 | 0.001 | |
| Common Stock after merger | 2,535 | 197,685 | 200,220 |
| Common Stock before merger | 126,741 | 4,942 | 131,683 |
| | | | 68,537 (i) |
| **Common Stock Subscribed** | | | |
| Outstanding shares before split | 1,000,000 | 1,540,000 | |
| 50-to-1 reverse stock split | 0.02 | | |
| 1-to-4 stock split | | 4 | |
| Shares subscribed after split | 20,000 | 6,160,000 | |
| Par value in merged company | 0.001 | 0.001 | |
| Common Stock after merger | 20 | 6,160 | 6,180 |
| Common Stock before merger | 1,000 | 154 | 1,154 |
| | | | 5,026 (ii) |
| **Additional Paid in Capital** | | | |
| Adjustment in common stock | | | 68,537 (i) |
| Adjustment in common stock subscribed | | | 5,026 (ii) |
| | | | 73,563 |
| Investment | | 175,000 | 175,000 |
| | | | 248,563 |

16

---

**Note 3 – Earnings (Loss) Per Share**

Basic earnings (loss) per share is computed by dividing net income (loss) available to common stockholders by the weighted average number of common shares outstanding during the period, excluding the effects of any potentially dilutive securities. Diluted earnings per share gives effect to all dilutive potential of shares of common stock outstanding during the period including stock options or warrants, using the treasury stock method (by using the average stock price for the period to determine the number of shares assumed to be purchased from the exercise of stock options or warrants), and convertible debt or convertible preferred stock, using the if-converted method. Earnings per share excludes all potential dilutive shares of common stock if their effect is antidilutive. There were no potential dilutive securities at March 31, 2018, December 31, 2017, September 30, 2017, December 31, 2016, June 30, 2016 and June 30, 2015. The basic and diluted earnings (loss) per share for the three month ended March 31, 2018, for the year ended December 31, 2017, the nine months ended September 30, 2017, for the six months ended December 31, 2016, for the year ended June 30, 2016 and 2015 as follows:

| | Three Months Ended March 31 | Year Ended Dec 31 | Nine Months Ended Sept 30 | Six Months Ended Dec 31, | Year Ended June 30, | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2017 | 2016 | 2016 | 2015 |
| **Numerator** | | | | | | |
| Net income (loss) | $ (185,762) | $ (449,143) | $ (115,507) | $ (313,886) | $ 147,845 | $ 155,948 |
| **Denominator** | | | | | | |
| Weighted average common shares outstanding – basic and diluted | 199,081,552 | 143,690,450 | 125,799,963 | 109,822,948 | 99,687,615 | 66,880,346 |

Table of Contents

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Earnings (Loss) per share - basic and diluted | $ | (0.001) $ | (0.003) $ | (0.001) $ | (0.003) $ | 0.001 $ | 0.01 |

The following table illustrates calculation of weighted average common shares in pro forma.

| | Weighted Average Shares | | |
|---|---|---|---|
| | Historical | | Pro Forma |
| **Three Months Ended March 31, 2018** | | | |
| ATI Modular Technology Corp. | 126,740,708 | 0.02 | 2,534,814 |
| AmericaTowne, Inc. | 49,136,685 | 4 | 196,546,738 |
| | | | **199,081,552** |
| **Year Ended December 31, 2017** | | | |
| ATI Modular Technology Corp. | 126,740,090 | 0.02 | 2,534,802 |
| AmericaTowne, Inc. | 35,356,412 | 4 | 141,425,648 |
| | | | **143,960,450** |
| **Nine Months Ended September 30, 2017** | | | |
| ATI Modular Technology Corp. | 126,739,881 | 0.02 | 2,534,798 |
| AmericaTowne, Inc. | 30,816,291 | 4 | 123,265,165 |
| | | | **125,799,963** |
| **Six Months Ended December 31, 2016** | | | |
| ATI Modular Technology Corp. | 121,171,157 | 0.02 | 2,423,423 |
| AmericaTowne, Inc. | 26,849,881 | 4 | 107,399,525 |
| | | | **109,822,948** |
| **Year Ended June 30, 2016** | | | |
| ATI Modular Technology Corp. | 16,075,716 | 0.02 | 321,514 |
| AmericaTowne, Inc. | 24,841,525 | 4 | 99,366,101 |
| | | | **99,687,615** |
| **Year Ended June 30, 2015** | | | |
| ATI Modular Technology Corp. | 16,075,716 | 0.02 | 321,514 |
| AmericaTowne, Inc. | 16,639,708 | 4 | 66,558,832 |
| | | | **66,880,346** |

17

Table of Contents

**Note 4 – Historical and Pro Forma per Share Data**

The unaudited pro forma data below is presented for illustrative purposes only. It does not purport to represent the historical results or what the combined company's financial position would have been if the Mergers occurred on the date assumed and it is not necessarily indicative of the combined company's future results or financial position.

Book Value per Share

|  | March 31, 2018 |
|---|---|
| **ATI Modular Technology Corporation** |  |
| Historical | $ 0.0032 |
| Pro Forma | $ 0.0168 |
|  |  |
| **AmericaTowne, Inc.** |  |
| Historical | $ 0.0680 |
| Pro Forma | $ 0.0168 |

Basic and Diluted Earnings per Share

|  | Three Month Ended March 31 2018 | Year Ended Dec 31 2017 | Nine Month Ended Sep 30 2017 | Six Month Ended Dec 31 2016 | Year Ended June 30 2016 | Year Ended June 30 2015 |
|---|---|---|---|---|---|---|
| **ATI Modular Tech Corp.** |  |  |  |  |  |  |
| Historical | $ 0.0002 | $ 0.0003 | $ 0.0003 | $ (0.0008) | $ (0.0002) | $ (0.0002) |
| Pro Forma | $ (0.0009) | $ (0.0031) | $ (0.0009) | $ (0.0029) | $ 0.0015 | $ 0.0023 |
|  |  |  |  |  |  |  |
| **AmericaTowne, Inc.** |  |  |  |  |  |  |
| Historical | $ (0.0025) | $ (0.0086) | $ (0.0044) | $ (0.0074) | $ 0.0058 | $ 0.0094 |
| Pro Forma | $ (0.0009) | $ (0.0031) | $ (0.0009) | $ (0.0029) | $ 0.0015 | $ 0.0023 |

18

---

**INFORMATION WITH RESPECT TO
ATI MODULAR TECHNOLOGY CORP.
(the "Acquiring Company")**

**General Description of Business**

ATI Modular Technology Corp. ("We," "us," or the "Company") is an operating company engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US-based methods for creating modular spaces, facilities, and properties. We are in the business of all aspects of modular construction, including but not limited to, (a) the furtherance of modular construction technology, education and development in developed and undeveloped countries, (b) acquisition and/or installation of construction equipment, materials, furnishings, adware, insulation, flooring, roofing, wiring, plumbing, heating and air conditioning, and landscaping, and (c) other businesses directly or tangentially related to these lines of services, including assisting businesses and entrepreneurs in securing naming, licensing or promotional rights, driving internet and media traffic, increasing visibility of product and name recognition, and other services. In China, the modular construction industry is new and in its very early stages. Though we expect other competitors to come forth, at this time, there are only three other competitors, and those competitors are based in China. None of the competitors are from the United States. We believe that it is recognized that United States modular technology is more advanced than our Chinese counterparts, and the technology is recognized as the gold standard. The construction industry in China, as a whole, has a mandate to immediately start developing modular technology with cities and provinces developing modular construction plans and targets to construct modular in both the public as well as private sectors. Most communities have milestones and are creating official policies on modular construction with the actual percentage of production mandated by particular target dates.

Table of Contents

We have been sought out by three separate governments in China to assist their communities in developing their modular industry based upon United States' technology. We have experience in the construction sector in China and the United States, and thus we believe we have the leverage in assembling experts in the modular industry to assist in delivery of goods, services, equipment, technology, and know-how all under the moniker of "Made in the USA."

On June 21, 2016, AmericaTowne, the controlling shareholder of the Company by virtue of its majority ownership of common stock in the Company, entered into a Cooperative Agreement with the Shexian County Investment Promotion Bureau (the "Shexian County Bureau") out of Shexian, China (hereinafter, the "AT/Shexian Cooperative Agreement"). The AT/Shexian Cooperative Agreement relates to the construction of an AmericaTowne location in advancing tourism in the Hanwang mountains.

Under the terms of the AT/Shexian Cooperative Agreement, AmericaTowne and the Shexian County Bureau have agreed to a strategic partnership wherein the Shexian County Bureau intends to invest local resources to AmericaTowne for construction of an AmericaTowne community. In consideration, AmericaTowne intends on investing funds towards the development of the AmericaTowne community. AmericaTowne will be obligated to bear any and all applicable taxes and the projected investment by AmericaTowne into the development of the AmericaTowne community is estimated to be $30,000,000. It is anticipated that the definitive agreement will set forth a detailed projection and proforma associated with the use of funds. There is no guarantee that AmericaTowne will be able to raise this capital in the event a definitive agreement is executed. Furthermore, AmericaTowne's ability to raise the necessary capital and to perform obligations under any definitive agreement might be materially affected in the event the Company is not able to perform any of its obligations under any future definitive agreement with the Shexian County Bureau.

On June 21, 2016, the Company agreed to participate with the Shexian County Bureau in building local modular construction, researching technology and intelligent systems related thereto, and servicing the full lifecycle of modular construction in the locale through the execution of the Cooperative Agreement (the "ATI Modular/Shexian Cooperative Agreement").

19

Pursuant to future negotiations and more definitive agreements, ATI Modular has agreed to purchase the requisite equipment and technology in performing under the ATI Modular/Shexian Cooperative Agreement. In consideration for the services provided by ATI Modular, the Shexian County Bureau has agreed to be responsible for providing factories and land, and other resources and manpower in developing the modular construction. The Company has also agreed to exercise its best efforts in raising approximately $30,000,000 in furthering the parties' collective interests under the ATI Modular/Shexian Cooperative Agreement. These funds would be allocated towards different operating costs than the funds necessary for AmericaTowne to perform under the AT/Shexian Cooperative Agreement. It is anticipated that the definitive agreement will set forth a detailed projection and proforma associated with the use of funds. The Company and the Shexian County Bureau have agreed to continue to cooperate in good faith in executing and further agreements needed in furthering their respective objectives. However, notwithstanding this intent, the Company's ability to perform might be materially affected in the event AmericaTowne is not able to meet its obligations in furthering any future definitive agreement with the Shexian County Bureau.

On September 8, 2016, the Company entered into the Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project with the Jiangnan Industry Zone in Anhui Province (the "Jiangnan Agreement"). Under the Jiangnan Agreement, the Company has agreed to manufacture and install modular buildings, and provide research into the development of green building module manufacturing. The Company has agreed to provide appropriate technology and intelligent systems in providing modular building lifecycle services. The location of the planned project is the New Material Industry Park in the Jiangnan Industry Zone in Anhui Province. The parties have projected a cost of $30,000,000.

On December 28, 2016, the Company entered into the American ATI Modular Technology Company Project Investment Agreement (the "Investment Agreement"), definitive agreement and supersedes the Jiangnan Cooperation Agreement of September 8, 2016. Under the Investment Agreement, the Administrative Committee of Jiangnan Industrial Concentration Zone of Anhui Province (hereinafter, "Jiangnan") and the Company have agreed to the construction of the Company's green, modular building and related technology under the project name "Modular Plant Production Base."

The capitalization under the Investment Agreement is, in part, the Company's responsibility. However, the Company and Jiangnan have agreed to certain provisions to mitigate against financing risks, including, but not limited to: (a) access upon request by the Company to local bank loans in the Anhui Province and United States Exim Bank, (b) equity fund insertion up to $3,000,000 USD, and (c) contribution by Jiangnan up to $2,900,000 upon meeting conditions in the Investment Agreement.

On September 9, 2016, the Company entered into the Investment and Cooperation Agreement for ATI Modular Green Building Manufacturing Project with the Yongan government in the Fujian province (the "Yongan Agreement"). Under the Yongan Agreement, similar to the Jiangnan Agreement, the Company has agreed to manufacture and install modular buildings, and provide research into the development of green building module manufacturing. The Company has agreed to provide appropriate technology and intelligent systems in providing modular building lifecycle services. The location of the planned project is Yongan city in the Fujian province, China. The parties have projected a cost of $30,000,000.

Table of Contents

The Company has agreed to grant the Yongan government audit, access, supervision, inspection and other rights. The Yongan government has agreed to coordinate any and all necessary services in securing benefits associated with the Company being a foreign investment enterprise, including but not limited to, providing the site for the manufacturing facility, tax relief, access to financing and a "Project Headquarter" for the Company, which is defined in the Yongan Agreement. The Yongan Agreement is not a definitive agreement; rather, it is a memorialization of the parties' future intent as to the subject matter therein. The Company's business plans and objectives could be impaired in the event the parties do not reach a definitive agreement. . The Company is responsible for financing and providing any necessary facilities inside any factory plant. There is no guarantee that the Company can secure such financing or develop the necessary facilities.

20

On June 27, 2016, we entered into a Sales and Support Services Agreement with Yilaime Corporation, a Nevada corporation ("Yilaime"). Yilaime is controlled by Mr. Perkins, who is our sole director and officer. Yilaime holds the majority of issued and outstanding shares of common stock in AmericaTowne, Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). Under the Services Agreement, Yilaime will provide the Company with marketing, sales and support services in the Company's pursuit of ATI Modular business in China in consideration of a commission equal to 10% of the gross amount of monies procured for the Company through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay the Company a quarterly fee of $250,000 starting on July 1, 2016. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. Yilaime retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement. Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of the Company.

On June 28, 2016, we entered into a Modular Construction & Technology Services Agreement (the "Modular Services Agreement") with AmericaTowne Inc. ("ATI"), a Delaware corporation and fully-reporting company with the SEC. The impetus behind the Modular Services Agreement was the Company's Cooperative Agreement with the Shexian County Government, China. Under the Cooperative Agreement, ATI and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains, Shexian, China. In addition, ATI, at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency plan to pursue the development of an AmericaTowne Community and an International School in Longyan County China.

Under the Modular Services Agreement, ATI Modular shall provide the research, development, training and modular technology in a manner deemed commercially acceptable by ATI based on its commercially reasonable requirements, plans and specifications, which shall be agreed upon in advance of any substantial and material construction. ATI will pay the Company a quarterly fee of $125,000 per quarter. The initial fee under the Modular Services Agreement with AmericaTowne was recorded as a related-party receivable upon its execution. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. ATI retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

On June 29, 2016, we entered into an IC-DISC Service Provider Agreement with AXP Holding Corporation, a Nevada corporation ("AXP Holding") and related party to the Company through Mr. Perkins control of AXP Holding. AXP Holding is an Interest Charge - Domestic International Sales Corporation, or "IC-DISC". AXP IC-DISC tax-exempt status was authorized and approved by the United States Department of the Treasury, Internal Revenue Service. As an IC-DISC, AXP Holding may, under certain conditions, act as a sister corporation to entities and provide services to assist a company in obtaining lower tax rates on export income. In addition to the export tax savings provided by AXP, AXP can provide an additional array of services including promoting the Company's export activities, purchasing receivables from the Company at a discount through a factoring relationship, and providing the Company with working capital loans.

21

The term under the IC-DISC Service Provider Agreement is set to expire on December 6, 2019, absent early termination for breach thereof by either party. AXP retains the right to extend the term, exercising its sole discretion, to December 6, 2024 by providing written notice to the Company by November 6, 2019. AXP has agreed to a non-compete and non-circumvent in providing the services under the IC-DISC Service Provider Agreement. The Company has agreed to pay AXP a commission fee up to the greater of 50% of the Company's export net income or 4% of the Company's export gross receipts. The Company will

<u>Table of Contents</u>

determine the exact amount and the method of payment of the commission fee. The commission fee shall be paid at the option of the Company periodically throughout the year, but no later than December 31 on annual basis. If there is no commission fee due to no export sales, the Company will pay AXP an export service fee of $50,000. The export service fee, if any, is due on or before December 31 on an annual basis.

In addition, for referring businesses from the Company's "Export Platform" or "Community," AXP agrees to pay the Company 25% of each "Sales Export Service Fee" charged and received as an "IC-DISC Commission" from each Exporter or Licensee resulting from participating in the Export Platform or Community. This fee is called a "Group Export Consulting Fee" in the IC-DISC Service Provider Agreement, and is due no later than fifteen business days after receipt from the Exporter or Licensee, but no later than December 31 on an annual basis. For illustrative purposes, if AXP receives and charges an Exporter 50% of its net export sales as a commission, and that value is $100,000, AXP would owe the Company 25%, or $25,000. Furthermore, during the term, the Company shall pay AXP a flat fee of $5,000 per transaction for purchasing receivables from the Company, plus an interest rate for such factoring at the prime rate plus one-percent.

The Company is in the early stages of its operations, and many of its plans and objectives are aspirational in nature, and thus might never come to fruition. At this time, the Company plans to retain engineering and architectural firms based in the United States who have extensive experience in developing modular structures in the United States, China and other foreign locations based on market demand, which has not been thoroughly researched to date. The Company has been focused on obtaining quotes, negotiating formal engagements and researching all aspects of the modular construction industry. While the infrastructure is still in the developmental stage, the Company is confident that it has the experience, or access to those with experience, in the modular construction field.

The Company plans on engaging in onsite placement and delivery of modular structures. Mr. Perkins has extensive experience in operating business in China. One of the reasons that Mr. Perkins was sought out and invited to participate in developing the modular industry in China is that he was the co-chairman of a construction company in China - Yilaime Foreign Partnership in Henghsui China. His experience with Yilaime Foreign Partnership allows ATI Modular to call on local companies in China as well as modular companies and experts in the United States to help provide on-site services. Yilaime Foreign Partnership is not a related party to the Company, ATI, Yilaime or AXP.

In addition, the Company recently joined the Modular Building Institute in Charlottesville, Virginia. In September of 2016, Mr. Perkins attended the Institute's annual exposition in order to line up available suppliers, and experts in the modular construction field.

We intend on offering support services in all phases of modular construction. Our approach will be to focus on exporting United States based technology, services and equipment, and general "know-how." Exporters in our related company, AmericaTowne, are experienced in the modular field and we plan on allowing those experienced exporters to participate in various levels of our program.

The Company currently does not have a principal supplier of raw materials. The Company has identified potential sources of raw materials in the United States through its membership in the Modular Building Institute. One of our primary challenges will be pricing the source of raw materials and delivery to China. We are also looking to potential raw material sources in China.

22

To operate within China, the Company requires approval of government officials in China. In both cases where the Company has signed Cooperative or Definitive Agreements (and in the case of the Shexian Agreement), and at the invitation of the local government, we have the approval to register and conduct business.

**Business Developments in Fiscal Year 2017**

The Company had disclosed that the Jiangnan Cooperation Agreement was not a definitive agreement. On December 28, 2016, the parties entered into the American ATI Modular Technology Company Project Investment Agreement (the "Investment Agreement"), which supersedes the Investment and Cooperation Agreement with the Jiangnan Industry Zone in Anhui Province dated September 8, 2016 disclosed in the Company's Form 10-12g Registration Statement.

Under the Investment Agreement, the Administrative Committee of Jiangnan Industrial Concentration Zone of Anhui Province (hereinafter, "Jiangnan") and the Company have agreed to the construction of the Company's green, modular building and related technology under the project name "Modular Plant Production Base." By or before February 27, 2017, the Company will rent buildings, factories and rental houses from Jiangnan, or its related-party - Jiangnan Construction & Development Co., Ltd. ("Jiangnan Construction"), with a total acreage of approximately 244,776 square meters (approximately 2,634,747 square feet) for purposes of advancing the Company's modular construction, technology and research, and with a chosen location within this area for the Company's global company offices; however, the Company will retain its offices in the United States, as identified above. In the event the Company does not occupy the rented facilities in one-year, Jiangnan may place other tenants in the buildings for unrelated projects. The rental rate is as follows per square meter, per month: (a) 9 Chinese Yuan (approximately $1.29 USD) for single-storied factory buildings, (b) 7 Chinese Yuan (approximately $1.01 USD) for multistoried factory buildings,

Table of Contents

(c) 6 Chinese Yuan (approximately $.86 USD) for two-storied buildings, (d) 5 Chinese Yuan (approximately $.75 USD) for threestoried buildings and public rental, and (e) 10 Chinese Yuan (approximately $1.38 USD) for commercial housing. The first twenty-seven months is rent free.

The initial deposit of 330,000 Chinese Yuan (approximately $48,000 USD) is due to Jiangnan Construction by January 11, 2016. This amount may be applied to the Company's rental obligations. The Company has agreed to further capitalize the operation with 396,000,000 Chinese Yuan (approximately $57,000,000 USD) with 79,200,000 Chinese Yuan (approximately $11,000,000 USD) by December 31, 2017.

The capitalization under the Investment Agreement is, in part, the Company's responsibility. However, the Company and Jiangnan have agreed to certain provisions to mitigate against financing risks, including, but not limited to: (a) access upon request by the Company to local bank loans in the Anhui Province and United States Exim Bank, (b) equity fund insertion up to $3,000,000 USD, and (c) contribution by Jiangnan up to $2,900,000 upon meeting conditions in the Investment Agreement.

The Company's majority and controlling shareholder, AmericaTowne, has no financial obligations under the Investment Agreement. However, AmericaTowne's director, officer and control person by virtue of his beneficial ownership of more than 51% of the issued and outstanding shares of common stock is Alton Perkins. Mr. Perkins is also the beneficial owner of the controlling interest in the Company by virtue of his ownership in AmericaTowne, and he is the Company's sole director and officer. As a result, Mr. Perkins might elect to vote AmericaTowne's shares, or exercise his rights as the sole member of the Board of Directors of AmericaTowne, to loan funds from AmericaTowne to the Company to satisfy the capital requirements under the Investment Agreement. If this occurred, the loaned funds would become a related-party debt to the Company. There are no current plans or intentions by Mr. Perkins to facilitate such a loan.

The Investment Agreement sets forth certain benefits, subsidies and incentives offered by the Chinese government, subject to the Company reaching certain benchmarks and employing a specific numbers of employees from the region. In addition, Jiangnan has agreed to certain financial contributions to the Company if it meets certain listing standards in China, and has agreed to exercise best efforts in pursuing private equity contributions for the benefit of the Company in China. The Investment Agreement contains events of default, and the respective rights and duties of the parties in the event of default. There is risk that investment by the Company may be made under the Investment Agreement, and as a result of an uncured default, the Company could lose its investment and opportunities in the region. Chinese law governs any disputes under the Investment Agreement, and the parties have agreed to jurisdiction of any dispute in Jiangnan's region. As a result, the Company might have logistical problems in litigating any such dispute.

23

On December 4, 2017, the Company and Mangel Klicks Company Limited, a Ghana corporation ("Mangel Klicks") entered into a Procurement Agreement for the procurement of hospital equipment to be used in Accra, Ghana (the "Procurement Agreement"). Pursuant to the terms of the Procurement Agreement, Mangel Klicks has agreed to pay $578,000 to the Company in consideration of the Company's procurement of specific hospital equipment set forth in the Procurement Agreement. Mangel Klicks has agreed to pay 25% of the consideration, or $144,500, upon execution of the Procurement Agreement. The Company has received this initial payment. The balance of the consideration shall be paid by an irrevocable, confirmed Letter of Credit from a banking institution deemed acceptable to the Company. The specific terms of the consideration are set forth in Section 2 of the Procurement Agreement. There is no material relationship between the Company and Mangel Klicks.

As with any business plan that is aspirational in nature, there is no assurance the Company will be able to accomplish all of its objectives or that it will be able to meet financing needs to accomplish said objectives. The Company is a "shell company," as defined under Rule 12b-2 of the Exchange Act. Our CIK number is 0001697426, and we have selected December 31 as our fiscal year.

**Description of Property**

We are currently evaluating a physical location for our operations in China along with a manufacturing facility. Our principal executive offices are located at 4700 Homewood Court, Suite 100 in Raleigh, North Carolina. We are registered as a foreign business entity in the State of North Carolina. We lease the office space from Yilaime Corporation, a Nevada corporation doing business in North Carolina for $2,500 per month. Yilaime is a related party to the Company.

**Legal Proceedings**

There are not presently any material pending legal proceedings to which the Company is a party or as to which any of its property is subject, and no such proceedings are known to the Company to be threatened or contemplated against it.

**Market Price of and Dividends on the Registrants Common Equity and Related Stockholder Matters.**

Prior to June 27, 2016, the Company was incorporated as Global Recycle Energy, Inc. On June 27, 2016, the Company amended its Articles of Incorporation with the State of Nevada to change the name of the Company to ATI Modular Technology Corporation. On June 12, 2017, FINRA approved the name change

Table of Contents

to ATI Modular Technology Corp and symbol change to ATMO. The Company is subject to Alternative Reporting Standards. The range of high and low bid information for the Company's common shares for each full quarterly period within the two most recent fiscal years, and any subsequent interim period for which financial statements are included, or as required under Article 3 of Regulation S-X, is as follows:

|  | 4/1/16-6/30/16 | 7/1/16-9/30/16 | 10/1/16-12/31/16 | 1/1/17-3/31/17 | 4/1/17-6/30/17 | 7/1/17-9/30/17 | 10/1/17-12/31/17 | 1/1/18-3/31/18 |
|---|---|---|---|---|---|---|---|---|
| High | 0.4 | 9.74 | 8.95 | 9.39 | 8.25 | 74.99 | 3749.50* | 4.00 |
| Low | 0.15 | 0.4 | 7.5 | 5.25 | 0.35 | 0.25 | 305.50* | .55 |

*OTCMarkets displays the Company's prices as if the Reverse Split discussed above has been effectuated. The Company does not consider the Reverse Split effectuated until the Commission's approval of the Company's Information Statement on Schedule 14C and Registration Statement on Form S-4.

As the most recent practicable date, there are approximately 181 record holders of our common stock with an aggregate of 126,740,708 shares issued and outstanding. The Company has not paid any cash dividends to date and does not anticipate or contemplate paying dividends in the foreseeable future. It is the present intention of management to utilize all available funds for the development of the Company's business. We have no securities authorized for issuance under any Equity Compensation Plans.

The Company's shares are traded on the OTC Markets on OTC:Pink. The Company is currently listed by FINRA as a Caveat Emptor security and public interest concern with the OTC. The potential reasons for this categorization are set forth at http://www.otcmarkets.com/stock/ATMO/quote, even though no specific reason has been stated by OTC.

24

Table of Contents

**Financial Statements**

ATI Modular Technology Corp
Balance Sheets

| | | March 31,<br>2018<br>(Unaudited) | | December 31,<br>2017 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 146,060 | $ | 159,746 |
| Accounts receivable, net - related parties | | 1,747,092 | | 1,396,202 |
| Other receivables - related parties | | 52,264 | | 98,424 |
| Total Current Assets | | 1,945,416 | | 1,654,372 |
| Office Equipment Furniture & Fixtures | | 9,945 | | 10,784 |
| Total Assets | $ | 1,955,361 | $ | 1,665,156 |
| | | | | |
| **Liabilities and Stockholders' Equity** | | | | |
| Current Liabilities | | | | |
| Accounts payable and accrued expenses | $ | 25,411 | $ | 40,411 |
| Deferred Revenue | | 1,504,387 | | 1,254,387 |
| Income tax payable | | 14,868 | | 10,337 |
| Total Current Liabilities | | 1,544,666 | | 1,305,135 |
| Total Liabilities | | 1,544,666 | | 1,305,135 |
| Commitments and Contingencies | | | | |
| **Stockholders' Equity** | | | | |
| Common stock,$0.001 par value, 500,000,000 shares authorized;<br>126,740,708 shares issued and outstanding | | 126,741 | | 126,741 |

Table of Contents

| | | | |
|---|---|---|---|
| Common stock subscribed | 1,000 | | 1,000 |
| Additional paid in capital | 897,340 | | 897,340 |
| Deferred compensation | (325,000) | | (350,000) |
| Receivable for issuance of stock | (206,980) | | (206,980) |
| Retained Earnings | (82,406) | | (108,080) |
| Total stockholders' equity | 410,695 | | 360,020 |
| Total liabilities and stockholders' equity | $ 1,955,361 | $ | 1,665,155 |

See Notes to Financial Statements

25

ATI Modular Technology Corp
Statements of Operations
(Unaudited)

| | For the Three Months Ended March 31, | | |
|---|---|---|---|
| | 2018 | | 2017 |
| Revenues - related parties | $ 125,000 | $ | 125,000 |
| Cost of revenues - related parties | = | | = |
| Gross profit | 125,000 | | 125,000 |
| | | | |
| Operating expenses | | | |
| General and administrative | 94,796 | | 110,235 |
| | | | |
| Net income from operation | 30,204 | | 14,765 |
| | | | |
| Other Income | — | | — |
| | | | |
| Net income from operation before taxes | 30,204 | | 14,765 |
| | | | |
| Provision for income taxes | 4,531 | | 2,215 |
| | | | |
| Net income | $ 25,673 | $ | 12,550 |

| | | |
|---|---|---|
| Earnings per common share-basic and diluted | $ 0 | $ 0.00 |
| Weighted average number of common shares outstanding basic and diluted | | |
| **See Notes to Financial Statements** | 126,740, | 126,738,200 |

26

ATI Modular Technology Corp
Statements of Cash Flows
(Unaudited)

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2018 | 2017 |
| **Operating Activities** | | |
| Net income (loss) of the period | $ 25,673 | $ 12,550 |
| Adjustments to reconcile net loss from operations | | |
| Bad debt expense | 17,670 | 15,422 |
| Depreciation | 839 | 2,123 |
| Amortization on deferred compensation | 25,000 | 25,000 |
| Changes in Operating Assets and Liabilities | | |
| Accounts receivable | (368,560) | (308,435) |
| Other receivables | 46,160 | 14,764 |
| Accounts payable and accrued expenses | (15,000) | (5,001) |
| Deferred revenue | 250,000 | 215,000 |
| Income tax payable | 4,531 | 2,215 |
| Net cash used in operating activities | (13,686) | (26,362) |
| **Investing Activities** | | |
| Purchase of fixed assets | — | (861) |
| Net cash used in investing activities | — | (861) |
| **Financing Activities** | | |
| Proceeds from issuance of stock | — | 22,500 |
| Net cash provided by financing activities | — | 22,500 |
| Net increase (decrease) in cash and equivalents | (13,686) | (4,723) |

Table of Contents

| | | | | |
|---|---|---:|---|---:|
| Cash and equivalents at beginning of the period | | 159,746 | | 94,266 |
| Cash and equivalents at end of the period | $ | 146,060 | $ | 89,543 |

Supplemental cash flow information:

| | | | | |
|---|---|---|---|---|
| Interest paid | $ | | $ | |
| Income taxes paid | $ | | $ | |

**See Notes to Financial Statements**

27

<u>Table of Contents</u>

**ATI Modular Technology Corp.**
**Notes to Financial Statements (Unaudited)**

## NOTE 1. ORGANIZATION AND DESCRIPTION OF BUSINESS

ATI Modular Technology Corp., defined above and herein as the "Company" formerly Global Recycle Energy, Inc., was incorporated under the laws of the State of Nevada on March 7, 2008. The Company is engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US-based methods for creating modular spaces, facilities, and properties. As with any business plan that is aspirational in nature, there is no assurance we will be able to accomplish all our objective or that we will be able to meet our financing needs to accomplish our objectives.

The Company is an operating company engaged in the development and the exporting of modular energy efficient and smart technology and processes that allow government and private enterprises in China and elsewhere to use US-based methods for creating modular spaces, facilities, and properties. The Company is in the business of all aspects of modular and smart construction, including but not limited to, (a) the furtherance of modular and smart construction technology, education, development and production in developed and undeveloped countries, (b) acquisition and/or installation of construction equipment, materials, furnishings, hardware, insulation, flooring, roofing, wiring, plumbing, heating and air conditioning, and landscaping, and (c) other businesses directly or tangentially related to these lines of services, including assisting businesses and entrepreneurs in securing naming, licensing or promotional rights, driving internet and media traffic, increasing visibility of product and name recognition, and other services.

Our principal executive offices are located at 4700 Homewood Court, Suite 100 in Raleigh, North Carolina. We are registered as a foreign business entity in the State of North Carolina. We lease the office space from Yilaime Corporation, a Nevada corporation doing business in North Carolina, and a related party to the Company, as set forth below. Our physical location for our operations in China along with a manufacturing facility is Anhui Province Jiangnan Industrial Concentration Zone New Energy Industry Park A1, A2, A5 Plant Chizhou City, Anhui Province, China. The Company has registering its wholly owned subsidiary Anhui Ao De Xin Modular Building Technology Co. Ltd. in Jiangnan Industry Zone, Chizhou, China.

The Company entered an Investment and Cooperation Agreement with the Jiangnan Industry Zone in Anhui Province, China dated September 8, 2016 (the "Jiangnan Cooperation Agreement"). On December 28, 2016, the Company entered the definitive agreement, American ATI Modular Technology Company Project Investment Agreement (the "Investment Agreement") with the Administrative Committee, Jiangnan Industry Zone in Anhui Province. The Investment Agreement superseded the Jiangnan Cooperation Agreement. Under the Investment Agreement, the Administrative Committee of Jiangnan Industrial Concentration Zone of Anhui Province (hereinafter, "Jiangnan") and the Company have agreed to the construction of the Company's green, modular building and related technology under the project name "Modular Plant Production Base."

Under the Investment Agreement, the Company has agreed to manufacture and install modular buildings, and provide research into the development of green building module manufacturing using US based technology. The Company has agreed to provide appropriate technology and intelligent systems in providing modular building lifecycle services. In addition, to modular and smart technology, the Company and Jiangnan has agreed to establish: 1) a modular development institute research and training center; 2) an entrepreneurial incubator; 3) an engineering technology research center; 4) an industrial design center; 5) a post-doctoral workstations and engineering laboratories; and 6) an international student intern summer work program. Where possible the Company's aim is to increase US exports by using American based technology, equipment and services. (Strategy).

The Company presented to Anhui Project to United States Ex-Im Bank, which provided a Letter of Interest in providing support for the Project. Additionally, pursuant to its agreement with Chizhou government, Chizhou preliminarily agreed to provide support for EX-IM funding either by a guarantee or local bank support. Although no loan application has been submitted management is under the impression that subject to meeting Ex-Im Bank's standard underwriting requirements, there is a possibility of loans, and other funding including working capital and insurance. Going forward, we plan on working with Ex-Im to seek insurance and funding for the Chizhou operations. There is no assurance that funding and or insurance will be obtained.

The Company entered the Modular Services Agreement with AmericaTowne, a related party and the majority and controlling shareholder of the Company, to support AmericaTowne's obligations under the Shexian Agreement in designing, installing and manufacturing American modular technology for use in all government and private buildings throughout Shexian County, and elsewhere in China. The terms and conditions of the Modular Services Agreement with AmericaTowne and the Shexian Agreement are set forth above.

Also, the Company has entered the Yongan and Shexian Agreements to pursue the development of business opportunities involving modular technology and investments, and business development. While we plan to have robust operations in the United States and international locations, we expect the bulk of our operations and revenue will come from China.

28

China's economy and its government impact our revenues and operations. While the Company has an agreement in place with the government of Jiangnan as well as the approval by government officials in Shexian and Yongan China to operate facilities there is no assurance that we will operate the facilities successfully. Additionally, the Company will need government approval in other locations in China to operate other aspects of our business plan. There is no assurance that we will be successful in obtaining approvals from government entities in other locations to operate other aspects of our business plan. Finally, Mr. Perkins, as a control person of each entity – AmericaTowne and the Company, might elect to forego certain obligations of AmericaTowne under other Corporative Agreements currently in place or not enter more definitive agreements with Governments in China and elsewhere, which in turn, could impact the Company's ability to meet its business plan set forth herein.

**NOTE** 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation

These financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP").

Interim Financial Statements

These interim unaudited financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. They do not include all the information and footnotes required by generally accepted accounting principles for complete financial statements. Therefore, these financial statements should be read in conjunction with the Company's audited financial statements and notes thereto contained in its report on Form 10-K for the transition period ended December 31, 2017.

The financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly the Company's financial position at March 31, 2018, and the results of its operations and cash flows for the three months ended March 31, 2018. The results of operations for the period ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

Accounting Method

The Company's financial statements are prepared using the accrual method of accounting. The Company has elected a fiscal year ending on December 31.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. In the opinion of management, all adjustments necessary in order to make the financial statements not misleading have been included. Actual results could differ from those estimates.

Financial Instruments

The carrying amount reported in the balance sheet for cash, accounts receivable, accounts payable, accrued expenses, interest payable and short-term notes payable approximate fair value because of the immediate or short term maturity of these financial instruments.

Cash Equivalents

The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

Accounts Receivable

Accounts' receivable are stated at the amount management expects to collect from outstanding balances. Management provides for probable uncollected amounts through a charge to earnings and a credit to an allowance for bad debts based on its assessment of the current status of individual accounts. Balances that are still outstanding after management has used reasonable collection efforts are written off through a charge to the allowance for bad debts and a credit to accounts receivable.

29

Table of Contents

Our bad debt policy is determined by the Company's periodic review of each account receivable for reasonable assurance of collection. Factors considered are the customer's financial condition, past payment history if any, any conversations with the customer about the customer's financial conditions and any other extenuating circumstances. Based upon the above factors the Company makes a determination whether the receivable are reasonable.

Concentration of Credit Risk

Financial instruments that potentially subject the Company to a significant concentration of credit risk consist primarily of cash and cash equivalents. The Company maintains deposits in federally insured financial institutions in excess of federally insured limits. However, management believes the Company is not exposed to significant credit risk due to the financial position of the depository institutions in which those deposits are held.

Property, Plant, and Equipment

Property, plant and equipment are initially recognized recorded at cost. Gains or losses on disposals are reflected as gain or loss in the period of disposal. The cost of improvements that extend the life of plant and equipment are capitalized. These capitalized costs may include structural improvements, equipment and fixtures. All ordinary repairs and maintenance costs are expensed as incurred.

Depreciation for financial reporting purposes is provided using the straight-line method over the estimated useful lives of the assets:

Office equipment                    3-5 years

For the three months ended March 31 2018 and 2017 depreciation expense is $839 and $2,123, respectively

Income Taxes

Income taxes are provided in accordance with Statement of Financial Accounting Standards ASC 740 Accounting for Income Taxes. A deferred tax asset or liability is recorded for all temporary differences between financial and tax reporting and net operating loss carry forwards. Deferred tax expense (benefit) results from the net change during the year of deferred tax assets and liabilities. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion of all the deferred tax assets will be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

The Company was established under the laws of the State of Nevada and is subject to U.S. federal income tax and Nevada state income tax, if any. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts and are based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred income tax assets to the amount expected to be realized.

Earnings per Share

In February 1997, the FASB issued ASC 260, "Earnings per Share", which specifies the computation, presentation and disclosure requirements for earnings (loss) per share for entities with publicly held common stock. ASC 260 supersedes the provisions of APB No. 15, and requires the presentation of basic earnings (loss) per share and diluted earnings (loss) per share. The Company has adopted the provisions of ASC 260 effective (inception).

Basic earnings or net loss per share amounts are computed by dividing the net income or loss by the weighted average number of common shares outstanding. Diluted earnings per share are the same as basic earnings per share due to the lack of dilutive items in the Company.

At March 31, 2018 and December 31, 2017, no potentially dilutive shares were outstanding.

Impact of New Accounting Standards

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

30

Revenue Recognition

Table of Contents

The Company's revenue recognition policies comply with FASB ASC Topic 605. The Company follows paragraph 605-10-S99-1 of the FASB Accounting Standards Codification for revenue recognition. The Company will recognize revenue when it is realized or realizable and earned. The Company considers revenue realized or realizable and earned when all the following criteria are met: (i) persuasive evidence of an arrangement exists, (ii) the product has been shipped or the services have been rendered to the customer, (iii) the sales price is fixed or determinable, and (iv) collectability is reasonably assured.

The Company does not provide unconditional right of return, price protection or any other concessions to its customers.

There were no sales returns and allowances from inception to March 31, 2018.

## NOTE 3. GOING CONCERN

The Company's financial statements are prepared using accounting principles generally accepted in the United States of America applicable to a going concern that contemplates the realization of assets and liquidation of liabilities in the normal course of business.

The Company is still in development stage and has not created sufficient revenue to cover any operating losses it may incur. Management's plans include the raising of capital through the equity markets to fund future operations, seeking additional acquisitions, and generating of revenue through our business. However, there can be no assurances the Company will be successful in its efforts to secure additional equity financing and obtaining sufficient revenue producing contracts. These factors raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classification of liabilities that might result from this uncertainty.

## NOTE 4. ACCOUNT RECEIVABLES – RELATED PARTIES

The nature of the accounts receivable for March 31, 2018 in the amount of $1,839,044 are for modular construction and technology services and utilization of anticipated modular construction technology by ATI pursuant to the Modular Construction & Technology Services Agreement between ATI and the Company dated June 28, 2016 (hereinafter, the "ATI Services Agreement") and for the Sales and Support Services Agreement with Yilaime on June 27, 2016 (the "Yilaime Services Agreement"). On March 31, 2018, the Company's allowance for bad debt is $91,952 which provides a net receivable balance of $1,747,092.

Accounts receivable consist of the following:

| | December 31 2017 | December 31 2016 |
|---|---|---|
| Accounts receivable related parties | 1,839,044 | 1,469,686 |
| Less: Allowance for doubtful accounts | (91,952) | (73,484) |
| **Accounts receivable, net** | $1,747,092 | $1,396,202 |

Bad debt expense was $17,670 and $15,422 for the three months ended March 31, 2018 and 2017, respectively.

## NOTE 5. DEFERRED REVENUE

The Company receives $250,000 quarterly fee from Yilaime for Sales and Support Services Agreement. In accordance with ASC 605-50-45, the Company defers and recognizes as a reduction to the future costs for quarterly fee. For the three months ended March 31, 2018, $250,000 fee from exclusive agreement incurred; $1,504,387 is booked deferred revenue as current liability on March 31, 2018 and $70,000 went against cost charged by Yilaime.

Case 5:18-cv-00487-D    Document 1-1    Filed 10/12/18    Page 145 of 223

## NOTE 6. SHAREHOLDER'S EQUITY

The stockholders' equity section of the Company contains the following classes of capital stock as of March 31, 2018:

Common stock, $ 0.001 par value: 500,000,000 shares authorized; 126,740,708 shares issued and outstanding;

Preferred stock, none: 0 shares authorized; but not issued and outstanding.

## NOTE 7. STOCK BASED COMPENSATION

The Company entered into an employment lock-up agreement on July 1, 2016 with Alton Perkins to serve as the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer and Secretary. The term of Mr. Perkins' agreement is five years with the Company retaining an option to extend in one-year periods. In consideration for Mr. Perkins' services, the Company has agreed to issue to his designee, the Alton & Xiang Mei Lin Perkins Family Trust, 10,000,000 shares of common stock. The Company may elect in the future to include money compensation to Mr. Perkins or his designee for his services provided there is sufficient cash flow.

For the three months ended March 31, 2018, $25,000 of stock compensation was charged to operating expenses and $325,000 was recorded as deferred compensation on March 31, 2018.

## NOTE 8. RELATED PARTIES TRANSACTIONS

The Company intends on relying on other businesses controlled by our sole director and officer, and beneficial owner of the majority shares of common stock in the Company – Alton Perkins, in implementing its business plan.

Mr. Perkins is the control person of Yilaime Corporation, AmericaTowne and AXP Holding Corporation. At this time, the purpose of the Company is to service the construction and related technology needs of AmericaTowne under AmericaTowne's agreements with the Shexian County Investment Promotion Bureau in developing an AmericaTowne community in the Hanwang mountains in Shexian, China. The Company also intends on supporting these services in other AmericaTowne ventures at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency in developing an AmericaTowne Community and an International School in Longyan County China.

The related export services rendered to the Company in the implementation of its business plan cannot be provided by AmericaTowne or through the AmericaTowne relationship. In order to avoid conflicts of interest, Mr. Perkins is of the opinion that there must be a separate and distinct agreement between, in this case, the Company and AXP Holding Corporation. Furthermore, although other similar IC-DISC entities exist, the Company is able to obtain better terms and conditions from AXP Holding Corporation in light of Mr. Perkins' control of AXP Holding Corporation.

AmericaTowne's Board of Directors determined that operating and controlling a separate but related entity focused on the development and the exporting of modular energy efficient technology and processes for government and private enterprises in China would be more prudent from a risk mitigation and operational standpoint than providing these services under the AmericaTowne business plan. Furthermore, the intent of the Company is to expand its services and relationships to other similar endeavors in projects not related to AmericaTowne, thus the need to maintain and operate a separate entity.

*Cooperative Agreement (Shexian County Government, China)*

The Company's majority and controlling shareholder – AmericaTowne, is a party under the Cooperative Agreement with the Shexian County Investment Promotion Bureau (the "Shexian Agreement"). Under the Shexian Agreement, AmericaTowne and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains. Although not definitive at this time, the parties have agreed that, in consideration for AmericaTowne's investment of approximately $30,000,000 into the development, plus any additional tax paid to the local government, where applicable, the Shexian County Bureau will dedicate local resources, including land (which AmericaTowne would be required to obtain rights through local bid invitation), and participation with AmericaTowne in an agreed upon equity split through a future definitive agreement.

The Company will be providing construction and technology services to AmericaTowne in facilitating AmericaTowne's obligations under the Shexian Agreement. The Company's ability to generate revenue under its agreement with AmericaTowne could be impaired in the event AmericaTowne is not able to meet its obligations under the Shexian Agreement. Furthermore, Mr. Perkins, as a control person of each entity, might elect to forego certain obligations of AmericaTowne under the Shexian Agreement or not enter into a more definitive agreement with the Shexian County Bureau, which in turn, could impact the Company's ability to meet its business plan set forth herein.

<u>Table of Contents</u>

32

---

*Sales and Support Services Agreement (Yilaime Corporation)*

On June 27, 2016, we entered into a Sales and Support Services Agreement with Yilaime Corporation, a Nevada corporation ("Yilaime"). Yilaime is controlled by Alton Perkins, who is our sole director and officer. Yilaime, and another related-party – Yilaime Corporation of NC, Inc. ("Yilaime NC"), are the holders of the majority of issued and outstanding shares of common stock in AmericaTowne, Inc. ("ATI"), a Delaware corporation and fully reporting company with the United States Securities and Exchange Commission (the "SEC"). Mr. Perkins is also the Trustee of the Alton & Xiang Mei Lin Perkins Family Trust ("Perkins Trust") and the AXP Nevada Asset Protection Trust 1 ("AXP"), which holds 5,100,367 and 120,000 shares, respectively, of the issued and outstanding common stock in ATI. Mr. Perkins is the beneficial owner of 20,674,484 shares of ATI, which equals 90.11% of issued and outstanding shares. Mr. Perkins is the beneficial owner of the majority and controlling interest in the Company through his direct holdings, and beneficial holdings through Yilaime, AXP and the Perkins Trust. ATI, Perkins Trust and Mr. Perkins beneficially own 110,117,593 shares, or 86%, of the Company's common stock.

Under the Services Agreement, Yilaime will provide the Company with marketing, sales and support services in the Company's pursuit of ATI Modular business in China in consideration of a commission equal to 10% of the gross amount of monies procured for the Company through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay the Company a quarterly fee of $250,000 starting on July 1, 2016. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. Yilaime retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of the Company.

*Modular Construction & Technology Services Agreement (AmericaTowne)*

On June 28, 2016, we entered into a Modular Construction & Technology Services Agreement (the "Modular Services Agreement") with AmericaTowne Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). The impetus behind the Modular Services Agreement was the Company's Cooperative Agreement with the Shexian County Government, China. Under the Cooperative Agreement, ATI and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains, Shexian, China. In addition, ATI, at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency plan to pursue the development of an AmericaTowne Community and an International School in Longyan County China.

Under the Modular Services Agreement, ATI Modular shall provide the research, development, training and modular technology in a manner deemed commercially acceptable by ATI based on its commercially reasonable requirements, plans and specifications, which shall be agreed upon in advance of any substantial and material construction. ATI will pay the Company a quarterly fee of $125,000 per quarter. The initial fee was paid upon signing the Modular Services Agreement. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. ATI retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

*Interest Charge – Domestic International Sales Agreement (AXP Holding Corporation)*

On June 29, 2016, we entered into an IC-DISC Service Provider Agreement with AXP Holding Corporation, a Nevada corporation ("AXP Holding") and related party to the Company through Mr. Perkins control of AXP Holding. AXP Holding is an Interest Charge - Domestic International Sales Corporation, or "IC-DISC". AXP IC-DISC tax-exempt status was authorized and approved by the United States Department of the Treasury, Internal Revenue Service. As an IC-DISC, AXP Holding may, under certain conditions, act as a sister corporation to entities and provide services to assist a company in obtaining lower tax rates on export income. In addition to the export tax savings provided by AXP, AXP can provide an additional array of services including promoting the Company's export activities, purchasing receivables from the Company at a discount through a factoring relationship, and providing the Company with working capital loans.

---

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 147 of 223

Table of Contents

The term under the IC-DISC Service Provider Agreement is set to expire on December 6, 2019, absent early termination for breach thereof by either party. AXP retains the right to extend the term, exercising its sole discretion, to December 6, 2024 by providing written notice to the Company by November 6, 2019. AXP has agreed to a non-compete and non-circumvent in providing the services under the IC-DISC Service Provider Agreement.

33

The Company has agreed to pay AXP a commission fee up to the greater of 50% of the Company's export net income or 4% of the Company's export gross receipts. The Company will determine the exact amount and the method of payment of the commission fee. The commission fee shall be paid at the option of the Company periodically throughout the year, but no later than December 31 on annual basis. If there is no commission fee due to no export sales, the Company will pay AXP an export service fee of $50,000. The export service fee, if any, is due on or before December 31 on an annual basis.

In addition, for referring businesses from the Company's "Export Platform" or "Community," AXP agrees to pay the Company 25% of each "Sales Export Service Fee" charged and received as an "IC-DISC Commission" from each Exporter or Licensee resulting from participating in the Export Platform or Community. This fee is called a "Group Export Consulting Fee" in the IC-DISC Service Provider Agreement, and is due no later than fifteen business days after receipt from the Exporter or Licensee, but no later than December 31 on an annual basis. For illustrative purposes, if AXP receives and or charges an Exporter 50% of its net export sales as a commission, and that value is $100,000, AXP would owe the Company 25%, or $25,000. Furthermore, during the term, the Company shall pay AXP a flat fee of $5,000 per transaction for purchasing receivables from the Company, plus an interest rate for such factoring at the prime rate plus one-percent.

The Company recognizes and confirms the requirements in ACS 850- 10-50-6 to disclose all related party transactions between the Company and related party transactions and or relationships.

The Company also leases office space from Yilaime for $2,500/month.

Pursuant to ASC 850-10-50-6, the Company makes the following transaction disclosures:

For Statement of Operations for the three months ended March 31, 2018 and 2017:

(a)$125,000 and $125,000 in revenues for ATI Services Agreements with the Company;
    (b)$7,500 and $7,500 for general and administrative expenses for rent expenses the Company paid to Yilaime towards its lease agreement;
    (c)$30,204 and $14,765 of compensation expense for AXP Holding Corp charges for DISC.
    (d)$25,000 and $25,000 for general and administrative operating expenses recorded as stock compensation for respective employment agreements;
    (e)$0 and $1,500 for general and administrative expenses for commissions and fees

For Balance Sheets on March 31, 2018 and December 31, 2017:

(a)$469,441 and $349,642 net account receivables ATI owes to the Company;
(b)$1,277,651 and $1,046,560 net account receivables Yilaime owes to the Company;
(c)$52,264 and $98,424 prepayments to AXP Holding Corp;
(d)$1,504,387 and $1,254,387 deferred revenue-Yilaime;
(e)$13,712 and 23,712 as accounts payable to Anhui Ao De Xin Modular Construction Technology Co., Ltd.;
(f) $325,000 and 350,000 as deferred compensation pursuant to respective employment agreements

34

## NOTE 9. INCOME TAXES

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

Significant components of income tax expense for the three months ended March 31, 2018 and 2017 are as follows

| For the Three Month Ended | March 31, 2018 | March 31, 2017 |
|---|---|---|

Table of Contents

| | | | | |
|---|---|---|---|---|
| Current tax expense | $ | 4,531 | $ | 2,215 |
| Deferred tax expense | | = | | = |
| Tax expense (benefit) | $ | 4,531 | $ | 2,215 |

The Company had $14,868 and $10,337 of income tax liability as of March 31, 2018 and December 31, 2017, respectively.

35

<u>Table of Contents</u>

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of ATI
Modular Technology Corp.

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of ATI Modular Technology Corp. as of December 31, 2017 and 2016, and the related statement of operations, stockholders' equity, and cash flows for the year ended December 31, 2017 and for the six months ended December 31, 2016, and the related notes (collectively referred to as the financial statements). In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of ATI Modular Technology Corp. as of December 31, 2017 and 2016, and the results of operations and cash flows for the year ended December 31, 2017 and for the six months ended December 31, 2016 in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion. **Consideration of the Company's Ability to Continue as a Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the financial statements, The Company is still in development stage and has not created sufficient revenue to cover any operating losses it may incur, which raise substantial doubt about the Company's ability to continue as a going concern. Management's plans concerning this matter are also described in Note 3. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*Yichien Yeh, CPA*

Yichien Yeh, CPA

We have served as the Company's auditor since 2016.

Oakland Gardens, New York
May 17, 2018

36

Table of Contents

**ATI Modular Technology Corp**
**Balance Sheets**

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| **Assets** |  |  |
| Current assets |  |  |
| Cash and cash equivalents | $ 159,746 | $ 94,266 |
| Accounts receivable, net - related parties | 1,396,202 | 458,755 |
| Other receivables - related parties | 98,424 | 159,772 |
| Total Current Assets | 1,654,372 | 712,793 |
|  |  |  |
| Office Equipment Furniture & Fixtures | 10,784 | 6,280 |
|  |  |  |
| Total Assets | $ 1,665,156 | $ 719,073 |
|  |  |  |
|  |  |  |
| **Liabilities and Stockholders' Equity** |  |  |
| Current Liabilities |  |  |
| Accounts payable and accrued expenses | $ 40,411 | $ 209,699 |
| Deferred Revenue | 1,254,387 | 324,387 |
| Income tax payable | 10,337 | = |
| Total Current Liabilities | 1,305,135 | 534,086 |
|  |  |  |
| Total Liabilities | 1,305,135 | 534,086 |
| Commitments and Contingencies |  |  |
|  |  |  |
| Stockholders' Equity |  |  |
|  |  |  |
| Common stock,$0.001 par value, 500,000,000 shares authorized; 126,740,708 and 126,733,337 shares issued and outstanding | 126,741 | 126,733 |
| Common stock subscribed | 1,000 | 982 |
| Additional paid in capital | 897,340 | 833,363 |
| Deferred compensation | (350,000) | (450,000) |
| Receivable for issuance of stock | (206,980) | (167,000) |
| Retained Earnings | (108,080) | (159,091) |
| Total stockholders' equity | 360,021 | 184,987 |

Table of Contents

**ATI Modular Technology Corp**

| | | | | | |
|---|---|---|---|---|---|
| Total liabilities and stockholders' equity | | $ | 1,665,156 | $ | 719,073 |

See Notes to Financial Statements

37

**Statements of Operations**

| | Year Ended December 31 2017 | Six Months Ended December 31 2016 | Years Ended June 30 | |
|---|---|---|---|---|
| | | | 2016 | 2015 |
| Revenues - related parties | $ 500,000 | $ 250,000 | $ 125,000 | $ — |
| Cost of revenues - related parties | = | = | = | = |
| Gross profit | 500,000 | 250,000 | 125,000 | — |
| | | | | |
| Operating expenses | | | | |
| General and administrative | 438,654 | 352,510 | 132,552 | 3,859 |
| | | | | |
| Net income (loss) from operation | 61,346 | (102,510) | (7,552) | (3,859) |
| | | | | |
| Other Income | 1 | — | 3,859 | — |
| | | | | |
| Net income (loss) from operation before taxes | 61,348 | (102,510) | (3,693) | (3,859) |
| | | | | |
| Provision for income taxes | 10,337 | — | — | — |
| | | | | |
| Net income (loss) | $ 51,011 | $ (102,510) | $ (3,693) | $ (3,859) |

Table of Contents

**ATI Modular Technology Corp**

| | | | | |
|---|---|---|---|---|
| Earnings (Loss) per common share-basic and diluted | $ | $ | $ | $ 0.00 |
| Weighted average number of common shares outstanding basic and diluted | 126,74| | 116,20| | 16,07| | 16,075,716 |

See Notes
to Financial Statements

38

---

**Statements of Changes in Stockholders' Equity**

| | Common Stock | | Common Stock Subscribed | Additional Paid-In Capital | Deferred Compensation | Receivable for Issuance of Stock | Retained Earnings | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Balance, June 30, 2014 | 16,075,716 | $ 16,076 | $ — | $ 32,953 | $ — | $ — | $ (49,029) | $ — |

Net loss for the year ended June 30,

Table of Contents

**ATI Modular Technology Corp**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2015 | = | = | = | | = | | = | = | (3,859) (3,859) |
| Balance, June 30, 2015 $ | | | $ = | $ 32,953 | $ = | $ = | | 16,075,716 $ 16,076 |
| (52,888) $ | (3,859) | — | | — | — | — | |
| Shares issued for services | 100,000,000 100,000 | = | = | = | = | — 100,000 |
| Net loss for the year ended June 30, | | | | | |
| 2016 | = | = | $ = | $ 32,953 | $ = | $ = | (3,693) (3,693) |
| Balance, June 30, 2016 $ | 982 | 310,410 | — | (167,000 | 116,075,716 $ 116,076 |
| | | 490,000 | (500,000 | — | (56,581) $ 92,448 |
| Shares issued for proceeds ) | 657,621 145,049 | — | — | 50,000 | 657 |
| Shares issued for services | 10,000,000 | = | = | = | = | 10,000 ) — |
| Amortization of Deferred Compensation | — | $ 982 | $ 833,363 | $ (450,000 | $ (167,000 | — 50,000 |
| | | 18 | 63,977 | | (39,980 |
| Net loss for the six months ended December 31, 2016 | = | = | — | — | 100,000 | (102,510) (102,510) |
| Balance, December 31, 2016 | 126,733,337 $126,733 | )) $ | — | — | 100,000 | (159,091) $ 184,987 |
| Shares issued for proceeds | 7,371 24,023 | = | = | = | = | 8 ) |
| | | 1,000 | 897,340 | (350,000 | (206,980 |
| Amortization of Deferred Compensation | — | — | | | — 100,000 |
| Net income for the year ended December 31, 2017 | = | = | | | 51,011 51,011 |
| | | | 126,740,708 126,741 | )) (108,080) 360,021 |

See Notes to Financial Statements

39
Statements of Cash Flows

Table of Contents

**ATI Modular Technology Corp**

| | Year Ended December 31 2017 | Six Months Ended December 31 2016 | Years Ended June 30 | |
|---|---|---|---|---|
| | | | 2016 | 2015 |
| Operating Activities | | | | |
| Net income (loss) of the period | )))$ 51,011 | $ (102,510 | $ (3,693 | $ (3,859 |
| Adjustments to reconcile net loss from operations | | | | |
| Bad debt expense | 65,435 | 17,895 | 6,250 | — |
| Depreciation | 1,893 | 416 | — | — |
| Shares issued for services | — | — | 100,000 | — |
| Amortization on deferred compensation | 100,000 | 50,000 | — | — |
| Changes in Operating Assets and Liabilities | | | | |
| Accounts receivable | ))) (1,002,882 | (357,900 | (125,000 | — |
| Other receivables | ) 61,348 | (159,772 | — | — |
| Advances to officers | ) — | 19,241 | (19,241 | — |
| Accounts payable and accrued expenses | ) (169,288 | 190,000 | 15,840 | 3,859 |
| Deposit from customers | ) — | (30,000 | 30,000 | — |
| Deferred revenue | 930,000 | 324,387 | — | — |
| Income tax payable | 10,337 | = | = | = |
| Net cash provided by (used in) operating activities | ) 47,854 | (48,243 | 4,156 | — |
| | | | | |
| Investing Activities | | | | |
| Purchase of fixed assets | )) (6,397 | (2,540 | = | = |
| Net cash used in investing activities | )) (6,397 | (2,540 | — | — |
| | | | | |
| Financing Activities | | | | |
| Proceeds from issuance of stock | 24,023 | 145,049 | = | = |
| Net cash provided by financing activities | 24,023 | 145,049 | — | — |
| | | | | |
| Net increase (decrease) in cash and equivalents | 65,480 | 94,266 | 4,156 | — |
| | | | | |
| Cash and equivalents at beginning of the period | 94,266 | = | = | = |
| Cash and equivalents at end of the period | $ 159,746 | $ 94,266 | $ 4,156 | $ = |
| Supplemental cash flow information: | | | | |
| Interest paid | | | | |
| Income taxes paid | $ = | $ = | $ = | $ = |
| | $ = | $ = | $ = | $ = |

**See Notes to Financial Statements**

40

Table of Contents

## ATI MODULAR TECHNOLOGY CORP Notes
### to Financial Statements

### NOTE 1. ORGANIZATION AND DESCRIPTION OF BUSINESS

ATI Modular Technology Corp., defined above and herein as the "Company" formerly Global Recycle Energy, Inc., was incorporated under the laws of the State of Nevada on March 7, 2008. The Company is engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US-based methods for creating modular spaces, facilities, and properties. As with any business plan that is aspirational in nature, there is no assurance we will be able to accomplish all our objective or that we will be able to meet our financing needs to accomplish our objectives.

The Company is an operating company engaged in the development and the exporting of modular energy efficient and smart technology and processes that allow government and private enterprises in China and elsewhere to use US-based methods for creating modular spaces, facilities, and properties. The Company is in the business of all aspects of modular and smart construction, including but not limited to, (a) the furtherance of modular and smart construction technology, education, development and production in developed and undeveloped countries, (b) acquisition and/or installation of construction equipment, materials, furnishings, hardware, insulation, flooring, roofing, wiring, plumbing, heating and air conditioning, and landscaping, and (c) other businesses directly or tangentially related to these lines of services, including assisting businesses and entrepreneurs in securing naming, licensing or promotional rights, driving internet and media traffic, increasing visibility of product and name recognition, and other services.

Our principal executive offices are located at 4700 Homewood Court, Suite 100 in Raleigh, North Carolina. We are registered as a foreign business entity in the State of North Carolina. We lease the office space from Yilaime Corporation, a Nevada corporation doing business in North Carolina, and a related party to the Company, as set forth below. Our physical location for our operations in China along with a manufacturing facility is Anhui Province Jiangnan Industrial Concentration Zone New Energy Industry Park A1, A2, A5 Plant Chizhou City, Anhui Province, China. The Company has registering its wholly owned subsidiary Anhui Ao De Xin Modular Building Technology Co. Ltd. in Jiangnan Industry Zone, Chizhou, China.

The Company entered an Investment and Cooperation Agreement with the Jiangnan Industry Zone in Anhui Province, China dated September 8, 2016 (the "Jiangnan Cooperation Agreement"). On December 28, 2016, the Company entered the definitive agreement, American ATI Modular Technology Company Project Investment Agreement (the "Investment Agreement") with the Administrative Committee, Jiangnan Industry Zone in Anhui Province. The Investment Agreement superseded the Jiangnan Cooperation Agreement. Under the Investment Agreement, the Administrative Committee of Jiangnan Industrial Concentration Zone of Anhui Province (hereinafter, "Jiangnan") and the Company have agreed to the construction of the Company's green, modular building and related technology under the project name "Modular Plant Production Base."

Under the Investment Agreement, the Company has agreed to manufacture and install modular buildings, and provide research into the development of green building module manufacturing using US based technology. The Company has agreed to provide appropriate technology and intelligent systems in providing modular building lifecycle services. In addition, to modular and smart technology, the Company and Jiangnan has agreed to establish: 1) a modular development institute research and training center; 2) an entrepreneurial incubator; 3) an engineering technology research center; 4) an industrial design center; 5) a post-doctoral workstations and engineering laboratories; and 6) an international student intern summer work program. Where possible the Company's aim is to increase US exports by using American based technology, equipment and services. (Strategy).

The Company presented to Anhui Project to United States Ex-Im Bank, which provided a Letter of Interest in providing support for the Project. Additionally, pursuant to its agreement with Chizhou government, Chizhou preliminarily agreed to provide support for EX-IM funding either by a guarantee or local bank support. Although no loan application has been submitted management is under the impression that subject to meeting Ex-Im Bank's standard underwriting requirements, there is a possibility of loans, and other funding including working capital and insurance. Going forward, we plan on working with Ex-Im to seek insurance and funding for the Chizhou operations. There is no assurance that funding and or insurance will be obtained.

41

The Company entered the Modular Services Agreement with AmericaTowne, a related party and the majority and controlling shareholder of the Company, to support AmericaTowne's obligations under the Shexian Agreement in designing, installing and manufacturing American modular technology for use in all government and private buildings throughout Shexian County, and elsewhere in China. The terms and conditions of the Modular Services Agreement with AmericaTowne and the Shexian Agreement are set forth above.

Also, the Company has entered the Yongan and Shexian Agreements to pursue the development of business opportunities involving modular technology and investments, and business development. While we plan to have robust operations in the United States and international locations, we expect the bulk of our operations and revenue will come from China.

China's economy and its government impact our revenues and operations. While the Company has an agreement in place with the government of Jiangnan as well as the approval by government officials in Shexian and Yongan China to operate facilities there is no assurance that we will operate the facilities successfully. Additionally, the Company will need government approval in other locations in China to operate other aspects of our business plan. There is no assurance that we will be successful in obtaining approvals from government entities in other locations to operate other aspects of our business plan. Finally, Mr. Perkins, as a control person of each entity – AmericaTowne and the Company, might elect to forego certain obligations of AmericaTowne under other Corporative Agreements currently in place or not enter more definitive agreements with Governments in China and elsewhere, which in turn, could impact the Company's ability to meet its business plan set forth herein.

Table of Contents

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Basis of Presentation

These financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP").

Accounting Method

The Company's financial statements are prepared using the accrual method of accounting. The Company has elected a fiscal year ending on December 31.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. In the opinion of management, all adjustments necessary in order to make the financial statements not misleading have been included. Actual results could differ from those estimates.

Financial Instruments

The carrying amount reported in the balance sheet for cash, accounts receivable, accounts payable, accrued expenses, interest payable and short-term notes payable approximate fair value because of the immediate or short term maturity of these financial instruments.

Cash Equivalents

The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

Accounts Receivable

Accounts' receivable are stated at the amount management expects to collect from outstanding balances. Management provides for probable uncollected amounts through a charge to earnings and a credit to an allowance for bad debts based on its assessment of the current status of individual accounts. Balances that are still outstanding after management has used reasonable collection efforts are written off through a charge to the allowance for bad debts and a credit to accounts receivable.

42

Our bad debt policy is determined by the Company's periodic review of each account receivable for reasonable assurance of collection. Factors considered are the customer's financial condition, past payment history if any, any conversations with the customer about the customer's financial conditions and any other extenuating circumstances. Based upon the above factors the Company makes a determination whether the receivable are reasonable.

Concentration of Credit Risk

Financial instruments that potentially subject the Company to a significant concentration of credit risk consist primarily of cash and cash equivalents. The Company maintains deposits in federally insured financial institutions in excess of federally insured limits. However, management believes the Company is not exposed to significant credit risk due to the financial position of the depository institutions in which those deposits are held.

Property, Plant, and Equipment

Property, plant and equipment are initially recognized recorded at cost. Gains or losses on disposals are reflected as gain or loss in the period of disposal. The cost of improvements that extend the life of plant and equipment are capitalized. These capitalized costs may include structural improvements, equipment and fixtures. All ordinary repairs and maintenance costs are expensed as incurred.

Depreciation for financial reporting purposes is provided using the straight-line method over the estimated useful lives of the assets:

Office equipment                                                              3-5 years

For the years ended December 31 2017 and for the six months ended December 31, 2016 depreciation expense is $1,893 and $416, respectively

Income Taxes

Income taxes are provided in accordance with Statement of Financial Accounting Standards ASC 740 Accounting for Income Taxes. A deferred tax asset or liability is recorded for all temporary differences between financial and tax reporting and net operating loss carry forwards. Deferred tax expense (benefit) results from the net change during the year of deferred tax assets and liabilities. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion of all the deferred tax assets will be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Table of Contents

The Company was established under the laws of the State of Nevada and is subject to U.S. federal income tax and Nevada state income tax, if any. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts and are based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred income tax assets to the amount expected to be realized.

Earnings per Share

In February 1997, the FASB issued ASC 260, "Earnings per Share", which specifies the computation, presentation and disclosure requirements for earnings (loss) per share for entities with publicly held common stock. ASC 260 supersedes the provisions of APB No. 15, and requires the presentation of basic earnings (loss) per share and diluted earnings (loss) per share. The Company has adopted the provisions of ASC 260 effective (inception).

Basic earnings or net loss per share amounts are computed by dividing the net income or loss by the weighted average number of common shares outstanding. Diluted earnings per share are the same as basic earnings per share due to the lack of dilutive items in the Company.

43

At December 31, 2017 and 2016, no potentially dilutive shares were outstanding.

Impact of New Accounting Standards

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

Revenue Recognition

The Company's revenue recognition policies comply with FASB ASC Topic 605. The Company follows paragraph 605-10-S99-1 of the FASB Accounting Standards Codification for revenue recognition. The Company will recognize revenue when it is realized or realizable and earned. The Company considers revenue realized or realizable and earned when all the following criteria are met: (i) persuasive evidence of an arrangement exists,
(ii) the product has been shipped or the services have been rendered to the customer, (iii) the sales price is fixed or determinable, and (iv) collectability is reasonably assured.

The Company does not provide unconditional right of return, price protection or any other concessions to its customers.

There were no sales returns and allowances from inception to December 31, 2017.

**NOTE 3. GOING CONCERN**

The Company's financial statements are prepared using accounting principles generally accepted in the United States of America applicable to a going concern that contemplates the realization of assets and liquidation of liabilities in the normal course of business.

The Company is still in development stage and has not created sufficient revenue to cover any operating losses it may incur. Management's plans include the raising of capital through the equity markets to fund future operations, seeking additional acquisitions, and generating of revenue through our business. However, there can be no assurances the Company will be successful in its efforts to secure additional equity financing and obtaining sufficient revenue producing contracts. These factors raise substantial doubt about the Company's ability to continue as a going concern. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classification of liabilities that might result from this uncertainty.

**NOTE 4. ACCOUNT RECEIVABLES – RELATED PARTIES**

The nature of the accounts receivable for December 31, 2017 in the amount of $1,469,686 are for modular construction and technology services and utilization of anticipated modular construction technology by ATI pursuant to the Modular Construction & Technology Services Agreement between ATI and the Company dated June 28, 2016 (hereinafter, the "ATI Services Agreement") and for the Sales and Support Services Agreement with Yilaime on June 27, 2016 (the "Yilaime Services Agreement"). On December 31, 2017, the Company's allowance for bad debt is $73,484 which provides a net receivable balance of $1,396,202.

Accounts receivable consist of the following:

|  | Dec 31, 2017 | Dec 31, 2016 |
|---|---|---|
| Accounts receivable- related parties | 1,469,686 | 482,900 |
| Less: Allowance for doubtful accounts | (73,484) | (24,145) |
| **Accounts receivable, net** | $ 1,396,202 | $ 458,755 |

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 158 of 223

<u>Table of Contents</u>

Bad debt expense was $65,435 and $17,895 for the year ended December 31, 2017 and for the six months ended December 31, 2016, respectively.

44

---

**NOTE 5. DEFERRED REVENUE**

The Company receives $250,000 quarterly fee from Yilaime for Sales and Support Services Agreement. In accordance with ASC 605-50-45, the Company defers and recognizes as a reduction to the future costs for quarterly fee. For the year December 31, 2017, $1,000,000 fee from exclusive agreement incurred; $1,254,387 is booked deferred revenue as current liability on December 31, 2017 and $70,000 went against cost charged by Yilaime.

**NOTE 6. SHAREHOLDER'S EQUITY**

The stockholders' equity section of the Company contains the following classes of capital stock as of December 31, 2017 and 2016:

Common stock, $ 0.001 par value: 500,000,000 shares authorized; 126,740,708 and 126,733,337 shares issued and outstanding as of December 31, 2017 and 2016, respectively;

Preferred stock, none: 0 shares authorized; but not issued and outstanding.

**NOTE 7. STOCK BASED COMPENSATION**

The Company entered into an employment lock-up agreement on July 1, 2016 with Alton Perkins to serve as the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer and Secretary. The term of Mr. Perkins' agreement is five years with the Company retaining an option to extend in one-year periods. In consideration for Mr. Perkins' services, the Company has agreed to issue to his designee, the Alton & Xiang Mei Lin Perkins Family Trust, 10,000,000 shares of common stock. The Company may elect in the future to include money compensation to Mr. Perkins or his designee for his services provided there is sufficient cash flow.

For the year ended December 31, 2017, $100,000 of stock compensation was charged to operating expenses and $350,000 was recorded as deferred compensation on December 31, 2017.

**NOTE 8. RELATED PARTIES TRANSACTIONS**

The Company intends on relying on other businesses controlled by our sole director and officer, and beneficial owner of the majority shares of common stock in the Company – Alton Perkins, in implementing its business plan.

Mr. Perkins is the control person of Yilaime Corporation, AmericaTowne and AXP Holding Corporation. At this time, the purpose of the Company is to service the construction and related technology needs of AmericaTowne under AmericaTowne's agreements with the Shexian County Investment Promotion Bureau in developing an AmericaTowne community in the Hanwang mountains in Shexian, China. The Company also intends on supporting these services in other AmericaTowne ventures at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency in developing an AmericaTowne Community and an International School in Longyan County China.

The related export services rendered to the Company in the implementation of its business plan cannot be provided by AmericaTowne or through the AmericaTowne relationship. In order to avoid conflicts of interest, Mr. Perkins is of the opinion that there must be a separate and distinct agreement between, in this case, the Company and AXP Holding Corporation. Furthermore, although other similar IC-DISC entities exist, the Company is able to obtain better terms and conditions from AXP Holding Corporation in light of Mr. Perkins' control of AXP Holding Corporation.

45

---

AmericaTowne's Board of Directors determined that operating and controlling a separate but related entity focused on the development and the exporting of modular energy efficient technology and processes for government and private enterprises in China would be more prudent from a risk mitigation and operational standpoint than providing these services under the AmericaTowne business plan. Furthermore, the intent of the Company is to expand its services and relationships to other similar endeavors in projects not related to AmericaTowne, thus the need to maintain and operate a separate entity.

*Cooperative Agreement (Shexian County Government, China)*

The Company's majority and controlling shareholder – AmericaTowne, is a party under the Cooperative Agreement with the Shexian County Investment Promotion Bureau (the "Shexian Agreement"). Under the Shexian Agreement, AmericaTowne and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains. Although not definitive at this time, the parties have agreed that, in consideration for AmericaTowne's investment of approximately $30,000,000 into the development, plus any additional tax paid to the local government, where applicable, the Shexian County Bureau will dedicate local resources, including land (which AmericaTowne would be required to obtain rights through local bid invitation), and participation with AmericaTowne in an agreed upon equity split through a future definitive agreement.

Case 5:18-cv-00487-D    Document 1-1    Filed 10/12/18    Page 159 of 223

Table of Contents

The Company will be providing construction and technology services to AmericaTowne in facilitating AmericaTowne's obligations under the Shexian Agreement. The Company's ability to generate revenue under its agreement with AmericaTowne could be impaired in the event AmericaTowne is not able to meet its obligations under the Shexian Agreement. Furthermore, Mr. Perkins, as a control person of each entity, might elect to forego certain obligations of AmericaTowne under the Shexian Agreement or not enter into a more definitive agreement with the Shexian County Bureau, which in turn, could impact the Company's ability to meet its business plan set forth herein.

*Sales and Support Services Agreement (Yilaime Corporation)*

On June 27, 2016, we entered into a Sales and Support Services Agreement with Yilaime Corporation, a Nevada corporation ("Yilaime"). Yilaime is controlled by Alton Perkins, who is our sole director and officer. Yilaime, and another related-party – Yilaime Corporation of NC, Inc. ("Yilaime NC"), are the holders of the majority of issued and outstanding shares of common stock in AmericaTowne, Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). Mr. Perkins is also the Trustee of the Alton & Xiang Mei Lin Perkins Family Trust ("Perkins Trust") and the AXP Nevada Asset Protection Trust 1 ("AXP"), which holds 5,100,367 and 120,000 shares, respectively, of the issued and outstanding common stock in ATI. Mr. Perkins is the beneficial owner of 20,674,484 shares of ATI, which equals 90.11% of issued and outstanding shares. Mr. Perkins is the beneficial owner of the majority and controlling interest in the Company through his direct holdings, and beneficial holdings through Yilaime, AXP and the Perkins Trust. ATI, Perkins Trust and Mr. Perkins beneficially own 110,117,593 shares, or 86%, of the Company's common stock.

Under the Services Agreement, Yilaime will provide the Company with marketing, sales and support services in the Company's pursuit of ATI Modular business in China in consideration of a commission equal to 10% of the gross amount of monies procured for the Company through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay the Company a quarterly fee of $250,000 starting on July 1, 2016. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. Yilaime retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of the Company.

46

*Modular Construction & Technology Services Agreement (AmericaTowne)*

On June 28, 2016, we entered into a Modular Construction & Technology Services Agreement (the "Modular Services Agreement") with AmericaTowne Inc. ("ATI"), a Delaware corporation and fully-reporting company with the United States Securities and Exchange Commission (the "SEC"). The impetus behind the Modular Services Agreement was the Company's Cooperative Agreement with the Shexian County Government, China. Under the Cooperative Agreement, ATI and the Shexian County Bureau have agreed to a partnership in furthering the development of an AmericaTowne community in the Hanwang mountains, Shexian, China. In addition, ATI, at the invitation of the Xiamen Longyan City Chamber of Commerce, Xiamen/Longyan China and the Xiamen City Growth Planning Agency plan to pursue the development of an AmericaTowne Community and an International School in Longyan County China.

Under the Modular Services Agreement, ATI Modular shall provide the research, development, training and modular technology in a manner deemed commercially acceptable by ATI based on its commercially reasonable requirements, plans and specifications, which shall be agreed upon in advance of any substantial and material construction. ATI will pay the Company a quarterly fee of $125,000 per quarter. The initial fee was paid upon signing the Modular Services Agreement. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. ATI retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to the Company by March 10, 2019. Yilaime has agreed to be the Company's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

*Interest Charge – Domestic International Sales Agreement (AXP Holding Corporation)*

On June 29, 2016, we entered into an IC-DISC Service Provider Agreement with AXP Holding Corporation, a Nevada corporation ("AXP Holding") and related party to the Company through Mr. Perkins control of AXP Holding. AXP Holding is an Interest Charge - Domestic International Sales Corporation, or "IC-DISC". AXP IC-DISC tax-exempt status was authorized and approved by the United States Department of the Treasury, Internal Revenue Service. As an IC-DISC, AXP Holding may, under certain conditions, act as a sister corporation to entities and provide services to assist a company in obtaining lower tax rates on export income. In addition to the export tax savings provided by AXP, AXP can provide an additional array of services including promoting the Company's export activities, purchasing receivables from the Company at a discount through a factoring relationship, and providing the Company with working capital loans.

The term under the IC-DISC Service Provider Agreement is set to expire on December 6, 2019, absent early termination for breach thereof by either party. AXP retains the right to extend the term, exercising its sole discretion, to December 6, 2024 by providing written notice to the Company by November 6, 2019. AXP has agreed to a non-compete and non-circumvent in providing the services under the IC-DISC Service Provider Agreement.

The Company has agreed to pay AXP a commission fee up to the greater of 50% of the Company's export net income or 4% of the Company's export gross receipts. The Company will determine the exact amount and the method of payment of the commission fee. The commission fee shall be paid at the option of the

Table of Contents

Company periodically throughout the year, but no later than December 31 on annual basis. If there is no commission fee due to no export sales, the Company will pay AXP an export service fee of $50,000. The export service fee, if any, is due on or before December 31 on an annual basis.

In addition, for referring businesses from the Company's "Export Platform" or "Community," AXP agrees to pay the Company 25% of each "Sales Export Service Fee" charged and received as an "IC-DISC Commission" from each Exporter or Licensee resulting from participating in the Export Platform or Community. This fee is called a "Group Export Consulting Fee" in the IC-DISC Service Provider Agreement, and is due no later than fifteen business days after receipt from the Exporter or Licensee, but no later than December 31 on an annual basis. For illustrative purposes, if AXP receives and or charges an Exporter 50% of its net export sales as a commission, and that value is $100,000, AXP would owe the Company 25%, or $25,000. Furthermore, during the term, the Company shall pay AXP a flat fee of $5,000 per transaction for purchasing receivables from the Company, plus an interest rate for such factoring at the prime rate plus one-percent.

The Company recognizes and confirms the requirements in ACS 850- 10-50-6 to disclose all related party transactions between the Company and related party transactions and or relationships.

The Company also leases office space from Yilaime for $2,500/month.

47

Pursuant to ASC 850-10-50-6, the Company makes the following transaction disclosures:

For Statement of Operations for the year ended December 31, 2017 and for the six months ended December 31, 2016:

(a) $500,000 and $250,000 in revenues for ATI Services Agreements with the Company;
(b) $30,000 and $15,000 for general and administrative expenses for rent expenses the Company paid to Yilaime towards its lease agreement;  (c) $61,348 and $0 of compensation expense for AXP Holding Corp charges for DISC.
 (d) $100,000 and $50,000 for general and administrative operating expenses recorded as stock compensation for respective employment agreements;  (e) $3,477 and $3,334 for general and administrative expenses for commissions and fees

For Balance Sheets on December 31, 2017 and 2016:

(a) $349,642 and $60,088 net account receivables ATI owes to the Company;
(b) $1,046,560 and $398,668 net account receivables Yilaime owes to the Company;
(c) $98,424 and $159,772 prepayments to AXP Holding Corp;
(d) $1,254,387 and $324,387 deferred revenue-Yilaime;
(e) $23,712 and 198,000 as accounts payable to Anhui Ao De Xin Modular Construction Technology Co., Ltd.;  (f) $350,000 and 450,000 as deferred compensation pursuant to respective employment agreements.

## NOTE 9. INCOME TAXES

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

Significant components of income tax expense for the year ended December 31, 2017 and for the six months ended December 31, 2016 are as follows

| | Year Ended | Six Months Ended |
|---|---|---|
| | December 31, 2017 | December 31, 2016 |
| Current tax expense | $ 10,337 | $ — |
| Deferred tax expense | — | — |
| Tax expense (benefit) | $ 10,337 | $ — |

The Company had $10,337 and $0 of income tax liability as of December 31, 2017 and 2016, respectively.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

The cumulative tax effect at the expected rate of 34% of significant items comprising the net deferred tax amount is at December 31, 2017 and 2016 as follows:

| | December 31, 2017 | December 31, 2016 |
|---|---|---|

Deferred tax assets:

| | | | | |
|---|---|---|---|---|
| Net operating losses | $ | — | $ | 34,853 |
| Total deferred tax assets | | — | | 34,853 |
| Less: valuation allowance | | — | | (34,853) |
| Deferred tax assets, net | $ | — | $ | — |

Reconciliation of Effective Income Tax Rate

| | Year Ended December 31, 2017 | Six Months Ended December 31, 2016 |
|---|---|---|
| Statutory U.S. tax rate | 16.85% | 34.00% |
| Less: valuation allowance | — | (34.00%) |
| Effective income tax rate | 16.85% | 0% |

48

---

**Management's Discussion and Analysis of Financial Condition and Results of Operations**

We qualify as an "emerging growth company" under the JOBS Act. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:
have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act; comply with any requirement that
- may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report
- providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);
   submit certain executive compensation matters to shareholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and disclose certain
- executive compensation related items such as the correlation between executive compensation and performance and comparisons of the CEO's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

The Company is in the early stages of its operations, and many of its plans and objectives are aspirational in nature, and thus might never come to fruition. At this time, the Company plans to retain engineering and architectural firms based in the United States who have extensive experience in developing modular structures in the United States, China and other foreign locations based on market demand, which has not been thoroughly researched to date. The Company has been focused on obtaining quotes, negotiating formal engagements and researching all aspects of the modular construction industry. While the infrastructure is still in the developmental stage, the Company is confident that it has the experience, or access to those with experience, in the modular construction field.

The Company plans on engaging in onsite placement and delivery of modular structures. Mr. Perkins has extensive experience in operating business in China. One of the reasons that Mr. Perkins was sought out and invited to participate in developing the modular industry in China is that he was the co-chairman of a construction company in China - Yilaime Foreign Partnership in Henghsui China. His experience with Yilaime Foreign Partnership allows ATI Modular to call on local companies in China as well as modular companies and experts in the United States to help provide on-site services. Yilaime Foreign Partnership is not a related party to the Company, ATI, Yilaime or AXP.

In addition, the Company recently joined the Modular Building Institute in Charlottesville, Virginia. In September of 2016, Mr. Perkins attended the Institute's annual exposition in order to line up available suppliers, and experts in the modular construction field.

We intend on offering support services in all phases of modular construction. Our approach will be to focus on exporting United States based technology, services and equipment, and general know-how. Exporters in our related company, AmericaTowne, are experienced in the modular field and we plan on allowing those experienced exporters to participate in various levels of our program.

Case 5:18-cv-00487-D    Document 1-1    Filed 10/12/18    Page 162 of 223

Table of Contents

The Company currently does not have a principal supplier of raw materials. The Company has identified potential sources of raw materials in the United States through its membership in the Modular Building Institute. One of our primary challenges will be pricing the source of raw materials and delivery to China. We are also looking to potential raw material sources in China.

To operate within China, the Company requires approval of government officials in China. In both cases where the Company has signed Cooperative Agreements (and in the case of the Shexian Agreement), and at the invitation of the local government, we have the approval to register and conduct business.

49

### Fiscal Year

Our fiscal year ends December 31.

### Results of Operations for the Three Months Ended March 31, 2018 and 2017

Our operating results for the three months ended March 31, 2018 and 2017 are summarized as follows:

|  | Three Months Ended | |
|---|---|---|
|  | March 31, 2018 | March 31, 2017 |
| Revenue | $ 125,000 | $ 125,000 |
| Cost of Revenues | $ — | $ — |
| Operating Expenses | $ 94,796 | $ 110,235 |
| Net Income | $ 25,673 | $ 12,550 |

*Revenues*

For the three months ended March 31, 2018, the Company generated revenue of $125,000. The Company's revenues came from related parties for services rendered for the service rights agreement with AmericaTowne. We can make no assurances that we will find commercial success in any of our revenue producing contracts. Our revenues, thus far, rely entirely on related parties. We are a new company and thus have very limited experience in sales expectations and forecasting. We also have not fully discovered any seasonality to our business as we began operations in the fourth quarter of 2016.

*Operating Expenses*

Our expenses for the first three months ended March 31, 2018 and 2017 are outlined in the table below:

|  | Three Months Ended | |
|---|---|---|
|  | March 31, 2018 | March 31, 2017 |
| General and Administrative | $ 94,796 | $ 110,235 |
| Total Operating Expenses | $ 94,796 | $ 110,235 |

Our operating expenses are largely attributable to administrative expenses related to our reporting requirements as a public company and implementation of our business plan.

*Net Income*

As a result of our operations, the Company reported net income before tax obligations of $30,204 for the three months ended March 31, 2018, an increase of $15,439 from the same period one year ago.

50

### Liquidity and Capital Resources

*Working Capital*

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 163 of 223

Table of Contents

| | | | |
|---|---|---|---|
| Current Assets | $ 1,945,416 | $ | 1,654,372 |
| Current Liabilities | $ 1,554,666 | $ | 1,305,135 |
| Working Capital | $ 390,750 | $ | 349,237 |

**Cash Flow**

|  | Three Months Ended | |
|---|---|---|
|  | March 31, 2018 | March 31, 2017 |
| Net Cash Used in Operating Activities | $ 13,686 | $ 26,362 |
| Net Cash Used in Investing Activities | $ — | $ 861 |
| Nat Cash Provided by Financing Activities | $ — | $ 22,500 |
| Decrease in Cash | $ 13,686 | $ 4,723 |

**Cash Provided by Operating Activities**

We have $13,686 and $26,362 net cash used in operating activities for the three months ended March 31, 2018 and 2017, respectively. The decrease is mainly due to increase in accounts receivable. **Cash Used in Investing Activities**

For the three months ended March 31, 2018 and 2017, we spent $nil and $861 on purchasing fixed assets, respectively.

**Cash Provided by Financing Activities**

We received $22,500 from issuance of stock for the three months ended March 31, 2017. The Company did not issue any stock in the first quarter of the 2018 fiscal year.

**Off-Balance Sheet Arrangements**

We have not entered into any off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Results of Operations through December 31, 2017**

Our operating results are summarized as follows:

|  | Year Ended December 31 2017 | | Six Months Ended December 31 2016 | | Years Ended June 30 2016 | | 2015 |
|---|---|---|---|---|---|---|---|
| Revenues | $ | 500,000 | $ | 250,000 | $ 125,000 | | — |
| Costs of Revenues | | — | | — | — | | — |
| Gross Profit | $ | 500,000 | $ | 250,000 | $ 125,000 | | — |
| Operating Expenses | $ | 438,654 | $ | 352,510 | 132,552 | $ | 3,859 |
| Other Income | $ | 1 | | — | $ 3,859 | | — |
| Provision for Income Taxes | $ | 10,337 | | — | — | | — |
| Net Income (Loss) | $ | 51,055 | ($ | 102,510) | ($ 3,693) | ($ | 3,859) |

**Revenues**

Pursuant to the Company's Service Agreements, AmericaTowne and Yilaime paid the Company $500,000 in fiscal year 2017. In 2017 the Company had paid an Operating Expenses of $438,654. The Operation Expenses primarily stem from implementing the Company's business plan, including legal and professional fees associated with the Company's filing requirements under the Securities Act and Securities and Exchange Act and the merger between AmericaTowne and the Company.

We can make no assurances that we will find commercial success in any of our revenue producing contracts. We are a new company and thus have very limited experience in sales expectations and forecasting. We also have not fully discovered any seasonality to our business as we began operations in the first quarter of 2017.

## Operating Expenses

Our expenses for the period through December 31, 2017 are outlined in the table below:

| | | Year Ended December 31 | | Six Months Ended December 31 | | Years Ended June 30 | | |
|---|---|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2016 | | 2015 |
| Operating Expenses | | | | | | | | |
| General Administrative | $ | 438,654 | $ | 352,510 | $ | 132,552 | $ | 3,859 |
| Total Operating Expenses | $ | 438,654 | $ | 352,510 | $ | 132,552 | $ | 3,859 |

Our operating expenses are largely attributable to office, rent and professional fees related to our reporting requirements as a public company and implementation of our business plan. In 2017, our operating expenses were $438,654, compared to $352,510 in the six months ending December 31, 2016, $132,553 in the year end June 30, 2016, and $3,859 in the year end June 30, 2015.

## Net Income

As a result of our operations, for 2017, the Company reported net income after provision for income tax of $51,055. In the six months ending December 31, 2016, our net loss was $102,510. The increase is due to further implementing our business plan. In the fiscal years ending June 30, 2016 and 2015, we reported losses of $3,693 and $3,859, respectively.

51

Table of Contents

**Liquidity and Capital Resources**

**Working Capital**

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Current Assets | $1,654,372 | $712,793 |
| Current Liabilities | $1,305,135 | $534,086 |
| Working Capital | $349,237 | $178,707 |

We have working capital of $349,237 on December 31, 2017. Compared to December 31, 2016, working capital of $178,707. The increase is due to effectively implementing our initial business plans.

**Cash Flow**

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Net cash provided by (used in) operating activities | $47,854 | ($48,243) |
| Cash provided by (used in) investing activities | ($6,397) | ($2,540) |
| Cash provided by financing activities | $24,023 | $145,049 |
| Increase (Decrease) in cash | $65,480 | $94,266 |

**Cash Provided by Operating Activities**

Compared to 2016, increase in cash provided by operating activities in 2017 is mainly due to decrease in accounts receivable.

**Cash Used in Investing Activities**

We spent $6,397 on fixed assets for 2017 compared to $2,540 in 2016.

**Cash Provided by Financing Activities**

Compared to 2016, our cash used in financing activities decreased by $121,026. This decrease was due to decrease in proceeds from issuance of common stock.

As of December 31, 2017, the Company had enough cash including receivables to operate its business at the current level for the next twelve months, but insufficient cash to achieve our business goals and initiatives set forth above. To address the cash situation, the Company continues to manage its cash accounts and receivables closely.

To date, we have been able to meet all our account payable obligations within a five to ten-day window. If required, we can extend this window to improve our cash flow position. Additionally, we have a plan to increase sales. There is no assurance that we will be able to maintain this level of operations.

The success of our business plan beyond the next twelve months is contingent upon us growing our business, keeping costs down, increasing revenue and obtaining additional equity and/or debt financing. We intend to fund operations through our pro-active efforts to monitor receivables, and debt and/or equity financing arrangements, which may be insufficient to fund our capital expenditures, working capital, or other cash requirements. We do have a commitment from Chizhou government to provide cash infusions and or loan guarantees as we complete our operations in China. Other than Chizhou, we do not have any formal commitments or arrangements for the sales of stock or the advancement or loan of funds at this time. There is no assurance that such additional financing will be available to us on acceptable terms, or at all or that our receivable plan will be effective in the future.

*Critical Accounting Policies*

Our financial statements and related public financial information are based on the application of accounting principles generally accepted in the United States ("US GAAP"). US GAAP requires the use of estimates; assumptions, judgments and subjective interpretations of accounting principles that have an impact on the assets, liabilities, revenues and expenses amounts reported. These estimates can also affect supplemental information contained in our external disclosures including information regarding contingencies, risk and financial condition.

We believe our use of estimates and underlying accounting assumptions adhere to GAAP and are consistently and conservatively applied. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ materially from these estimates under different assumptions or conditions. We continue to monitor significant estimates made during the preparation of our financial statements.

We believe the following is among the most critical accounting policies that impact our consolidated financial statements. We suggest that our significant accounting policies, as described in our financial statements in the Summary of Significant Accounting Policies, be read in conjunction with this Management's Discussion and Analysis of Financial Condition and Results of Operations.

*Revenue Recognition*

The Company recognizes revenue at the date of delivery to customers when a formal arrangement exists, the price is fixed or determinable, the delivery is completed, no other significant obligations of the Company exist and collectability is reasonably assured. The Company's Revenue Recognition policy is provided in detail at Note 2 of the Financial Statements.

*Income Taxes*

The Company accounts for income taxes in accordance with ASC Topic 740, "Income Taxes." ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

*Recent Accounting Pronouncements*

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

53

**Plan of Operation and Cash Requirements**

The Company anticipates that its expenses over the next twelve months will be approximately $8,000,000 as described in the table below. These estimates may change significantly depending on the nature of our business activities and our ability to raise capital from our shareholders or other sources.

| Description | Potential Completion Date | Estimated Expenses $ |
|---|---|---|
| Initial Plant and Operations Set-up | 12 months | 2,250,000 |
| Salaries | 12 months | 1,300,000 |
| Utility expenses | 12 months | 50,000 |
| Investor relations costs | 12 months | 50,000 |
| Marketing expenses | 12 months | 100,000 |
| Professional fees | 12 months | 150,000 |
| Other administrative expenses | 12 months | 100,000 |
| Equipment Purchases | 12 months | 4,000,000 |

Our other administrative expenses for the year will consist primarily of transfer agent fees, bank and interest charges and general office expenses. The professional fees are related to our regulatory filings throughout the year and include legal, accounting and auditing fees. The equipment purchases and plant set-up are related to the materially definitive agreement with Jiangnan.

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 167 of 223

Based on our planned expenditures, we will require approximately $8,000,000 to proceed with our business plan over the next twelve months. If we secure less than the full amount of financing that we require, we will not be able to carry out our complete business plan and we will be forced to proceed with a scaled back business plan based on our available financial resources.

We intend to raise the balance of our cash requirements for the next twelve months pursuant to our agreement with Jiangnan by accessing upon request bank loans, bank guarantees and equity funding. Additionally, we may have private placements, shareholder loans or possibly a registered public offering (either self-underwritten or through a broker-dealer). If we are unsuccessful in raising enough money through such efforts, we may review other financing possibilities such as bank loans. At this time, other than our agreement with Jiangnan we do not have a commitment from any third-party to provide us with financing. There is no assurance that any financing will be available to us or if available, on terms that will be acceptable to us.

Even though we plan to raise capital through equity or debt financing, we believe that the latter may not be a viable alternative for funding our operations, as we do not have sufficient tangible assets to secure any such financing. We anticipate that any additional funding will be in the form of equity financing from the sale of our common stock. At the close of 2017, we are considering financing arrangements for our common stock. However, the arrangements are not final and we cannot provide any assurance that we will be able to raise sufficient funds from the sale of our common stock to finance our operations. In the absence of such financing, we may be forced to abandon our business plan.

54

## Off-Balance Sheet Arrangements

We have not entered into any off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources and would be considered material to investors.

## Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

There are not and have not been any changes in or disagreements between the Company and its accountants on any matter of accounting principles, practices or financial statement disclosure

## Quantitative and Qualitative Disclosures About Market Risk.

As a smaller reporting company, as defined in 17 CFR § 229.10(f)(1), we are not required to provide the information requested by this Item.

55

### INFORMATION WITH RESPECT TO
### AMERICATOWNE, INC.
### (the "Acquired Company")

**General Description of Business**

AmericaTowne aims to increase US export and employment by providing upper and middle-income consumers in China and elsewhere with "Made in the USA" goods and services allowing customers to experience the United States' culture and lifestyle. In achieving this objective, AmericaTowne focuses on four initiatives:

(1) The development of a United States International Trade Center in Meishan Ningbo China and elsewhere with employees and/or independent contractors focusing on advancing our initial business objective, which is to be the "go-to" place for all things "Made In The USA."

(2) The development of upwards of 20 AmericaTowne communities in China with each community consisting of upwards of 50 United States based companies, and upscale hotels, villas, children theme parks, senior care, wellness and educational facilities - all based upon United States culture and lifestyle.

(3) The development of an internet platform in Chinese to complement (1) and (2), above, focusing on importing "Made In The USA" goods and services to China through internet sales.

(4) The development of franchise operations in the United States and internationally to support and advance the above-referenced initiatives.

These initiatives are aspirational in nature. AmericaTowne's intent is to accomplish the majority, if not all, of these initiatives, but there is no assurance of success.

56

<u>Table of Contents</u>

*General Discussion*

AmericaTowne aims to earn revenues and income, and generate cash, by focusing on the four core business operations and initiatives set forth above. At this point, AmericaTowne revenue is generated from Service Provider, Exporter Service Agreements, and related agreements with companies throughout the United States. AmericaTowne generates revenues and cash by servicing these agreements. It works with exporters carefully and focus on our accounts receivable as part of managing its projected tight liquidity position. Additionally, AmericaTowne works with exporters closely in developing export strategies for the goods and services they planned to export. AmericaTowne has successfully engaged in multiple Export Service Agreements with entities throughout the United States since the Company's inception.

At present, the bulk of AmericaTowne's operations take place in its Raleigh, North Carolina office, which acts as a model for plans for our United States Trade Center Operations. AmericaTowne is in the process of outfitting operations in Chizhou, China. Two full-time managers have been hired to operate the facilities located at Chizhou and other locations in China. AmericaTowne is working with the Chizhou Port Authorities to ensure that our operational procedures are in compliance with various import laws.

AmericaTowne's short-term operational objective is to develop exporter pipeline, grow revenues and increase operations and facilities in the United States, Africa and Europe while bringing the facility online in Chizhou, China. AmericaTowne's focus currently is on enhancing an exporter base, including working with state export agencies to identify exporters as well as sources of goods and services made in the United States that are in demand in China. Along with increasing its United States operations, AmericaTowne aims to expand additional key staff in the United States and China that can help implement its plan.

To achieve its long-term objectives, AmericaTowne intends on shifting its revenue stream from a United Stated-based to a China-based stream by fully operating all planned activities at the planned Chizhou trade center, and activities within our AmericaTowne complexes and Chinese-based internet sites. Each of AmericaTowne's four core initiatives presents challenges, risks, and opportunities.

AmericaTowne sees positive trends in the export area. Additionally, AmericaTowne plans to pursue opportunities in export not often thought of as an "exported commodity. Along with AmericaTowne's planned core "AmericaTowne communities," trade centers in the United States and China, and Internet operations, AmericaTowne plans on pursuing opportunities that are traditionally not thought of as an export commodity.

57

*AmericaTowne's Investment in ATI Nationwide Holding Corp.*

On July 5, 2016, AmericaTowne entered into a Master Joint Venture and Operational Agreement (the "Joint Venture Agreement") with Nationwide Microfinance Limited, a Ghanaian corporation ("Nationwide"). Under the terms of the Joint Venture Agreement, the parties agreed combine efforts, resources and established relationship in furthering the operational and financial development of a Savings & Loan company operating under the laws of Ghana, and potentially related services, in the United States and Ghana through a publicly reporting and trading entity in the United States. Nationwide has represented that it currently operates a Tier 2 microfinance company providing retail and commercial financial products and services in Ghana pursuant to a valid license in good standing issued by the Ghana Banking Authority.

The intent, at this time, is that AmericaTowne will be issued 51% of the voting shares in the joint venture entity; however, as set forth in more detail in the Joint Venture Agreement, AmericaTowne will not be involved in financing, insurance, securities or other investment company or banking matters. Rather, a subcommittee to the Board of Directors called the "Ghana Committee" will operate under the sole direction of the Accountable Manager of Nationwide, and will be responsible for the day-to-day operations in Ghana, and the operational recommendations to the Board of Directors, and to the Operations and Ethics Committee (another subcommittee as set forth in the Joint Venture Agreement) related to any and all aspects of Nationwide's financial services business, including but not limited to, (i) final decisions concerning day-to-day operations of the savings and loans programs, (ii) determination of personnel employed in support of savings and loan service operations including the managing director, human resources, customers, operations, sales and marketing, quality assurance, and accounting and payroll, and (iii) any other commercially necessary and reasonable services benefiting Nationwide and the joint venture business combination entity. The Ghana Committee will report directly to the Board of Directors, and the officers of the joint venture business combination entity shall implement the directives of the Ghana Committee.

On October 3, 2016 AmericaTowne entered into two Stock Purchase Agreements with sellers Carson Holdings, LLC, and Joseph C. Passalaqua in furtherance of the Joint Venture Agreement. Pursuant to the Stock Purchase Agreements, the Company acquired 65,000,000 shares of common stock in EXA, Inc., a Florida corporation, traded on the OTC Pink Sheets under the symbol EXAI. The Stock Purchase Agreements were privately negotiated between the parties without facilitation through brokers or promotors, or third-parties, except legal counsel, and were approved by the Company's Board of Directors as being in the best interests of the Company. As a result of the Stock Purchase Agreements, AmericaTowne became the controlling and majority shareholder in EXA, Inc.

AmericaTowne owns 65,000,000 of the 99,175,486 issued and outstanding shares of EXA, Inc. The shares under the Stock Purchase Agreement were purchased for $175,000, and the source of funds was working capital from AmericaTowne. AmericaTowne purchased the shares with the intent to hold in its personal account on a restricted basis absent registration or qualification under an exemption to registration.

Following the acquisition of EXA, Inc., AmericaTowne filed Amended Articles of Incorporation, changing EXA, Inc.'s name to ATI Nationwide Holding Corp. ("ATI Nationwide"). AmericaTowne has since filed ATI Nationwide's corporate action, which was approved in fiscal year 2017, effectively changing the name of the corporation to ATI Nationwide Holding Corp., as well as the trading symbol to "ATIN." ATI Nationwide's Form 10 information has been filed with the Securities and Exchange Commission. As a result of the Plan of Merger discussed herein, ATI Nationwide will become a subsidiary of ATI Modular.

58

**Business Developments in Fiscal Year 2017**

*Trade Center Agreements and Exporter Service Agreements*

The Company has entered into a series of International Trade Center Service Provider Agreements (the "Trade Center Agreements", or singularly, the "Trade Center Agreement"). As disclosed in prior filings, the general purpose behind the Trade Center Agreements is for the specific "Service Provider," defined under the Trade Center Agreement, to support the operations of the Company's programs in a specific geographical area. As a Service Provider, the party represents to the Company that the individual or his related entity has distinct experience working with individuals and businesses who may be candidates for the Company's operations and business, including but not limited to, experience assisting businesses and entrepreneurs who may be candidates for occupancy and participation in an AmericaTowne community, or facilitating the acquisition of goods and performing services to the Company, securing funding (credit lines, loans and loan guarantees), insurance, supplier and export contracts and other related services that could assist candidates in conducting business with the Company. These services are referred to in similar and previously disclosed agreements as "Support Services." Trade Center Agreements are for both International services (International Trade Center Agreements) and services based in the United States (U.S. Trade Center Agreements). The US Trade Service Agreements provide for the same, or similar, "Support Services" as the Trade Center Agreement in foreign jurisdictions, but the joint venture's hub of operations is in the United States.

In consideration for the Service Provider entering into the Trade Center Agreement, the parties agree to form a joint venture limited liability company (or similarly structured entity upon consent of the parties) in which the Service Provider would be issued a specific percentage of equity and would deploy its resources in furtherance of an AmericaTowne community in a given geographical area. Each party has agreed to a mutual compensation schedule, which is incorporated into the Trade Center Agreements resulting in a fully integrated and materially definitive agreement. The reader is directed to the exhibits for the full copy of the Trade Center Agreements executed by the Company.

Table of Contents

The Company also enters into Exporter Service Agreements. Under the Exporter Services Agreements, the Company represents to the customer that it is in the process of preparing the AmericaTowne Platform. This platform will consist of exhibition, showroom and display facilities, support office(s) and staff located in the United States and China, and the platform will provide a buyer's network, and online websites either directly owned by AmericaTowne or in a partnership with third-parties in order to support the exhibition center, showroom and network to market imported goods and services to consumers in China. The AmericaTowne Platform will provide the customer with access to and participation in a program whereby the Company will exercise its experience, expertise and training in assessing the customer's market acceptance and demand of the customer's products or services in China (and perhaps other locales depending on the Company's findings). In short, the Company is focused on increasing USA exports to China and elsewhere.

In 2017, the Company entered into a total of twenty-three (23) Trade Center Agreements and three (3) Export Service Agreements. If all twenty-six contracts are performed without breach, the Company stands to earn a total of $2,173,500 in revenue over the lifetime of these agreements. Each individual agreement is discussed in detail below. The Company notes that, while this revenue is projected, it is not certain as there are risks associated with these contracts, including non-performance by the service providers. Details regarding these agreements can be found in AmericaTowne's Annual Report on Form 10-K for the fiscal year 2017, hereby incorporated by reference.

**Description of Property**

AmericaTowne's principal executive offices are located at 4700 Homewood Court, Suite 100 in Raleigh, North Carolina. AmericaTowne also leases office space from Yilaime Corporation, a Nevada corporation doing business in North Carolina. Yilaime is a related party to the Company and AmericaTowne.

**Legal Proceedings**

There are not presently any material pending legal proceedings to which AmericaTowne is a party or as to which any of its property is subject, and no such proceedings are known to AmericaTowne to be threatened or contemplated against it.

59

**Market Price of and Dividends on the Registrants Common Equity and Related Stockholder Matters.**
*Authorized Capital Stock*

AmericaTowne has 100,000,000 shares of authorized Common Stock, par value $.0001 per share, of which there are 49,200,932 shares issued and outstanding. AmericaTowne has 5,000,000 shares of Preferred Stock, par value $.0001 per share, of which none have been designated or issued. AmericaTowne's common stock is not traded on a public market, though it is registered with the Securities and Exchange Commission.

Holders of shares of AmericaTowne's common stock are entitled to one vote for each share on all matters to be voted on by the stockholders. Holders do not have cumulative voting rights. Holders of common stock are entitled to share ratably in dividends, if any, as may be declared from time to time by AmericaTowne's Board of Directors in its discretion from funds legally available. In the event of a liquidation, dissolution or winding up of AmericaTowne, the holders of common stock are entitled to share pro rata all assets remaining after payment in full of all liabilities. All of the outstanding shares of common stock are fully paid and non-assessable. Holders of common stock have no preemptive rights to purchase the AmericaTowne's common stock. There are no conversion or redemption rights or sinking fund provisions with respect to the common stock.

AmericaTowne has not paid any dividends on its common stock and does not presently intend to pay cash dividends. The payment of cash dividends in the future, if any, will be contingent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to consummation of a business combination, if any. The payment of any dividends subsequent to a business combination, if any, will be within the discretion of AmericaTowne's then existing board of directors. It is the present intention of AmericaTowne's board of directors to retain all earnings, if any, for use in its business operations and, accordingly, the board of directors does not anticipate paying any cash dividends in the foreseeable future.

*Securities Authorized for Issuance under Equity Compensation Plans*

In 2017, the Company entered into Employment Agreements with four (3) employees. Three of these employees were issued shares of restricted common stock in lieu of compensation in 2017. These employees are as follows:

| Name | Position | Date of Employment Agreement | Stock Issuance |
|---|---|---|---|
| Andre Chaslin | Executive Vice President for Export & Europe Operations | October 18, 2017 | 120,000 shares of restricted common stock |
| Brian Eberhart | Vice President for Procurement Services | October 18, 2017 | 20,000 shares of restricted common stock |
| Du Jixiang | Executive Sales & Marketing Manager—China | November 1, 2017 | 10,000 shares of restricted common stock |

60

<u>Table of Contents</u>

**Financial Statements**

**Item 1. Financial Statements.**

| | | | | |
|---|---|---|---|---|
| | | (Unaudited) | | |

| ASSETS | | | | |
|---|---|---|---|---|
| Current Assets | | | | |
| Cash and cash equivalents | $ | 913,289 | $ | 900,168 |
| Notes receivable - related parties | | 71,750 | | 73,000 |
| Accounts receivable, net | | 812,868 | | 764,800 |
| Accounts receivable, net - related parties | | 2,779,409 | | 2,336,179 |
| Other receivables - related parties | | 127,343 | | 180,547 |
| Prepayment-current | | 644 | | 644 |
| Total Current Assets | | 4,705,303 | | 4,255,338 |
| | | | | |
| Prepayment-non current | | 6,715 | | 7,035 |
| Property, plant and equipment, net | | 38,729 | | 41,264 |
| Deferred tax assets | | 239,613 | | 169,291 |
| Goodwill | | 40,331 | | 40,331 |
| Investments | | 3,860 | | 3,860 |
| Total Assets | $ | 5,034,551 | $ | 4,517,119 |

AMERICATOWNE Inc. and Subsidiaries
Consolidated Balance Sheets

| | | March 31 | | December 31 |
|---|---|---|---|---|
| | | 2018 | | 2017 |

| LIABILITIES AND SHAREHOLDERS' EQUITY | | | | |
|---|---|---|---|---|
| Current Liabilities | | | | |
| Accounts payable and accrued expenses | $ | 55,511 | $ | 80,611 |
| Deferred revenues-current | | 1,508,929 | | 1,258,930 |
| Other payables | | 560 | | 1,060 |
| Deposit from customers | | 1,469 | | 1,469 |
| Due to related parties | | — | | 8,646 |
| Income tax payable | | 57,840 | | 53,309 |
| Total Current Liabilities | | 1,624,309 | | 1,404,025 |
| Deferred revenues-non current | | 48,306 | | 49,441 |
| Total Liabilities | | 1,672,615 | | 1,453,466 |

Commitments & Contingencies

| Shareholders' Equity | | | | |
|---|---|---|---|---|
| Preferred stock, $0.0001 par value; 5,000,000 shares authorized; none issued and outstanding | | — | | — |
| Common stock, $0.0001 par value; 100,000,000 shares authorized, 49,421,350 and 48,985,026 shares issued and outstanding | | 4,942 | | 4,899 |
| Common stock subscribed | | 154 | | 87 |

Table of Contents

| | | |
|---|---:|---:|
| Additional paid-in capital | 5,910,632 | 5,684,903 |
| Deferred compensation | (2,161,542) | (2,359,220) |
| Receivable for issuance of stock | (90,223) | (90,223) |
| Retained Earnings | (325,281) | (204,425) |
| Noncontrolling interest | 23,254 | 27,632 |
| Shareholders' Equity | 3,361,936 | 3,063,653 |
| Total Liabilities and Shareholders' Equity | $ 5,034,551 | $ 4,517,119 |

See Notes to Consolidated Financial Statements

61

AMERICATOWNE Inc. and Subsidiaries
Consolidated Statements of Operations
(Unaudited)

| | For the Three Months Ended | |
|---|---|---|
| | March 31, 2018 | March 31, 2017 |
| Revenues | | |
| Sales | $ 111,135 | $ 61,135 |
| Services-related parties | 237,000 | 230,000 |
| | 348,135 | 291,135 |
| Cost of Revenues-Related Parties | 35,499 | 59,416 |
| Gross Profit | 312,636 | 231,719 |
| | | |
| Operating Expenses | | |
| General and administrative | 418,756 | 247,451 |
| Professional fees | 84,899 | 75,064 |
| Total operating expenses | 503,655 | 322,515 |
| Income from operations | (191,019) | (90,796) |
| | | |
| Other Expenses (Income) | 8 | (228) |
| | | |
| Provision for income taxes | (65,792) | 2,215 |
| Net Income (Loss) | (125,235) | (92,783) |
| | | |
| Less: Net loss (income) attributable to the noncontrolling interest | 4,379 | 3,107 |
| | | |
| Net income (loss) attributable to AMERICATOWNE, Inc common stockholders | $ (120,856) | $ (89,676) |
| | | |
| Earnings per share - basic and diluted | ) )$ (0.00 | $ (0.003 |
| Weighted average shares outstanding- basic and diluted | 49,136,685 | 27,004,775 |

See Notes to Consolidated Financial Statements.

62

AMERICATOWNE Inc. and Subsidiaries
Consolidated Statements of Cash Flows
(Unaudited)

| | For the Three Months Ended | |
|---|---|---|
| | March 31, 2018 | March 31, 2017 |

Operating Activities:

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 174 of 223

| | | | |
|---|---|---:|---:|
| Net income (loss) | $ | (125,235) | $ (92,783) |
| Adjustments to reconcile net income to net cash provided by operations | | | |
| Depreciation | | 4,054 | 4,513 |
| Stock compensation | | 240,178 | 123,429 |
| Bad debt provision | | 24,036 | 19,494 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net | | (515,334) | (412,638) |
| Other receivable - related parties | | 28,399 | (196,917) |
| Prepayment | | 320 | 316 |
| Deferred tax assets | | (70,322) | — |
| Accounts payable and accrued expenses | | (25,100) | 150,316 |
| Deferred revenues | | 248,865 | 213,865 |
| Other payables | | (500) | (1,928) |
| Deposit from customers | | — | 13,672 |
| Due to related parties | | 16,160 | 16,090 |
| Income tax payable | | 4,531 | 2,215 |
| Net cash provided by (used in) operating activities | | (169,948) | (160,357) |
| | | | |
| Investing Activities: | | | |
| Purchase of fixed assets | | (1,520) | (3,123) |
| Issuance of notes receivable | | 1,250 | — |
| Net cash used in Investing activities | | (270) | (3,123) |
| | | | |
| Financing Activities: | | | |
| Proceeds from issuance of common stock | | 183,339 | 22,500 |
| Net cash provided by financing activities | | 183,339 | 22,500 |
| | | | |
| Increase (Decrease) in cash and cash equivalents | | 13,121 | (140,981) |
| Cash and cash equivalents at beginning of period | | 900,168 | 973,015 |
| Cash and cash equivalents at end of period | $ | 913,289 | 832,034 |

Supplemental disclosure of cash flow information _____

| | | |
|---|---:|---:|
| | $ — | |
| | $ = | $ = |

Table of Contents

Interest paid

Income taxes paid                    $                    =

See Notes to Consolidated Financial Statements.

63

**AMERICATOWNE Inc.**
**Notes to Consolidated Financial Statements**
**(Unaudited)**

### NOTE 1. ORGANIZATION AND DESCRIPTION OF BUSINESS

AmericaTowne, Inc. (the "Company") was incorporated under the laws of the State of Delaware on April 22, 2014. The Company is engaged in exporting and consulting in the exportation of American made goods, products and services to China and Africa through strategic relationships in China and in the United States, which is referred to internally by the Company as the "AmericaTowne Platform". The Company's forward-looking vision is to create a physical location called AmericaTowne in China that incorporates business selling the "American experience" in housing, retail, education, senior care and entertainment. On June 6, 2016, the Company purchased the majority and controlling interest in ATI Modular Technology Corp ("ATI Modular"), formerly Global Recycle Energy, Inc. through the acquisition of 100,000,000 shares (86%) of restricted common stock. The Stock Purchase and Sale Agreement dated June 2, 2016 (the "SPA") closed on June 6, 2016 with the $175,000 payment of the purchase price to Joseph Arcaro, prior shareholder, and sole director and officer of ATI Modular.

ATI Modular is engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US based methods for creating modular spaces, facilities, and properties. The Company's forward-looking vision is to create a physical location and manufacturing facility that promotes the export of US based technology, equipment, and process that focuses on building modular buildings, and structures of all types that will be used by both the public and private building and technology sectors in China.

On October 3, 2016, the Company purchased the majority and controlling interest in ATI Nationwide Holding Corp ("ATI Nationwide"), formerly EXA, Inc. OTC:Pinks (EXAI) through the acquisition of 65,000,000 shares (65.5%) shares of restricted common stock. The Stock Purchase and Sale Agreement dated October 3, 2016 (the "SPA EXAI") closed on October 10, 2016 with the $175,000 payment of the purchase price to Joseph C. Passalaqua, prior shareholder and director and officer of ATI Nationwide.

The Company intends on using this acquisition to facilitate its performance under the July 11, 2016 Master Joint Venture and Operational Agreement with Nationwide Microfinance Limited, a Ghanaian corporation, as disclosed in the Company's July 14, 2016 Form 8-K (see exhibit table above).

In both acquisitions, the Company purchased the shares with the intent to hold in its personal account on a restricted basis absent registration or qualification under an exemption to registration. The Stock Purchase Agreements were privately negotiated between the parties without facilitation through brokers or promotors, or third-parties, except legal counsel, and were approved by the Company's Board of Directors as being in the best interests of the Company. The source of funds was working capital from the Company. There is no material relationship between the Company and any of the parties under the Stock Purchase Agreements.

As with any business plan that is aspirational in nature, there is no assurance we will be able to accomplish all our objective or that we will be able to meet our financing needs to accomplish our objectives.

### NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

These financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP").

64

**Principles of Consolidation**

The consolidated financial statements include the accounts of the Company and all its majority-owned subsidiaries which require consolidation. Intercompany transactions have been eliminated in consolidation.

Table of Contents

**Interim Financial Statements**

These interim unaudited financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information. They do not include all of the information and footnotes required by generally accepted accounting principles for complete consolidated financial statements. Therefore, these consolidated financial statements should be read in conjunction with the Company's audited financial statements and notes thereto contained in its report on Form 10-K for the years ended December 31, 2017

The consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly the Company's financial position at March 31, 2018, and the results of its operations and cash flows for the three months ended March 31, 2018. The results of operations for the period ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

**Accounting Method**

The Company's financial statements are prepared using the accrual method of accounting. The Company has elected a fiscal year ending on December 31.

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. In the opinion of management, all adjustments necessary in order to make the financial statements not misleading have been included. Actual results could differ from those estimates.

**Financial Instruments**

The carrying amount reported in the balance sheet for cash, accounts receivable, accounts payable, accrued expenses, interest payable and short-term notes payable approximate fair value because of the immediate or short-term maturity of these financial instruments.

**Cash Equivalents**

The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

**Concentration of Credit Risk**

Financial instruments that potentially subject the Company to a significant concentration of credit risk consist primarily of cash and cash equivalents. The Company maintains deposits in federally insured financial institutions in excess of federally insured limits. However, management believes the Company is not exposed to significant credit risk due to the financial position of the depository institutions in which those deposits are held.

65

---

**Property, Plant, and Equipment**

Property, plant and equipment are initially recognized recorded at cost. Gains or losses on disposals are reflected as gain or loss in the period of disposal. The cost of improvements that extend the life of plant and equipment are capitalized. These capitalized costs may include structural improvements, equipment and fixtures. All ordinary repairs and maintenance costs are expensed as incurred.

Depreciation for financial reporting purposes is provided using the straight-line method over the estimated useful lives of the assets:

| | |
|---|---|
| Office equipment | 3-5 years |

For the three months ended March 31, 2018 and 2017, depreciation expense is $4,054 and $4,513, respectively.

**Investments**

Investments primarily include cost method investments. On March 31, 2018 and December 31, 2017, the carrying amount of investments was $3,860 and $3,860, respectively. There are no identified events or changes in circumstances that may have a significant adverse effect on fair value of the investment as of March 31, 2018.

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 177 of 223

<u>Table of Contents</u>

**Income Taxes**

Income taxes are provided in accordance with Statement of Financial Accounting Standards ASC 740 Accounting for Income Taxes. A deferred tax asset or liability is recorded for all temporary differences between financial and tax reporting and net operating loss carry forwards. Deferred tax expense (benefit) results from the net change during the year of deferred tax assets and liabilities. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion of all of the deferred tax assets will be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

The Company was established under the laws of the State of Delaware and is subject to U.S. federal income tax and Delaware state income tax. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts and are based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred income tax assets to the amount expected to be realized. On March 31, 2018 and December 31, 2017 and 2016, there is deferred tax assets of $239,613 and $169,291, respectively. The Company had $57,840 and $53,309 of income tax liability as of March 31, 2018 and December 31, 2017, respectively.

**Earnings per Share**

In February 1997, the FASB issued ASC 260, "Earnings per Share", which specifies the computation, presentation and disclosure requirements for earnings (loss) per share for entities with publicly held common stock. ASC 260 supersedes the provisions of APB No. 15, and requires the presentation of basic earnings (loss) per share and diluted earnings (loss) per share. The Company has adopted the provisions of ASC 260 effective (inception).

Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted-average number of shares of common stock outstanding during the period. Diluted earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of shares of common stock outstanding during the period increased to include the number of additional shares of common stock that would have been outstanding if potentially dilutive securities had been issued. There were no potentially dilutive securities outstanding during the periods presented.

For the three months ended March 31, 2018 and 2017, diluted earnings per share are the same as basic earnings per share due to the lack of dilutive items in the Company.

66

---

**Segment Information**

The standard, "Disclosures about Segments of an Enterprise and Related Information", codified with ASC 280, requires certain financial and supplementary information to be disclosed on an annual and interim basis for each reportable segment of an enterprise. The Company believes that it operates in business segment of marketing and sales in China while the Company's general administration function is performed in the United States. On March 31, 2018, all assets and liabilities are in the United States where the income and expense has been incurred since inception to March 31, 2018.

**Impact of New Accounting Standards**

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

**Pushdown Accounting and Goodwill**

Pursuant to applicable rules (FASB ASC 805-50-S99) the Company used push down accounting to reflect Yilaime Corporation's purchase of 100% of the shares of the Company's common stock. Richard Chiang, the Company's prior sole shareholder entered into an agreement to sell an aggregate of 10,000,000 shares of the Company's common stock to Yilaime Corporation effective upon the closing date of the Share Purchase Agreement dated June 26, 2014. Richard Chiang executed the agreement and owned no shares of the Company's common stock. This transaction resulted in Yilaime Corporation retaining rights, title and interest to all issued and outstanding shares of common stock in the Company.

**Revenue Recognition**

The Company's revenue recognition policies comply with FASB ASC Topic 605. Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the price is fixed or determinable, collectability is reasonably assured, and there are no significant subsequent obligations for the Company to assume.

Table of Contents

Prior to an agreement, the Company assesses whether collectability from the potential customer is reasonably assured. The Company reviews the customer's financial condition, which is an indicator of both its ability to pay, and, in turn, whether or not revenue is realizable.

The ability to pay is an important criterion for entrance into an agreement with the customer. If management believes that the potential customer does not have the ability to pay, normally an agreement is not entered into with the customer.

If, at the outset an arrangement is entered into and the Company determines that the collectability of the revenue amount from the customer is questionable, management would not recognize revenue until it receives the amount due or conditions change so that collectability is reasonably assured. If collectability is reasonably assured at the outset of an arrangement, but subsequent changes in facts and circumstances indicate collection from the customer is no longer probable, the amount is recorded as bad debt expense.

There are two primary customer agreements currently offered to the Company's customers - (a) Licensing, Lease and Use Agreement ("Licensing Agreement"), and (b) Exporter Services Agreement ("Exporter Agreement").

(a) Licensing, Lease and Use Agreement

For the License, Lease and Use Agreement, the Company reflects revenue recognition over the course of the term.

(b) Exporter Services Agreement.

For services provided in the Exporter Service Agreement, the Company has two primary types of services called the Service Fee and Transaction Fee. Additionally, under certain circumstances, the Company may charge an Extension Fee. The customer under the Exporter Services Agreement is defined in this section as the "Exporter."

67

**The Service Fee**

Upon signing the Exporters Agreement, the Exporter is provided with services consisting of eight related components including: 1) market analysis; 2) review of proposed goods and services; 3) expectations for supply and demand in the market; 4) conducting export business in China; 5) information on financing; 6) information on the export tax savings programs; 7) international trade center assistance; and 8) selecting and assigning a tax saving company. All eight components of the Service Fee are delivered as one deliverable upon the signing or shortly thereafter of the Exporter Service Agreement with the exporter. The Company completes the earnings process upon the signing the Exporter Service Agreement since the one service fee deliverable has been delivered and we have no further obligations. Revenue is not recognized until the completion of these eight components and the Company has no further obligations.

**The Transaction Fee**

During this process, the Exporter's goods and services are tested in the market, buyers or identified, deals or negotiated and the exporter products and services are delivered, and payment is made. The Transaction Fee is normally a percentage of each transaction.

The Transaction Fee process includes the Exporter's participation in three programs: 1) the Sample and Test Market Program; 2) Market Acceptance Program; and 3) Export Delivery Action. In the Sample and Test Market Program, an Exporter's products and services are tested in the market; sources of goods and services are confirmed; price indications are confirmed; and an Exporter and buyer match occurs. In the Market Acceptance Program, the export deal is identified and negotiated. Finally, in the Export Delivery Action, the goods are shipped and delivered and payment is made. The Company does not recognize revenue until completion of these three programs and the Company has no further obligations.

Throughout the life of the Exporter Agreement, the Company expects Exporters to complete multiple transactions. Each transaction is a separate and independent process.

**The Extension Fee**

The Extension Fee is an independent accounting unit. The Extension Fee is a fee charged to those Exporters who in rare cases for whatever reason fail to avail themselves of the Transaction Process. The Exporter has one-year to participate in the Sample and Test Market Program. Afterwards, provided no transaction has occurred and the Exporter agrees to pay a fee equal to 25% of the original Service fee within thirty (30) days (the "Extension Fee"), the Exporter may continue the Transaction Process. If the Extension Fee is not paid, the Exporter's participation and membership in the Sample and Test Program terminates. In the event of termination, the balance of any prior fees is still due and payable.

Table of Contents

Provided that the Exporter agrees to pay the Extension Fee and continues with the Transaction Process, at the end of the Transaction Process and the last Transaction Fee deliverable is made, the Transaction Fee Process is completed. Upon completion, the Company has no further obligations, revenue is recognized, and the Exporter is invoiced for both the Extension Fee and the Transaction Fee.

After the Exporter pays the Extension Fee, if no transaction has occurred for sixty (60) calendars days, the Company is exempt from any obligation to provide further Transaction Process services and it recognizes revenue of the Extension Fee.

The Company recognizes revenue on a gross basis.

We have gross presentation for services provided by Yilaime, a contractor to the Company prior to the consummation of an arrangement.

68

In accordance with ASC605-45-45, the gross basis to recognize revenue applies since the Company is the primary obligor in the arrangement.

The Company expects to realize revenue for export funding and support, and franchise and license fees for United States support locations, and education initiatives. Additionally, if and when the Company further develops AmericaTowne, revenues would be expected to be recognized for (a) villa sales, rentals, timeshare and leasing; (b) hotel leasing and or operational revenues and sales; (c) theme park and performing art center operations, sales and/or leasing; and (d) senior care facilities, operations and or sales.

The Company does not provide unconditional right of return, price protection or any other concessions to its customers.

There were no sales returns and allowances from inception to December 31, 2017.

**Valuation of Goodwill**

We assess goodwill for potential impairments at the end of each fiscal year, or during the year if an event or other circumstance indicates that we may not be able to recover the carrying amount of the asset. In evaluating goodwill for impairment, we first assess qualitative factors to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount. If we conclude that it is not more likely than not that the fair value of a reporting unit is less than its carrying value, then no further testing of the goodwill assigned to the reporting unit is required. However, if we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value, then we perform a twostep goodwill impairment test to identify potential goodwill impairment and measure the amount of goodwill impairment to be recognized, if any.

In the first step of the review process, we compare the estimated fair value of the reporting unit with its carrying value. If the estimated fair value of the reporting unit exceeds its carrying amount, no further analysis is needed. If the estimated fair value of the reporting unit is less than its carrying amount, we proceed to the second step of the review process to calculate the implied fair value of the reporting unit goodwill in order to determine whether any impairment is required. We calculate the implied fair value of the reporting unit goodwill by allocating the estimated fair value of the reporting unit to all of the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination. If the carrying value of the reporting unit's goodwill exceeds the implied fair value of the goodwill, we recognize an impairment loss for that excess amount. In allocating the estimated fair value of the reporting unit to all of the assets and liabilities of the reporting unit, we use industry and market data, as well as knowledge of the industry and our past experiences.

We base our calculation of the estimated fair value of a reporting unit on the income approach. For the income approach, we use internally developed discounted cash flow models that include, among others, the following assumptions: projections of revenues and expenses and related cash flows based on assumed long-term growth rates and demand trends; expected future investments to grow new units; and estimated discount rates. We base these assumptions on our historical data and experience, third-party appraisals, industry projections, micro and macro general economic condition projections, and our expectations.

We have had no goodwill impairment charges for the three months ended March 31, 2018. The estimated fair value of each of our reporting units exceeded its' respective carrying amount by more than 100 percent based on our models and assumptions.

*NOTE 3. NOTES RECEIVABLE – RELATED PARTIES*

On July 12, 2017, the Company issued $15,000 secured promissory note to a shareholder with annual 6% interest rate. The note is due on October 30, 2017. The interest rate is 9% after the due date. The note is secured by the personal guarantee of the borrower and the borrower's stock of the Company. The company has got repayment of $1,250 till March 31, 2018. The note is past due as of March 31, 2018.

69

<u>Table of Contents</u>

On August 31, 2017, the Company issued $58,000 secured promissory note to a shareholder with annual 3.5% interest rate. The note is due on April 1, 2018. The interest rate is 9% after the due date. The note is secured by the borrower's stock of the Company.

## NOTE 4. ACCOUNTS RECEIVABLE

The nature of the net accounts receivable for March 31, 2018, in the amount of $4,020,680 are for Export Service Agreements. The Company's allowance for bad debt is $428,403 which provides a net receivable balance of $3,592,277.

Accounts' receivable is stated at the amount management expects to collect from outstanding balances. Management provides for probable uncollected amounts through a charge to earnings and a credit to an allowance for bad debts based on its assessment of the current status of individual accounts. Balances that are still outstanding after management has used reasonable collection efforts are written off through a charge to the allowance for bad debts and a credit to accounts receivable.

Accounts receivable consist of the following:

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Accounts receivable | $        1,097,034 | $        1,045,412 |
| Accounts receivable- related parties | 2,923,646 | 2,459,135 |
| Less: Allowance for doubtful accounts | (428,403) | (403,568) |
| Accounts receivable, net | $        3,592,277 | $        3,100,979 |

Bad debt expense was $24,036 and $19,494 for the three months ended March 31, 2018 and 2017, respectively.

**Allowance for bad debt policy**

Our bad debt policy is determined by the Company's periodic review of each account receivable for reasonable assurance of collection. Factors considered are the exporter's financial condition, past payment history if any, any conversations with the exporter about the exporter's financial conditions and any other extenuating circumstances. Based upon the above factors the Company makes a determination whether the receivable are reasonable assured of collection. Based upon our review if required we adjust the allowance for bad debt.

## NOTE 5. SHAREHOLDER'S EQUITY

The Company incorporates by reference all prior disclosures for the period identified herein. See Part II, Item 6. The stockholders' equity section of the Company contains the following classes of capital stock as of March 31, 2018:

- Common stock, $ 0.0001 par value: 100,000,000 shares authorized; 49,421,350 shares issued and outstanding Preferred
- stock, $ 0.0001 par value: 5,000,000 shares authorized; but not issued and outstanding.

## NOTE 6. DEFFERED REVENUE

ATI Modular receives $250,000 quarterly fee from Yilaime for Sales and Support Services Agreement. In accordance with ASC 605-50-45, the Company defers and recognizes as a reduction to the future costs for quarterly fee. For the three months ended March 31, 2018, $250,000 fee from exclusive agreement incurred; $1,504,387 is booked deferred revenue as current liability on March 31, 2018 and $70,000 went against cost charged by Yilaime.

70

## NOTE 7. STOCK BASED COMPENSATION

For the three months ended March 31, 2018 and 2017, $240,178 and $123,429 of stock compensation were charged to operating expenses, respectively. $2,161,542 and $2,359,220 were recorded as deferred compensation on March 31, 2018 and December 31, 2017, respectively.

ATI Modular entered into an employment lock-up agreement on July 1, 2016 with Alton Perkins to serve as the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer and Secretary. The term of Mr. Perkins' agreement is five years with ATI Modular retaining an option to extend in one-year periods. In consideration for Mr. Perkins' services, ATI Modular has agreed to issue to his designee, the Alton & Xiang Mei Lin Perkins Family Trust, 10,000,000

<u>Table of Contents</u>

shares of common stock. ATI Modular may elect in the future to include money compensation to Mr. Perkins or his designee for his services provided there is sufficient cash flow.

On June 20, 2017, the Company signed the "First Amendment Employment Agreement with Alton Perkins amending the original Employment Agreement dated November 21, 2014. The new Agreement lifts up any lock-up provisions related to shares issued to Alton Perkins or its designee. In addition, in accordance with the new Agreement, the Company issued Alton Perkins additional 10,000,000 shares of restricted common stock and extend his employment until June 19, 2022.

On September 11, 2017, the Company signed the "Second Amendment Employment Agreement with Alton Perkins amending the original Employment Agreement dated November 21, 2014, as amended on June 20, 2017. Mr. Perkins agreed to serve as the Chairman and Chief Executive of AmericaTowne Holdings, Inc. as well as continue to serve for five years through September 11, 2022, in the same capacity for AmericaTowne, Inc., ATI Modular Technology Corp, and its subsidiary Anhui Ao De Xin Modular New Building Material Co., Ltd. In accordance with the new amended Agreement, the Company issued Alton Perkins and or his designee 8,831,145 shares of restricted common stock.

*NOTE 8. RELATED PARTY TRANSACTIONS*

Yilaime Corporation, a Nevada corporation ("Yilaime") and Yilaime Corporation of NC ("Yilaime NC") are related parties to the Company. Yilaime is a "Control Party" to AmericaTowne because it has title to greater than 50% of the issued and outstanding shares of common stock in the Company. Alton Perkins is the majority shareholder and controlling principal of Yilaime, Yilaime NC, Perkins DISC and the Company. Additionally, for those "trade centers" set forth below, Mr. Perkins directs all major activities and operating policies of each entity. The common control may result in operating results or a financial position significantly different from that, which would have been obtained if the enterprises were autonomous. Further, pursuant to ASC 850-10-50-6 the Company lists and provides details for all material Related Party transactions so that readers of the financial statements can better assess and predict the possible impact on performance.

Nature of Related Parties' Relationship

On October 8, 2014, the Company entered into the Stock Exchange Agreement with Yilaime NC. Pursuant to the terms of the Stock Exchange Agreement, in consideration for the issuance of 3,616,059 shares of common stock in the Company to Yilaime NC, Yilaime NC conveyed 10,848,178 shares of its restricted common stock to the Company. The intent of the parties in executing and performing under the Stock Exchange Agreement is to effectuate tax-free reorganization under Section 368 of the Internal Revenue Code of 1986. The Company issued the 3,616,059 shares of common stock to Yilaime NC on May 14, 2015. As result of receiving 10,848,178 shares of issued and outstanding common stock in Yilaime (4.5% of issued and outstanding), the Company recorded a $3,860 investment in use of Cost Method.

The Company authorized Yilaime NC to transfer 3,616,059 of these shares pursuant to the Company's effective registration statement on Form S-1/A on November 5, 2015.

The Company entered into a Service Provider Agreement with Yilaime on October 27, 2014 (the "Service Agreement") wherein certain "Export Funding and Support Services" and "Occupancy Services," as defined therein, are provided to the Company in consideration for a fee. In addition to these fees, Yilaime has to pay an Operations Fee to the Company for exclusive rights. Mr. Perkins is the Chief Executive Officer of the Company and is the majority shareholder and controlling person of Yilaime.

71

The Company also leased office space from Yilaime NC for $3,516 per month.

On June 27, 2016, ATI Modular entered into a Sales and Support Services Agreement with Yilaime. Under the Services Agreement, Yilaime will provide ATI Modular with marketing, sales and support services in the ATI Modular's pursuit of ATI Modular business in China in consideration of a commission equal to 10% of the gross amount of monies procured for ATI Modular through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay ATI Modular a quarterly fee of $250,000 starting on July 1, 2016. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. Yilaime retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to ATI Modular by March 10, 2019. Yilaime has agreed to be ATI Modular's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of ATI Modular.

Pursuant to ASC 850-10-50-6, the Company makes the following transaction disclosures for three months ending March 31,

Consolidated Operating Statement Related Party Transactions (for three months ending March 31, 2018 and 2017).

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 182 of 223

Table of Contents

(a) $50,000 and $50,000 in revenues for Yilaime's exclusive agreement with the Company;

(b) $187,000 and $180,000 in Trade Center Service Agreement Revenue;

(c) $35,338 and $59,416 in costs of revenues to Yilaime for services pursuant to the Service Agreement;

(d) $174,775 and $159,686 for general and administrative expenses for commissions and fees.

(e) For the year ended, March 31, 2018, $10,547 for general and administrative expenses for rent expenses the Company paid to Yilaime towards its leaseagreement; For the three months ended, March 31, 2018, $7,500 for general and administrative expenses for rent expenses ATI Modular paid to Yilaime towards its lease agreement. For the three months ended, March 31, 2018, $7,500 for general and administrative expenses for rent expenses ATI Nationwide paid to Yilaime towards its lease agreement.

(f) For the three months ended, March 31, 2017, $10,555 for general and administrative expenses for rent expenses the Company paid to Yilaime towards itslease agreement; $7,500 for general and administrative expenses for rent expenses ATI Modular paid to Yilaime towards its lease agreement; $7,500 for general and administrative expenses for rent expenses ATI Nationwide Holding Corp paid to Yilaime towards its lease agreement

(g) $240,178 and $123,429 for general and administrative operating expenses recorded as stock compensation for respective employment agreements.

Consolidated Balance Sheet Related Party Transactions (on March 31, 2018 and December 31, 2017)

(a) $71,750 and $73,000 notes receivable to shareholders;

(b) $1,377,010 and $1,128,033 net account receivables Yilaime owes to the Company;

(c) $1,402,399 and $1,208,146 Trade Center receivables owed to the Company;

(d) On March 31, 2018, other receivables include $112,666 owed by Perkins Hsu Export Corporation and $14,677 purchase mining equipment and advancesfor Yilaime Nairobi Ltd.

On December 31, 2017, other receivables include $165,870 owed by Perkins Hsu Export Corporation and $14,677 purchase mining equipment and advances for Yilaime Nairobi Ltd;
(e) $1,504,387 and $1,254,387 deferred revenue-Yilaime;

(f) $13,712 and 23,712 as accounts payable to Anhui Ao De Xin Modular Construction Technology Co., Ltd.

72

**FISCAL YEAR**

Our fiscal year ends December 31.

**Results of Operations for the Three Months Ended March 31, 2018 and 2017**

The following table sets forth the summary income statement for the three month periods ended March 31, 2018 and 2017:

|  | Three Months Ended | |
|---|---|---|
|  | March 31, 2018 | March 31, 2017 |
| Revenue | $ 348,135 | $ 291,135 |
| Cost of Revenues-Related Parties | $ 35,499 | $ 59,416 |
| Operating Expense | $ 503,655 | $ 322,515 |
| Net Income (Loss) | $ (125,235) | $ (92,783) |

### Revenues

During the first quarter of 2018, the Company had revenues of $348,135, as compared to $291,135 for the same period in 2017. This increase is due primarily to an increase in revenue from service fee, as well as a slight increase in services from related parties.

### Operating Expenses

Our expenses for the three months ended March 31, 2018 and 2017 are outlined in the table below:

| | Three Months Ended | | | |
| | March 31, 2018 | | March 31, 2017 | |
|---|---|---|---|---|
| General and Administrative | $ | 418,756 | $ | 247,451 |
| Professional Fees | $ | 84,899 | $ | 75,064 |
| Total Operating Expenses | $ | 503,655 | $ | 322,515 |

Our operating expenses are largely attributable to commissions and professional fees related to our reporting requirements as a public company and implementation of our business plan. Compared to the same period in 2017, the increase of operating expenses in 2018 is due to increases in professional fees related to our pending merger with related-party ATI Modular Technology Corp., and increased in general administrative expenses attributed to stock based compensation.

### Net Loss

As a result of our operations, the Company reported net loss of $125,235 for the first quarter of 2018, a $92,783 increase in net loss from the same period one year ago.

73

### Liquidity and Capital Resources

### Working Capital

| | March 31, 2018 (Unaudited) | | December 31, 2017 | |
|---|---|---|---|---|
| Current Assets | $ | 4,705,303 | $ | 4,255,338 |
| Current Liabilities | $ | 1,624,309 | $ | 1,404,025 |
| Working Capital | $ | 3,080,994 | $ | 2,851,313 |

### Cash Flow

| | Three Months Ended | | | |
| | March 31, 2018 | | March 31, 2017 | |
|---|---|---|---|---|
| Net Cash Used in Operating Activities | $ | 169,948 | $ | 160,357 |
| Net Cash Used in Investing Activities | $ | 270 | $ | 3,123 |
| Nat Cash Provided by Financing Activities | $ | 183,339 | $ | 22,500 |
| Increase (Decrease) in Cash and Cash Equivalents | $ | 13,121 | $ | (140,981) |

### Cash Used in Operating Activities

Higher net cash used in operating activities for the three months ended March 31, 2018 is mainly due to an increase in accounts receivable.

<u>Table of Contents</u>

*Cash Used in Investing Activities*

We spent $270 and $3,123 on fixed assets for three months ended March 31, 2018 and 2017, respectively.

*Cash Provided by Financing Activities*

We received proceeds of $183,339 and $22,500 from issuing common stock for the three months ended March 31, 2018 and 2017, respectively.

**Off-Balance Sheet Arrangements**

We have not entered into any off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

74

*Critical Accounting Policies*

Our financial statements and related public financial information are based on the application of accounting principles generally accepted in the United States ("US GAAP"). US GAAP requires the use of estimates; assumptions, judgments and subjective interpretations of accounting principles that have an impact on the assets, liabilities, revenues and expenses amounts reported. These estimates can also affect supplemental information contained in our external disclosures including information regarding contingencies, risk and financial condition.

We believe our use of estimates and underlying accounting assumptions adhere to GAAP and are consistently and conservatively applied. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ materially from these estimates under different assumptions or conditions. We continue to monitor significant estimates made during the preparation of our financial statements.

We believe the following is among the most critical accounting policies that impact our consolidated financial statements. We suggest that our significant accounting policies, as described in our financial statements in the Summary of Significant Accounting Policies, be read in conjunction with this Management's Discussion and Analysis of Financial Condition and Results of Operations.

*Revenue Recognition*

The Company recognizes revenue at the date of delivery to customers when a formal arrangement exists, the price is fixed or determinable, the delivery is completed, no other significant obligations of the Company exist and collectability is reasonably assured. The Company's Revenue Recognition policy is provided in detail at Note 2 of the Financial Statements.

*Income Taxes*

The Company accounts for income taxes in accordance with ASC Topic 740, "Income Taxes." ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

*Recent Accounting Pronouncements*

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

75

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 185 of 223

Table of Contents

To the Board of Directors and Stockholders of AMERICATOWNE Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of AMERICATOWNE Inc. and its subsidiaries (the "Company") as of December 31, 2017 and 2016, and the related statement of operations, stockholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2017, and the related notes (collectively referred to as the financial statements). In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Company. as of December 31, 2017 and 2016, and the results of operations and cash flows for each of the years in the two-year period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

*Yichien Yeh, CPA*

Yichien Yeh, CPA

We have served as the Company's auditor since 2014

Oakland Gardens, New York
May 17, 2018

76

## AMERICATOWNE Inc. and Subsidiaries
## Consolidated Balance Sheets

|  | December 31 2017 | December 31 2016 |
|---|---|---|
| ASSETS |  |  |
| Current Assets |  |  |
| Cash and cash equivalents | $ 900,168 | $ 973,015 |
| Notes receivable - related parties | 73,000 | — |
| Accounts receivable, net | 764,800 | 610,715 |
| Accounts receivable, net - related parties | 2,336,179 | 687,966 |
| Other receivables - related parties | 180,547 | 259,569 |

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 186 of 223

| | | | | |
|---|---|---|---|---|
| Prepayment-current | | 644 | | 644 |
| Total Current Assets | | 4,255,338 | | 2,531,909 |
| | | | | |
| Prepayment-non current | | 7,035 | | 7,675 |
| Property, plant and equipment, net | | 41,264 | | 25,861 |
| Deferred tax assets | | 169,291 | | 10,774 |
| Goodwill | | 40,331 | | 40,331 |
| Investments | | 3,860 | | 3,860 |
| Total Assets | $ | 4,517,119 | $ | 2,620,410 |

**LIABILITIES AND SHAREHOLDERS' EQUITY**

| | | | | |
|---|---|---|---|---|
| Current Liabilities | | | | |
| Accounts payable and accrued expenses | $ | 80,611 | $ | 240,287 |
| Deferred revenues-current | | 1,258,930 | | 328,929 |
| Other payables | | 1,060 | | 5,016 |
| Deposit from customers | | 1,469 | | — |
| Due to related parties | | 8,646 | | 42,839 |
| Income tax payable | | 53,309 | | 42,972 |
| Total Current Liabilities | | 1,404,025 | | 660,043 |
| Deferred revenues-non current | | 49,441 | | 53,981 |
| Total Liabilities | | 1,453,466 | | 714,024 |

Commitments & Contingencies

| | | | | |
|---|---|---|---|---|
| Shareholders' Equity | | | | |
| Preferred stock, $0.0001 par value; 5,000,000 shares authorized; none issued and outstanding | | — | | — |
| Common stock, $0.0001 par value; 100,000,000 shares authorized; 48,985,026 and 26,974,775 shares issued and outstanding | | 4,899 | | 2,697 |
| Common stock subscribed | | 87 | | 90 |
| Additional paid-in capital | | 5,684,903 | | 3,329,750 |
| Deferred compensation | | (2,359,220) | | (1,450,842) |
| Receivable for issuance of stock | | (90,223) | | (65,223) |
| Retained Earnings | | (204,425) | | 98,631 |
| Noncontrolling interest | | 27,632 | | (8,717) |
| Shareholders' Equity | | 3,063,653 | | 1,906,386 |
| Total Liabilities and Shareholders' Equity | $ | 4,517,119 | $ | 2,620,410 |

**See Notes to Consolidated Financial Statements**

77

Table of Contents

AMERICATOWNE Inc. and Subsidiaries

Consolidated Statements of Operations

For the Years Ended

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Revenues | | |
| Sales | $ 478,011 | $ 1,209,540 |
| Services-related parties | 1,296,992 | 550,000 |
| | 1,775,003 | 1,759,540 |
| Cost of Revenues-Related Parties | 303,549 | 244,486 |
| Gross Profit | 1,471,454 | 1,515,054 |
| | | |
| Operating Expenses | | |
| General and administrative | 1,567,366 | 1,275,141 |
| Professional fees | 371,096 | 317,044 |
| Total operating expenses | 1,938,462 | 1,592,185 |
| Income from operations | (467,008) | (77,131) |

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 188 of 223

AMERICATOWNE Inc. and Subsidiaries

|  |  |  |
|---|---|---|
| $ | (0.003 | |
|  | 26,599,745 | |

|  |  |  |  |  |
|---|---|---|---|---|
|  | $ | (0.01 |  |  |
|  |  | 35,356,412 |  |  |
| Other Expenses (Income) |  | (2,352) |  | (2,441) |
| Provision for income taxes |  | (146,512) |  | (3,549) |
| Net Income (Loss) |  | (318,144) |  | (71,141) |
| Less: Net loss (income) attributable to the noncontrolling interest |  | 15,088 |  | 33,525 |
| Net income (loss) attributable to AMERICATOWNE, Inc common stockholders | $ | (303,056) | $ | (37,616) |
| Earnings per share - basic and diluted |  |  |  | )) |
| Weighted average shares outstanding- basic and diluted |  |  |  |  |

See Notes to Consolidated Financial Statements.

Table of Contents

AMERICATOWNE Inc. and Subsidiaries

78

Consolidated Statements of Stockholders' Equity
For the Years Ended December 31, 2017 and 2016

Americatowne Inc. Shareholders

| Preferred Stock | Common Stock | Common Stock | Additional Paid-In | Retained | Deferred | Receivable for Issuance | Non-Controlling |
|---|---|---|---|---|---|---|---|
| — | | | | | | | |
| — | | | | | | | |
| — | | | | | | | |
| — | | | | | | | |
| — | | | | | | | |
| — | | | | | | | |
| — | | | | | | | |
| — | | | | | | | |
| — | | | | | | | |
| = | | | | | | | |
| $ = | | | | | | | |

AMERICATOWNE Inc. and Subsidiaries

| stock | Total Interest | Shares | Amount | Shares | Amount Subscribed | Capital | Earnings | Compensation | of |
|---|---|---|---|---|---|---|---|---|---|

$ =

| Balance, December 31, 2015 | $1,343,671 — $ | | | Shares Issued for Compensation | — |
|---|---|---|---|---|---|

| Shares Issued for Service | 875 — | | Amortization of Deferred Compensation | 612,616 |
|---|---|---|---|---|

| Shares Issued for Compensation | — — | | Shares Issued for Proceeds | 734,991 |
|---|---|---|---|---|

| Amortization of Deferred Compensation | 436,653 — | | Capital Contribution | 127,803 |
|---|---|---|---|---|

| Shares issued for Debt Conversion | 169,168 — | | Net loss for the Period | (318,144) |
|---|---|---|---|---|

| Shares Issued for Proceeds | 235,970 — | | Balance, December 31, 2017 | 3,063,653 — |
|---|---|---|---|---|

| Business Combination | (534) — |
|---|---|

| Capital Contribution | 145,049 — | — 25,243,205 $2,524 $ | — $2,438,099 $ 136,246 $ | (1,233,198) $ | — $ — |
|---|---|---|---|---|---|

| Acquisition of non-business entity | (353,325) — |
|---|---|

| Net loss for the Period | (71,141) — |
|---|---|

| Balance, December 31, 2016 | $1,906,386 — |
|---|---|

Table of Contents

AMERICATOWNE Inc. and Subsidiaries

|  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
| | 8,718 | — | | | — | | | | |
| 1 | 874 | | | | | | | | |
| — | — | — | | (654,298 | — | — | (353,325) | — | |
| | 617,190 | 62 | (37,616) | 436,653 | — | | | | |
| 654,236 | — ) | | | | — | (33,525) | | | |
| — | — | — | 26,974,775 | $2,697 | $3,329,750 $ | 98,631 ) | $ (65,223) | $ (8,717) | |
| | | 90 | 11,148,892 | 1,115 | 1,519,879 | ) | | | |
| — | — | — | | — | | | | | |
| | | | | 10,861,359 | 1,086 ) | 758,908 | | | |
| 169,151 | 171,628 | 17 | (25,000) | | | | 76,365 | | |
| — | — | | 51,438 | | | | | | |
| | | $ 90 | | $ (1,450,842 | | | | | |
| | | | (303,056) | | | (15,088) | | | |
| 301,010 | 934,034 | 93 | (1,520,994 | | | | | | |
| (65,223) | — | | 48,985,026 | $4,899 | $5,684,903 $(204,425) ) | $ (90,223) | $ 27,632 | | |

See Notes to Consolidated Financial Statements. 612,616

| | — | (3 | 79 |
|---|---|---|---|
| — | — | | |
| — | (534) | | |
| | | $ 87 | |
| 119,706 | — | | $ (2,359,220 |
| — | 25,343 | | |

Consolidated Statements of Cash Flows

| | For the Years Ended | |
|---|---|---|
| | December 31, 2017 | December 31, 2016 |
| **Operating Activities:** | | |
| Net income (loss) | $ (318,144) | $ (71,141 |
| Adjustments to reconcile net income to net cash provided by operations | | |

Table of Contents

AMERICATOWNE Inc. and Subsidiaries

| | | |
|---|---:|---:|
| Depreciation | 8,484 | 3,388 |
| Stock compensation | 612,616 | 436,653 |
| Stock issued for services | — | 875 |
| Bad debt provision | 198,443 | 128,816 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (2,000,740) | (568,573 |
| Other receivable | 0 | — |
| Other receivable - related parties | 74,495 | (278,811) |
| Prepayment | 640 | 2,436 |
| Deferred tax assets | (158,517) | (10,774 |
| Accounts payable and accrued expenses | (159,678) | 274,187 |
| Deferred revenues | 925,460 | 319,847 |
| Other payables | (3,956) | 5,016 |
| Deposit from customers | 1,469 | |
| Due to related parties | 74,114 | 62,080 |
| Income tax payable | 10,337 | 7,225 |
| Net cash provided by (used in) operating activities | (734,977) | 311,224 |
| | | |
| Investing Activities: | | |
| Purchase of fixed assets | (23,885) | (10,891 |
| Issuance of notes receivable | (73,000) | |
| Acquisition of subsidiaries | = | (350,000 |
| Net cash used in Investing activities | (96,885) | (360,891 |
| | | |
| Financing Activities: | | |
| Proceeds from issuance of common stock | 759,015 | 381,019 |
| Net cash provided by financing activities | 759,015 | 381,019 |
| | | |
| Increase (Decrease) in cash and cash equivalents | (72,847) | 331,352 |
| Cash and cash equivalents at beginning of period | 973,015 | 641,663 |
| Cash and cash equivalents at end of period | $ 900,168 | 973,015 |
| | | |
| Supplemental disclosure of cash flow information | — | |
| | $ = | |
| | $ = | $ = |
| | | |
| | $ = | 169,168 |

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 193 of 223

Table of Contents

AMERICATOWNE Inc. and Subsidiaries

| | | |
|---|---|---|
| Interest paid | | |
| Income taxes paid | $ | 535 |

Noncash investing and financing activities:    Shares issued to convert notes payable and other debts

**See Notes to Financial Statements**

80

Case 5:18-cv-00487-D   Document 1-1   Filed 10/12/18   Page 194 of 223

Table of Contents

**AMERICATOWNE Inc.**
**Notes to Consolidated Financial Statements**

*NOTE 1. ORGANIZATION AND DESCRIPTION OF BUSINESS*

AmericaTowne, Inc. (the "Company") was incorporated under the laws of the State of Delaware on April 22, 2014. The Company is engaged in exporting and consulting in the exportation of American made goods, products and services to China and in Africa through strategic relationships in China and in the United States, which is referred to internally by the Company as the "AmericaTowne Platform". The Company's forward-looking vision is to create a physical location called AmericaTowne in China that incorporates business selling the "American experience" in housing, retail, education, senior care and entertainment. On June 6, 2016, the Company purchased the majority and controlling interest in ATI Modular Technology Corp ("ATI Modular"), formerly Global Recycle Energy, Inc. through the acquisition of 100,000,000 shares (86%) of restricted common stock. The Stock Purchase and Sale Agreement dated June 2, 2016 (the "SPA") closed on June 6, 2016 with the $175,000 payment of the purchase price to Joseph Arcaro, prior shareholder, and sole director and officer of ATI Modular.

ATI Modular is engaged in the development and the exporting of modular energy efficient technology and processes that allow government and private enterprises in China to use US based methods for creating modular spaces, facilities, and properties. The Company's forward-looking vision is to create a physical location and manufacturing facility that promotes the export of US based technology, equipment, and process that focuses on building modular buildings, and structures of all types that will be used by both the public and private building and technology sectors in China.

On October 3, 2016, the Company purchased the majority and controlling interest in ATI Nationwide Holding Corp ("ATI Nationwide"), formerly EXA, Inc. OTC:Pinks (EXAI) through the acquisition of 65,000,000 shares (65.5%) shares of restricted common stock. The Stock Purchase and Sale Agreement dated October 3, 2016 (the "SPA EXAI") closed on October 10, 2016 with the $175,000 payment of the purchase price to Joseph C. Passalaqua, prior shareholder and director and officer of ATI Nationwide.

The Company intends on using this acquisition to facilitate its performance under the July 11, 2016 Master Joint Venture and Operational Agreement with Nationwide Microfinance Limited, a Ghanaian corporation, as disclosed in the Company's July 14, 2016 Form 8-K (see exhibit table above).

In both acquisitions, the Company purchased the shares with the intent to hold in its personal account on a restricted basis absent registration or qualification under an exemption to registration. The Stock Purchase Agreements were privately negotiated between the parties without facilitation through brokers or promotors, or third-parties, except legal counsel, and were approved by the Company's Board of Directors as being in the best interests of the Company. The source of funds was working capital from the Company. There is no material relationship between the Company and any of the parties under the Stock Purchase Agreements.

As with any business plan that is aspirational in nature, there is no assurance we will be able to accomplish all our objective or that we will be able to meet our financing needs to accomplish our objectives.

*NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES*

**Basis of Presentation**

These financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP").

81

**Principles of Consolidation**

The consolidated financial statements include the accounts of the Company and all its majority-owned subsidiaries which require consolidation. Intercompany transactions have been eliminated in consolidation. **Accounting Method**

The Company's financial statements are prepared using the accrual method of accounting. The Company has elected a fiscal year ending on December 31.

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. In the opinion of management, all adjustments necessary in order to make the financial statements not misleading have been included. Actual results could differ from those estimates.

<u>Table of Contents</u>

**Financial Instruments**

The carrying amount reported in the balance sheet for cash, accounts receivable, accounts payable, accrued expenses, interest payable and short-term notes payable approximate fair value because of the immediate or short-term maturity of these financial instruments.

**Cash Equivalents**

The Company considers all highly liquid investments with maturity of three months or less when purchased to be cash equivalents.

**Concentration of Credit Risk**

Financial instruments that potentially subject the Company to a significant concentration of credit risk consist primarily of cash and cash equivalents. The Company maintains deposits in federally insured financial institutions in excess of federally insured limits. However, management believes the Company is not exposed to significant credit risk due to the financial position of the depository institutions in which those deposits are held.

**Property, Plant, and Equipment**

Property, plant and equipment are initially recognized recorded at cost. Gains or losses on disposals are reflected as gain or loss in the period of disposal. The cost of improvements that extend the life of plant and equipment are capitalized. These capitalized costs may include structural improvements, equipment and fixtures. All ordinary repairs and maintenance costs are expensed as incurred.

Depreciation for financial reporting purposes is provided using the straight-line method over the estimated useful lives of the assets:

Office equipment                                    3-5 years

For the years ended December 31, 2017 and 2016, depreciation expense is $8,484 and $3,388, respectively.

82

**Investments**

Investments primarily include cost method investments. On December 31, 2017 and 2016, the carrying amount of investments was $3,860 and $3,860, respectively. There are no identified events or changes in circumstances that may have a significant adverse effect on fair value of the investment as of December 31, 2017.

**Income Taxes**

Income taxes are provided in accordance with Statement of Financial Accounting Standards ASC 740 Accounting for Income Taxes. A deferred tax asset or liability is recorded for all temporary differences between financial and tax reporting and net operating loss carry forwards. Deferred tax expense (benefit) results from the net change during the year of deferred tax assets and liabilities. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion of all of the deferred tax assets will be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

The Company was established under the laws of the State of Delaware and is subject to U.S. federal income tax and Delaware state income tax. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts and are based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred income tax assets to the amount expected to be realized. On December 31, 2017 and 2016, there is deferred tax assets of $169,291 $10,774, respectively. The Company had $53,309 and $42,972 of income tax liability as of December 31, 2017 and 2016, respectively.

**Earnings per Share**

In February 1997, the FASB issued ASC 260, "Earnings per Share", which specifies the computation, presentation and disclosure requirements for earnings (loss) per share for entities with publicly held common stock. ASC 260 supersedes the provisions of APB No. 15, and requires the presentation of basic earnings (loss) per share and diluted earnings (loss) per share. The Company has adopted the provisions of ASC 260 effective (inception).

<u>Table of Contents</u>

Basic earnings (loss) per common share is computed by dividing net income (loss) available to common shareholders by the weighted-average number of shares of common stock outstanding during the period. Diluted earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of shares of common stock outstanding during the period increased to include the number of additional shares of common stock that would have been outstanding if potentially dilutive securities had been issued. There were no potentially dilutive securities outstanding during the periods presented.

For the years ended December 31, 2017 and 2016, diluted earnings per share are the same as basic earnings per share due to the lack of dilutive items in the Company.

**Segment Information**

The standard, "Disclosures about Segments of an Enterprise and Related Information", codified with ASC 280, requires certain financial and supplementary information to be disclosed on an annual and interim basis for each reportable segment of an enterprise. The Company believes that it operates in business segment of marketing and sales in China while the Company's general administration function is performed in the United States. On December 31, 2017, all assets and liabilities are in the United States where the income and expense has been incurred since inception to December 31, 2017.

**Impact of New Accounting Standards**

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow.

83

**Pushdown Accounting and Goodwill**

Pursuant to applicable rules (FASB ASC 805-50-S99) the Company used push down accounting to reflect Yilaime Corporation's purchase of 100% of the shares of the Company's common stock. Richard Chiang, the Company's prior sole shareholder entered into an agreement to sell an aggregate of 10,000,000 shares of the Company's common stock to Yilaime Corporation effective upon the closing date of the Share Purchase Agreement dated June 26, 2014. Richard Chiang executed the agreement and owned no shares of the Company's common stock. This transaction resulted in Yilaime Corporation retaining rights, title and interest to all issued and outstanding shares of common stock in the Company.

**Revenue Recognition**

The Company's revenue recognition policies comply with FASB ASC Topic 605. Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the price is fixed or determinable, collectability is reasonably assured, and there are no significant subsequent obligations for the Company to assume.

Prior to an agreement, the Company assesses whether collectability from the potential customer is reasonably assured. The Company reviews the customer's financial condition, which is an indicator of both its ability to pay, and, in turn, whether or not revenue is realizable.

The ability to pay is an important criterion for entrance into an agreement with the customer. If management believes that the potential customer does not have the ability to pay, normally an agreement is not entered into with the customer.

If, at the outset an arrangement is entered into and the Company determines that the collectability of the revenue amount from the customer is questionable, management would not recognize revenue until it receives the amount due or conditions change so that collectability is reasonably assured. If collectability is reasonably assured at the outset of an arrangement, but subsequent changes in facts and circumstances indicate collection from the customer is no longer probable, the amount is recorded as bad debt expense.

There are two primary customer agreements currently offered to the Company's customers - (a) Licensing, Lease and Use Agreement ("Licensing Agreement"), and (b) Exporter Services Agreement ("Exporter Agreement").

(a) Licensing, Lease and Use Agreement

For the License, Lease and Use Agreement, the Company reflects revenue recognition over the course of the term.

(b) Exporter Services Agreement.

Table of Contents

For services provided in the Exporter Service Agreement, the Company has two primary types of services called the Service Fee and Transaction Fee. Additionally, under certain circumstances, the Company may charge an Extension Fee. The customer under the Exporter Services Agreement is defined in this section as the "Exporter."

**The Service Fee**

Upon signing the Exporters Agreement, the Exporter is provided with services consisting of eight related components including: 1) market analysis; 2) review of proposed goods and services; 3) expectations for supply and demand in the market; 4) conducting export business in China; 5) information on financing; 6) information on the export tax savings programs; 7) international trade center assistance; and 8) selecting and assigning a tax saving company. All eight components of the Service Fee are delivered as one deliverable upon the signing or shortly thereafter of the Exporter Service Agreement with the exporter. The Company completes the earnings process upon the signing Exporter Service Agreement since the one service fee deliverable has been delivered and we have no further obligations. Revenue is not recognized until the completion of these eight components and the Company has no further obligations.

84

**The Transaction Fee**

During this process, the Exporter's goods and services are tested in the market, buyers or identified, deals or negotiated and the exporter products and services are delivered, and payment is made. The Transaction Fee is normally a percentage of each transaction.

The Transaction Fee process includes the Exporter's participation in three programs: 1) the Sample and Test Market Program; 2) Market Acceptance Program; and 3) Export Delivery Action. In the Sample and Test Market Program, an Exporter's products and services are tested in the market; sources of goods and services are confirmed; price indications are confirmed; and an Exporter and buyer match occurs. In the Market Acceptance Program, the export deal is identified and negotiated. Finally, in the Export Delivery Action, the goods are shipped and delivered and payment is made. The Company does not recognize revenue until completion of these three programs and the Company has no further obligations.

Throughout the life of the Exporter Agreement, the Company expects Exporters to complete multiple transactions. Each transaction is a separate and independent process.

**The Extension Fee**

The Extension Fee is an independent accounting unit. The Extension Fee is a fee charged to those Exporters who in rare cases for whatever reason fail to avail themselves of the Transaction Process. The Exporter has one-year to participate in the Sample and Test Market Program. Afterwards, provided no transaction has occurred and the Exporter agrees to pay a fee equal to 25% of the original Service fee within thirty (30) days (the "Extension Fee"), the Exporter may continue the Transaction Process. If the Extension Fee is not paid, the Exporter's participation and membership in the Sample and Test Program terminates. In the event of termination, the balance of any prior fees is still due and payable.

Provided that the Exporter agrees to pay the Extension Fee and continues with the Transaction Process, at the end of the Transaction Process and the last Transaction Fee deliverable is made, the Transaction Fee Process is completed. Upon completion, the Company has no further obligations, revenue is recognized, and the Exporter is invoiced for both the Extension Fee and the Transaction Fee.

After the Exporter pays the Extension Fee, if no transaction has occurred for sixty (60) calendars days, the Company is exempt from any obligation to provide further Transaction Process services and it recognizes revenue of the Extension Fee.

The Company recognizes revenue on a gross basis.

We have gross presentation for services provided by Yilaime, a contractor to the Company prior to the consummation of an arrangement.

In accordance with ASC605-45-45, the gross basis to recognize revenue applies since the Company is the primary obligor in the arrangement.

The Company expects to realize revenue for export funding and support, and franchise and license fees for United States support locations, and education initiatives. Additionally, if and when the Company further develops AmericaTowne, revenues would be expected to be recognized for (a) villa sales, rentals, timeshare and leasing; (b) hotel leasing and or operational revenues and sales; (c) theme park and performing art center operations, sales and/or leasing; and (d) senior care facilities, operations and or sales.

The Company does not provide unconditional right of return, price protection or any other concessions to its customers.

There were no sales returns and allowances from inception to December 31, 2017.

85

## Valuation of Goodwill

We assess goodwill for potential impairments at the end of each fiscal year, or during the year if an event or other circumstance indicates that we may not be able to recover the carrying amount of the asset. In evaluating goodwill for impairment, we first assess qualitative factors to determine whether it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount. If we conclude that it is not more likely than not that the fair value of a reporting unit is less than its carrying value, then no further testing of the goodwill assigned to the reporting unit is required. However, if we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value, then we perform a twostep goodwill impairment test to identify potential goodwill impairment and measure the amount of goodwill impairment to be recognized, if any.

In the first step of the review process, we compare the estimated fair value of the reporting unit with its carrying value. If the estimated fair value of the reporting unit exceeds its carrying amount, no further analysis is needed. If the estimated fair value of the reporting unit is less than its carrying amount, we proceed to the second step of the review process to calculate the implied fair value of the reporting unit goodwill in order to determine whether any impairment is required. We calculate the implied fair value of the reporting unit goodwill by allocating the estimated fair value of the reporting unit to all of the assets and liabilities of the reporting unit as if the reporting unit had been acquired in a business combination. If the carrying value of the reporting unit's goodwill exceeds the implied fair value of the goodwill, we recognize an impairment loss for that excess amount. In allocating the estimated fair value of the reporting unit to all of the assets and liabilities of the reporting unit, we use industry and market data, as well as knowledge of the industry and our past experiences.

We base our calculation of the estimated fair value of a reporting unit on the income approach. For the income approach, we use internally developed discounted cash flow models that include, among others, the following assumptions: projections of revenues and expenses and related cash flows based on assumed long-term growth rates and demand trends; expected future investments to grow new units; and estimated discount rates. We base these assumptions on our historical data and experience, third-party appraisals, industry projections, micro and macro general economic condition projections, and our expectations.

We have had no goodwill impairment charges for the nine months ended September 30, 2017. The estimated fair value of each of our reporting units exceeded its' respective carrying amount by more than 100 percent based on our models and assumptions.

## NOTE 3. NOTES RECEIVABLE – RELATED PARTIES

On July 12, 2017, the Company issued $15,000 secured promissory note to a shareholder with annual 6% interest rate. The note is due on October 30, 2017. The interest rate is 9% after the due date. The note is secured by the personal guarantee of the borrower and the borrower's stock of the Company. The note is past due as of December 31, 2017

On August 31, 2017, the Company issued $58,000 secured promissory note to a shareholder with annual 3.5% interest rate. The note is due on April 1, 2018. The interest rate is 9% after the due date. The note is secured by the borrower's stock of the Company.

## NOTE 4. ACCOUNTS RECEIVABLE

The nature of the net accounts receivable for December 31, 2017, in the amount of $3,504,547 are for Export Service Agreements. The Company's allowance for bad debt is $403,568 which provides a net receivable balance of $3,100,979

Accounts' receivable is stated at the amount management expects to collect from outstanding balances. Management provides for probable uncollected amounts through a charge to earnings and a credit to an allowance for bad debts based on its assessment of the current status of individual accounts. Balances that are still outstanding after management has used reasonable collection efforts are written off through a charge to the allowance for bad debts and a credit to accounts receivable.

86

Accounts receivable consist of the following:

| | December 31 2017 | December 31 2016 |
| --- | --- | --- |

Table of Contents

| | | | | |
|---|---|---|---|---|
| Accounts receivable | $ | 1,045,412 | $ | 795,727 |
| Accounts receivable- related parties | | 2,459,135 | | 724,175 |
| Less: Allowance for doubtful accounts (403,568) (221,221) **Accounts receivable, net $ 3,100,979 $ 1,298,681** | | | | |

Bad debt expense was $198,443 and $128,816 for the years ended December 31, 2017 and 2016, respectively.

**Allowance for bad debt policy**

Our bad debt policy is determined by the Company's periodic review of each account receivable for reasonable assurance of collection. Factors considered are the exporter's financial condition, past payment history if any, any conversations with the exporter about the exporter's financial conditions and any other extenuating circumstances. Based upon the above factors the Company makes a determination whether the receivable are reasonable assured of collection. Based upon our review if required we adjust the allowance for bad debt.

## NOTE 5. SHAREHOLDER'S EQUITY

The Company incorporates by reference all prior disclosures for the period identified herein. See Part II, Item 6. The stockholders' equity section of the Company contains the following classes of capital stock as of September 30, 2017:

- Common stock, $ 0.0001 par value: 100,000,000 shares authorized; 48,985,026 shares issued and outstanding Preferred
- stock, $ 0.0001 par value: 5,000,000 shares authorized; but not issued and outstanding.

## NOTE 6. DEFFERED REVENUE

ATI Modular receives $250,000 quarterly fee from Yilaime for Sales and Support Services Agreement. In accordance with ASC 605-50-45, the Company defers and recognizes as a reduction to the future costs for quarterly fee. For the year December 31, 2017, $1,000,000 fee from exclusive agreement incurred; $1,258,929 is booked deferred revenue as current liability on December 31, 2017 and $70,000 went against cost charged by Yilaime.

## NOTE 7. STOCK BASED COMPENSATION

For the years ended December 31, 2017 and 2016, $612,616 and $436,653 of stock compensation were charged to operating expenses, respectively. $2,359,220 and $1,450,842 were recorded as deferred compensation on December 31, 2017 and 2016, respectively.

ATI Modular entered into an employment lock-up agreement on July 1, 2016 with Alton Perkins to serve as the Chairman of the Board, President, Chief Executive Officer, Chief Financial Officer and Secretary. The term of Mr. Perkins' agreement is five years with ATI Modular retaining an option to extend in one-year periods. In consideration for Mr. Perkins' services, ATI Modular has agreed to issue to his designee, the Alton & Xiang Mei Lin Perkins Family Trust, 10,000,000 shares of common stock. ATI Modular may elect in the future to include money compensation to Mr. Perkins or his designee for his services provided there is sufficient cash flow.

On June 20, 2017, the Company signed the "First Amendment Employment Agreement with Alton Perkins amending the original Employment Agreement dated November 21, 2014. The new Agreement lifts up any lock-up provisions related to shares issued to Alton Perkins or its designee. In addition, in accordance with the new Agreement, the Company issued Alton Perkins additional 10,000,000 shares of restricted common stock and extend his employment until June 19, 2022.

87

On September 11, 2017, the Company signed the "Second Amendment Employment Agreement with Alton Perkins amending the original Employment Agreement dated November 21, 2014, as amended on June 20, 2017. Mr. Perkins agreed to serve as the Chairman and Chief Executive of AmericaTowne Holdings, Inc. as well as continue to serve for five years through September 11, 2022, in the same capacity for AmericaTowne, Inc., ATI Modular Technology Corp, and its subsidiary Anhui Ao De Xin Modular New Building Material Co., Ltd. In accordance with the new amended Agreement, the Company issued Alton Perkins and or his designee 8,831,145 shares of restricted common stock.

## NOTE 8. INCOME TAXES

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. The cumulative tax effect of significant items comprising the net deferred tax amount is at December 31, 2017 and 2016 as follows:

Table of Contents

|  | 2017 | 2016 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating losses | $ 419,019 | $ 260,502 |
| | | |
| Total deferred tax assets | 419,019 | 260,502 |
| Less: valuation allowance | (249,728) | (249,728) |
| | | |
| Deferred tax assets, net | $ 169,291 | $ 10,774 |

As of December 31, 2017, for U.S. federal income tax reporting purposes, the Company has approximately $1,271,862 of unused net operating losses ("NOLs") available for carry forward to future years. Because United States tax laws limit the time during which NOL carry forwards may be applied against future taxable income, the Company may be unable to take full advantage of its NOLs for federal income tax purposes should the Company generate taxable income. Further, the benefit from utilization of NOL carry forwards could be subject to limitations due to material ownership changes that could occur in the Company as it continues to raise additional capital. Based on such limitations, the Company has significant NOLs for which realization of tax benefits is uncertain.

Significant components of income tax expense for the years ended December 31, 2017 and 2016 are as follows

|  | 2017 | 2016 |
|---|---|---|
| Current tax expense | $ 12,005 | $ 7,225 |
| Benefits of operating loss carryforwards | (158,517) | (10,774) |
| Tax expense (benefit) | $ (146,512) | $ (3,549) |

The Company had $53,309 and $42,972 of income tax liability as of December 31, 2017 and 2016 respectively.

Reconciliation of Effective Income Tax Expense is as follows

|  | 2017 | 2016 |
|---|---|---|
| Statutory U.S. tax | $ (158,517) | $ (253,277) |
| Adjustment of tax in prior years | 12,005 | — |
| Less: Valuation Allowance | = | 249,728 |
| Tax expense (benefit) | $ (146,512) | $ (3,549) |

### NOTE 9. RELATED PARTY TRANSACTIONS

Yilaime Corporation, a Nevada corporation ("Yilaime") and Yilaime Corporation of NC ("Yilaime NC") are related parties to the Company. Yilaime is a "Control Party" to AmericaTowne because it has title to greater than 50% of the issued and outstanding shares of common stock in the Company. Alton Perkins is the majority shareholder and controlling principal of Yilaime, Yilaime NC, Perkins DISC and the Company. Additionally, for those "trade centers" set forth below, Mr. Perkins directs all major activities and operating policies of each entity. The common control may result in operating results or a financial position significantly different from that, which would have been obtained if the enterprises were autonomous. Further, pursuant to ASC 850-10-50-6 the Company lists and provides details for all material Related Party transactions so that readers of the financial statements can better assess and predict the possible impact on performance.

88

Nature of Related Parties' Relationship

On October 8, 2014, the Company entered into the Stock Exchange Agreement with Yilaime NC. Pursuant to the terms of the Stock Exchange Agreement, in consideration for the issuance of 3,616,059 shares of common stock in the Company to Yilaime NC, Yilaime NC conveyed 10,848,178 shares of its restricted common stock to the Company. The intent of the parties in executing and performing under the Stock Exchange Agreement is to effectuate tax-free reorganization under Section 368 of the Internal Revenue Code of 1986. The Company issued the 3,616,059 shares of common stock to Yilaime NC on May 14, 2015. As result

Table of Contents

of receiving 10,848,178 shares of issued and outstanding common stock in Yilaime (4.5% of issued and outstanding), the Company recorded a $3,860 investment in use of Cost Method.

The Company authorized Yilaime NC to transfer 3,616,059 of these shares pursuant to the Company's effective registration statement on Form S-1/A on November 5, 2015.

The Company entered into a Service Provider Agreement with Yilaime on October 27, 2014 (the "Service Agreement") wherein certain "Export Funding and Support Services" and "Occupancy Services," as defined therein, are provided to the Company in consideration for a fee. In addition to these fees, Yilaime has to pay an Operations Fee to the Company for exclusive rights. Mr. Perkins is the Chief Executive Officer of the Company and is the majority shareholder and controlling person of Yilaime.

The Company also leased office space from Yilaime NC for $3,516 per month.

On June 27, 2016, ATI Modular entered into a Sales and Support Services Agreement with Yilaime. Under the Services Agreement, Yilaime will provide ATI Modular with marketing, sales and support services in the ATI Modular's pursuit of ATI Modular business in China in consideration of a commission equal to 10% of the gross amount of monies procured for ATI Modular through Yilaime's services. In consideration of the right to receive this commission, Yilaime has agreed to pay ATI Modular a quarterly fee of $250,000 starting on July 1, 2016. The Services Agreement is set to expire on June 10, 2020, absent early termination for breach thereof by either party. Yilaime retains an option to extend the term under its sole discretion until June 10, 2025 by providing written notice to ATI Modular by March 10, 2019. Yilaime has agreed to be ATI Modular's exclusive independent contractor in providing the services in the Services Agreement, and has agreed to a non-compete and non-circumvent agreement.

Yilaime is obligated to provide support services only in a manner that is deemed commercially acceptable by Yilaime and Yilaime has the sole right to determine the means, manner and method by which services will be provided and at the time and location of its choosing. Furthermore, as the control person of Yilaime, Mr. Perkins might make decisions he deems are in the best interests of Yilaime, which might be to the detriment of the goals and objectives of ATI Modular. Pursuant to ASC 850-10-50-6, the Company makes the following transaction disclosures for years ending December 31, Consolidated

Operating Statement Related Party Transactions (for years ending December 31, 2017 and 2016).

(a) $200,000 and $200,000 in revenues for Yilaime's exclusive agreement with the Company;

(b) $1,066,750 and $350,000 in Trade Center Service Agreement Revenue;

(c) $30,242 and $0 in commission revenue with Nationwide Microfinance Limited;

(d) $112,916 and $244,486 in costs of revenues to Yilaime for services pursuant to the Service Agreement;

(e) $823,836 and $282,829 for general and administrative expenses for commissions and fees.

(f) For the year ended, December 31, 2017, $42,594 for general and administrative expenses for rent expenses the Company paid to Yilaime towards its leaseagreement; For the year ended, December 31, 2017, $30,000 for general and administrative expenses for rent expenses ATI Modular paid to Yilaime towards its lease agreement. For the year ended, December 31, 2017, $30,000 for general and administrative expenses for rent expenses ATI Nationwide paid to Yilaime towards its lease agreement.

For the year ended, December 31, 2016, $33,118 for general and administrative expenses for rent expenses the Company paid to Yilaime towards its lease agreement; $15,000 for general and administrative expenses for rent expenses ATI Modular paid to Yilaime towards its lease agreement; $7,500 for general and administrative expenses for rent expenses ATI Nationwide Holding Corp paid to Yilaime towards its lease agreement

(g) $612,616 and $436,653 for general and administrative operating expenses recorded as stock compensation for respective employment agreements.

Consolidated Balance Sheet Related Party Transactions (on December 31, 2017 and December 31, 2016)

(a) $73,000 and $0 notes receivable to a shareholder;

(b) $1,128,033 and $405,817 net account receivables Yilaime owes to the Company;

(c) $0 and $42,839 due to Yilaime;

(d) $1,208,146 and $282,149 Trade Center receivables owed to the Company;

(e) On December 31, 2017, other receivables include $165,870 owed by Perkins Hsu Export Corporation and $14,677 purchase mining equipment andadvances for Yilaime Nairobi Ltd

On December 31, 2016, other receivables include $69,120 owed by Yilaime $175,772 owed by Perkins Hsu Export Corporation and $14,677 purchase mining equipment and advances for Yilaime Nairobi Ltd;

(f) $1,254,387 and $324,387 deferred revenue-Yilaime;

(g) $23,712 and 198,000 as accounts payable to Anhui Ao De Xin Modular Construction Technology Co., Ltd.

90

Management's Discussion and Analysis of Financial Condition and Results of Operations

You should read the following discussion of our financial condition and results of operations together with the audited financial statements and the notes to the audited financial statements included in this Annual Report on Form 10-K. This discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results may differ materially from those anticipated in these forward-looking statements.

We qualify as an "emerging growth company" under the JOBS Act. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;

- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis); submit certain executive compensation matters to shareholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and

- disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the CEO's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an "emerging growth company" for up to five years, or until the earliest of (i) the last day of the first fiscal year in which our total annual gross revenues exceed $1 billion, (ii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, which would occur if the market value of our ordinary shares that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iii) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period. As an emerging growth company, the company is exempt from Section 14A and B of the Securities Exchange Act of 1934 which require the shareholder approval of executive compensation and golden parachutes. The Company is an Emerging Growth Company under the JOBS Act of 2012, but the Company has irrevocably opted out of the extended transition period for complying with new or revised accounting standards pursuant to Section 107(B) of the JOBS Act.

The Company incorporates by reference the historical information set forth above, including but not limited to the discussion related to material definitive agreements under Item 1.01 and completion of acquisition of assets under Item 2.01. In further response, we were originally organized as a vehicle to investigate and, if such investigation warrants, acquire a target company or business seeking the perceived advantages of being a publicly held corporation.

91

<u>Table of Contents</u>

We plan to raise capital following our recent change in status to an operating entity through the offering of shares of common stock or preferred stock to investors. We anticipate we will need to pursue capital to fund our operations over the next twelve months. We believe we will be able to raise the necessary capital to carry out our business plan, but there is no assurance that we will be able to do so.

**Overview**

As a result of the Contribution Agreement, the Company acquired all rights, title and interest in and to AmericaTowne and AmericaStreet images, signatures, business plans, studies, analyses, likenesses and goodwill appurtenant thereto. The Company acquired certain rights of publicity in the trademark and registration of AmericaTowne, and the name, image, likeness, signature and other elements of AmericaTowne persona and identity. The Company acquired all rights, title and interest in any derivative or joint development programs using the intellectual property contributed under the Contribution Agreement, plus all historical contacts, business relationships, business expectancies, references and any other actual or perceived business interests in China. Using these assets, the Company procured those agreements set forth in Item 1.01 (i.e. the Exporter Services Agreement and the Licensing, Lease and Use Agreement).

In fiscal year 2017, the Company achieved $1,775,003 in revenue, compared to $1,759,540 in revenue for the fiscal year 2016. We can make no assurances that we will find commercial success in any of our products. We also rely upon the Service Agreement with Yilaime NC, November 11, 2014 Form 8K, under Item 15(a)(3) 10.8, for revenues. We are a new company and thus have very limited experience in sales expectations and forecasting. We also have not fully discovered any seasonality to our business as we began operations for the first quarter of 2016. We intend on relying on Yilaime for operational support. If we cannot achieve independent commercial success, we may need to continue to rely on Yilaime for support. If Yilaime at any time decides to alter or change materially our arrangement, we could experience a material adverse effect on the Company.

**Results of Operations through December 31, 2017** Our
operating results are summarized as follows:

|  | For the Year Ended December 31, 2017 | For the Year Ended December 31, 2016 |
|---|---|---|
| Revenues | $1,775,003 | $1,759,540 |
| Cost of Revenues | $303,549 | $244,486 |
| Gross Profit | $1,471,454 | $1,515,054 |
| Operating Expenses | $1,938,462 | $1,592,185 |
| Provision for income taxes | ($146,512) | ($3,549) |
| Net Income (Loss) | ($318,144) | ($71,141) |

**Revenues**

During fiscal year 2017, the Company had revenues of $1,775,003, compared to 2016 sales of $1,759,540. Our sales consisted of $478,011 in primarily Export Service Agreements, and $1,209,540 in Services to related parties for Operation fees. The Cost of Revenues to related parties were $303,549 and 244,486 for the years ended December 31, 2017 and 2016, respectively. Compared to 2016, our revenues increased $15,463 or less than 1%. The increase is due to implementing our business plan focusing on increasing exporters in our program.

92

Pursuant to the Company's Service Agreement with Yilaime, Yilaime paid the Company $200,000 in fiscal year 2017 for an "Operations Fee." In 2016, the Company had paid an Operations Fee of $200,000. The Operations Fee stems from the agreement between Yilaime and the Company whereby Yilaime acts as the Company's exclusive representative. In 2017, the Operations Fee remained the same as 2016. The Operations Fee is not related to costs of revenues.

We can make no assurances that we will find commercial success in any of our revenue producing contracts. We are a new company and thus have very limited experience in sales expectations and forecasting. We also have not fully discovered any seasonality to our business as we began operations in the first quarter of 2016.

**Operating Expenses**

Our expenses for the period through December 31, 2017 are outlined in the table below:

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| General and administrative | $1,567,366 | $1,275,141 |
| Professional fees | $371,096 | $317,044 |
| Total operating expenses | $1,938,462 | $1,592,185 |

<u>Table of Contents</u>

Our operating expenses are largely attributable to office, rent and professional fees related to our reporting requirements as a public company and preparing our Registration Statement on Form S-1, and implementing our business plan. Compared to 2016, our operating expenses decreased by $346,277.

**Net Income**

As a result of our operations, for 2017, the Company reported net loss after provision for income tax of $318,144. Compared to 2016, our net loss increased $246,973. This increase is due to starting our marketing strategy to increase exporters, as well as increased costs associated with implementing our business plan.

**Liquidity and Capital Resources**

**Working Capital**

|  | December 31, 2017 | December 31, 2016 |
| --- | --- | --- |
| Total Current Assets | $4,255,338 | $2,531,909 |
| Total Current Liabilities | $1,404,024 | $660,043 |
| Working Capital | $2,851,314 | $1,871,866 |

We have working capital of $2,851,314 on December 31, 2017. Compared to December 31, 2016, our working capital increased $979,448 or 52%. The increase is due to effectively implementing our marketing, growth and equity sales plans. **Cash Flow**

|  | December 31, 2017 | December 31, 2016 |
| --- | --- | --- |
| Net cash provided by (used in) operating activities | ($734,977) | $311,225 |
| Cash used in investing activities | $96,885 | $360,891 |
| Cash provided by financing activities | $759,015 | $381,019 |
| Increase (Decrease) in cash | ($72,847) | $331,352 |

93

**Cash Provided by (Used in) Operating Activities**

Compared to 2016, increase in cash used in operating activities in 2017 is mainly due to increase in accounts receivable. **Cash**

**Used in Investing Activities**

We spent $23,885 on fixed assets for 2017. **Cash**

**Provided by Financing Activities**

Compared to 2016, our cash used in financing activities increased $377,996. The increase is due to proceeds from issuance of common stock in 2017.

As of December 31, 2017, the Company had sufficient amount of cash to operate its business at the current level for the next twelve months, but insufficient cash to achieve our business goals and initiatives set forth above. To address the cash situation, the Company continues to manage its cash accounts and receivables closely.

To date, we have been able to meet all of our account payable obligations within a five to ten day window. If required, we can extend this window to improve our cash flow position. Additionally, we have a plan to increase sales. There is no assurance that we will be able to maintain this level of operations.

The success of our business plan beyond the next twelve months is contingent upon us growing our business, keeping costs down, increasing revenue and obtaining additional equity and/or debt financing. We intend to fund operations through our pro-active efforts to monitor receivables, and debt and/or equity financing arrangements, which may be insufficient to fund our capital expenditures, working capital, or other cash requirements. We do not have any formal commitments or arrangements for the sales of stock or the advancement or loan of funds at this time. There is no assurance that such additional financing will be available to us on acceptable terms, or at all or that our receivable plan will be effective in the future.

**Plan of Operation and Cash Requirements**

The Company anticipates that its expenses over the next twelve months will be approximately $5,000,000 as described in the table below. These estimates may change significantly depending on the nature of our business activities and our ability to raise capital from our shareholders or other sources.

| Description | Potential Completion Date | Estimated Expenses ($) |
|---|---|---|
| Trade Center Operations | 12 months | 550,000 |
| Salaries | 12 months | 2,500,000 |
| Utility expenses | 12 months | 50,000 |
| Investor relations costs | 12 months | 100,000 |
| Marketing expenses | 12 months | 350,000 |
| Professional fees | 12 months | 150,000 |
| Other administrative expenses | 12 months | 1,200,000 |
| **Total** | | **5,000,000** |

94

Our other administrative expenses for the year will consist primarily of transfer agent fees, bank and interest charges and general office expenses. The professional fees are related to our regulatory filings throughout the year and include legal, accounting and auditing fees.

Based on our planned expenditures, we will require approximately $5,000,000 to proceed with our business plan over the next twelve months. If we secure less than the full amount of financing that we require, we will not be able to carry out our complete business plan and we will be forced to proceed with a scaled back business plan based on our available financial resources.

We intend to raise the balance of our cash requirements for the next twelve months from private placements, shareholder loans or possibly a registered public offering (either self-underwritten or through a broker-dealer). If we are unsuccessful in raising enough money through such efforts, we may review other financing possibilities such as bank loans. At this time we do not have a commitment from any third-party to provide us with financing. There is no assurance that any financing will be available to us or if available, on terms that will be acceptable to us.

Even though we plan to raise capital through equity or debt financing, we believe that the latter may not be a viable alternative for funding our operations, as we do not have sufficient tangible assets to secure any such financing. We anticipate that any additional funding will be in the form of equity financing from the sale of our common stock. At the close of 2017, we are considering financing arrangements for our common stock. However, the arrangements are not final and we cannot provide any assurance that we will be able to raise sufficient funds from the sale of our common stock to finance our operations. In the absence of such financing, we may be forced to abandon our business plan.

**Off-Balance Sheet Arrangements**

We have not entered into any off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Critical Accounting Policies**

Our financial statements and related public financial information are based on the application of accounting principles generally accepted in the United States ("US GAAP"). US GAAP requires the use of estimates; assumptions, judgments and subjective interpretations of accounting principles that have an impact on the assets, liabilities, revenues and expenses amounts reported. These estimates can also affect supplemental information contained in our external disclosures including information regarding contingencies, risk and financial condition.

Table of Contents

We believe our use of estimates and underlying accounting assumptions adhere to GAAP and are consistently and conservatively applied. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ materially from these estimates under different assumptions or conditions. We continue to monitor significant estimates made during the preparation of our financial statements.

We believe the following is among the most critical accounting policies that impact our consolidated financial statements. We suggest that our significant accounting policies, as described in our financial statements in the Summary of Significant Accounting Policies, be read in conjunction with this Management's Discussion and Analysis of Financial Condition and Results of Operations.

**Revenue Recognition**

The Company recognizes revenue at the date of delivery to customers when a formal arrangement exists, the price is fixed or determinable, the delivery is completed, no other significant obligations of the Company exist and collectability is reasonably assured. The Company's Revenue Recognition policy is provided in detail at Note 2, page F11 of the Financial Statements.

95

**Income Taxes**

The Company accounts for income taxes in accordance with ASC Topic 740, "Income Taxes." ASC 740 requires a company to use the asset and liability method of accounting for income taxes, whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion, or all of, the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Under ASC 740, a tax position is recognized as a benefit only if it is "more likely than not" that the tax position would be sustained in a tax examination, with a tax examination being presumed to occur. The amount recognized is the largest amount of tax benefit that is greater than 50% likely of being realized on examination. For tax positions not meeting the "more likely than not" test, no tax benefit is recorded. The adoption had no effect on the Company's consolidated financial statements.

**Recent Accounting Pronouncements**

The Company does not expect the adoption of recently issued accounting pronouncements to have a significant impact on the Company's results of operations, financial position, or cash flow. **Contractual Obligations**

As a "smaller reporting company" as defined by Item 10 of Regulation S-K, the Company is not required to provide this information.

**Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

There are not and have not been any changes in or disagreements between the Company and its accountants on any matter of accounting principles, practices or financial statement disclosure

**Quantitative and Qualitative Disclosures About Market Risk.**

As a smaller reporting company, as defined in 17 CFR § 229.10(f)(1), we are not required to provide the information requested by this Item

96

**THIS IS NOT A NOTICE OF A MEETING OF STOCKHOLDERS AND NO STOCKHOLDERS' MEETING WILL BE HELD TO CONSIDER ANY MATTER DESCRIBED HEREIN.**

**THIS INFORMATION STATEMENT IS BEING FURNISHED TO YOU SOLELY FOR THE PURPOSE OF INFORMING YOU OF THE MATTERS DESCRIBED HEREIN.**

**STOCKHOLDERS' RIGHTS**

<u>Table of Contents</u>

The elimination of the need for a special meeting of the stockholders to approve the Actions described in this Information Sheet is authorized by Section 78.320 of the Nevada Revised Statutes ("NRS"). Section 78.320 provides that, unless otherwise provided in a company's articles of incorporation, action taken at an annual or special meeting may be taken without a meeting, without prior notice, and without a vote, if consents are signed by shareholders that constitute a majority of the votes of issued and outstanding common stock in the company.

## THE NAME CHANGE

**Overview**

Pursuant to Article II, Section 8 of the Bylaws of the Company, the Company's majority shareholder AmericaTowne approved the recommendation of the Board of Directors to change the Company's name from ATI Modular Technology Corp. to AmericaTowne Holdings, Inc. The name changes was recommended as it relates to the Plan of Merger, which is described below. It is the intent of the Company, once the Plan of Merger below is implemented, to continue forward under the name AmericaTowne Holdings, Inc. The Company's name change will be effective twenty (20) days after this Information Sheet is mailed to shareholders. As of the date of this filing, the Company has 126,740,708 shares of Common Stock issued and outstanding to 181 active shareholders. Approval for the name change is memorialized in the Consent of Shareholders in Lieu of Meeting dated June 23, 2017 and the Board of Directors' Resolution dated the same day. Both are attached hereto.

The Board of Directors originally recommended the Company's name be changed to "ATI Holdings, Inc." However, the name "ATI Holdings, Inc." was already registered in the State of Nevada. The original recommendation by the Board of Directors is memorialized in the Board of Directors Resolution dated June 23, 2017, with the shareholders consenting to said action occurring on the same day. The Board of Directors Resolution dated June 23, 2017 and the Consent of Shareholders in Lieu of Meeting dated June 23, 2017 are attached hereto, as they remain effective and outline the remaining actions approved by Shareholders described herein.

**Reasons for the Name Change**

Changing the Company's name was recommended for purposes of facilitating the Plan of Merger, discussed below. In order to meet the conditions precedent to effectuating the Plan of Merger, the Company had to execute the Certificate of Amendment to its Articles of Incorporation to change the name of the Company to AmericaTowne Holdings, Inc. The Plan of Merger is attached to this Information Statement. It is a legal document and shareholders are urged to read the document in its entirety.

The purpose of the Name Change is to provide the Company with a new, more accurate name once the Company merges with AmericaTowne. The Company will no longer be focused solely on modular technology. Rather, being the "Surviving Entity" in the Plan of Merger, the Company will assume the various business enterprises in which AmericaTowne is presently involved and plans on expanding into new markets as well. Changing the Company's name to AmericaTowne Holdings, Inc., allows for the Company to accurately reflect the Company's new business plan and the combination of two, previously related entities.

**Effect of the Amendments**

Simply put, the Company's name will be changed from ATI Modular Technology Corp. to AmericaTowne Holdings, Inc. The Company believes the name "AmericaTowne Holdings, Inc." will project to customers, investors, and target markets that the Company has expanded its market to include both modular technology and the business endeavors of AmericaTowne. The term "Holdings" also suggests that the Company now oversees a variety of different activities, which more accurately reflects the new business plan of the Company.

97

## THE STOCK SPLIT

**Overview**

AmericaTowne approved the recommendation of the Board of Directors to effectuate a fifty-to-one (50-to-1) reverse stock split, meaning that every fifty (50) Common Stock shares issued and outstanding, which are held by stockholders will be combined, reconfigured, and reissued as a single share of Common Stock at par value of $0.0001 without any affirmative action on behalf of the stockholders. Any fractional shares will be rounded up to the nearest whole share. These actions are outlined in the aforementioned Consent of Shareholders in Lieu of Meeting dated June 23, 2017 and the Board of Directors' Resolution dated the same day.

<u>Table of Contents</u>

**Reason for the Stock Split**

    AmericaTowne believes that the Stock Split will increase shareholder value and allow for a more competitive market once the Plan of Merger, discussed below, is effectuated. By reducing the number of issued and outstanding Common Stock shares of the Company, AmericaTowne hopes to drastically increase the value of each individual share.

**Effect of the Stock Split**

    The Stock Split will result in a significant decrease in the number of issued and outstanding Common Stock shares. Those shareholders with fewer than fifty shares will receive one (1) share as a result of the Stock Split, and any individual with a fractional share remaining will have that fraction rounded up. By way of example, if a shareholder holds seventy-five (75) shares of Common Stock prior to the Stock Split, after the Certificate of Change is filed, the shareholder will hold a total of two (2) shares.

    The Stock Split may increase the value of each shareholder's shares. The Company hopes that the Stock Split will increase trading interest in the Company's stock as a result of the higher valuation, though the higher prices and smaller market may have the reverse effect.

98

# THE PLAN OF MERGER

### Overview

The Agreement and Plan of Merger executed in June 29, 2017 and First Amendment to the Agreement and Plan of Merger dated July 14, 2017 (collectively, "Plan of Merger") is an agreement entered into between the Company and AmericaTowne, the Company's majority shareholder. The Company is a Nevada corporation and a publicly reporting company with the Securities and Exchange Commission. It is publicly traded on the Over-the-Counter Marketplace, which is governed by the Financial Industry Regulatory Authority, under the trading symbol "ATMO."

The Plan of Merger outlines the merger between the Company and AmericaTowne. AmericaTowne is defined as the "Merging Entity" while the Company is defined as the "Surviving Entity." Pursuant to the merger, AmericaTowne will merge into the Company to increase operational efficiency and to increase shareholder value. Additionally, shareholders of AmericaTowne will have their shares exchanged on a pro rata basis with the Company's shares. The Company, being traded over-the-counter, provides former shareholders of AmericaTowne with a resource to sell or transfer their shares.

There are several conditions that must be met prior to closing the Plan of Merger. These include (1) changing the Company's name from ATI Modular Technology Corp., to AmericaTowne Holdings, Inc., (2) the completion of the Company's 50-to-1 reverse stock split, as described herein, and (3) AmericaTowne's completion of its 1-to-4 stock split. Additionally, effectiveness of this transaction is dependent upon the registration of the Company's shares to be used in this transaction, which have been filed in a Registration Statement on Form S-4 with the Securities and Exchange Commission. After these conditions are met, and the Registration Statement on Form S-4 is approved, the Company will issue to AmericaTowne shares of the Company's restricted common stock equal to the total amount of AmericaTowne common stock shares issued and outstanding. The Company's issuance will then be used by AmericaTowne to effectuate a 1-for-1 exchange with all AmericaTowne shareholders. Thus, after the Plan of Merger closes, each AmericaTowne shareholder will hold shares of the Company's common stock equal to the shareholder's prior AmericaTowne holdings.

By way of example, an AmericaTowne shareholder that held 100 shares of AmericaTowne common stock prior to the Plan of Merger will have 400 shares of AmericaTowne common stock after the conditions precedent to the Plan of Merger are met. Thereafter, the Plan of Merger will close, resulting in the AmericaTowne shareholder receiving 400 shares of the Company's restricted common stock in exchange for his 400 shares of AmericaTowne common stock.

The Surviving Entity will be named AmericaTowne Holdings, Inc., and will assume the contracts and liabilities of the Company and AmericaTowne. The Surviving Entity will, if necessary, develop separate committees to address commitments or business of AmericaTowne and the Company. It is estimated that this Plan of Merger will be deemed effective 20 days after this Information Statement is distributed to shareholders of the Company.

### Reasons for the Plan of Merger

AmericaTowne has an interest in registering its shares with a national market, such as the OTC Markets Group. In researching the most cost-effective ways to move forward with registration, it became apparent that merging into ATI Modular, the Company's subsidiary, which is already trading over-the-counter, would provide two benefits to the Company's shareholders.

First, by merging operations, the Company and AmericaTowne will benefit from a decrease in operational costs. Presently, both entities have reporting obligations under the Securities Exchange Act, resulting in duplicative reporting. By merging the entities, the Company and AmericaTowne eliminate the duplicative work, resulting in decreased administrative and professional costs. Though not guaranteed, the Plan of Merger would ideally allow for the Surviving Entity to be more profitable, have less overhead, increasing shareholder value.

Second, the Plan of Merger allows for AmericaTowne's issued and outstanding shares to be exchanged with the shares of ATI Modular and traded on OTCPink under the symbol "ATMO." This may provide AmericaTowne investors with greater liquidity and allow shareholders to enter a marketplace where they more easily transfer their shares, subject to all applicable federal and state regulations.

### Effect of the Plan of Merger

The Plan of Merger will result in AmericaTowne merging into the Company. The Company will amend its Articles of Incorporation to change its name to AmericaTowne Holdings, Inc., as detailed above. Additionally, the Company will absorb AmericaTowne's shareholders, allowing for a larger shareholder base. The Surviving Entity will assume the obligations and assets of AmericaTowne. Shareholders of AmericaTowne will have their shares exchanged on a pro rata basis. Thus, once the Plan of Merger is complete, the remaining entity—AmericaTowne Holdings, Inc.—will be trading on the OTCPink using the symbol "ATMO."

This Plan of Merger is entered into in accordance with the Nevada Revised Statutes.

## DISSENTERS' RIGHT OF APPRAISAL

With respect to the Actions described herein, Stockholders have no right under the NRS, the Company's Articles, or the Company's Bylaws to exercise dissenters' rights of appraisal.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information regarding our shares of Common Stock beneficially owned as of July 5, 2017 for (i) each shareholder known to be the beneficial owner of 5% or more of the Company's outstanding shares of Common Stock, (ii) each named executive officer and director, and (iii) all executive officers and directors as a group. A person is considered to beneficially own any shares: (i) over which such person, directly or indirectly, exercises sole or shared voting or investment power, or (ii) of which such person has the right to acquire beneficial ownership at any time within 60 days. Unless otherwise indicated, the address of each shareholder is c/o AmericaTowne, Inc., 4700 Homewood Court, Suite 100 in Raleigh, North Carolina 27609.

For purposes of this table, a person or group of persons is deemed to have "beneficial ownership" of any shares of Common Stock that such person has the right to acquire within 60 days of this Information Statement. For purposes of computing the percentage of outstanding shares of our Common Stock held by each person or group of persons named above, any shares that such person or persons has the right to acquire within 60 days of this Information Statement is deemed to be outstanding, but is not deemed to be outstanding for the purpose of computing the percentage ownership of any other person. The inclusion herein of any shares listed as beneficially owned does not constitute an admission of beneficial ownership. The beneficial ownership of each person was calculated based on 126,740,708 shares of common Stock outstanding of the Company as of July 5, 2017.

| Name and Address of Beneficial Owner | Number of Shares Beneficially Owned | Percentage Beneficially Owned |
|---|---|---|
| All Executive Officers and Directors | 110,218,318 | 86.9% |
| Alton Perkins (1) | 110,218,318 | 86.9% |
| AmericaTowne, Inc. | 100,000,000 | 78.9%, |
| Alton Perkins & Xiang Mei Lin Family Trust | 10,000,000 | 7.9% |

(1) Denotes officers and directors of the Company.

The following table depicts the estimated beneficial ownership of the same group of individuals after the Plan of Merger is effectuated, assuming the Surviving Entity (i.e. the Company) has 198,425,702 shares of common stock issued and outstanding after the closing of the Plan of Merger. This number takes into account the Company's 50-to-1 reverse stock split, as well as AmericaTowne's 1-to-4 stock split, though the actual number of issued and outstanding shares after the Plan of Merger is effectuated may change, based on the rounding of fractional shares.

| Name and Address of Beneficial Owner Executive Officers and Directors | Number of Shares Beneficially Owned | Percentage Beneficially Owned All |
|---|---|---|
| 83.1% Yilaime Corporation | 164,899,710 | 83.1% Alton Perkins (1)(2) 164,899,710 |
| 103,995,756   52.4% | 55,028,864 | 27.5%, Alton Perkins & Xiang Mei Lin Family Trust |

(1) Denotes the Chairman of the Board of Directors, Chief Executive Officer, Chief Financial Officer, and Secretary of the Company.

(2) Mr. Perkins is the majority shareholder of Yilaime. Mr. Perkins is also the Trustee of the Alton & Xiang Mei Lin Perkins Family Trust.

100

## WHERE YOU CAN FIND MORE INFORMATION

The Company files annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements and other information with the SEC. You may obtain such SEC filings from the SEC's website at address. This practice, known as "householding," is designed to reduce our SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. You can obtain information about the operation of the SEC's public reference room by calling the SEC at 1-800-SEC-0330.

## ITEM 3. INTERESTS OF CERTAIN PERSONS IN OR OPPOSITION TO MATTER TO BE ACTED UPON

Except as disclosed elsewhere in this Information Statement, none of our directors or officers since January 1, 2016, being the commencement of our last completed fiscal year, nor any associate of any of the foregoing persons, have any substantial interest, direct or indirect, by security holdings or otherwise in either (1) amending the Articles to effectuate the Name Change and/or Stock Split, nor (2) the Plan of Merger.

## ITEM 4. PROPOSALS BY SECURITY HOLDERS

None.

## ITEM 5. DELIVERY OF DOCUMENTS TO SECURITY HOLDERS SHARING AN ADDRESS

If hard copies of the materials are requested, we will send only one Information Statement and other corporate mailings to shareholders who share a single address unless we received contrary instructions from any shareholder at that address. This practice, known as "householding," is designed to reduce our printing and postage costs. However, the Company will deliver promptly upon written or oral request a separate copy of the Information Statement to a shareholder at a shared address to which a single copy of the Information Statement was delivered. You may make such a written or oral request by (a) sending a written notification stating (i) your name, (ii) your shared address and (iii) the address to which the Company should direct the additional copy of the Information Statement, to the Company at American Housing Income Trust, Inc., at the address identified on the first page of this Information Sheet, attention: Chief Executive Officer.

If multiple shareholders sharing an address have received one copy of this Information Statement or any other corporate mailing and would prefer the Company to mail each shareholder a separate copy of future mailings, you may send notification to or call the Company's principal executive offices. Additionally, if current shareholders with a shared address received multiple copies of this Information Statement or other corporate mailings and would prefer the Company to mail one copy of future mailings to shareholders at the shared address, notification of such request may also be made by mail or telephone to the Company's principal executive offices.

By Order of the Board of Directors,

/s/ Alton Perkins
Alton Perkins Chairman
of the Board

Dated: June 15, 2018

101

## CONSENT OF BOARD OF DIRECTORS IN LIEU OF MEETING
## (ATI MODULAR TECHNOLOGY CORPORATION)

NOW COMES the Board of Directors for ATI Modular Technology Corporation, a Nevada corporation (the "Company"), hereby consents pursuant to Article IV, Section 2 of the Bylaws to the following action in lieu of a meeting:

RESOLVED that the Board of Directors hereby approves and recommends that the Company file its Certificate of Amendment to its Articles of Incorporation to change its name from ATI Modular Technology Corporation to ATI Holdings, Inc. ("Name Change").

RESOLVED that the Board of Directors hereby approves and recommends the Company implement a fifty-to-one (50-to-1) reverse stock split,

<u>Table of Contents</u>

whereby fifty (50) individual shares of the Company's issued and outstanding common stock are converted and reconstituted into one (1) share of common stock with par value of $0.0001 with any fractional shares being rounded up to the nearest whole share (the "Reverse Split").

RESOLVED that, the Board of Directors hereby approves and recommends the Plan of Merger between the Company and AmericaTowne, Inc. (the "Plan of Merger").

RESOLVED that, the Board of Directors shall submit the Name Change, Reverse Splits and Plan of Merger to the shareholders entitled to vote on approval of the Plan of Merger for adoption either by vote and meeting, or by consent in lieu of a shareholder meeting.

RESOLVED that, in the event the majority of shareholders adopt the recommendations of the Board of Directors outlined herein, including the Plan of Merger, the Secretary shall certify the approval and adoption in the books and records of the Company, and in turn make the necessary filings with the State of Nevada.

RESOLVED, that, in the event the majority of shareholders adopt and ratify the Name Change, Reverse Split, and Plan of Merger, Alton Perkins, as the Company's Chief Executive Officer and Chief Financial Officer, may take any and all necessary steps to implement the Reverse Split and Plan of Merger, including, but not limited to, filing the proposed Certificate of Amendment of Articles of Incorporation, Certificate of Change, or any other corporate action that must be taken to finalize the Reverse Split or Plan of Merger. Dated:

June 23, 2017

*/s/ Alton Perkins*

By: Alton Perkins

102

### CONSENT OF SHAREHOLDERS IN LIEU OF MEETING
### (ATI MODULAR TECHNOLOGY CORPORATION)

The undersigned shareholder holding the majority of shares of common stock entitled to vote in ATI Modular Technology Corporation, a Nevada corporation (the "Company"), hereby consents in lieu of a meeting pursuant to Article II, Section 8 of the Bylaws and Nevada Revised Statutes § 78.320 to the following actions:

RESOLVED that, the Board of Directors is hereby authorized to amend the Company's Articles of Incorporation and file any required Certificate of Amendment or Certificate of Change, as applicable, to (1) change the name of the Company to ATI Holdings, Inc., and (2) effectuate a fifty-to-one (50-to-1) reverse stock split, whereby every fifty (50) shares of the Company's issued and outstanding common stock shall be converted and reconstituted into one (1) share of common stock with par value of $0.0001 without any further action from any individual shareholder, with any fractional shares resulting from said conversion being rounded up to the nearest whole share.

RESOLVED that the Plan of Merger with AmericaTowne, Inc., a Delaware corporation presented by the Board of Directors as being in the best interests of the Company, the Board of Directors is hereby authorized to take any and all actions necessary to effectuate the Plan of Merger.

Dated: June 23, 2017

AmericaTowne, Inc., a Delaware corporation

*/s/ Alton Perkins*
By: Alton Perkins
Its: Chairman of the Board of Directors

103



104

Table of Contents



105

outstanding, with 100,000,000 issued to the Merging Corporation. The Surviving Corporation has no class of preferred stock authorized.

(c) Filing with the State of Nevada. The Surviving Corporation shall make any and all necessary filings with the Nevada Secretary of State prior to the Effective Date of the Merger evidencing this Plan of Merger.

106

(b) The Board of Directors of the Merging Corporation shall have recommended this Plan of Merger to the majority of shareholders entitled to vote, and upon receipt of the majority vote of the shareholders entitled to vote, duly approve and adopt this Plan of Merger in accordance with the provisions of the Delaware Statute, the Articles of Incorporation and Bylaws of the Merging Corporation.

(c) As part of the consent resolutions set forth in subsection (a), above, the adoption and effectuation of a split of the Merging Corporation's shares of common stock on a 1:4 basis, i.e. 1 share for 4 shares currently issued and outstanding, and any and all related actions in disclosing under the rules promulgated by the SEC.

(d) As part of the consent resolutions set forth in subsection (b), above, the adoption and effectuation of amended articles of incorporation changing the name of the Surviving Corporation to "ATI Holdings, Inc." and concomitant thereto, the adoption and effectuation of a split of the Surviving Corporation's shares of common stock on a 1:50 basis, i.e. 1 share for 50 shares currently issued and outstanding, and any and all related actions in disclosing under the rules promulgated by the SEC and in obtaining approval from FINRA on the name change and stock split.

(e) Upon the full performance of the conditions set forth in subsections (a) through (d), above, the Constitute Corporations shall file this Plan of Merger with their respective States of incorporation, and take any and all other necessary action under the Nevada Statute and Delaware Statute in effectuating this Plan of Merger, including any action required with respect to appraisal rights under the Nevada Statute or Delaware Statute, if any.

(f) The Surviving Corporation shall facilitate the filing of its FINRA Notice of Company-Related Action in noticing the name change, stock split, merger, change in control and any other action deemed necessary by the Surviving Corporation.

(g) The Constituent Corporations shall take any and all necessary action with the SEC in disclosing this Plan of Merger, and the actions set forth herein, under Form 8-K, Schedule 14C and in any amendments to beneficial ownership disclosures as a result of this Plan of Merger.

(h) No temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the Merger shall be in effect.

## ARTICLE III

### Certificate of Incorporation of the Surviving Corporation

3.1    Surviving Corporation's Certificate of Incorporation.  At the Effective Time of the Merger, the Certificate of Incorporation of the Surviving Corporation (the "Certificate of Incorporation"), as in effect immediately prior to the Effective Time, shall continue to be the Certificate of Incorporation of the Surviving Corporation, but under the name of "ATI Holdings, Inc." and with the inclusion of the "AmericaTowne Committee" and the "ATI Modular Committee," and the duties and obligations for each set forth therein, and until thereafter amended as provided by the Nevada Statute and such Certificate of Incorporation. The Surviving Corporation shall file assumed names for "AmericaTowne" and "ATI Modular Technology Corporation" in Nevada, and foreign business registrations for these entities in any State deemed necessary by the Board of Directors for the Surviving Corporation.

4

107

Table of Contents



3.2

108

Table of Contents

aggregate number of shares of Surviving Corporation Shares issuable pursuant to Section 4.1 in exchange for outstanding Merging Corporation Shares.

(b) No Further Ownership Rights. The shares of Surviving Corporation Shares issued upon the surrender for exchange of Merging Corporation Shares in accordance with the terms of this Section 4.2 shall be deemed to have been issued in full satisfaction of all rights pertaining to such Merging Corporation Shares, and there shall be no further registration of transfers on the records of the Surviving Corporation of Merging Corporation Shares which were outstanding immediately prior to the Effective Time of the Merger. If, after the Effective Time of the Merger, Merging Corporation Shares are presented to the Surviving Corporation for any reason, they shall be canceled and exchanged as provided herein.

ARTICLE V

Termination

5.1 Termination by Mutual Agreement. Notwithstanding the approval of this Plan of Merger by the Constituent Corporations' respective majority shareholders entitled to vote and their respective Boards of Directors, this Plan of Merger may be terminated at any time prior to the Effective Time of the Merger by mutual consent of the Constituent Corporations. This Plan of Merger may also be terminated by the Constituent Corporations if: (i) there shall be a final non-appealable order of a federal or state court in effect preventing consummation of the Plan of Merger; or (ii) there shall be any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the Plan of Merger by any governmental entity that would make consummation of the Plan of Merger illegal.

5.2 Effects of Termination. In the event of the termination of this Plan of Merger, this Plan of Merger shall become void and there shall be no liability on the part of the Constituent Corporations, or their respective officers or directors or managers.

ARTICLE VI

General Provisions

6.1 Amendment. This Plan of Merger may be amended by the Constituent Corporations any time before or after approval hereof through written approval by the Constituent Corporations.

6.2 Counterparts. This Plan of Merger may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one agreement.

6.3 Governing Law. This Plan of Merger and all acts and transactions pursuant hereto and the rights and obligations of the Constituent Corporations shall be governed, construed and interpreted in accordance with the laws of the State of Nevada, without giving effect to its principles governing conflicts of laws.

6.4 Entire Agreement. This Plan of Merger constitutes the entire agreement among the Constituent Corporations pertaining to the subject matter hereof, and all negotiations and drafts of the Constituent Corporations with regard to the transactions contemplated herein, and any and all written or oral agreements existing between the Constituent Corporations hereto regarding such transactions are expressly canceled.

6

109

110

111

Table of Contents

| 112 |
| --- |
| 113 |
| 114 |
| 115 |
| 116 |
| 117 |

### CONSENT OF SHAREHOLDERS IN LIEU OF MEETING
### (ATI MODULAR TECHNOLOGY CORPORATION)

The undersigned shareholder holding the majority of shares of common stock entitled to vote in ATI Modular Technology Corporation, a Nevada corporation (the "Company"), hereby consents in lieu of a meeting pursuant to Article II, Section 8 of the Bylaws and Nevada Revised Statutes § 78.320 to the following actions:

RESOLVED that, the Board of Directors is hereby authorized to amend the Company's Articles of Incorporation and file any required Certificate of Amendment to change the name of the Company to AmericaTowne Holdings, Inc.

RESOLVED that the name change presented by the Board of Directors is in the best interests of the Company and the Board of Directors is hereby authorized to take any and all actions necessary to effectuate the name change.

Dated:        August        8,        2017
AmericaTowne, Inc.,
a Delaware corporation

/s/ Alton Perkins
By: Alton Perkins
Its: Chairman of the Board of Directors

118

## CONSENT OF BOARD OF DIRECTORS IN LIEU OF MEETING
## (ATI MODULAR TECHNOLOGY CORPORATION)

NOW COMES the Board of Directors for ATI Modular Technology Corporation, a Nevada corporation (the "Company"), hereby consents pursuant to Article IV, Section 2 of the Bylaws to the following action in lieu of a meeting:

WHEREAS the Board of Directors previously recommended the filing of its Certificate of Amendment to its Articles of Incorporation to change the name of the Company to ATI Holdings, Inc.

WHEREAS, the prior Certificate of Amendment to its Articles of Incorporation was accepted by the State of Nevada without notification that a conflict existed with the name ATI Holdings, Inc.

WHEREAS, the Board of Directors has performed its due diligence and now recommends the Company change its name from ATI Modular Technology Corporation to AmericaTowne Holdings, Inc.

NOW THEREFORE, the Board hereby consents to the following actions:

RESOLVED that, the Board of Directors hereby approves and recommends that the Company file its Certificate of Amendment to its Articles of Incorporation to change its name from ATI Modular Technology Corporation to AmericaTowne Holdings, Inc.

RESOLVED that, the Board of Directors shall submit the proposed name change to the shareholders entitled to vote on approval of the name change either by vote and meeting, or by consent in lieu of a shareholder meeting.

RESOLVED that, in the event the majority of shareholders adopt the recommendations of the Board of Directors outlined herein, the Secretary shall certify the approval and adoption in the books and records of the Company, and in turn make the necessary filings with the State of Nevada.

RESOLVED that, in the event the majority of the shareholders adopt the recommendations of the Board of Directors outlined herein, the effective date of the name change shall be (1) ten (10) days after the approval of the Company's FINRA company-related action, or (2) twenty (20) days after the Company's filing of its Definitive Schedule 14C with the Securities and Exchange Commission, whichever is later.

RESOLVED, that, in the event the majority of shareholders adopt and ratify the name change discussed herein, Alton Perkins, as the Company's Chief Executive Officer and Chief Financial Officer, may take any and all necessary steps to implement and effectuate the name change.

Dated: August 8, 2017

*/s/ Alton Perkins*
By: Alton Perkins
Its: Chairman of the Board

119



**From:** Issuer Services
**To:** ap@atimodular.com
**Cc:** Devin Bone
**Subject:** AmericaTowne Holdings, Inc. (ATMO)
**Date:** Wednesday, August 15, 2018 6:30:50 PM

Dear Mr. Perkins,

We are writing to notify you that we have reviewed AmericaTowne Holdings, Inc.'s caveat emptor status and determined not to remove this designation at this time. We believe a public interest concern still exists.

Our staff will continue to monitor the company and its trading activity among other things. You are welcome to contact us regarding another review of this designation in 90 days.

Any questions can be directed to us in writing.

Regards,


**Amanda**
OTC Markets Group
100 M Street SE, Suite 220 / Washington, DC 20003
Office: (212) 896-4420
Email: issuers@otcmarkets.com

Website: http://www.otcmarkets.com/home
Twitter: https://twitter.com/OTCMarkets
Facebook: https://www.facebook.com/OTCMarkets
LinkedIn: https://www.linkedin.com/company/otc-markets-group

---

This e-mail (including any attachments) is confidential and may contain sensitive or legally privileged information. It is for the intended recipient only. Do not, directly or indirectly, copy, reproduce, print or disclose any part of this e-mail without the prior written consent of OTC Markets Group Inc. If you receive this message in error, please delete it and any attachments, and notify OTC Markets Group of misdelivery by return e-mail.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---

**Total Control Panel**        Login

To: dbone@paalawfirm.com    Remove this sender from my allow list
From: issuers@otcmarkets.com

*You received this message because the sender is on your allow list.*